1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ---------------------------------x
                                          15-CR-213(SJ)
3    UNITED STATES OF AMERICA,
                                          United States Courthouse
4             Plaintiff,                  Brooklyn, New York

5             -against-                   December 15, 2016
                                          11:00 a.m.
6    NOELLE VELENTZAS and ASIA SIDDIQUI,

7             Defendants.
     ---------------------------------x

8
          TRANSCRIPT OF CRIMINAL CAUSE FOR MOTION HEARING
9          BEFORE THE HONORABLE STERLING JOHNSON, JR.
               UNITED STATES SENIOR DISTRICT JUDGE
10
     APPEARANCES
11   For the Government:          ROBERT L. CAPERS, ESQ.
                                  United States Attorney
12                                Eastern District of New York
                                  271 Cadman Plaza East
13                                Brooklyn, New York 11201
                                  BY:  JENNIFER SASSO, AUSA
14                                     ALEXANDER SOLOMON, AUSA
                                       DOUGLAS PRAVDA, AUSA
15
     For Defendant Siddiqui:     CONSTITUTIONAL LAW CENTER FOR MUSLIMS
16                                IN AMERICA
                                  833 E. Arapaho Road, Suite 102
17                                Richardson, TX 75081
                                  BY:  CHARLES D. SWIFT, ESQ.
18
     For Defendant Velentzas:    LAW OFFICE OF SEAN M. MAHER, PLLC
19                                The Woolworth Building
                                  233 Broadway, Suite 801
20                                New York, NY 10279
                                  BY:  SEAN M. MAHER, ESQ
21
     Court Reporter:             Georgette K. Betts, RPR, CSR, OCR
22                                Phone:  (718)804-2777
                                  Fax:    (718)804-2795
23                                Email:  Georgetteb25@gmail.com
     Proceedings recorded by mechanical stenography.  Transcript
24   produced by computer-aided transcription.

25

1          THE COURTROOM DEPUTY:  U.S. versus Velentzas and

2   Siddiqui.

3          THE COURT:  Note your appearances.

4          MS. SASSO:  Good morning, Your Honor, for the United

5   States, Jennifer Sasso, Alex Solomon and Douglas Pravda.

6          MR. SWIFT:  Good morning, Your Honor, for

7   Ms. Siddiqui, Charles Swift.

8          MR. MAHER:  Good morning, Your Honor, Sean Maher for

9   Ms. Velentzas.

10          THE COURT:  Okay.  Whose motion is this?

11          MS. SASSO:  Your Honor, there is a motion by the

12   defendant and a response by the government as well as a cross

13   motion by the government and a response by defendant.

14          THE COURT:  Let's hear from the defendant.

15          MR. SWIFT:  Yes, Your Honor, we filed letters with

16   this court requesting to use -- notifying under the protective

17   order --

18          THE COURT:  I got the letter.  You have information

19   that you say is the undercover in this case.

20          MR. SWIFT:  Yes, we do.

21          THE COURT:  I don't know if the government answered

22   or not, but if they do answer they are going to confirm or not

23   confirm and you want to use this information.

24          MR. SWIFT:  Yes, it was independently obtained by

25   myself and my own investigation.  It was not obtained through

1    discovery and no portion did I get it through discovery.   I

2    obtained it through public sources, and then investigating

3    those public sources.

4         This case was discussed in the Gothamist and from

5    that discussion I was able to draw down and discover the name

6    of the undercover informant by doing a little research.

7         THE COURT:   Let me ask you this, assume you are now

8    conceding that this name that you did discover was the actual

9    undercover --

10        MR. SWIFT:   Yes.

11        THE COURT:   -- would that be classified if it were

12   given to you by the government?

13        MR. SWIFT:   I don't know.   That would be up to the

14   government to decide whether it was classified or not when

15   they gave it to me in the process, but they haven't given it

16   to me.   And I would point you to the Seattle Times and The New

17   York Times on classified information, Your Honor.

18        The fact that it's classified, even if it is, if

19   they are restricted in some manner by the government controls

20   it when it's given in discovery.   It doesn't control it when

21   it's independently obtained, that the First Amendment rights

22   and all the cases cited by the government have to do with

23   cases where they control the information and were giving it

24   out.

25        This is not the case here.   In this case, I obtained

1    the information independently, through my own investigation,

2    as I am required to do as counsel.  I found that and now I

3    want to further investigate it, because there's a protective

4    order because it's unusual --

5            THE COURT:  When you say investigate, what do you

6    want to investigate?

