DMP/AAS:JMS/CRH
F.#2014R00196

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA                  MEMORANDUM OF LAW

  - against -                              15-CR-213 (SJ)

NOELLE VELENTZAS and
ASIA SIDDIQUI
    also known as "Najma Samaa"
    and "Murdiyyah,"

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT ASIA SIDDIQUI'S
MOTION TO SUPPRESS STATEMENTS MADE TO LAW ENFORCEMENT

RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York

Alexander A. Solomon
Jennifer M. Sasso
Craig R. Heeren
Assistant United States Attorneys
(Of Counsel)

## PRELIMINARY STATEMENT

Defendant Asia Siddiqui has moved to suppress the statements charged in Count Three because she claims that she was (1) "seized" without probable cause at United States Customs, in violation of the Fourth Amendment, because she had already cleared Customs in Canada; and (2) in custody but was not read her <u>Miranda</u> rights, so any statements made were in violation of the Fifth Amendment.

Shortly after the defendant entered the United States from Canada at LaGuardia Airport, she was briefly questioned at that United States border about her time in a foreign country and her association with foreign terrorists.  Though Siddiqui had been examined at the preclearance point in Canada, that examination did not lawfully preclude a subsequent secondary examination at the United States point of entry, pursuant to the border exception and the United States' unique interest in protecting its borders.

During that lawful border inspection, Siddiqui was never handcuffed or restrained, and was permitted to leave the airport after the interview concluded.  Indeed, Siddiqui herself makes no suggestion that she was restrained or threatened or that weapons were drawn; she alleges only that one agent questioned her in a "demanding and confrontational" tone, while another agent who took notes "seemed angry, red in the face and shaking while he wrote."  Siddiqui Decl. ¶ 9.  Critically, the defendant never claimed she thought that she was under arrest in statements made to an undercover agent immediately after the interview, demonstrating that Siddiqui herself did not believe she was in custody.  Accordingly, her interview was neither an "interrogation" nor "custodial" such that it was necessary for law enforcement to advise her of her rights under <u>Miranda</u>.  Even if the defendant were somehow considered to be temporarily detained for an investigative stop (rather than a

2

border inspection), that stop and subsequent interview was lawful and supported by reasonable suspicion of her involvement with a foreign terrorist organization.  Accepting all of Siddiqui's factual allegations as true, she has still failed to raise a genuine issue of fact or law, and therefore her motion to suppress should be denied without a hearing.

## **BACKGROUND**

Defendants Noelle Velentzas and Asia Siddiqui are charged in a three-count indictment with conspiring to use a weapon of mass destruction against persons and property within the United States, in violation of Title 18, United States Code, Section 2332a(a)(2) (Count One), and teaching and distributing information pertaining to the making and use of an explosive, destructive device and weapon of mass destruction, in violation of Title 18, United States Code, Section 842(p) (Count Two).  Siddiqui is also charged with making material false, fictitious and fraudulent statements in a matter involving international and domestic terrorism, in violation of Title 18, United States Code, Section 1001 (Count Three).

Starting in or about July 2014, Velentzas and Siddiqui began meeting with an undercover officer (the "UC").  (Unless otherwise noted herein, all meetings involving the UC were recorded.)   During the course of these meetings and continuing until their arrests, Velentzas and Siddiqui conspired to create an explosive device to be detonated in a terrorist attack in the United States, specifically aimed at law enforcement.  Velentzas and Siddiqui discussed with the UC various historical terrorist attacks and attempted attacks in detail.  They also researched how to execute similar attacks, including seeking out and collecting the material components needed to create such explosives.  These meetings and the activity engaged in by the defendants during the charged conspiracy period form the basis for Counts One and Two of the Indictment.

## **Siddiqui's Material False Statements to FBI Special Agents**

Siddiqui is charged separately in Count Three with making material false statements related to a matter of international or domestic terrorism, based on the following:

In approximately 2006, Siddiqui became close with Samir Khan, who later became a prominent figure of Al Qa'ida in the Arabian Peninsula ("AQAP")[1], a designated foreign terrorist organization. While living in the United States, Khan ran a blog called "InshallahShaheed," ("Martyr, God willing"). See Complaint and Affidavit in Support of Arrest Warrants, No. 15-CR-213 (Docket Entry No. 1) (hereafter "Compl.") ¶ 11. After moving to Yemen, Khan became the editor of Inspire magazine, through which AQAP disseminates propaganda and actively tries to recruit Muslims throughout the world – including in the United States – to join cause with AQAP. Id. Khan wrote and published several works regarding making home bombs and suicide bombing and called for attacks on the United States. Id. Specifically, he authored an article titled "I am proud to be a traitor to America," in which Khan outlined his grievances against the United States. Khan also published an article titled, "Make a Bomb in the Kitchen of Your Mom." Id. Additionally, Khan wrote a sixteen-page English-language manual titled Expectations Full, in which he addressed the difficulties of being a suicide bomber. Id. This manual included calls for attacks within and on the United States. Id. Khan was killed in 2011 in Yemen. Id.

