UNITED STATES DISTRICT COURT                          (Hon. Sterling Johnson, Jr.)
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

UNITED STATES OF AMERICA                              REPLY TO
                                                      GOVERNMENT'S
                                                      OPPOSITION TO MOTION
-against-                                             TO SUPPRESS


NOELLE VELENTZAS and ASIA SIDDIQUI,

                    Defendants.                                1:15-cr-00213-SJ

---------------------------------------------------------------X

## REPLY TO GOVERNMENT'S MEMORANDUM IN
## OPPOSITION TO ASIA SIDDIQUI'S MOTION TO SUPPRESS

### Introduction

In her suppression motion, Ms. Siddiqui argues that the FBI's seizure of her person at La Guardia airport on July 10, 2014, violated the Fourth Amendment because the agents did not have probable cause or reasonable suspicion for their actions at the time they seized her. Ms. Siddiqui also argues that, because an ordinary traveler in Ms. Siddiqui's position would not expect the questions she received, the FBI agents violated *Miranda* by interrogating her without advising her of her *Miranda* rights.

In its response, the Government contends that, under the extended border doctrine or the functional equivalent of the border doctrine, the FBI agents interrogating Ms. Siddiqui did not need probable cause to seize her, and that the stop was justified as an investigative stop.  The Government argues that the agents were not required to provide Ms. Siddiqui her *Miranda* warnings, because the questioning was within the scope of what a reasonable traveler would expect for admissibility to the United States.

1

For the reasons set forth below, Ms. Siddiqui respectfully requests that this Court reject the Government's arguments. Even if the Government is correct that Ms. Siddiqui was at the border, the Government fails to articulate reasonable suspicion supporting the officers' seizure of Ms. Siddiqui. Further, even if the seizure was justified, under this Court's and the Second Circuit's case law, the totality of the circumstances, including the location and circumstances of the interrogation and the nature of the questions asked, show that Ms. Siddiqui's experience would have raised the suspicions of an ordinary traveler. Thus, the agents should have read Ms. Siddiqui her *Miranda* warnings.

## I.      The FBI seized Ms. Siddiqui in violation of the Fourth Amendment.

Contrary to the Government's response, FBI agents violated Ms. Siddiqui's Fourth Amendment rights when they seized her without reasonable suspicion. The Government argues at length that Ms. Siddiqui's interrogation took place "at the border." Doc. 86 at 11-14. But this is a red herring. Under the Fourth Amendment "extended border" doctrine, interrogating officers must still have reasonable suspicion to seize a person. *United States v. Hernandez*, 639 F. Supp. 629, 633 (E.D.N.Y. 1986); *United States v. Gaviria*, 805 F.2d 1108, 1112 (2d Cir. 1986).[1]

In arguing that the Fourth Amendment does not bar Ms. Siddiqui's seizure, the Government relies heavily on *United States v. Hernandez*, 639 F. Supp. 629, 633 (E.D.N.Y. 1986), which held that a search at La Guardia was a "border search" even after pre-clearance in Canada, under the

---

[1] There is no border exception to *Miranda* at all. *See United States v. FNU LNU*, 653 F.3d 144, 149 (2d Cir. 2011) ("Supreme Court precedents establish no similar [border] exception to *Miranda*'s prophylactic requirement under the Fifth Amendment."). Despite including the "border" argument in a section ostensibly discussing *Miranda*, the Government concedes in a footnote that a border "analysis is not relevant to whether a law enforcement interview at the border is lawful under the Fifth Amendment." Doc. 86 at 12 n.5.

"extended border" doctrine. As the Second Circuit has explained, however, even an "'extended' border search" requires reasonable suspicion that a crime has occurred:

> An "extended" border search is a search that usually is conducted after a person or some property has "cleared an initial customs checkpoint and [has] entered the United States." An extended border search does not require a warrant, but, due to the "greater intrusion on legitimate expectations of privacy, [it is] permitted only if supported by reasonable suspicion."