7            MR. SWIFT:  What I want to do is investigate this

8    person.  On my way over I was reminded -- I was in law school

9    at the time that the OJ Simpson case went on, so I watched it.

10   And one of the most striking moments was F. Lee Bailey's

11   cross-examination of the chief detective.  What he had done

12   was he had investigated that chief detective extensively.  He

13   knew all about his background, about statements he'd made,

14   about things he had done in the past to discredit that

15   detective.

16           What I want to do is investigate this person in the

17   same way.  I want to find out what they've done in the past,

18   statements they've made in the past, statements they've made

19   currently.  As we point out in our letters, we see a potential

20   entrapment defense here.  Their conduct in other ones will be

21   directly relevant to that and how they approached and what

22   they do in the undercover's operation.

23           There is also, as pointed out, several gaps in

24   taping where we're going to have rely on this undercover's

25   honesty.  I would be like to be able to take a look at that

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

1    and confront them with instances where they have maybe not

2    been honest.  To do that, I need to do a thorough

3    investigation.

4              THE COURT:  What do you say of the government's

5    position of national security?

6              MR. SWIFT:  The national security has no bearing on

7    the part.  They say national security.  We pointed to

8    Carmichael in the case.  And in Carmichael -- it was a drug

9    case, they are correct on that, but the same interests are

10   absolutely present in a drug case.  We could hardly say that

11   an undercover operative in the war on drugs, that their

12   effectiveness might be compromised if they were published.

13   That an undercover operative might suffer some speculative

14   risk if things were published.  Nevertheless, the Court found

15   in Carmichael that those balances on a general part don't

16   outweigh it.

17             THE COURT:  But you agree there was a balancing

18   test.

19             MR. SWIFT:  I don't agree in Carmichael that they

20   really balanced it in the part.  In the end when you take a

21   look at in the part they noted those things, but they went to

22   the First and Sixth Amendments where there was no balance

23   because it had been independently obtained.

24             All of the balancing tests that have been utilized,

25   Your Honor, have been from cases where the Court is using its

1   control of discovery, not applicable here.  You're not

2   controlling discovery.  You're not controlling anything that

3   was handed out by the government.  You're controlling how the

4   defense investigates its case if you put the part on.  You're

5   saying, you can look here but you can't look there.  You can

6   do this, but you can't do that in preparing for trial.  And

7   that's where the Court comes in.

8           And you're also restricting the speech, both of

9   Ms. Siddiqui and of myself in saying you can't say this to

10  anyone else even though none of it came to you from the

11  government, and that was the point in Carmichael.  You can't

12  do that.  Those rights are not -- I shouldn't say can't.

13  Those rights aren't subject to a balancing test here.

14          We looked at the Court's order, the plain language

15  of the Court's order and our own belief allowed us to do this,

16  I think the Court and the proper interpretation was the Court

17  wasn't ordering something that would be unconstitutional

18  inside the process, that the language of the order was open,

19  you know, simply required notification, which we've done.

20  We've provided notification.

21          And I would look to also here in the affidavit.  The

22  affidavit on this part is simply a generic application.  It's

23  generic in its process that it says, well, she has worked in

24  the past; yes, we know that, in part.  And that she might be

25  generically at some level of risk.  Every officer is at some

1    level of risk on the part here and to speculate and close down

2    these is inappropriate.

3          So I would point to three factors in closing.  One,

4    the Court in approaching this must approach it from the

5    position -- and we would be, I admit, in a far different place

6    if the government had turned this over, but they didn't.  They

7    didn't give that to me and to all the balancing tests on

8    undercover informants are when, presumably, the government

9    is -- or on the record of when the government is turning it

10   over.  They didn't do that.  I obtained it independently, as a

11   matter of both the protective order and courtesy 'cause want

12   the government -- you know, don't want to endanger anyone

13   inadvertently, told the government of our plan to go out and

14   canvass mosques and other places to find witnesses, which is

15   exactly what you would expect me to do.

16         If there were a key witness against my client who is

17   known in the community and I didn't investigate that, I would

18   be derelict, so that's what I'm going to do.  I'm going to go

19   out to the community with investigators, post it and find this

20   person.

21         THE COURT:  What do you say about the government's

22   application to close the courtroom?

23         MR. SWIFT:  Again, now, there are three -- that's a

24   different set and there is well established black letter law.

25   Black letter law 1, 2 and 3.

1          The first part on it is that you look at how long

2     will the closure be, the requesting parties' interest in this

3     and how long will it be.