---

[1] AQAP is a militant Islamic organization, primarily operating in Yemen and Saudi Arabia. It was formed in January 2009 and formerly designated as a Foreign Terrorist Organization by the U.S. Department of State on January 19, 2010. AQAP claimed responsibility for at least two plots to bomb United States bound flights, and issued a video addressed to Americans, threatening to "come for you to slaughter, and we have prepared for you men who love death like you love life."

Siddiqui grew close to Khan in or around 2006 and submitted her poetry espousing radical violent ideology to Khan for publication.  Specifically, in or about 2009, Siddiqui wrote a poem called "Take Me to the Lands Where the Eyes Are Cooled."  Compl. ¶ 12.  Siddiqui's poem was published in a magazine called <u>Jihad Recollections</u>, a predecessor publication of <u>Inspire</u>.  <u>Id.</u>  The poem Siddiqui penned calls for readers to engage in violent jihad and to destroy enemies of Islam.  For example, Siddiqui wrote that she "drop[s] bombs" as she swings on a hammock and "[h]it[s] cloud nine with the smell of turpentine, nations wiped clean of filthy shrines."  <u>Id.</u>  She continued, writing that she "taste[s] the Truth through fists and slit throats" and that there is "[n]o excuse to sit back and wait – for the skies rain martyrdom."  <u>Id.</u>

Separately, Siddiqui wrote a letter expressing her support for Mohammad Mohamud, who was arrested on November 26, 2010, after he attempted to detonate a vehicle-borne improvised explosive device at a Christmas tree-lighting ceremony in Portland, Oregon. Compl. ¶ 13.  Siddiqui mailed her letter to Mohamud in his jail facility soon after his arrest for that bombing plot.  <u>Id.</u>  The Federal Bureau of Investigation (the "FBI") obtained a copy of the letter and the envelope in which it arrived at the Bureau of Prisons facility.  <u>Id.</u> at ¶ 14.  The return address on the envelope is "Najma Samaa, 9420 Guy R. Benson Blvd, Jamaica, New York, 11451."  <u>Id.</u>  This address is associated with Siddiqui's alma mater, York College.  <u>Id.</u> The defendant signed the letter as "Murdiyyah."[2]  <u>Id.</u>  In her letter to Mohamud, Siddiqui wrote

---

[2] In a conversation with the UC on or about August 3, 2014, Siddiqui referenced an article that she had written under the pen name "Murdiyyah."  In that article, Siddiqui referred to having written the poem in <u>Jihad Recollections</u> that is referred to above.  Moreover, Facebook registration and IP address information obtained pursuant to a subpoena show that

that Mohamud was "not forgotten in the Ummah's efforts and prayers." Id. "Ummah" is an Arabic word meaning "nation" or "community." Id. Siddiqui sent the letter in or about September 2011. Id.

On or about July 10, 2014, FBI Special Agents interviewed Siddiqui upon her inbound arrival at LaGuardia Airport in Queens, New York, on a flight originating in Toronto, Canada. As reflected in the FBI report summarizing the interview, before interviewing the defendant, the agents identified themselves as FBI agents and advised Siddiqui that it is a crime to lie to federal agents. See Ex. A to Def.'s Mot. to Suppress (hereafter "Ex. A") at 1.[3] A Customs and Border Patrol ("CBP") Officer was present for the interview in addition to at least two FBI Special Agents. Id. There is no indication in the report—and the defendant does not claim—that she was touched or held by any person, handcuffed or otherwise restrained, or that any firearms were drawn or visible. Id. Siddiqui was asked about the purpose of her time in Canada; where she lived there; why she was returning to the United States; and where she would be staying while in the United States. Id. Additionally, she was asked about contact with individuals "seeking to harm the U.S.," including any "U.S. designated terrorist and/or groups," whether she had ever supported or promoted any "radical Islamic agendas." Id. These were all typical questions regarding the defendant's fitness for entry into the United States.

---

Facebook accounts in the names of "Najma Saama" and "Murdiyyah" are both associated with Siddiqui.

[3] The defendant's motion was filed under seal and without a docket entry number.

During the interview, Siddiqui also denied contributing to or publishing in any jihadist magazines.  Ex. A at 1.  She also denied having any contact with Khan or any terrorist groups.  Id.  Siddiqui was asked whether she specifically published in Inspire magazine, which she denied.  Id.  She indicated that she had not been in contact with and did not know anyone associated with Inspire.  Id.  She indicated she had "heard of" Samir Khan but was never in contact with him.  Id.

In the same interview, Siddiqui stated that she "knew of" Tarek Mehanna, who was convicted of conspiracy to provide material support to al Qaeda, providing material support to terrorists, and other charges, stemming from his attempt to join an Iraqi militia in Yemen intending to fight against the United States and from his subsequent distribution of al Qaeda propaganda on the internet.  During her interview, Siddiqui informed agents that Mehanna was "allegedly" convicted for plotting to bomb a shopping mall.  Ex. A at 2.  She indicated that he might be innocent and that she had written three to four letters to him while he was incarcerated, to show emotional support.  Id.  She explained that Mehanna wrote her back, thanking her for that support.  Id.  Siddiqui also stated that she "knows of" Aafia Siddiqui (no known relation) from the news.  Id.  Aafia Siddiqui was arrested in Afghanistan in 2008 where she was found in possession of recipes for conventional bombs and weapons of mass destruction, sodium cyanide and descriptions of New York City landmarks with references to a mass casualty attack.  When Americans attempted to interview her at the time of her arrest, she shot at them with a rifle.  Aafia was convicted in 2010 on charges of attempted murder and armed assault.  During the time Aafia was incarcerated, defendant Asia Siddiqui printed letters from the Internet and sent them to Aafia to show support.  Id.