*Gaviria*, 805 F.2d at 1112 (citations omitted). Thus, even if this Court accepts the Government's argument that the FBI detained Ms. Siddiqui at the border, the detention still required reasonable suspicion of criminal activity under the extended border doctrine.[2]

The Government also argues that Ms. Siddiqui's interrogation in a private room at the airport, surrounded by FBI agents, "was a lawful investigative stop based on reasonable suspicion

---

[2] Since the seizure took place at La Guardia after pre-clearance by United States CBP, and La Guardia has no permanent customs area, this Court should reject the Government's contention that La Guardia was simply the functional equivalent of the border. The Second Circuit defines an "extended" border search as taking place after a person "has cleared an initial customs checkpoint and [has] entered the United States," which describes the situation here. *Gaviria*, 805 F.2d at 1112 (citations omitted); *see also United States v. Bareno-Burgos*, 739 F. Supp. 772, 799-80 (E.D.N.Y. 1990) (Raggi, J.) ("[T]he court in *Gaviria* suggested that what was more relevant to an extended border search than time and space was the fact that a person or some property has initially cleared Customs and entered the United States. . . . Once this has occurred, any subsequent search involves greater intrusion on legitimate expectations of privacy than would occur at the border or its functional equivalent. Thus arises the need for reasonable suspicion to support the intrusion.").

The Government's citation to the Eleventh Circuit *Santiago* case disregards the nature of the searched "material" here.  *See* Doc. 86 at 12 (citing *United States v. Santiago*, 837 F.3d 1545 (11th Cir. 1988)).  *Santiago* dealt expressly with searched bags and the evidence derived from them. 837 F.2d at 1548. Here, Ms. Siddiqui seeks to suppress statements derived from her seizure. Under this Court's reasoning in *Bareno-Burgos*, this distinction is significant. 739 F. Supp. at 779 ("[O]nce a departing passenger has checked baggage through to a foreign destination, providing for its exclusive transport by common carrier with no further personal involvement in its movements, there is no greater intrusion on privacy or inconvenience caused by having the Customs inspection occur at the point where the bags are first surrendered than at the point where they will ultimately leave the United States."). The Court accordingly should decline the Government's invitation to stretch *Santiago*'s (non-binding) holding beyond its strictures and opt instead to apply the binding Second Circuit's applicable test to suppress introduction of Ms. Siddiqui's statements.

that Siddiqui was involved with foreign-based terrorists." Doc. 86 at 22. To support this assertion, it proffers that Ms. Siddiqui had contacted Samir Khan, written letters to prisoners, and had published a poem containing violent imagery. Thus, the Government claims that "[l]aw enforcement had an ongoing level of concern that Siddiqui **could** support a terrorist or related organization in an act of terrorism, engage in some material support of the same, or engage in such an action on her own." *Id.* at 24 (emphasis added). The Government does not assert, though, that it had reasonable suspicion Ms. Siddiqui had committed or was committing a crime.

Further, the Government does not proffer any evidence of what the interrogating agents knew *when they interrogated Ms. Siddiqui*.[3] *See McBean v. City of N.Y.*, 260 F.R.D. 120, 130 (S.D.N.Y. 2009) (noting that, "[i]f the information causing reasonable suspicion was unknown or irrelevant to the person performing the search, it is not part of [a] determination of 'reasonableness' under the Fourth Amendment") (quoting *N.G. v. Connecticut*, 382 F.3d 225, 244-45 (2d Cir. 2004) (Sotomayor, J., concurring in part and dissenting in part)). For this reason alone, Ms. Siddiqui requests that this Court suppress her alleged statements. *See United States v. Bristol*, 819 F. Supp. 2d 135, 142 (E.D.N.Y. 2011) ("The Government bears the burden of proving, by a preponderance of the evidence, that reasonable suspicion existed for a stop.") (quoting *United States v. Stewart*, 604 F. Supp. 2d 676, 680 (S.D.N.Y. 2009)).