4          In this case, and in a lot of the cases that were

5     cited by the government, it was only a minor closure.  This is

6     the principal witness.  This will basically result in at least

7     a 50 percent, or maybe almost a hundred percent closed trial

8     during the portion of which would transform this courtroom --

9          THE COURT:  It's not closed to the family of the

10    defendants, and it's beamed, as they say, to another room or

11    something.

12         MR. SWIFT:  The broadcast part but we are still at a

13    level of a closed trial.

14         The second part though is where they really fall

15    down.  They have not made, under the Second Circuit black

16    letter law, the tests that are required to do that.  They have

17    not articulated a specific threat to this agent, unlike the

18    cases where they had testimony regarding specific threats that

19    had been made to this person, nor have they indicated a

20    ongoing, in the same area, investigation.  In fact, when we

21    look at that declaration, what it says is we might use her in

22    the future.

23         Under those parts if the government's arguments are

24    accepted here, then any time an UC, an undercover agent

25    testifies, the courtroom is closed, because they could always

1    be testifying in the future, that's always possible.

2         And then we go to the next one part is they could

3    always have some level of threat.  That's always possible.

4    There is no situation where it wouldn't be possible.  So under

5    the government's arguments and the affidavit that they've

6    given here with no particularization, they should not close

7    the courtroom at this point.  If the government has specific

8    parts on it that would be a fish of a different -- a different

9    kettle of fish, Your Honor, but they have not done that to

10   this point.  And so our position is that the courtroom should

11   not be closed until the government puts this out.

12        And the last part I put out is that the government

13   ignores the fact that this witness -- I was able to discover

14   this witness because they've already had substantial

15   publicity.

16        And there is a prejudice to my client when the

17   courtroom is closed because it says to the people in that box,

18   that this is dangerous.  That we have to close the courtroom.

19   There is a level --

20        THE COURT:  Would that be resolved by curative

21   instructions?

22        MR. SWIFT:  It certainly will help, but it does not

23   resolve the possibility.  This is why there is a set of

24   factors that begin to balance it in her interests in an open

25   trial.

1          And again, where I sit at this, Your Honor, is

2     that --

3          THE COURT:  Let me ask you this, if there were

4     family and people who are authorized to be in the courtroom,

5     how would the jury know that it was closed?

6          MR. SWIFT:  In the sense -- in my sense as to date

7     none of my client's family members have attended anything.

8     And I don't anticipate that they will unless one or two might

9     be called as witnesses and excluded anyway.

10         I do anticipate that there will be spectators and

11    media on this trial, so the jury will see all of them ushered

12    out on the process.  So the jury will a have -- well, a fairly

13    good knowledge that something's going on here on the process

14    and they will be gone for the entirety of the undercover's

15    testimony.

16         And again, I'm not asking to use her actual name in

17    cross-examination as long as the government stipulates, should

18    I cross examine her about some things from her actual life,

19    that it's the same person.  That she's not going to say, oh,

20    that's not me.  I can handle that.  I'm not trying to

21    broadcast her name.  Her image is already out there.  There

22    are no photographs allowed inside this courtroom.  She

23    interacted in this community for years.  So the part on it

24    seems to be somewhat speculative and it certainly prejudices

25    my client, coming back to each of those parts on it.

1          And I do, though, to come back to Your Honor as my

2     propose to the Court is, one, to allow us to investigate.

3     We're going to investigate.  We did offer a compromise.  My

4     need to investigate her in the community where my -- you know,

5     the Muslim communities in this area is to find other --

6          THE COURT:  What do you say about the government's

7     offer to compromise.

8          MR. SWIFT:  It is insufficient.  If they are willing

9     to hand over all the people she's had contact with -- because

10    that's what I'm looking for.  If they are willing to hand over

11    that list of names, she talked to these people, these are all

12    the people she's talked to, I'll go approach those people

13    independently.  Because my part in doing this is to find those

14    people.  And I agree they're really saving me a lot of work

15    and I wouldn't do the work, but if they are willing to do that

16    and give me the exhaustive list, then I'm fine.  But scanning

17    through it and saying, well, I think this is relevant, I think

18    this isn't relevant in part, this is not in the compromise,

19    this is not a part under the discovery requirements.  They

20    were required to give me anything that was relevant anyway in

21    the process.  So I don't see that as a compromise and I don't

22    part -- what I would say is that they gave me all of the

23    contacts that she's had with the community in not just this

24    investigation but any investigation that she's participated

25    in, that would be sufficient because those are the people I'm

1    trying to find.  And, you know, it cuts out a step of work.