Finally, Siddiqui was asked about whether she knew anyone who wanted to commit violent jihad in the United States and whether she had any contact with AQAP or their related entities.  Ex. A at 2.  She denied these things.  Id.  She told law enforcement that a Canadian Public Safety Officer had asked the same questions of Siddiqui while she was in Canada.  Id.  Although Siddiqui does not recall the length of time she met with law enforcement, the limited number of questions reflects a brief interview.  After the interview, Siddiqui was allowed to leave the airport on her own volition.

Immediately following the interview, the UC picked up Siddiqui at LaGuardia Airport.  Siddiqui entered the vehicle and explained to the UC that FBI agents had questioned Siddiqui at the airport.  See Compl. ¶ 16.  The conversation was recorded (though portions of the conversation were unintelligible in the recording).  Id.[4]  Siddiqui began explaining what had transpired to the UC.  She stated that she was worried about speaking freely to the UC because Siddiqui believed the FBI had installed a "bug" in her computer.  Id.  During their conversation, Siddiqui told the UC she believed she was "gonna be arrested soon" – but notably, did not say she thought she was under arrest, or about to be arrested, on that day or during the interview.  The UC asked Siddiqui if she got "nervous" or if she cried.  Siddiqui told the UC, "just thirsty I said to him.  I was nervous and thirsty," describing what she had told an agent.  Siddiqui did not state at that time that she had been restrained, believed she was in custody, had been fearful for her safety or threatened, or otherwise placed in harm's way.

Siddiqui called her brother while in the car with the UC and stated that she was "here in New York safe and sound," and that she had "been greeted with FBI Agents when I

---

[4] The recording of this conversation and a draft transcript were produced in discovery.

arrived in New York.  I was spoken to and everything so it's the usual trip, plus the agents talk when I arrived as well, that was a double interrogation when I was done … from Homeland and then the other one."  After that call, Siddiqui elaborated to the UC that she had "spoken to agents at the border when I've arrived" on other trips – "to border agents for Canada, for both American and Canadian, and then Homeland Security."  She stated that she had been "interrogated" when she arrived in Canada but that she had never spoken to an FBI agent before.  Siddiqui twice repeated that she was trying to stay "positive" and "make the best" of the situation.

      Additionally, Siddiqui indicated that the FBI asked her "everything that I imagined they would, they asked me about my brother [Samir] Khan, who I know."  Siddiqui told the UC in a low voice that she had known Khan even before he was deemed a terrorist. See Compl. ¶ 16.  Siddiqui explained that, in 2006, she had sent a poem to Samir Khan via his blog or website.  Id.  She stated that Khan published her poem and that her poem had become popular.  Id.  Additionally, Siddiqui stated that she needed to go online and delete "stuff" from her email accounts.  Id.

      Siddiqui's statements to the FBI about Samir Khan and about her publication of a jihadist poem on July 10, 2014 were material and false.  By denying involvement with jihadist publications and known terrorists, the statements influenced the FBI Special Agents' decision to release Siddiqui rather than question her further or detain her or take other investigative action.

      For her false statements to law enforcement, Siddiqui was subsequently charged in Count Three of the indictment as follows:

9

On or about July 10, 2014, within the Eastern District of New York, the defendant ASIA SIDDIQUI, also known as "Najma Samaa" and "Murdiyyah," did knowingly and willfully make one or more materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit: the Federal Bureau of Investigation ("FBI"), where the offense involved international and domestic terrorism, in that the defendant made the following false statements:

(a) SIDDIQUI falsely stated and represented to FBI Special Agents that she had not contributed writings to or published writings in any jihadist magazines, when in fact, as she then and there well knew and believed, she had written jihadist poetry that was published in a jihadist magazine called Jihad Recollections; and

(b) SIDDIQUI falsely stated and represented to FBI Special Agents that she had not been in contact with Samir Khan, a United States person who had joined and supported the foreign terrorist organization al-Qaeda in the Arabian Peninsula, when in fact, as she then and there well knew and believed, she had been in contact with Khan.

## **ARGUMENT**

Siddiqui's brief encounter with law enforcement shortly after she arrived in the United States from a foreign country was lawful for two reasons.  First, the defendant was asked border-related questions that do not constitute an "interrogation," and she was not in custody at the time of that questioning; therefore, she did not need to be advised of her rights under Miranda before she was questioned.  Second, even if the Court were to conclude that the defendant was detained at the time of her interview, the law enforcement agents had reasonable suspicion to stop Siddiqui, and their conduct constitutes a lawful investigatory stop.