Regardless, Ms. Siddiqui's alleged activities would not support an investigative stop under *Terry v. Ohio*, 392 U.S. 1 (1968), as the Government maintains. The Government alleges that Ms. Siddiqui had first contacted Samir Khan in 2006 and had written a violent poem in 2009, all while

---

[3] The Government's brief cites to allegations in the Complaint, but the Complaint does not specify whether FBI agents knew any of this *on July 10, 2014*. Doc. 86 at 23-24. In fact, the Government hints that the agents were not aware of this information. *See* Doc. 86 at 18 ("Nor was there an expectation by law enforcement that the defendant would provide an incriminating response.").

4

Ms. Siddiqui was still in the United States. The FBI detained Ms. Siddiqui at the airport in July 2014. The Government did not proffer any information it learned about Ms. Siddiqui's time in Canada. The Government implies that law enforcement agents were concerned not that Ms. Siddiqui had committed or was committing a crime, but rather that she *could* commit a crime at some point in the future. *Farag v. United States*, 587 F. Supp. 2d 436, 457 n.29 (E.D.N.Y. 2008) ("Notably, this was not a 'ticking-time-bomb' scenario in which law enforcement officials harbored a reasonable suspicion that an actual terrorist attack was imminent.").

Under *Terry*, it is not sufficient that a law enforcement officer suspects that a person might commit a crime at some point in the future. Rather, "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity '*may be afoot*.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (emphasis added). In contrast to this case, the officers in the cases cited by the Government had reasonable suspicion that criminal activity had already happened or was happening imminently. *United States v. Bareno-Burgos*, 739 F. Supp. 772, 785 (E.D.N.Y. 1990); *Grice v. McVeigh*, 873 F.3d 162, 167 (2d Cir. 2017). In *Bareno-Burgos*, officers knew that the passenger had "hundreds of thousands of dollars in United States currency concealed in children's toys" in his baggage checked to Columbia. 739 F. Supp. at 785. In *Grice*, the suspect matched the description of someone who was allegedly trying to detonate a device to blow up a train. 873 F.3d at 167.

Here, the nature of the FBI agents' questions shows that Ms. Siddiqui's detention was not a *Terry* stop. As the Second Circuit has explained, a "*Terry* stop is limited to the degree of intrusion necessary to confirm or dispel the reasonable suspicion that justifies the stop in the first place." *Grice*, 873 F.3d at 167. But Ms. Siddiqui's seizure was not calculated to dispel or confirm any suspicion of wrongdoing. If, in response to Agent Mustafa's questions, Ms. Siddiqui had

confirmed that she had communicated with Samir Khan and had published a poem containing violent imagery, it would not confirm or dispel any suspicion of illegal activity. The First Amendment protects these activities. *Cf. Holder v. Humanitarian Law Project*, 561 U.S. 1, 39 (2010) (recognizing that "mere association with a foreign terrorist organization" is protected under the First Amendment). Indeed, the Government admits that mere contact with a terrorist organization is not a basis to prevent a citizen from reentering the country. Doc. 86 at 17. United States CBP had already questioned Ms. Siddiqui about her activities in Canada and had already searched her bags and her phone. The Government does not assert that it obtained any suspicious information during the Canadian stop, or that the FBI suspected Ms. Siddiqui was not a citizen. Under these circumstances, the FBI did not have reasonable suspicion of criminal activity to justify detaining Ms. Siddiqui, under the extended border doctrine or as an investigative stop.

## II.     The FBI interrogated Ms. Siddiqui in violation of *Miranda*.

Regardless of whether Ms. Siddiqui's seizure was permissible under the Fourth Amendment, her interrogation violated *Miranda*. The determination of whether *Miranda* warnings are required is independent of whether a stop is permissible under the Fourth Amendment. *See FNU LNU*, 653 F.3d at 149 ("[A]s we have previously said, 'whether a "stop" was permissible under [Fourth Amendment doctrine] is irrelevant to the *Miranda* analysis.'") (quoting *United States v. Ali*, 68 F.3d 1468, 1473 (2d Cir. 1995)).[4]

---

[4] In its response, the Government initially argues that Ms. Siddiqui's questioning was not an "interrogation" at all. The Court, however, can reject this contention out of hand. In *FNU LNU*, the Second Circuit defined "interrogation" and explained that "[a]n interrogation consists of 'express questioning or its functional equivalent.'" F.3d at 148 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)). Here, because the Government does not dispute that FBI agents expressly questioned Ms. Siddiqui, the term "interrogation" "aptly describes the interaction between [the FBI agents] and the defendant." *Id.*