2    If they are willing to do that, then I don't need to do more

3    on it and we put that in our responsive letter on this.

4               I don't know what the government's position is.

5               THE COURT:  Counsel, you want to add something?

6               MR. MAHER:  I would, Judge.  Mr. Swift filed his

7    motion under seal.  I haven't even had an opportunity to see

8    it.  It's not been made available to me, so as much as the

9    arguments he has raised are applicable to Ms. Velentzas, I

10   join that.

11              I also especially join his arguments against the

12   government's motion to close the courtroom at trial at all.

13   And just factually I just would note for the Court's

14   consideration, Ms. Velentzas has not only had family here

15   every Court appearance I believe, but she's also had friends,

16   members of her mosque and religious community and others who

17   have come to Court and I very much expect that people will be

18   coming to Court on her behalf who are not members of her

19   immediate family.

20              THE COURT:  What do we have from the government?

21              MS. SASSO:  Yes, Your Honor, just to sort of reframe

22   the first issue that's before the Court.  The question is

23   really whether the defendant can adequately investigate her

24   case and prepare for trial without the proposal of splashing

25   en masse the identity of a counterterrorism undercover across

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

1   New York City.

2          There are two substantial government interests at

3   stake here:  The safety of the undercover and the interest of

4   investigating national security in an ongoing manner.

5          The Court is required to consider both of those

6   interests and while Carmichael itself, which is a nonbinding

7   authority --

8          THE COURT:  How do you answer the question as

9   counsel points out, CIPA pertains to discovery given to the

10  defendant and the information that they have was not given to

11  the defendant, they discovered it on their own.

12         MS. SASSO:  Well, as a initial matter, Your Honor,

13  there is a process that the defense outlined in its papers in

14  so far as how they found the identity of the undercover.  And

15  our law enforcement has attempted to recreate the search and

16  independently also find the identity the way that the defense

17  claims to have and they have been unable to do so.  So there

18  is a question at the outset about what is actually public and

19  what was actually independently obtained without using any

20  material provided by the government.  So that's just at the

21  threshold.

22         Regardless --

23         THE COURT:  You're disputing the fact the

24  information that they have on this individual is the

25  undercover, that's what you're disputing.

1      MS. SASSO:  Not whether it's the undercover, but

2 whether it was, in fact, independently obtained the way that

3 the defense represents it to be.

4      THE COURT:  First of all, did the government give

5 the information that they say they have to the defendant?

6      MS. SASSO:  The government has not provided the real

7 identity of the undercover to the defendant.

8      THE COURT:  And the defendant now says they have

9 this information, it was not provided, as you say, to them by

10 the government, why shouldn't they be able to use it?

11      MS. SASSO:  It appears that they have pieced

12 together various strands of information in order to get to the

13 real identity of the undercover.  It is unclear to the

14 government whether that process, in fact, did involve some

15 strands of information that were provided by the government.

16 Running independent searches on the Internet, as the defense

17 represents that they have done, the government has not been

18 able to find the true identity of the undercover in the way

19 the defense says that they have.  So there is a question as to

20 the process --

21      MR. SWIFT:  I can break --

22      THE COURT:  No, no.  But the statute says

23 information that was provided by the government to the

24 defendant.  And the defendant says no information was provided

25 to them by the government.  The government says no information

1    was provided to the defendant by the government.  Why

2    shouldn't they be able to use what they've discovered

3    independently?

4           MS. SASSO:  Well, Your Honor, what I think we're

5    raising is the question as to whether they actually did

6    independently discover it.  But even if they were to have

7    independently discovered it, the Court is still required to

8    consider under both the protective order and the law, the

9    interests in -- the government's interest at stake if they

10   were to try to move forward with this information.  The

11   protective order requires that an application be made to this

12   Court, which is why we're here today --

13          THE COURT:  Right.

14          MS. SASSO:  -- in order for the Court to consider

15   what interests are at stake.  And so this Court, even under

16   Carmichael, is required to consider the government's interest

17   and the public's interest and those are substantial here.

18          With the undercover safety matter, regardless of

19   whether certain information has been published about the

20   undercover, her image has not -- excuse me, the undercover's

21   image has not been published as the defense represents.  So,

22   first of all, that would be new information that would be

23   provided to the public.  Additionally, the real identity of

24   the undercover has not been distributed en masse or in public

25   media.  So that would also be endangering information that the

1    defense would be providing to the public.