I.     **Siddiqui Was Subject to Lawful Border Questioning for Which No <u>Miranda</u> Warnings Were Required**

   A.  **Siddiqui's Questioning Took Place at the United States Border**

   As an initial matter, Siddiqui was interviewed at the functional equivalent of the border because she arrived at LaGuardia Airport aboard an airplane from Toronto, Canada. "An airport is considered the functional equivalent of a border, and thus a search there may fit within the border search exception." <u>United States v. Irving</u>, 452 F.3d 110, 123 (2d Cir. 2006); <u>see also</u> <u>Almeida-Sanchez v. United States</u>, 413 U.S. 266, 273 (1973) ("[A] search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search . . . ."). While most cases involve the "border search" exception to the Fourth Amendment's warrant requirement, the fact that a subject is at the border or functional equivalent thereof similarly impacts the analysis of a stop and interview by law enforcement under the Fifth Amendment.  <u>See</u> <u>United States v. FNU LNU</u>, 653 F.3d 144, 148 (2d Cir. 2011) (holding that some degree of custody or confinement is expected as an individual approaches a border, and therefore a defendant stopped and interviewed at airport was lawfully questioned without being advised of their <u>Miranda</u> rights).

   The defendant argues that "it is not clear that Ms. Siddiqui was at the functional equivalent of the border" because she precleared United States Customs while in Canada, and "did not need to enter the Customs area or the international arrivals section" at LaGuardia Airport.  This argument is unavailing.  The fact that a search or inspection of a passenger takes place at a preclearance location does not prevent a subsequent search or inspection at the point of entry (border or functional equivalent of the border) into the United States.  Indeed, at least

11

one court in this district has specifically held that a person who precleared Customs in Canada was still at the border when he arrived at LaGuardia Airport.  See United States v. Hernandez, 639 F. Supp. 629, 632-33 (E.D.N.Y. 1986) (holding that "LaGuardia Airport clearly is part of the border of the United States," and a search at the airport was lawful because there was reasonable suspicion under the "extended border" doctrine); see also United States v. Santiago, 837 F.2d 1545, 1548-49 (11th Cir. 1988) (affirming denial of motion to suppress because defendants who precleared customs in Nassau were still lawfully subject to search at Atlanta airport as "functional equivalent" to the border).[5]

The courts' logic in both Hernandez and Santiago is sound.  "The border is a zone, not a line," United States v. Walters, 591 F.2d 1195, 1197 (5th Cir. 1979) (internal quotation and citation omitted), and the "'border area' reasonably includes not only actual land border checkpoints but also the checkpoints at all international ports of entry and a reasonable extended geographic area in the immediate vicinity of any entry point," United States v. Glaziou, 402 F.2d 8, 12–13 (2d Cir. 1968); Irving, 452 F.3d at 124 ("[T]he border space of an airport includes 'a reasonable extended geographic area in the immediate vicinity of any entry

---

[5] While the distinction between the "functional equivalent" of the border and the "extended border" is relevant to whether a search requires no suspicion or reasonable suspicion under the Fourth Amendment, see, e.g. United States v. Gaviria, 805 F.2d 1108, 1112 (2d Cir. 1986) (holding that goods that entered the United States by airplane in Miami, and had been delivered by truck to John F. Kennedy International Airport for final inspection, was still subject to suspicionless border search), such an analysis is not relevant to whether a law enforcement interview at the border is lawful under the Fifth Amendment.  As explained more fully herein, the fact that an individual is at or near a border factors into whether a reasonable person will expect some limitation on their movement and expect some questioning from law enforcement.  See FNU LNU, 653 F. 3d at 153-54 (holding that "in the context of arriving at an American airport from" a foreign country "a reasonable traveler will expect some constraints as well as questions and follow-up about his or her citizenship, authorization to enter the country, destination, baggage, and so on").

point.'"").  Federal regulations explain that "preclearance is the <u>tentative</u> examination and inspection of air travelers and their baggage at foreign places where U.S. Customs personnel are stationed for that purpose."  19 C.F.R. §24.18(a) (emphasis added).  As the Eleventh Circuit has held, the use of the word "tentative" in 19 C.F.R. §24.18(a) "implies that a secondary search upon arrival in the United States is authorized by law," and therefore a search at an airport after an initial preclearance in a foreign country still constitutes a lawful border search.  <u>See</u> <u>Santiago</u>, 837 F.2d at 1548-49 (11th Cir. 1988) (affirming denial of motion to suppress).

Courts have repeatedly held that individuals who have cleared a customs area may still be treated as at the United States border when considering the applicability of border exceptions to law enforcement activity.  <u>See</u> <u>United States v. Nieves</u>, 609 F.2d 642, 647 (2d Cir. 1979) (holding that individual who had cleared customs but remained in an international arrivals building was still properly searched pursuant to border authority); <u>Walters</u>, 591 F.2d at 1197 (holding that defendant who cleared customs and walked around airport for fifty-five minutes was lawfully searched pursuant to border exception); <u>United States v. Wardlaw</u>, 576 F.2d 932, 935 (1st Cir. 1978) (holding that "[w]here a suspect has merely passed through a luggage inspection but not yet left the site of her arrival into the country, <u>i.e.</u> the "border", as was true of [the defendant], courts agree that a secondary body inspection is a border search governed by the less restrictive standard applicable to the initial inspection.").  <u>Cf.</u> <u>Irving</u>, 452 F.3d at 124 (2d Cir. 2006) (holding that initial inspection of luggage at Dallas-Fort Worth Airport, and subsequent secondary inspection of luggage forty yards from initial inspection were both valid border searches (citing <u>Nieves</u>)).[6]