In the context of a border stop, *Miranda* determinations consider the totality of the circumstances, especially including the nature of the questions being asked. *United States v. Djibo*, 151 F. Supp. 3d 297, 306 (E.D.N.Y. 2015) ("[P]ractically speaking, the most important factor in determining whether Miranda applies at our borders will often be the objective function of the questioning.") (quoting *FNU LNU*, 653 F.3d at 155 (Jacobs, J., concurring)).

The Government argues that the circumstances of Ms. Siddiqui's interrogation did not require the agents to provide *Miranda* warnings before questioning her because a reasonable traveler would have expected such questioning upon return from Canada. Doc. 86 at 17. The Government ignores, however, that the agents were not asking Ms. Siddiqui about her contacts with individuals during her time in Canada, but rather about her alleged contacts years earlier in the United States. The United States CBP had already questioned Ms. Siddiqui extensively about her admissibility and activities in Canada and had already searched her bags and her phone.

The Government attempts to distinguish *Djibo* by arguing that (1) Ms. Siddiqui was an inbound passenger rather than an outbound passenger; (2) she was not required to do anything unusual like fill out a second customs form; and (3) the information requested was not a "means to a purely law enforcement-related end." Doc. 86 at 18-19.

The Government's arguments fail for several reasons. First, this Court, in *Djibo*, did not make the distinction between inbound and outbound travelers central to its analysis. Instead, this Court observed that "an individual *departing* from a United States airport will have similar expectations" to an individual arriving in the United States. *Djibo*, 151 F. Supp. 3d at 305. The Government's second and third contentions are belied by the facts. Although the agents did not ask Ms. Siddiqui to fill out a second customs form, there were several other "aberrations" that "would raise the suspicions of an ordinary traveler." *See id.* Ms. Siddiqui was singled out and

isolated from the other passengers after already having gone through customs once. She was interrogated by FBI law enforcement officers rather than customs officials. Finally, and critically, the questioning primarily concerned her pre-travel contacts with specific individuals and organizations, not her travels in Canada. The interrogation centered on Ms. Siddiqui's alleged activities years earlier while she was in the United States. The nature of the questioning makes clear that *Miranda* warnings were required. The Court's holding in *Djibo* prohibits officers from doing precisely what they did here: using a border stop as a pretext to interrogate about unrelated criminal activity, without providing *Miranda* warnings.

Contrary to the Government's suggestion,[5] the Court's resolution of the investigative stop inquiry is not relevant to whether the interrogating agents should have read Ms. Siddiqui her *Miranda* rights. The Second Circuit has explained that "whether [a] 'stop' was permissible under *Terry v. Ohio* . . . is irrelevant to the *Miranda* analysis. *Terry* is an 'exception' to the Fourth Amendment probable cause requirement, not to the Fifth Amendment protections against self-incrimination." *Ali*, 68 F.3d at 1473. Thus, the Government's focus in the *Miranda* portion of its memorandum on whether Ms. Siddiqui's interrogation was a lawful investigative stop is misplaced.[6]

This case is easily distinguishable from the cases cited by the Government because here, FBI agents asked questions unrelated to Ms. Siddiqui's admissibility to the country. *United States v. Broughton*, 983 F. Supp. 2d 224, 230 (E.D.N.Y. 2013); *United States v. Tavares*, No. 11-CR-610 (NGG), 2012 U.S. Dist. LEXIS 7327 (E.D.N.Y. Jan. 23, 2012); *United States v. Yilmaz*, 508

---

[5] *See* Doc.86 at 22 ("A stop and interview pursuant to the <u>Terry</u> standard does not require that law enforcement advise the subject of her <u>Miranda</u> rights.").
[6] The Government repeatedly conflates its Fourth Amendment and *Miranda* analyses, even though the analyses are analytically separate. *See* Doc. 86 at 12 n.5.