2              THE COURT:  But what if the defendant published the

3    information they have?

4              MS. SASSO:  That would create a substantial risk of

5    harm to the undercover as well as to the government's interest

6    in ongoing national security investigations.  It would alert

7    past individuals, who may have been targeted by or interacted

8    with the undercover, that they were in fact targets of

9    investigations, and simply because they were past targets does

10   not mean that that they're not currently still under

11   investigation or could not be future targets, so those

12   individuals would be put on the alert that they had been under

13   investigation which could very well cause them to change the

14   way in which they operate.

15             THE COURT:  What you are saying is that the

16   government has a national security interest and a personal

17   security interest?

18             MS. SASSO:  That's correct.

19             THE COURT:  What do you say about your application

20   to close the Court.

21             MS. SASSO:  Your Honor, the same interests underlie

22   that application.  The safety of the undercover and the

23   ability to conduct ongoing investigations are both implicated

24   by an open courtroom.  And the approach that has been

25   requested here is very substantially tailored in order to meet

1   the rights of the defendant to have a public trial and to

2   confront the witness.  The defendants would both be able to

3   confront in person, face-to-face the witness and any public

4   member observing the trial would be able to hear the live

5   audio feed of the testimony of the undercover while it's

6   happening and a transcript of that testimony would be

7   immediately released thereafter.

8            THE COURT:  Put on the record exactly what you are

9   proposing for the closed court.

10           MS. SASSO:  Your Honor, we are proposing that the

11   defendants and the defendants' family members be permitted to

12   be in a closed courtroom, able to examine the undercover live

13   time with no disguise or no concealment whatsoever of the

14   undercover.

15           We would propose that the audio testimony of the

16   undercover be live streamed into an outlet courtroom where any

17   member of the public who wishes to hear that testimony as it's

18   happening to listen to it.

19           Immediately thereafter we would request an expedited

20   transcript be produced of the undercover's testimony which

21   would be made available to the public.

22           So the only thing that the public would be deprived

23   of is the ability to see the undercover's face which, as I

24   mentioned, to date has not been publicized.  The undercover's

25   face is not available on mass media, it has not been strewn

1    about and so that is an interest that the government still

2    would like to protect.

3         THE COURT:  How do you explain the defendants say

4    they have copies of this picture of the undercover.

5         MS. SASSO:  The defendants may have copies that they

6    obtained during their time with the undercover, but those have

7    not been distributed to date on the Internet or in any sort of

8    massive manner.

9              In this era of very global terrorism, if the

10   undercover's identity or photo were released in any form, if

11   they were posted on a bulletin board in a local mosque, in a

12   heartbeat that could be copied and distributed over the

13   Internet globally.  So the risk here in a terrorism case is

14   substantially different than many other cases and the way that

15   the affidavit is structured, as Your Honor would have seen,

16   any sort of terrorism groups at play here are using the

17   Internet and using mass distribution of information in order

18   to target government informants and government undercovers and

19   law enforcement.

20        THE COURT:  You want to comment on your offer to

21   compromise to show part of the file of the undercover to the

22   defendant?

23        MS. SASSO:  Yes, Your Honor.  As an initial matter

24   the government is not required to disclose that file or any

25   information about the undercover's prior operations, and the

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

1    government has proposed that certain parts of that information

2    be produced in this case as a courtesy and a compromise for

3    the defense.  The government, having gone through those files,

4    believes that it is very clearcut in terms of what would be

5    relevant.

6            Giving actual identifying information about past

7    targets to the defense would create a substantial risk of harm

8    for ongoing national security investigations.  It would put

9    past targets on the alert that they have been on any sort of

10   surveillance or counterterrorism investigation list and that

11   could cause them to change the way that they operate, making

12   them operate in a more covert manner and essentially able to

13   evade counterterrorism efforts.  So the government does not

14   feel it is appropriate and, in fact, raises substantial risk

15   of harm to provide that particular information.  However, the

16   government would be, should there be any close call, would be

17   amenable providing portions of those questionable materials to

18   the Court for an in camera review and determination as to the

19   relevance and the need to produce that to the defense.

20           THE COURT:  Let me ask you this, Counsel, do you

21   have photographs of the person you say is the undercover?