_____

[6] In an analogous context, courts in this circuit and elsewhere have held that property that has entered the United States from a foreign country, which was stopped and

In this case, Siddiqui was interviewed shortly after she landed for the first time in the United States from a foreign country, and before she exited the international airport. The fact that she did not have to enter a particular customs area upon her arrival does not alter this analysis. As the Hernandez court explained when faced with the same argument:

> The border of the United States is not solely the physical boundary of the country but includes airports which accept flights from abroad. The pre-clearance center's status as a border point does not make the United States destination of pre-cleared flights not a border point. Both areas are and may be considered to be the functional equivalent of the border. Logic and precedent compel this conclusion.

Hernandez, 639 F. Supp. at 632-33.

## B. Siddiqui Was Not Subjected to a "Custodial Interrogation" as Proscribed by Miranda

Law enforcement's border interview with Siddiqui did not amount to a custodial interrogation, considering all of the circumstances from the perspective of a reasonable person. Her Fifth Amendment rights were not implicated, and Miranda warnings were not necessary.

Generally, pursuant to Miranda, a person must be advised of certain rights before being subject to a "custodial interrogation." Miranda v. Arizona, 384 U.S. 436, 444 (1966). Therefore, in order for the warnings to be required, the Court must find both that (1) there was an interrogation of the defendant, and (2) the interrogation was while the defendant was in "custody." United States v. FNU LNU, 653 F.3d 144, 148 (2d Cir. 2011) (citing Cruz v. Miller, 255 F.3d 77, 80-81 (2d Cir. 2001). For Miranda purposes,

---

inspected at one port of entry, may still be inspected at its final destination pursuant to the border search doctrine. See United States v. Bareno-Burgos, 739 F. Supp. 772, 778 (E.D.N.Y. 1990) (holding that cargo from Colombia that was preliminarily inspected in Miami was lawfully inspected at its final destination at LaGuardia Airport and collecting cases with similar rulings).

"interrogation" includes express questioning of the suspect and its "functional equivalent . . . words or actions on the part of law enforcement officers that the officers should know are reasonably likely to elicit an incriminating response for the suspect."  Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

With respect to the custody prong, an individual is only in "custody" for the purposes of Miranda if "a reasonable person in the suspect's position would have understood h[im]self to be subjected to restraints comparable to those associated with formal arrest." United States v. Yilmaz, 508 Fed. App'x 49, 51 (2d Cir. 2013) (quoting FNU LNU, 653 F.3d at 154).  The inquiry into the "custody" prong requires a court to imagine oneself "in the suspect's position," and necessarily involves considering the circumstances of the suspect's encounter with authorities, including:

> the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; [and] whether officers told the suspect he was free to leave or under suspicion . . .

FNU LNU, 653 F.3d at 153.  "[T]he circumstances also include, and especially so in border situations, the nature of the questions asked."  Id.  Whether a person is in custody for Miranda purposes "is determined by neither the perception of the defendant nor of the police."  United States v. Galloway, 316 F.3d 624, 629 (6th Cir. 2003).  Rather, it is determined by the "objective perception of a reasonable man in the defendant's shoes."  Id. (citing Stansbury v. California, 511 U.S. 318, 323 (1994)); see also FNU LNU, 653 F.3d at 153.  Notably, the reasonable person from whose perspective "custody" is defined is a reasonable innocent person.  See Florida v. Bostick, 501 U.S. 429, 437–38 (1991); United States v. Moya, 74 F.3d

1117, 1119 (11th Cir. 1996).   Whether a defendant knows he is guilty and believes incriminating evidence will soon be discovered is irrelevant.  See Bostick, 501 U.S. at 437–38; Moya, 74 F.3d at 1119.

The Second Circuit has made clear that questioning at an airport, particularly when individuals are arriving from a foreign country, presents unique factors that must be considered in the foregoing analysis.  When arriving at an American airport, "compulsory questioning — with no freedom to enter the United States and with nowhere else to go — inheres in the situation" and the traveler "has voluntarily submitted to some degree of confinement and restraint by approaching the border."  FNU LNU, 653 F.3d at 153-54.  As a result, "a reasonable traveler will expect some constraints as well as questions and follow-up about his or her citizenship, authorization to enter the country, destination, baggage, and so on."  Id. at 154.  This expectation of both constraints and questions and the fact that, "at least initially, every traveler in the airport must submit to the same sort of questioning while not free to leave[,] reduces the likelihood that reasonable persons in that situation would consider themselves to be under arrest."  Id.  The inquiry "remains a holistic one in which the nature and context of the questions asked, together with the nature and degree of restraints placed on the person questioned are relevant."  Id. (citing Berkemer, 468 U.S. 420, 441 (1984)).

"As the Supreme Court stated in Carroll v. United States, 267 U.S. 132,154 (1925), the rationale behind a routine customs inquiry is that 'national self protection reasonably requir[es] one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in.'"  United States v. Silva, 715 F.2d 43, 46-47 (2d Cir. 1983).  See also United States v. Ramsey, 431 U.S. 606, 616 (1977) (border

16

searches are considered reasonable "pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country").