F. App'x 49, 52 (2d Cir. 2013). In *Broughton*, "the CBP officers were engaged in a routine aspect of border control, examining a suspicious item in [Broughton's] luggage, and Broughton's statements were not made in response to specific questions regarding the circumstances under which the cocaine-laden shoes were found in her luggage." 983 F. Supp. 2d at 230. In *Tavares*, CBP asked the defendant specific questions relating to whether his passport was genuine. 2012 U.S. Dist. LEXIS 7327, at *2. The court noted that questions about "name, country of birth, citizenship, etc." directly relate to admissibility. *Id.* In *Yilmaz*, "the questions asked of Yilmaz during the secondary inspection were routine and relevant to his admissibility and the admissibility of his effects." *Yilmaz*, 508 F. App'x at 52. The CPB officers asked him questions about the customs declaration form, the purpose of his trip, how he had entered, and how he intended to use property he acquired there. *Id.* All of these cases involved routine questions about admissibility and the defendant's time in a foreign country.

Here, by contrast, the FBI did not focus on Ms. Siddiqui's citizenship, or her admissibility, or her time in Canada. United States CBP had already asked admissibility questions and searched Ms. Siddiqui's personal effects. Instead, FBI agents interrogated Ms. Siddiqui about *specific* contacts she had years earlier while in the United States. The FBI's questions related not to admissibility but rather to its ongoing investigation into Ms. Siddiqui's activities in the United States. This line of questioning, unlike routine questions about admissibility, "would raise the suspicions of an ordinary traveler." *Djibo*, 151 F. Supp. 3d at 305.

Finally, the Government misstates the proffered facts. Contrary to the Government's suggestion, Ms. Siddiqui did not state that "she believed . . . that she could be arrested at some

point in the future—not on July 10, 2014." Doc. 86 at 21.[7] She stated that she believed, based on the nature of the questions and the agents' "demanding and confrontational" tone, that she was "about to be arrested." Regardless, the test is not what Ms. Siddiqui believed, but what an ordinary traveler in her circumstances would believe. Under the facts Ms. Siddiqui proffered, this Court should suppress the statements she allegedly made to the FBI.

### III. This Court should hold an evidentiary hearing, unless it concludes that it can rule for Ms. Siddiqui on the basis of the undisputed facts.

In its response, the Government does not contest any of the facts Ms. Siddiqui proffered. Instead, it contends that, even if her proffers are accepted, Ms. Siddiqui has not established that her rights were violated. As shown in her initial motion and above, however, Ms. Siddiqui's proffers, if believed, establish her entitlement to relief. Thus, this Court should either hold a hearing or grant the motion based on the uncontroverted facts.

### Conclusion

Therefore, Defendant Asia Siddiqui respectfully requests that this Court grant her motion to suppress statements allegedly made while she was detained at La Guardia airport on July 10, 2014.

Respectfully submitted this 9th day of February, 2018.

By: /s/ *Charles Swift*
Charles D. Swift,
Pro Hac Attorney for ASIA SIDDIQUI
833 E. Arapaho Rd., Suite 102
Richardson, TX  75081
(972) 914-2507
cswift@clcma.org

---

[7] The Government derived this "fact" from Ms. Siddiqui's statements to the undercover agent after the interrogation. Doc. 86 at 8. Ms. Siddiqui allegedly told the undercover agent that she felt she was "gonna be arrested soon." *Id.* But this is misleading, because of course Ms. Siddiqui did not believe, after the interrogation was over, that she was would be arrested at the interrogation. And, she never said that she believed she would not be arrested on July 10, 2014.

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of defendant Siddiqui's **Reply to the Government's Memorandum in Opposition to Asia Siddiqui's Motion to Suppress** was electronically filed  and served on the Court's electronic filing system:

DATED this 9th day of February, 2018.

_____/s/ Charles D. Swift_____
Charles D. Swift
Pro Hac Attorney for Asia Siddiqui
833 – E. Arapaho Rd., Ste. 102
Richardson, TX  75081
Tel: (972) 914-2507
Fax: (972) 692-7454
cswift@clcma.org

11