22           MR. SWIFT:  Yes, I do.

23           THE COURT:  How did you obtain these?

24           MR. SWIFT:  Through the Internet.

25           THE COURT:  Okay.  Anything else?

1          MS. SASSO:  Your Honor, it's our understanding that

2   those photos have subsequently been removed by law enforcement

3   for the protection of the undercover.

4          THE COURT:  Removed from where?

5          MS. SASSO:  The Internet.  They've been scrubbed off

6   by law enforcement so that photos are not currently available

7   online of the undercover.

8          THE COURT:  But the defendants say they already have

9   them.

10          MS. SASSO:  I believe they obtained that when there

11   was an initial kind of leak of a photograph, I believe they

12   were obtained during that window.  Subsequently, law

13   enforcement quickly moved to remove those photographs, so they

14   have not been out on the Internet in this interim time period.

15          THE COURT:  But they already have these photographs

16   and the government has not given it to them.

17          MS. SASSO:  That's correct.

18          THE COURT:  Anything else?

19          MR. SWIFT:  Just to respond on the part on the

20   undercover.  The government's position is essentially that I

21   can't investigate, that I can't go talk to people that she's

22   interacted with, that I can't conduct the type of criminal

23   investigation --

24          THE COURT:  How do you know who she's interacted

25   with?

1          MR. SWIFT:  How I find that out is I take her

2    picture around to the different areas in the community and say

3    has anybody met, known, did you know her, did you talk to her

4    on the process and I find those people.  That's how I go out

5    and do an investigation and that part -- that's how I'm going

6    to go do it.  If the government is unwilling to turn over the

7    people that I've found, I have a responsibility to go find

8    them.  Because that's where I get the derogatory information

9    about a critical government witness, that's who I'm going to

10   get it from.  I'm not going to get it from them.

11          MS. SASSO:  Your Honor, we're not seeking to

12   proscribe the defense's ability to investigate entirely.  The

13   reality of the matter is that the undercover has not used her

14   real -- excuse me, the undercover has not used the real

15   identity out in the course of investigations and so using the

16   real identity to inquire about the undercover is really

17   irrelevant and pointless, but also harmful.  It's not as

18   though going out and using the real name is going to vet

19   someone who says, yes, I know that person by that person's

20   real name because past operations have never used that name.

21          THE COURT:  All right, I got the argument, I am

22   going to reserve decision.

23          MS. SASSO:  Thank you, Your Honor.

24          THE COURT:  What date do you want?  It will probably

25   be after the holidays.

22

1            MR. SWIFT:  Late January.

2            MS. SASSO:  Sometime in late January.

3            THE COURT: Give me a date, Ana.

4            THE COURTROOM DEPUTY:  January 26th at 9:30.

5            MS. SASSO:  And, Your Honor, because you have

6    previously designated this as complex, we would ask that time

7    be excluded.

8            THE COURT:  Time is excluded.  It is a complex case.

9            MS. SASSO:  That it is.

10           MR. SWIFT:  I think we can reach only one agreement,

11   but we can agree on that.

12           THE COURT:  When this goes to trial how long did you

13   say it will take?

14           MS. SASSO:  I think under two weeks.

15           THE COURT:  All right.

16           MS. SASSO:  Thank you, Your Honor.

17           MR. MAHER:  One other thing, Your Honor, the hard

18   drive that was supposed to be fixed and given to Ms. Velentzas

19   at the MDC still has not been provided to her and it's been

20   months.

21           MR. SWIFT:  And the same for my client.

22           THE COURT:  What's the story on that?

23           MR. PRAVDA:  Your Honor, we'll check on the status

24   and we'll reach out to Mr. Maher and let him know.

25           THE COURT:  Do it like yesterday.

1          MR. PRAVDA:  Yes, we will.

2          THE COURT:  Who was supposed to do this?

3          MR. PRAVDA:  Your Honor, it was going to the legal

4    personnel each at MDC and MCC who were then going to place it

5    an appropriate location within the facilities so that the

6    defendants would be able to access the hard drive.

7          THE COURT:  Has it been done, given to the MDC?

8          MR. PRAVDA:  That's what I'm going to check on, Your

9    Honor.

10         THE COURT:  Okay, if you have any problems let me

11   know.

12         MR. MAHER:  I will.

13         THE COURT:  Okay.

14         MR. MAHER:  Thank you.

15         MR. PRAVDA:  Thank you.

16         (Matter concluded.)

17                   *     *     *     *     *

18

19   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

20

21   s/ Georgette K. Betts                January 17, 2017

22   GEORGETTE K. BETTS                   DATE

23

24

25