### i. Siddiqui's Questioning Did Not Constitute an "Interrogation" for Which Miranda Warnings Were Required

First, the defendant was not subjected to an "interrogation" for which Miranda warnings were required.  Rather, she experienced questions appropriate in the context of the border – the purpose of her trip, why she had left the United States for an extended period, and questions related to safety and national security.  Such questions are precisely the type of questions that a reasonable person would anticipate while travelling internationally.  See FNU LNU, 653 F.3d at 154; Yilmaz, 508 Fed. App'x at 52.  "In the context of Customs inspections, our assessment of whether an interrogation is custodial must take into account the strong governmental interest in controlling our borders."  United States v. Fernandez-Ventura, 132 F.3d 844, (1st Cir. 1998) (citing Moya, 74 F.3d at 1119).  The questions asked of Siddiqui pertained directly to the interest in safe borders:  contacts with foreign nationals, known terrorists, or support for the same.  These are not inconceivable questions at the time an individual reenters the United States after a prolonged time away.  Indeed, involvement with foreign terrorist organization and endorsing terrorist activity are statutory bases to exclude a non-citizen from entering the United States.  See 8 U.S.C. § 1182(a)(3)(B) (stating that a non-citizen who "endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization…is inadmissible.").  While Siddiqui herself is a citizen, it is not unreasonable for law enforcement protecting the border to ask citizens and non-citizens alike about border security issue like terrorism and whether they know (or are themselves) individuals who are properly excluded from the country because of their ties to

terrorist activities.  Nor was there an expectation by law enforcement that the defendant would provide an incriminating response – Siddiqui was in fact candid about certain of her contact with known, or convicted, terrorists – which would indicate her willingness to provide truthful information relevant to the national security queries.  Cf. Moya, 74 F.3d at 1120 ("[B]ecause of the sovereign's responsibility, some degree of questioning and of delay is necessary and is to be expected at entry points into the United States.").

Although the defendant relies heavily on United States v. Djibo, 151 F. Supp. 3d. 297 (E.D.N.Y. 2015), the case is readily distinguishable from Siddiqui's.  Djibo centered around law enforcement's request for the defendant's cell phone access information, and subsequent search of the defendant's phone at the border, as the defendant sought to leave the United States.  151 F. Supp. 3d. 297.  In that case, the phones themselves were not contraband and, as this Court determined, were unrelated to the matter of border security or the purview of U.S. Customs.  Importantly, this Court noted that "the function of the questioning of an inbound passenger to establish her identity is fundamentally different from the function of the questioning of an outbound passenger about currency through the use of his cell phone," particularly in combination with the fact that Djibo "was asked to execute an inbound passenger customs declaration form, an aberration that 'would raise the suspicions of an ordinary traveler.'"  Djibo, 151 F. Supp. 3d at 306 (internal citation omitted) (emphasis added). At the point that the focus of the interview shifted to the phone belonging to a passenger who was about to depart the United States, this Court held that the officer's inquiry was no longer pursuant to a border exception.

There are several significant distinguishing factors between that Djibo and this case.  First, Siddiqui was an inbound passenger, seeking to enter the United States after a

prolonged period away.  Second, she was not required to do anything out of the ordinary course of an inbound passenger – she was not asked to complete abnormal paperwork; she was not asked for information to access her electronic devices; she was not asked about topics unrelated to national security and the national interest in protecting United States borders.  Finally, the information law enforcement requested from Siddiqui was not a means to a purely law enforcement-related end – unlike in Djibo, where law enforcement sought to use their interview to gain access to a device for reasons other than safety and border security. Siddiqui's interview pertained to the fact that she was outside of the United States for nearly a year; what she did in that foreign country; her contact with terrorists; her support for anti-American Islamic organizations; and her intentions or actions taken with respect to anti-American movements.  These are not beyond the conceivable interview topics for a reasonable person entering the United States, and, particularly after September 11, 2001, when considering the totality of the circumstances, are properly within the realm of questions that law enforcement can ask to keep the border secure.

### ii. Siddiqui Was Not in "Custody" as Required for Miranda to Apply

Second, the defendant cannot be considered to have been in "custody" during her interview.  Viewing the defendant's experience in the private conference room "holistically," see FNU LNU, 653 F.3d at 154, a reasonable person in Siddiqui's shoes would not have felt restrained to a degree comparable to formal arrest.  Indeed, even Siddiqui herself has not stated that she believed she was under arrest in her affidavit – nor did she contemporaneously inform the UC that she believed she had been in "custody" right after the interview at LaGuardia Airport.  Notably, "custody" for Miranda purposes is narrower than the colloquial understanding of "custody."  Id. at 152–53.  Even where a suspect might not be

19

free to leave, such as during a traffic stop, the suspect is not necessarily in custody for purposes of Miranda.  Id. at 153.  That is especially true at the border, where "a reasonable traveler will expect some constraints as well as questions and follow-up."  Id. at 153–54.

Even though Siddiqui may not have been free to leave, the totality of the circumstances demonstrates that a reasonable person in the defendant's position would not have felt restrained to a degree comparable to formal arrest.  See FNU LNU, 653 F.3d at 153-54.  Siddiqui has alleged that she was in a "conference room" with "approximately seven" people who "stood around the room," Siddiqui Decl. ¶ 5, but does not claim it was crowded or a particularly confining location akin to a cell or detention facility.  She recalled that she was advised that it was a crime to lie to FBI agents, id. ¶ 6, which coincides with the information in the FBI report, indicating that the substance of that report is accurate.  Also as recounted in the report, Siddiqui indicated that she was questioned about her time living in Canada, id. ¶ 8.  She alleges that one agent "seemed angry, red in the face, and shaking while he wrote," id. ¶ 9, but does not claim that any law enforcement agent physically touched her or threatened her, or that any perceived anger or "shaking" was reflected verbally or otherwise directed at her.  Siddiqui next alleges that a second agent was "demanding and confrontational."  Id. ¶ 9.  However, there is again no allegation that this particular agent restrained her, touched her in any way, menaced her, drew a weapon or otherwise caused a threat or fear of harm.  Siddiqui also contends that from "the tone of the questioning," she "believed" she was "about to be arrested."  But the defendant was not advised that she was under suspicion or that she was going to be arrested.  Siddiqui was not handcuffed or physically placed under arrest, and in fact was permitted to leave after the interview; she has not averred anything to the contrary.  And, significantly, just moments following her interview, during her conversation with the

20

UC, there is no indication that Siddiqui stated that she had been threatened or placed in custody. She specified that she believed the FBI was investigating her and that she <u>could be arrested</u> at some point in the future—not on July 10, 2014.

Even accepting the defendant's characterization of the interview as accurate for the purpose of this motion, a reasonable person in the defendant's place would not have felt restrained to the point of formal arrest. A reasonable person who had just arrived at an airport in the United States aboard a plane from a foreign country would not believe that being asked to engage in a brief interview with law enforcement—with no restraints and no other overt signs of force or displays of authority apart from identification and notification of the consequences of lying to law enforcement—would believe that they were under arrest and in custody during that interview. <u>See</u> <u>United States v. Broughton</u>, No. 13-CR-164 (KAM), 2013 WL 5744473 (E.D.N.Y. Oct. 23, 2013) (the defendant was not in "custody" in a private search room because a reasonable person in the defendant's situation "would not have believed she was under arrest at this point in her interaction with the CBP officers" given a brief detention period, routine interaction in the border context, and the fact that the defendant was not handcuffed); <u>United States v. Tavares</u>, No. 11-CR-610 (NGG), 2012 WL 194974, at *2 (E.D.N.Y. Jan. 23, 2012) (defendant not in "custody" after arriving at JFK, when he was escorted by uniformed agent to a separate inspection area from which he was not free to leave and questioned about admissibility into the United States); <u>see also</u> <u>Yilmaz</u>, 508 Fed. App'x at 52 (defendant stopped at Canadian border not in "custody" during secondary inspection when he was detained for approximately ninety minutes, not free to leave and asked routine questions relevant to his admissibility into the United States); <u>FNU LNU</u>, 653 F.3d at 155 (defendant

was not in "custody" where she was interrogated in a closed room for ninety minutes but was not restrained and the questions asked of her related to her admission to the country).

## II.     The Interview of Siddiqui Was Also a Lawful Investigative Stop

Moreover, the brief interview was a lawful investigative stop based on reasonable suspicion that Siddiqui was involved with foreign-based terrorists. The Fourth Amendment sanctions a warrantless investigatory stop where a police officer reasonably suspects that a person is committing or has committed a criminal offense. See Terry v. Ohio, 392 U.S. 1, 30 (1968). It is well-settled that a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further. United States v. Bert, No. 12-CR-100 (RRM), 2014 WL 358983, at *8 (E.D.N.Y. Feb. 3, 2014) (quoting Hiibel v. Sixth Judicial Dist. Court of Nev., 542 U.S. 177, 185 (2004)); see also United States v. Elmore, 482 F.3d 172, 178 (2d Cir. 2007) ("[P]olice may briefly detain an individual for questioning if they have a reasonable suspicion that criminal activity is afoot . . . ."); United States v. Gori, 230 F.3d 44, 56 (2d Cir. 2000) (compiling cases) ("[I]t is well established that officers may ask (or force) a suspect to move as part of a lawful Terry stop."). A stop and interview pursuant to the Terry standard does not require that law enforcement advise the subject of her Miranda rights. See Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (stating that "[t]he comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of Miranda"); United States v. Bareno-Burgos, 739 F. Supp. 772, 786-87 (E.D.N.Y. 1990) (finding un-Mirandized interview of defendant in airport galley to be lawful investigative stop).

Whether there is reasonable suspicion to justify a stop depends on the totality of the circumstances, including the information known to the officer and any reasonable inferences to be drawn at the time of the stop. Sokolow, 490 U.S. at 8. In other words, "the proper inquiry is not whether each fact considered in isolation denotes unlawful behavior, but whether all the facts taken together support a reasonable suspicion of wrongdoing." United States v. Lee, 916 F.2d 814, 820 (2d Cir. 1990). Courts evaluate the totality of the circumstances from the perspective of a trained and experienced officer. United States v. Cortez, 449 U.S. 411, 418 (1981). The reasonable suspicion determination is based on "common sense judgments and inferences about human behavior" and "[e]ven conduct that is as consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity." Bert, 2014 WL 358983, at *7 (internal citations omitted). "Reasonable suspicion is an objective standard; hence, the subjective intentions or motives of the officer making the stop are irrelevant." United States v. Bayless, 201 F.3d 116, 133 (2d Cir. 2000) (citing United States v. Glover, 957 F.2d 1004, 1009 (2d Cir. 1992)).

Here, as recounted above, law enforcement agents knew that Siddiqui had been in frequent, ongoing contact with a number of identified terrorists and terrorist organizations. Agents knew that Siddiqui had reached out to a number of incarcerated terrorists to lend support; that she had been engaged in electronic communication with AQAP affiliates and contacted other designated terrorists using various monikers other than her legal name and, for that reason, law enforcement knew they did not have complete information about all of the contact Siddiqui was having with terrorists or terrorist organizations. See also Compl. ¶¶ 10-11, 13-14; Ex. A. Additionally, law enforcement knew that Siddiqui had authored letters,

23

poetry and electronic correspondence supporting such actions as violent jihad, attempting to develop relationships with terrorists and expressing other extremist views.  Id. ¶¶ 9, 11-12. Law enforcement had an ongoing level of concern that Siddiqui could support a terrorist or related organization in an act of terrorism, engage in some material support of the same, or engage in such an action on her own.

In light of this knowledge of Siddiqui's prior contact with known terrorists, and particularly since the defendant was returning to the United States for the first time after an extended stay in a foreign country, it was reasonable for law enforcement to stop Siddiqui and briefly question her about her ongoing involvement with terrorists to ensure the safety and security of the United States upon her reentry to this country.  See Bareno-Burgos, 739 F. Supp. at 786-87 (holding that questioning of defendant in galley of airplane at LaGuardia Airport after discovering currency in luggage constituted lawful investigative stop).  These specific facts are paradigmatic of the type of information that would lead a reasonable law enforcement officer to have a reasonable suspicion that a suspect had engaged, or was engaging, in criminal activity.  See Grice v. McVeigh, 873 F.3d 162, 168 (2d Cir. 2017) (holding that handcuffing and interviewing defendant was a lawful investigative stop because law enforcement had facts that reflected suspicion the defendant might use a device to set off an explosive on train tracks).  The fact that Siddiqui was escorted to a different location for questioning does not render the stop unlawful or more invasive.  See id. ("totality of circumstances" of lawful stop include "the secondary location to which he was taken…was neither so confining, isolated, reflective of police authority or otherwise comparable to an official detention facility as to be characterized as a custodial environment").  Based on the facts and circumstances of this case, a brief interview of the defendant—who was not

handcuffed, in a room at LaGuardia Airport—based on knowledge of her involvement with foreign terrorists was a lawful investigative stop.

## III.    The Defendant's Motion Should Be Denied Without an Evidentiary Hearing.

The defendant has failed to create a disputed issue of fact and, therefore, is not entitled to a hearing.  A defendant has no absolute right to an evidentiary hearing on a motion to suppress evidence.  See United States v. Watson, 404 F.3d 163, 167 (2d Cir. 2005) (holding that an evidentiary hearing on a motion to suppress requires a showing that "contested issues of fact going to the validity of the search are in question") (citation and internal quotation marks omitted); see also United States v. Gillette, 383 F.2d 843, 848 (2d Cir. 1967) (suppression hearing available only if there is a "factual issue to be resolved"); United States v. Viscioso, 711 F. Supp. 740, 745 (S.D.N.Y. 1989) ("the defendant must show that disputed issues of material fact exist before an evidentiary hearing is required") (citation and internal quotation marks omitted).  Rather, a trial court is required to grant such a hearing only when a movant's affidavit contains specific factual allegations which, if proven at a hearing, would warrant the relief requested.  See United States v. Culotta, 413 F.2d 1343, 1345 (2d Cir. 1969); see also United States v. Pena, 961 F.2d 333, 339 (2d Cir. 1992) (defendant is not entitled to a hearing on a motion to suppress unless the defendant's submissions raise a "sufficiently definite, specific, detailed, and nonconjectural" factual basis for the motion).

Even assuming all the facts to be as set forth in the defendant's motion, the defendant's motion fails under the law because her interview was a lawful non-custodial border interview, or in the alternative was a lawful investigative stop supported by reasonable suspicion of criminal activity.  Accordingly, a hearing is not required.  See United States v. Rush, 352 F. Supp. 2d 383, 386 (E.D.N.Y. 2005) (denying the defendant's motion to suppress

without a hearing because, even assuming the facts as set forth by the defendant, the motion fails as a matter of law).

## **CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court deny the defendant's motion to suppress without a hearing.

Dated:        Brooklyn, New York
              January 26, 2018

                                        RICHARD P. DONOGHUE
                                        United States Attorney
                                        Eastern District of New York

                              By:      /s/ Jennifer M. Sasso
                                        Jennifer M. Sasso
                                        Alexander A. Solomon
                                        Craig R. Heeren
                                        Assistant U.S. Attorneys
                                        (718) 254-7000