DMP/AAS:JMS/CRH
F.#2014R00196

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA                    MEMORANDUM OF LAW

  - against -                                             15-CR-213 (SJ)

NOELLE VELENTZAS and
ASIA SIDDIQUI
    also known as "Najma Samaa"
    and "Murdiyyah,"

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS COUNTS ONE AND TWO



                            RICHARD P. DONOGHUE
                            United States Attorney
                            Eastern District of New York


Alexander A. Solomon
Jennifer M. Sasso
Craig R. Heeren
Assistant United States Attorneys
(Of Counsel)

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 2

I.    The Defendants' Interest in Committing Violent Jihad ................................................ 3

II.   The Defendants Teach Themselves How to Build a Bomb ....................................... 5

III.  The Defendants Discuss Targets for an Attack ...................................................... 13

IV.  The Charges Against the Defendants ..................................................................... 14

ARGUMENT ......................................................................................................................... 15

I.    Section 2332a Is Not Vague or Overbroad ............................................................. 16

    A.  Statutory Language ...................................................................................... 17

    B.  Section 2332a is Not Unconstitutionally Void for Vagueness ........................... 18

        1. Section 2332a Is Not Vague As Applied to This Case .................................... 19

        2. Section 2332a Is Not Vague on Its Face ....................................................... 23

    C.  Section 2332a Is Not Overbroad ..................................................................... 25

II.   Section 842(p) Is Not Vague or Overbroad ............................................................. 28

    A.  Statutory Language ...................................................................................... 28

    B.  Section 842(p) Is Not Vague ........................................................................... 29

        1. Section 842(p) Is Not Vague As Applied to this Case .................................... 29

        2. Section 842(p) Is Not Vague on Its Face ....................................................... 31

    C.  Section 842(p) Is Not Overbroad ................................................................... 32

III.  Both Count One and Count Two State an Offense with Sufficient Specificity ....... 33

    A.  Count One Sufficiently States an Offense ....................................................... 36

    B.  Count Two Sufficiently States an Offense........................................................ 38

    C.  Count Two Sufficiently Charges the Defendants with a "Crime of Violence" ... 39

CONCLUSION ..................................................................................................................... 43

## TABLE OF AUTHORITIES

**Cases**

Blodgett v. Holden,
  275 U.S. 142 (1927).................................................................................. 20

Boyce Motor Lines, Inc. v. United States,
  342 U.S. 337 (1952).................................................................................. 37

Brandenburg v. Ohio,
  395 U.S. 444 (1969).................................................................................. 26

Broadrick v. Oklahoma
  413 U.S. 601 (1973)...................................................................... 19, 27, 28

Chapman v. United States,
  500 U.S. 453 (1991).................................................................................. 19

Farrell v. Burke,
  449 F.3d 470 (2d Cir. 2006) ............................................................... 24, 27

Grayned v. City of Rockford,
  408 U.S. 104 (1972).................................................................................. 21

Hill v. Colorado,
  530 U.S. 703 (2000).................................................................................. 34

Hoffman Estates v. Flipside, Hoffman Estates, Inc.,
  455 U.S. 489 (1982)........................................................... 19, 23, 24, 26

Holder v. Humanitarian Law Project,
  561 U.S. 1 (2010).............................................................................. passim

In re Terrorist Bombings of U.S. Embassies in E. Africa,
  552 F.3d 93 (2d Cir. 2008) ....................................................................... 29

Leocal v. Ashcroft,
  543 U.S. 1 (2004)............................................................................... 33, 44

Malik v. McGinnis,
  No. 06 CIV. 3361 RJS GWG, 2010 WL 3239216 (S.D.N.Y. Aug. 16, 2010).................. 32

N.A.A.C.P. v. Claiborne Hardware,
  458 U.S. 886 (1982).................................................................................. 25

National Mobilization Committee to End the War in VietNam v. Foran,
  411 F.2d 934 (7th Cir. 1969) .................................................................... 36

New York v. Ferber,
  458 U.S. 747 (1982).................................................................................. 29

Parker v. Levy,
  417 U.S. 733 (1974).................................................................................. 19

Perez v. Hoblock,
    368 F.3d 166 (2d Cir. 2004) ..................................................................... 21

Staples v. United States,
    511 U.S. 600 (1994)................................................................................... 23

United States v. Ahmed,
    94 F. Supp. 3d 394 (E.D.N.Y. 2015) ........................................................ 37

United States v. al Farekh,
    No. 15-CR-268 (E.D.N.Y.) (BMC) ........................................................... 29

United States v. Alahmedalabdaloklah,
    No. 12-1263, 2017 WL 2988236, at *4 (D. Ariz. July 13, 2017)...................... 46

United States v. Aleynikov,
    676 F.3d 71 (2d Cir. 2012) ................................................................... 36, 37

United States v. Alfonso,
    143 F.3d 772 (2d Cir. 1998) ................................................................. 37, 38

United States v. Aliperti,
    867 F. Supp. 142 (E.D.N.Y. 1994) ............................................................ 38

United States v. Bailey,
    516 U.S. 137 (1995)................................................................................... 22

United States v. Canty,
    971 F. Supp. 687 (N.D.N.Y. 1997)....................................................... 39, 43

United States v. Citron,
    783 F.2d 307 (2d Cir. 1986) ...................................................................... 38

United States v. Collazo,
    No. 04 CR. 297 2004 WL 2997843 (S.D.N.Y. Dec. 22, 2004) ......................... 40

United States v. Conteh,
    No. 6-116, 2006 WL 3103329 (S.D.N.Y. Nov. 1, 2006) .................................. 42

United States v. Coronado,
    461 F. Supp. 2d 1209, 1213 (S.D. Cal. 2006)....................................... 33, 34, 35

United States v. Crawford,
    No. 16-4261-cr, 2017 WL 4994459 (2d Cir. Nov. 1, 2017)................... 20, 22, 45

United States v. Davila,
    461 F.3d 298 (2d Cir. 2006) ...................................................................... 29

United States v. Desposito,
    704 F.3d 221 (2d Cir. 2013) ...................................................................... 22

United States v. Farhane,
    634 F.3d 127 (2d Cir. 2011) ............................................................... passim

United States v. Featherston,
    461 F.2d 1119 (5th Cir. 1972) ....................................................................... 35

United States v. George,
    386 F.3d 383 (2d Cir. 2004) ......................................................................... 21

United States v. Khalil,
    214 F.3d 111 (2d Cir. 2000) ......................................................................... 44

United States v. LaSpina,
    299 F.3d 165 (2d Cir. 2002) ......................................................................... 37

United States v. McClean,
    528 F.2d 1250 (2d Cir. 1976) ........................................................ 38, 39, 41, 43

United States v. McVeigh,
    153 F.3d 1166 (10th Cir. 1998) .............................................................. 20, 23

United States v. McVeigh,
    940 F. Supp. 1571 (D. Colo. 1996) ............................................................... 41

United States v. Nichols,
    169 F.3d 1255 (10th Cir. 1999) ..................................................................... 29

United States v. Persico,
    621 F. Supp. 842 (S.D.N.Y. 1985) ................................................................ 38

United States v. Pirro,
    212 F.3d 86 (2d Cir. 2000) ........................................................................... 37

United States v. Rahman,
    189 F.3d 88 (2d Cir. 1999) ........................................................................... 26

United States v. Rahman,
    No. S3 93 CR. 181 (MBM), 1994 WL 388927 (S.D.N.Y. July 22, 1994) ........................ 26

United States v. Rubin,
    743 F.3d 31 (2d Cir. 2014) ..................................................................... 38, 40

United States v. Salerno,
    481 U.S. 739 (1987) ..................................................................................... 20

United States v. Sattar,
    314 F. Supp. 2d 279 (S.D.N.Y. 2004) ............................................................ 25

United States v. Sattar,
    395 F. Supp. 2d 79 (S.D.N.Y. 2005) .............................................................. 26

United States v. Spring,
    108 Fed. App'x 116 (4th Cir. 2004) ............................................................... 45

United States v. Stein,
    No. 16-10141-02, 2017 WL 930713 (D. Kan. Mar. 9, 2017) ............................... 45

<u>United States v. Stringer</u>,
    730 F.3d 120 (2d Cir. 2013) ................................................................... 38

<u>United States v. Tsarnaev</u>,
    157 F. Supp 3d 57 (D. Mass. 2016) ........................................................ 45

<u>United States v. Viscome</u>,
    144 F.3d 1365 (11th Cir. 1998) ............................................................. 29

<u>United States v. Walsh</u>,
    194 F.3d 37 (2d Cir. 1999) ....................................................... 39, 42, 43

<u>United States v. Wydermyer</u>,
    51 F.3d 319 (2d Cir. 1995) ..................................................................... 40

<u>Virginia v. Hicks</u>,
    539 U.S. 113 (2003) ................................................................................ 28

<u>Wong Tai v. United States</u>,
    273 U.S. 77 (1927) .................................................................................. 40

**Statutes**

18 U.S.C. § 16 ............................................................................................... 44

18 U.S.C. § 2 ................................................................................................. 15

18 U.S.C. § 231(a) ........................................................................................ 35

18 U.S.C. § 2332a .............................................................................. 15, 17, 45

18 U.S.C. § 3551 ........................................................................................... 15

18 U.S.C. § 842(p) ........................................................................ 15, 30, 31, 35

18 U.S.C. § 844(a)(2) .................................................................................... 15

18 U.S.C. § 844(j) ......................................................................................... 30

18 U.S.C. § 921(a)(4) ......................................................................... 17, 21, 40

**Other Authorities**

Merriam-Webster Dictionary .......................................................................... 27

**Rules**

Fed. R. Crim. P. 12(b)(1) ............................................................................... 39

Fed. R. Crim. P. 7(c)(1) ................................................................................. 39

## PRELIMINARY STATEMENT

Defendants Noelle Velentzas and Asia Siddiqui hatched a conspiracy to build a bomb that they would use in a terrorist attack in the United States.  The two defendants taught each other chemistry and electrical skills directly related to creating explosives and building detonating devices, shopped for and acquired materials to be used in a bomb or an improvised explosive device, discussed similar devices used in past terrorist incidents like the Boston Marathon Bombing, and researched potential targets of an attack, such as law enforcement.  In April 2015, Velentzas and Siddiqui were charged in an Indictment with, inter alia, conspiring to use a weapon of mass destruction against persons and property within the United States, in violation of Title 18, United States Code, Section 2332a(a)(2) (Count One) and teaching and distributing information pertaining to the making and use of an explosive, destructive device and weapon of mass destruction, in violation of Title 18, United States Code, Section 842(p) (Count Two).

The defendants have now moved to dismiss these two counts of the Indictment. See Def. Mem. of Law in Supp. of Mots. To Dismiss (Docket Entry No. ("D.E.") 84) (hereafter "Def. Br.").[1]   The defendants claim that (1) both statutes are "facially and as applied" "unconstitutionally overbroad" and vague; and (2) both counts lack "sufficient factual specificity and fail[] to state an offense."  The defendants' motion is meritless and should be denied, as neither statute is unconstitutionally vague or overbroad, and the Indictment states

---

[1] Siddiqui joined in Velentzas's motion after filing.  See Def.'s Letter dated January 23, 2018 (D.E. 85).

1

offenses with sufficient specificity, particularly when coupled with the complaint and extensive discovery in this case.

## **BACKGROUND**

The factual background below is based on information contained in the affidavit in support of a complaint against the defendants, as well as materials already produced to the defendants through the discovery process.  The defendants have received extensive discovery over the course of this case including, but not limited to, audio recordings of their conversations with an undercover officer ("the UC"); surveillance; internet search history; social media accounts; handwritten notes made by the defendants; copies of the materials they studied together and took notes on; photographs and text messages; and additional evidence establishing their conspiratorial acts.  The information described below is supported by the discovery that defendants have had in their possession.

Starting in or about 2013, Velentzas and Siddiqui began meeting with the UC[2]. (Compl. and Aff. in Supp. of Arrest Warrants ("Compl.") ¶ 5).  During the course of these meetings and continuing until their arrests, Velentzas and Siddiqui conspired to create an explosive device to be detonated in a terrorist attack in the United States, specifically aimed at law enforcement.  Velentzas and Siddiqui and the UC discussed various historical terrorist attacks and attempted attacks in detail.  They also researched how to execute similar attacks, including seeking out and collecting the material components needed to create such explosives. Over the course of their studies and teaching, Velentzas and Siddiqui also discussed their respective roles.  They referred to Velentzas as the "teacher."  In one conversation, Velentzas

---

[2] Unless otherwise noted herein, all meetings involving the UC were audio recorded.

referred to a chemistry discussion and stated that what she was about to "teach" Siddiqui and the UC was "not exactly legal." (Id. ¶ 50).

I.      The Defendants' Interest in Committing Violent Jihad

In 2013, the UC met with Velentzas on multiple occasions. (Compl. ¶ 5). During these meetings, which were not recorded, Velentzas expressed violent jihadist ideology and an interest in terrorism. For example, Velentzas praised the attacks of September 11, 2001 and stated that being a martyr through a suicide attack guarantees entrance into heaven. (Id.). According to Velentzas, a suicide bomber does not take her life; she gives her life in the name of Allah. (Id.). Velentzas repeatedly informed the UC that Usama Bin Ladin and Bin Laden's mentor, Abdullah Azzam, are Velentzas' heroes. Velentzas showed the UC her phone, which included as a background picture an image of Bin Laden holding an AK-47 gun, and played for the UC an audiotape of Bin Laden speaking. (Id. ¶ 6). Additionally, Velentzas told the UC that terrorism is based on Islamic writings found in the Qur'an, and that Bin Laden's ideas, as manifested in his public letters, are similar to her own. (Id.). Velentzas also had a picture on her cellular phone of Yahya Ayyash. (Compl. ¶ 42, 48). Ayyash was a known bomb-maker infamous for building bombs used in a number of Hamas suicide attacks. (Id.).

Siddiqui likewise had a long-term interest in violent jihad and terrorist activities. Beginning around 2006, Siddiqui became close with Samir Khan, who later became a prominent figure of Al Qa'ida in the Arabian Peninsula ("AQAP")[3], a designated foreign

_____

[3] AQAP is a militant Islamic organization, primarily operating in Yemen and Saudi Arabia. It was formed in January 2009 and formerly designated as a Foreign Terrorist Organization by the U.S. Department of State on January 19, 2010. AQAP claimed responsibility for at least two plots to bomb United States bound flights, and issued a video

terrorist organization.  (Compl. ¶ 11).  While living in the United States, Khan ran a blog called "InshallahShaheed," ("Martyr, God willing").  (Id.).  After moving to Yemen, Khan became the editor of Inspire magazine, through which AQAP disseminates propaganda and actively tries to recruit Muslims throughout the world – including in the United States – to join cause with AQAP.  (Id.).  Khan wrote and published several works regarding making home bombs and suicide bombing and called for attacks on the United States.  (Id.).   For example, he authored an article titled "I am proud to be a traitor to America," in which Khan outlined his grievances against the United States, and also published an article titled, "Make a Bomb in the Kitchen of Your Mom."  (Id.).   Additionally, Khan wrote a sixteen-page English-language manual titled "Expectations Full," in which he addressed the difficulties of being a suicide bomber and included calls for attacks within and on the United States.  (Id.).

Siddiqui grew close to Khan in or around 2006 and submitted her poetry espousing radical violent ideology to Khan for publication.  (Compl. ¶ 12).  Specifically, in or about 2009, Siddiqui wrote a poem called "Take Me to the Lands Where the Eyes Are Cooled." (Id.).  Siddiqui's poem was published in a magazine called Jihad Recollections, a predecessor publication of Inspire.  (Id.).  The poem Siddiqui penned calls for readers to engage in violent jihad and to destroy enemies of Islam.  (Id.).  For example, Siddiqui wrote that she "drop[s] bombs" as she swings on a hammock and "[h]it[s] cloud nine with the smell of turpentine, nations wiped clean of filthy shrines."  (Id.).  She continued, writing that she "taste[s] the Truth

---

addressed to Americans, threatening to "come for you to slaughter, and we have prepared for you men who love death like you love life."

through fists and slit throats" and that there is "[n]o excuse to sit back and wait – for the skies rain martyrdom."  (Id.).

Separately, Siddiqui wrote a letter expressing her support for Mohammad Mohamud, who was arrested on November 26, 2010, after he attempted to detonate a vehicle-borne improvised explosive device at a Christmas tree-lighting ceremony in Portland, Oregon. (Compl. ¶ 13).  Siddiqui mailed her letter to Mohamud in his jail facility soon after his arrest for that bombing plot.  (Id.).  In her letter to Mohamud, Siddiqui wrote that Mohamud was "not forgotten in the Ummah's efforts and prayers."  (Id. ¶ 14).  "Ummah" is an Arabic word meaning "nation" or "community."

## II.     The Defendants Teach Themselves How to Build a Bomb

On or about August 6, 2014, Velentzas and Siddiqui met with the UC and discussed learning "science" in order to construct an explosive device.[4]  (Compl. ¶ 18). Velentzas asked Siddiqui and the UC, "how about science?"  (Id.).  When the UC asked Velentzas to clarify what she meant, Velentzas motioned with her hands to simulate the explosion of a bomb.  (Id.).  Velentzas said that even if they understood science, making a bomb was not easy, and noted that many mujahideen (an Arabic word typically referring to individuals engaged in violent jihad, such as members of Al Qaeda or ISIS) have lost fingers or limbs when things have gone wrong making explosives.  (Id.).  Later that month, Velentzas discussed other attempted plots to detonate explosives on American soil, including the 1993

---

[4] The audio quality of this meeting is poor, and it is difficult to hear the defendants' statements.

World Trade Center bombing and the attempted bombing of the Herald Square subway station in Manhattan.  (Id. ¶ 20).

About a week later, Siddiqui and the UC went to a public library.  Siddiqui cited the earlier conversation about "science," and searched for chemistry books for beginners to study.  (Compl. ¶ 23).  On or about September 1, 2014, Velentzas, Siddiqui and the UC met at a park to review course books provided by Siddiqui from an electricity course she had taken.  (Id. ¶ 24).  Siddiqui showed the others a passage on electrolytic capacitors and pointed to a sentence reflecting that connecting positive wires to negative receivers and negative wires to positive receivers can cause a fire or explosion.  (Id.).  Velentzas questioned how to cause an explosion in this way without hurting themselves, unless they intended to do so—a reference to suicide bombing.  (Id.).  However, Velentzas and Siddiqui implied that their goal was to learn how to blow up a bomb from afar rather than conduct a suicide bombing.  (Id.).

That same day, Velentzas suggested to Siddiqui and the UC that they look at explosive items in a Home Depot store.  (Compl. ¶ 25).  Velentzas also suggested that they needed to learn how the science behind explosives worked so that they would not be like Faizal Shahzad and have a failed attempt at detonation.  (Id.).  Faizal Shahzad was the individual who committed the attempted Time Square car bombing.  In 2010, Shahzad drove a Nissan Pathfinder, loaded with improvised explosive and incendiary devices to Times Square.  He attempted to detonate these devices, but they failed to explode.

During meetings with Velentzas and the UC, Siddiqui stated that Velentzas was also obsessed with pressure cookers since the Boston Marathon attacks in 2013, and frequently made comments about pressure cookers.  (Compl. ¶ 7).  The Boston Marathon bombing was a terrorist attack, followed by subsequent related shootings, that occurred when two pressure

cooker bombs exploded during the Boston Marathon on April 15, 2013.  The bombs killed three civilians and injured an estimated 264 others.  Velentzas told the UC that she had received a pressure cooker as a present and joked about cooking something in it – she said she would cook "food", which was a coded reference to explosive materials.  (Id.).  Velentzas also told the UC, "You can fit a lot of things in [the pressure cooker], even if its not food," and then pointed to a thick rope and an axe in the vicinity of her pressure cooker.  (Id.).  On or about September 24, 2014, Velentzas was driving with the UC past a hardware store in Queens.  (Id. ¶ 28).  Velentzas pointed to a cooking pot in the window display of the store and said "why the hell is the hardware store sell [sic] the pressure cooker? …. The devil is fucking with me." (Id.).

Also in September 2014, Siddiqui told the UC that she and Velentzas were reading Siddiqui's electricity course books.  Velentzas explained what she was learning from the course books about transformers and alternating current and direct current, while referencing the 1993 World Trade Center bombing and how to make a homemade grenade or bomb.  (Compl. ¶ 26).  The 1993 World Trade Center bombing was a terrorist attack on the World Trade Center, carried out on February 26, 1993, when a truck bomb detonated below the North Tower of the World Trade Center.

On or about October 24, 2014, Velentzas viewed on her cellular telephone a YouTube tutorial for soldering wires and circuit boards, mistakes in soldering, and introduction to "flux," a product used for soldering.  (Compl. ¶ 30).  On the same day, Velentzas sent a text message to a male asking him "can you go [to the] store and get flux." (Id. ¶ 31).  The next day, the individual told Velentzas that the flux was at her home and she stated she would check it out when she got there.  (Id.).  On or about October 30, 2014,

Velenztas told the UC that she was progressing in her electrical studies and had used a soldering tool to solder copper wires together.  (Id. ¶ 34).

At a meeting in November 2014, while the UC was with Velentzas and Siddiqui, Velentzas was reading a book called "Chemistry: The Central Science," and said they could practice at her house.  (Compl. ¶ 35).  Velentzas suggested that the UC print out a portion of The Anarchist Cookbook, an open source guerrilla warfare manual that included instructions on how to build explosive and incendiary devices.  (Id.).  Later that day, Velentzas and the UC sought out and located a bottle of potassium gluconate, which was referenced in the books they had been reading.  (Id. ¶ 36).  Velentzas also discussed the possibility of filling a vehicle with manure and renting a car as was done in the 1993 World Trade Center bombing.   (Id. ¶ 38).

On November 2, 2014, Velentzas, Siddiqui and the UC went to Home Depot and looked at copper wires, paint containers with the word "combustible", metal pipes, sodium chloride and heater fluid.  (Compl. ¶ 37).  Velentzas additionally looked at manure, commenting to Siddiqui and the UC that manure was used in the Oklahoma City bombing. (Id.).  The Oklahoma City bombing was a 1995 domestic terrorist bombing of the Alfred P. Murrah Federal Building in downtown Oklahoma City that killed 168 people, and injured more than 680 others, using a bomb that was made with ammonium nitrate, a fertilizer.  On or about November 3 and 5, 2014, Velentzas viewed on her cellular phone product pages for explosive precursors, including ammonium nitrate and nitromethane.  (Id. ¶ 39).  She also accessed online forums entitled "Where Does Electricity Go?" and "Cold Explosions," which discussed explosions resulting from ammonium nitrate and water.  (Id.).  On or about November 11, 2014, Velentzas viewed articles regarding Miracle Gro, a fertilizer sometimes used in

8

homemade explosives.  (Id. ¶ 40).  On that day, Velentzas showed the UC a bag of Miracle Gro and explained how it contained potassium, magnesium and ammonium nitrate.  (Id. ¶ 41).

On or about November 20, 2014, Velentzas stated in coded terms that Inspire magazine would be useful for the UC to learn about explosives.  (Compl. ¶ 44).  Velentzas remarked that what the "White guy" did was easy.  (Id.).  The UC asked whom Velentzas meant, and Velentzas whispered "Oklahoma," which was a reference to the Oklahoma City bombing conspirators.  (Id.).  Velentzas urged the UC to download Inspire.  (Id.).  A few days later, Velentzas asked the UC about whether the UC had done any more bomb research. Velentzas retrieved portions of The Anarchist Cookbook from the UC and began to read it. (Compl. ¶ 46).  They discussed a page on the fertilizer bomb and how it was like the bomb used by the Oklahoma City bombing conspirators.  (Id.).

Later that month, the UC visited Velentzas and found her studying The Anarchist Cookbook, with her handwritten notebook containing notes on explosives open. (Compl. ¶ 50).  In an apparent gesture of tradecraft (i.e., techniques designed to evade law enforcement surveillance), Velentzas removed her SIM card from her phone and required the UC do the same before she would speak to the UC.  (Id.)  After the SIM cards were removed, Velentzas began explaining how different chemical components react to each other.  Velentzas stated that explaining these things is "not exactly legal."  (Id.).  Velentzas also opened to a section on "Nitroglycerin" in The Anarchist Cookbook and spoke about the necessity of keeping acid in a container inside of a bathtub filled with ice.  (Id.).  Velentzas further advised that the ice must be refilled frequently.  (Id.).  Additionally, she instructed that they would all need to wear protective gear, such as a mask and gloves, if they were to combine such

chemicals.  (Id.).  Velentzas requested other educational materials from the UC, mentioning that Inspire magazine provides easy instructions.  (Id. ¶ 51).

Additionally, on or about November 20, 2014, Velentzas inquired about using The Anarchist Cookbook and instructed that Inspire magazine was useful for cooking "food," a coded reference to explosives.  (Compl. ¶ 44).  On or about November 24, 2014, Velentzas stated that they all needed to learn how to cook a lot of "food," which she indicated was code. (Id. ¶ 52).  Then Velentzas told the UC to bring The Anarchist Cookbook next time the UC visited.  (Id.).  The following week, when the three individuals were eating, Velentzas referred to cooking and stated that cutting food into really small pieces would yield a lot more food – which was understood as a reference to making a bigger explosion.  (Compl. ¶ 54).  Velentzas later added that the "finer" a substance, the "purer" it becomes for mixing purposes.  (Id.).

On or about November 30, 2014, Velentzas instructed the UC and Siddiqui on how "finer" substances are "purer" for mixing purposes.  (Compl. ¶ 54).  She also commented on where to get diesel fuel, which is a component for fertilizer bombs listed in The Anarchist Cookbook.  (Id.).  Velentzas additionally stated that they all needed to study to the point where they could retain the information without needing a book to consult, knowing how much of each substance was needed to make a fertilizer bomb.  (Id. ¶ 55).  She referenced an index of common household items containing the substances they had spoken about.  (Id.).

On or about December 2, 2014, Velentzas viewed product pages for bleach and a hydrometer, which are two household components listed in The Anarchist Cookbook as ingredients for "Making Plastic Explosives from Bleach."  (Compl. ¶ 56).  She viewed related web forums.  (Id.).

On or about December 24, 2014, Velentzas stated that the most practical option for building an explosive would be to build a nitroglycerin bomb.  (Compl. ¶ 59).  She expressed that it might be difficult to acquire the materials.  For example, she said "if I was to go buy a chemical fertilizer and I don't have any plants [to purchase], I will [say to the Home Depot workers that I am buying it] because I got plants, why else?"  (Id.).  Velentzas also explained that they should only buy the explosive materials when they were ready to use them, rather than leave them lying around the house.  She stated, "You have to light it and walk away." (Id.).  That same day, Velentzas studied the Spring 2014 issue of Inspire magazine that the UC had printed at Velentzas's request, taking notes in her notebook on how to make a car bomb.   She spent several hours reading an article called "Car Bombs Inside America." (Compl. ¶ 58).

On or about December 27, 2014, Siddiqui showed the UC and Velentzas the notes she had taken while she and Velentzas were studying The Anarchist Cookbook.  (Compl. ¶ 61).  The notes explained how to use and combine various chemicals.  This included notes about nitroglycerin and nitric acid.  (Id.).  The group also studied instructions on building a car bomb.  (Id.).  Velentzas and Siddiqui agreed each person needed to understand all of the steps and be able to move forward without notes.  (Id.).

On or about January 18, 2015, Velentzas described for the UC a video that Velentzas had watched of a 20-year-old man conducting a suicide bombing in a truck in either Syria or Iraq.  (Compl. ¶ 64).  Velentzas stated that the explosion looked like a nuclear blast with a mushroom cloud on top, describing it as "so cool" and the "best video on the Internet." (Id.).  A few days later, Velentzas told the UC that she never stopped studying, and stated that she studied the basics of chemistry, read through all of The Anarchist Cookbook, and that she

11

had compared what she read between the two to make sure that the information matched up. (Id. ¶ 66).

The next month, on or about February 3, 2015, the UC met with Velentzas, and Velentzas talked about her recent areas of study, which included chemistry and physics. (Compl. ¶ 69).  Velentzas spoke about various chemical compositions, and noted that potassium could be used in different mixtures and aluminum "gives your shit wings ... that's how reactive it is."  (Id.)  During the conversation, after being asked why the Quran was on top of a pressure cooker, Velentzas responded, "I don't know ... Freudian slip."  (Id.). Velentzas again discussed the explosive properties of aluminum a week later with the UC. (Compl. ¶ 75).  On or about February 22, 2015, the UC, Velentzas and Siddiqui discussed a news story about women traveling to join the Islamic State of Iraq and al-Sham ("ISIS")[5] in Syria. (Id. ¶ 78).  When the UC indicated that they would not be able to join and support ISIS in Syria, Velentzas responded "You never know, there is other ways …There's other ways to do that." (Id.).

On or about March 1, 2015, Siddiqui explained to the UC how she had been studying the car bomb instructions from Inspire magazine and taking notes.  (Compl. ¶ 81). She showed her notes to the UC.  They discussed how Siddiqui had in her house many of the components similar to the ones in the car bomb instructions.  (Id.)  Siddiqui also stated that

_____

[5] ISIS is a foreign terrorist organization that, since 2013, has claimed credit for numerous terrorist activities, including seizing Mosul, a city in northern Iraq, launching rocket attacks on eastern Lebanon in March 2014, the November 2015 terrorist attacks in Paris, France, and the March 2016 suicide bombings in Brussels, Belgium, among many others. These terrorist activities are part of ISIS's broader goal of forming an Islamic state or "caliphate" in Iraq and Syria.

she had been studying organic chemistry and all the other books and materials that Velentzas would want to be studying.  Later that month, Siddiqui, Velentzas and the UC viewed videos of chemical reactions.  (Id. ¶ 83).  Velentzas stated that the substances in the videos could be purchased in a supermarket and indicated with her hands that it could be used to create an explosion.  (Id.).

III.    The Defendants Discuss Targets for an Attack

The defendants also discussed viable targets, expressing a distinct preference for law enforcement targets, rather than civilian targets.  For example, they criticized the attempted bombing of the Herald Square subway station in Manhattan because the victims would have been "just regular people."  (Compl. ¶ 20).  Velentzas also stated that the Boston Marathon bombers had erred in attacking regular people.  By contrast, Velentzas praised Mohammed Shnewer, who was "charged with quite an admirable thing … conspiring to attack Fort Dix in New Jersey," which was a plot against military targets.  (Id.)  On or about December 21, 2014, Velentzas and the UC discussed the recent murder of two NYPD officers in Brooklyn.  Velentzas stated that the murder showed it was easy to kill a police officer. (Compl. ¶ 57).  She added that killing a police officer is easier than buying "food," because sometimes one has to wait in line to buy "food."  (Id.).  Velentzas explained that if so much time and effort is spent on studying how to make an explosive, it is better to go for the enemy directly rather than civilians.  (Id. ¶ 60).  She stated that it would be better to attack "the head, the neck, the shoulders" of the "snake" (i.e., enemy), referring to those who harm Muslims, but not "the tail."  (Id.).

On or about December 27, 2014, the UC noted that there had been more than 25,000 police officers together in one place at the funeral for NYPD Officer Rafael Ramos

13

who had been killed sitting in his police car.  (Compl. ¶ 62).  Velentzas complimented the UC on coming up with an attractive potential target.  (Id.).  She asked the UC several times whether there were any "regular people" (i.e., civilians) at the funeral and how far away they were from the police during the funeral.  (Id.).

On February 22, 2015, the UC and Veletnzas met Siddiqui at her home.  (Compl. ¶ 79).  Velentzas pointed to four propane gas tanks in Siddiqui's apartment and asked what it was.  (Id.).  Siddiqui stated "I got everything."  (Id.).  When asked whether the tanks were propane, Siddiqui replied "I got everything up in this joint.  I already told you.  If you guys ... once we learn … I got everything up in this joint."  (Id.).  Velentzas and the UC also saw a torch in Siddiqui's apartment.  (Id.).  Around March 1, 2015, Siddiqui stated that she had car bomb instructions from Inspire magazine and the components resembled the components that Siddiqui had in her home.

Velentzas and Siddiqui were arrested on April 2, 2015, pursuant to a criminal complaint.  Agents executed search warrants on each of their residences, at which time they recovered three propane gas tanks, soldering tools, pipes, a pressure cooker, fertilizer, flux, detailed handwritten notes on the recipes for bomb making, and extensive jihadist literature. Additionally, agents seized two machetes and two daggers.  On April 30, 2015, a federal grand jury in the Eastern District of New York returned the Indictment.

IV.   The Charges Against the Defendants

Count One of the Indictment charges:

In or about and between May 2013 and April 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants NOELLE VELENTZAS and ASIA SIDDIQUI, also known as "Najma Samaa" and "Murdiyyah," without lawful authority, did knowingly and intentionally conspire to use a weapon of mass destruction, to

14

wit: an explosive device, against persons and property within the United States, and in furtherance of the offense a facility of interstate and foreign commerce, to wit: the Internet, was used.

(Title 18, United States Code, Sections 2332a(a)(2) and 3551 et seq.)

Count Two of the Indictment charges the following:

In or about and between May 2013 and April 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants NOELLE VELENTZAS and ASIA SIDDIQUI, also known as "Najma Samaa" and "Murdiyyah," together with others, did knowingly and intentionally teach and demonstrate the making and use of an explosive, destructive device, and weapon of mass destruction, and did distribute information pertaining to, in whole and in part, the manufacture and use of an explosive, destructive device, and weapon of mass destruction, with the intent that such teaching, demonstration, and information be used for, and in furtherance of, an activity that constitutes a federal crime of violence, to wit: use of a weapon of mass destruction.

(Title 18, United States Code, Sections 842(p)(2)(A), 844(a)(2), 2 and 3551 et seq.)

## **ARGUMENT**

The defendants argue that Count One and Count Two should be dismissed as unconstitutionally vague and overbroad under the First and Fifth Amendments, both as applied to the facts of their case and facially to any person charged with these crimes. The defendants' argument should be denied for several reasons. First, the statutes are not unconstitutionally vague as applied to the facts of this case, because a person of ordinary intelligence would understand that it was a crime to plan a terrorist attack similar to recent infamous terrorist attacks, and that it was also a crime to teach people how to make explosives for the purposes of perpetrating similar attacks. Second, the statutes are not facially void for vagueness because the defendants cannot meet the high burden of proving that "all applications" of the statutes are vague. Third, the statutes are not overbroad because the statutes do not implicate protected

15

speech in any fashion and, even if they did, the defendants cannot show that either statute substantially infringes on First Amendment rights.

The defendants also challenge the specificity of the Indictment.  Notably, they raise these challenges almost three years after the indictment was returned.  During that passage of time, the defendants have never raised an insufficiency argument, moved for a bill of particulars, or made other motions to specify.  Moreover, during the course of the past several years, the defendants have received and reviewed volumes of discovery supporting the charges.  Both Counts One and Two state a sufficiently specific offense, particularly when taken in combination with the detailed complaint and voluminous discovery in this case.  Accordingly, the defendants' motion to dismiss the Counts One and Two of the indictment should be denied.

I.      Section 2332a Is Not Vague or Overbroad

As an initial matter, the defendants conflate the legal principles relevant to their motion.  Vagueness and overbreadth are separate legal issues based on separate constitutional provisions.  "As the Supreme Court recently observed, vagueness and overbreadth are distinct concerns, the first implicating the Due Process Clause and the latter the First Amendment." United States v. Farhane, 634 F.3d 127, 136 (2d Cir. 2011) (citing Holder v. Humanitarian Law Project, 561 U.S. 1, 18 (2010) (hereafter "HLP")).  A vagueness challenge under the Due Process Clause considers whether the defendant had fair notice that their conduct was unlawful.  Vagueness is routinely analyzed only as an "as applied" challenge based on the facts of the particular case; facial vagueness is sustained only where "all applications" of the statute would be unconstitutionally vague.  See HLP, 561 U.S. at 20.  By contrast, an overbreadth challenge under the First Amendment is exclusively a facial challenge to the statute, and is

16

based on whether the statute punishes a substantial amount of protected speech.  <u>Farhane</u>, 634

F.3d at 136.  The defendants cannot satisfy either test.

    A.   <u>Statutory Language</u>

Title 18, United States Code, Section 2332a(a)(2) provides:

(a) Offense against a national of the United States or within the United States -
- A person who, without lawful authority, uses, threatens, or attempts or
conspires to use, a weapon of mass destruction –…

    (2) against any person or property within the United States, and

        (A) the mail or any facility of interstate or foreign commerce is
        used in furtherance of the offense
        …

shall be imprisoned for any term of years or for life, and if death results, shall
be punished by death or imprisoned for any term of years or for life.

As relevant here, Section 2332a(c) provides as follows:

(2) the term "weapon of mass destruction" means--
(A) any destructive device as defined in section 921 of this title;
(B) any weapon that is designed or intended to cause death or serious
bodily injury through the release, dissemination, or impact of toxic or
poisonous chemicals, or their precursors;
(C) any weapon involving a biological agent, toxin, or vector (as those
terms are defined in section 178 of this title); or
(D) any weapon that is designed to release radiation or radioactivity at
a level dangerous to human life …

Under 18 U.S.C. § 921(a)(4), the term "destructive device" means:

(A) any explosive, incendiary, or poison gas—
    (i) bomb,
    (ii) grenade,
    (iii) rocket having a propellant charge of more than four ounces,
    (iv) missile having an explosive or incendiary charge of more
    than one-quarter ounce,
    (v) mine, or
    (vi) device similar to any of the devices described in the
    preceding clauses;

17

(B) any type of weapon (other than a shotgun or a shotgun shell which the Attorney General finds is generally recognized as particularly suitable for sporting purposes) by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter; and

(C) any combination of parts either designed or intended for use in converting any device into any destructive device described in subparagraph (A) or (B) and from which a destructive device may be readily assembled.

The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 4684(2), 4685, or 4686 of title 10; or any other device which the Attorney General finds is not likely to be used as a weapon, is an antique, or is a rifle which the owner intends to use solely for sporting, recreational or cultural purposes.

B.   Section 2332a is Not Unconstitutionally Void for Vagueness

A statute is unconstitutionally vague under the Due Process Clause of the Fifth Amendment when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."   HLP, 561 at 18. The test does not require "meticulous specificity in the identification of proscribed conduct" but instead "requires only that the statutory language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices."   Farhane, 634 F.3d at 139 (internal quotations and citations omitted).

The court should first engage in an as-applied analysis when a vagueness challenge is raised, because "[a] plaintiff who engages in some conduct that is clearly

18

proscribed cannot complain of the vagueness of the law as applied to the conduct of others."
Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982).  It is well-
established that facial attacks on a statute for vagueness are disfavored and fail as a matter of
law where a defendant's culpability under the statute as applied is readily apparent.  See
Chapman v. United States, 500 U.S. 453, 467 (1991) ("First Amendment freedoms are not
infringed by [the statute at issue], so the vagueness claim must be evaluated as the statute is
applied").  This preference for as-applied review is "'[e]mbedded in the traditional rules
governing constitutional adjudication,'" notably, in "'the principle that a person to whom a
statute may constitutionally be applied will not be heard to challenge that statute on the ground
that it may conceivably be applied unconstitutionally to others, in other situations not before
the Court.'"  Parker v. Levy, 417 U.S. 733, 759 (1974) (quoting Broadrick v. Oklahoma, 413
U.S. 601, 610 (1973)).  That principle, grounded in the separation of powers, serves the
jurisprudential maxim that "as between two possible interpretations of a statute, by one of
which it would be unconstitutional and by the other valid," a court's "plain duty is to adopt
that which will save the Act" enacted by Congress.  Blodgett v. Holden, 275 U.S. 142, 148
(1927); see also United States v. Salerno, 481 U.S. 739, 745 (1987) (observing that defendant
mounting facial challenge bears heavy burden because he "must establish that no set of
circumstances exists under which the Act would be valid").

    1.   Section 2332a Is Not Vague As Applied to This Case

       Section 2332a is not vague as applied to the defendants' conduct.  A person of
ordinary intelligence would understand that a law that prohibits conspiring to use a weapon of
mass destruction against another person or property would include a plan to build a bomb to
kill numerous people.  Such conduct is "clearly proscribed" by the statute.  See United States

v. Crawford, No. 16-4261-cr, 2017 WL 4994459 (2d Cir. Nov. 1, 2017) (summary order) (holding that similar statute prohibiting the "use, or … threat[ened] … use of radioactivity-releasing devices" is not void for vagueness).  The defendant's brief does not grapple with the defendants' conduct or whether they would be on notice[6] that such conduct—ongoing attempts to learn about and obtain explosive materials to build a bomb for use in a terrorist attack—was a violation of the statute.

The defendants instead argue in the abstract that the terms "use," "against" and "without lawful authority" render the statute vague because they are undefined.[7]  The fact that these terms are undefined is not fatal to the statute, nor evidence of vagueness.  A statute's language is read in the context of the whole statute, using common sense and the canons of

---

[6] To be clear, the Due Process Clause only requires notice in the sense that the statute puts individuals generally on notice of what sort of conduct would constitute a crime.  See HLP, 561 U.S. at 18 (explaining that a statute needs to provide an ordinary person "fair notice of what is prohibited").  The law does not require the government to prove that the particular defendants were specifically aware of the law that their conduct violated, and there is no requirement of willfulness or specific intent to violate the statute.  See United States v. McVeigh, 153 F.3d 1166, 1194 (10th Cir. 1998) (abrogated on other grounds) (holding that Section 2332a requires that conduct was done "knowingly"); United States v. George, 386 F.3d 383, 390 (2d Cir. 2004) (noting that "[t]he general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system," and that even where willfulness is an element of the offense, "the Second Circuit has held that the term 'willfully' in criminal statutes typically does not require the government to prove the defendant's specific intent to violate the particular criminal statute in question.")

[7] The defendants also decry the term "weapon of mass destruction" as "catchy for politicians" but confusing and inclusive of items that are "not necessarily a weapon" and not something that will cause "mass destruction." (Def. Br. at 5.)  The defendants do not claim the term is unconstitutionally vague, nor could they.  The phrase is specifically and carefully defined by statute, see supra, and includes a clear list of items that, even absent such a list, a person of ordinary intelligence would know could qualify as a weapon of mass destruction.  Although their argument is unclear, the defendants are presumably not arguing that a bomb, grenade, rocket, missile or mine are confusing concepts or could not cause mass destruction.  See 18 U.S.C. § 921(a)(4).

statutory construction.  See Farhane, 634 F.3d at 142 (collecting cases).  Legislators drafting statutes are "[c]ondemned to the use of words" and therefore "we can never expect mathematical certainty from [such] language."   Grayned v. City of Rockford, 408 U.S. 104, 110 (1972).  Accordingly, the Second Circuit has made clear that "a statute … is not required to specify every prohibited act" and has recognized "limitations inherent in English language" to drafting a statute.  Perez v. Hoblock, 368 F.3d 166, 175 (2d Cir. 2004).  In such circumstances, the context and ordinary meaning of a term is applied.   United States v. Desposito, 704 F.3d 221, 226-27 (2d Cir. 2013) (applying "ordinary meaning" to the term "use" in statute).

Relevant case law in this Circuit and elsewhere reinforce that the language identified by the defendants is not unconstitutionally vague.  For example, multiple federal criminal statutes employ without defining the word "use," and the use of that term has repeatedly been upheld.  See, e.g., United States v. Bailey, 516 U.S. 137, 143 (1995) (determining the meaning of "use" in the context of 18 U.S.C. 924(c)); Desposito, 704 F.3d at 226-27 (supplying the term "use" in 18 U.S.C. § 841(h)(1) with its "ordinary meaning" from the dictionary and affirming conviction under the statute).  Most significantly, in United States v. Crawford, the Second Circuit recently considered a claim that the term "use" was vague in a similar statute that criminalized the "use, or … threat[ened] … use of radioactivity-releasing devices" and affirmed in a summary order the lower court's ruling that such an undefined term was not void for vagueness.  See Crawford, 2017 WL 4994459 at *5.

Similarly, in the context of a statute about explosives, the ordinary meaning of the term "against" and the broader phrase "against any person or property" as well as the phrase "without lawful authority" are readily understandable and consistent with common usage and

dictionary definitions.  "Against" is commonly defined as "in the direction of and into contact with."  Merriam-Webster Dictionary (available at https://www.merriam-webster.com/dictionary/against).  By dictionary, "lawful" is defined as "constituted, authorized, or established by law."  Id. (available at https://www.merriam-webster.com/dictionary/lawful).  The fact that the defendants cite no case law in support of their claim, cannot articulate how those terms could be misunderstood as applied to the facts of this case, and focus only on hypothetical scenarios underscores that the statute's terminology is not vague.

The defendants also argue that a lack of scienter creates a vagueness issue.  But the defendants have it backwards.  Although "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed," Hoffman Estates, 455 U.S. at 499, the defendants cite no case law in support of the idea that a lack of a scienter requirement itself renders a statute unconstitutionally vague.  In any event, when Congress is silent as the necessary mens rea, courts adopt a "knowingly" standard of proof of mental state.  See, e.g., Staples v. United States, 511 U.S. 600, 620 (1994) (Ginsburg, J., concurring) (explaining that "[a]lthough the word 'knowingly' does not appear in the statute's text, courts generally assume that Congress, absent a contrary indication, means to retain a mens rea requirement" and collecting cases).  The one Circuit to squarely consider the issue has likewise held that Section 2332a requires that the government prove that the conduct was done "knowingly."  See United States v. McVeigh, 153 F.3d 1166, 1194 (10th Cir. 1998) (abrogated on other grounds).  The government is required to prove that the defendants acted "knowingly," and so there is no concern, as there might be in a strict liability setting, that the defendants failed to have sufficient notice that their conduct was proscribed.

22

The defendants make these citation-free assertions, untethered to the facts of this case, because the statute's application is obvious in this circumstance. Any reasonable person familiar with the English language would know that activities such as building and detonating a bomb would qualify under the ordinary meaning of "use," that trying to hurt or kill other people fits a common understanding of "against any person or property," and that the defendants' planned act of terror was "without lawful authority" as that term would ordinarily be understood. See HLP, 561 U.S. at 21-22 (holding that "the statutory terms [prohibiting material support to foreign terrorist organizations] are clear in their application" to the plaintiffs' set of facts because "most of the activities in which plaintiffs seek to engage readily fall within the scope of the terms").

### 2.    Section 2332a Is Not Vague on Its Face

As is clear from their heavy reliance on hypotheticals divorced from the facts of this case, the defendants' focus is on the facial validity of the statute. But, as indicated above, a facial challenge for vagueness is highly disfavored and often an as-applied analysis is the only appropriate consideration. See Farhane, 634 F.3d at 138 ("In the absence of First Amendment concerns, courts generally view vagueness challenges to a statute as applied to the defendant's case."); Farrell v. Burke, 449 F.3d 470, 495 (2d Cir. 2006) (stating that "[c]ourts have looked with disfavor on facial vagueness challenges to statutes that do not implicate fundamental rights"). To the extent a facial challenge may even be maintained, the test is a variation of the as-applied analysis, "requiring the defendant to show 'that the law is impermissibly vague in all of its applications.'" Farhane, 634 F.3d at 138-39 (quoting Hoffman Estates, 455 U.S. at 497) (emphasis added). Here, since the defendants cannot

23

succeed in showing that the statute is vague as applied to the facts of this case, they cannot prove that it is vague in "all of its applications."

The defendants seek to avoid this result by arguing that Section 2332a implicates their First Amendment rights, and therefore they may still maintain a facial vagueness challenge. First, the statute does not implicate, let alone infringe upon, free speech or expression under the Constitution. The defendants' conspiracy to use of a weapon of mass destruction involves conduct, as their agreement is evidenced by numerous acts committed by the defendants, such as shopping for bomb-making materials and testing potential bomb components. The First Amendment does not extend its immunity to criminal conduct, especially the violent crime involved here. See N.A.A.C.P. v. Claiborne Hardware, 458 U.S. 886, 916 (1982) ("The First Amendment does not protect violence. Certainly violence has no sanctuary in the First Amendment, and the use of weapons, gunpowder, and gasoline may not constitutionally masquerade under the guise of advocacy.") (internal quotation marks and citation omitted); United States v. Sattar, 314 F. Supp. 2d 279, 301 (S.D.N.Y. 2004) ("The First Amendment provides no protection for the conduct of providing resources knowing and intending that they are to be used for crimes of violence.").

Even if the only proof of the defendants' conspiracy were through words and not actions, the fact that the defendants are charged with conspiracy and their words constitute a portion of the criminal conduct does not alter the analysis. "Speech is not protected by the First Amendment when it is the very vehicle of the crime itself … The gist of the crime of conspiracy is agreement to violate the law … Thus, it is both possible and permissible to charge that criminal statutes were violated entirely by means of speech." United States v. Rahman, No. S3 93 CR. 181 (MBM), 1994 WL 388927, at *1–2 (S.D.N.Y. July 22, 1994), aff'd in

24

pertinent part, United States v. Rahman, 189 F.3d 88, 114-15 (2d Cir. 1999) (holding that First Amendment challenge to seditious conspiracy statute was "without merit").[8]

Moreover, even if the First Amendment were implicated in this case, courts do not conduct additional assessment beyond the "all applications" test described by Hoffman Estates.  The defendants incorrectly argue that a statute may be void for vagueness if it "regulates a substantial amount of protected speech."  (See Def. Br. at 2).  While courts in the past have sometimes confused the due process concerns of a vagueness challenge with a First Amendment issue, the Supreme Court has clearly held that the vagueness doctrine "makes no exception for conduct in the form of speech … Thus, even to the extent a heightened vagueness standard applies, a plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice. And he certainly cannot do so based on the speech of others."  HLP, 561 U.S. at 20.  Thus, here, the defendants cannot show the statute is vague in all of its possible applications, let alone as applied to the facts of this case, and therefore their facial vagueness claim should be denied.

C.    Section 2332a Is Not Overbroad

The defendant's claim of overbreadth also fails.  A law is overbroad "if it punishes a substantial amount of protected free speech, judged in relation to [its] plainly legitimate sweep."  Farhane, 634 F.3d at 136 (internal quotations and citations omitted).  All

---

[8] For largely the same reasons, the defendant's invocation of Brandenburg v. Ohio, 395 U.S. 444 (1969), is also inapposite.  The statute at issue here does not criminalize "mere advocacy," but rather criminalizes conduct that may include some elements of speech. Brandenburg v. Ohio, 395 U.S. 444 (1969).  See, e.g., United States v. Sattar, 395 F. Supp. 2d 79, 102 (S.D.N.Y. 2005) ("Brandenburg analysis does not apply to unlawful speech-acts such as conspiracy or aiding and abetting") aff'd sub nom. United States v. Stewart, 590 F.3d 93 (2d Cir. 2009).

overbreadth claims are facial challenges, because the challenge is based on the idea that the rights of hypothetical third parties would be violated if applied to them. See Farrell, 449 F.3d at 498 (citations omitted).  To be invalid, "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." Broadrick, 413 U.S. at 615.  An overbreadth finding "invalidates all enforcement of a challenged law" in most circumstances, and therefore "[m]indful that such relief is 'strong medicine,' the law rigorously enforces the burden on the challenging party to demonstrate 'substantial' infringement of speech." Farhane, 634 F.3d at 136–37 (emphasis in original).

Even where a statute may hypothetically sweep in some protected conduct, "there comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law—particularly a law that reflects 'legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct.'" Virginia v. Hicks, 539 U.S. 113, 119 (2003) (quoting Broadrick, 413 U.S. at 615).  Therefore, the Supreme Court has "insisted that a law's application to protected speech be substantial, not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications." Hicks, 539 U.S. at 119-20 (quotations and citation omitted). Moreover, "[r]arely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." Id. at 124.

The defendants cannot demonstrate that Section 2332a is substantially overbroad.  First, as detailed supra, the First Amendment is not implicated by the type of conduct the statute intends to prohibit.  The conduct associated with using a weapon of mass destruction against a person or property is not protected speech in any circumstance, nor is a

26

conspiracy to do the same.  The defendants themselves can only conjure up theoretical occurrences, like using a weapon of mass destruction as a paper weight, an item to be photographed, or an art installation.  None of those activities as described would satisfy the statute when its terms are given ordinary and common sense meaning.

Even if these examples could come close to the penumbra of the statute's reach, these isolated concerns would fall far short of a "substantial" infringement on speech.  By contrast, the vast majority of potential applications fit comfortably within constitutional bounds.  Indeed, individuals have been tried and convicted on multiple occasions, in this Circuit and elsewhere, of violations of Section 2332a based on facts that raise no constitutional concerns.  See, e.g., In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 93 (2d Cir. 2008) (affirming convictions of defendants involved in conspiracy to detonate truck bombs outside U.S. Embassies in Kenya and Tanzania); United States v. Davila, 461 F.3d 298 (2d Cir. 2006) (affirming conviction for threatening to use weapon of mass destruction where defendant sent letter with fake anthrax to state prosecutor); United States v. al Farekh, No. 15-CR-268 (E.D.N.Y.) (BMC) (defendant convicted of Section 2332a conspiracy for participating in plan to detonate car bombs at U.S. military base in Afghanistan); see also, e.g., United States v. Viscome, 144 F.3d 1365 (11th Cir. 1998) (affirming convictions of defendants who built and planted bomb placed under car of spouse of one defendant); United States v. Nichols, 169 F.3d 1255, 1260 (10th Cir. 1999) (affirming conviction of defendant under Section 2332a for his involvement in Oklahoma City Bombing conspiracy).  Because the statute appropriately applies to such a large number of instances of unprotected conduct related to violent acts and terrorism, the statute's "legitimate reach dwarfs its arguably impermissible applications." New York v. Ferber, 458 U.S. 747, 773 (1982).  The number of hypothetically inappropriate

applications amounts to, at most, no more than "a tiny fraction of the [instances] within the statute's reach." Id.

II.  **Section 842(p) Is Not Vague or Overbroad**

For largely the same reasons as described above, Section 842(p) is also not vague or overbroad.  The same legal standards related to the vagueness and overbreath doctrines that are applied to Section 2332a, see supra, apply equally to this statute.

A.  **Statutory Language**

Title 18, United States Code, Section 842(p)(2)(A) provides:

> (2) Prohibition. -- It shall be unlawful for any person --
> (A) to teach or demonstrate the making or use of an explosive, a destructive device, or a weapon of mass destruction, or to distribute by any means information pertaining to, in whole or in part, the manufacture or use of an explosive, destructive device, or weapon of mass destruction, with the intent that the teaching, demonstration, or information be used for, or in furtherance of, an activity that constitutes a Federal crime of violence. . . .

The terms "destructive device," "explosive," and "weapon of mass destruction" are defined under 18 U.S.C. § 842(p)(1)(A)-(C), as follows:

> (p) Distribution of Information Relating to Explosives, Destructive Devices, and Weapons of Mass Destruction.—
> (1) Definitions.--In this subsection—
> (A) the term "destructive device" has the same meaning as in section 921(a)(4);
> (B) the term "explosive" has the same meaning as in section 844(j); and
> (C) the term "weapon of mass destruction" has the same meaning as in section 2332a(c)(2).

"Explosive" is defined in 18 U.S.C. § 844(j):

> (j) For the purposes of subsections (d), (e), (f), (g), (h), and (i) of this section and section 842(p), the term "explosive" means gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuzes (other than electric circuit breakers), detonators, and other detonating agents, smokeless powders, other

28

explosive or incendiary devices within the meaning of paragraph (5) of section 232 of this title, and any chemical compounds, mechanical mixture, or device that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture, or device or any part thereof may cause an explosion.

B.      Section 842(p) Is Not Vague

1.      Section 842(p) Is Not Vague As Applied to this Case

The defendants' as-applied challenge to Section 842(p) fails for similar reasons as their challenge to Section 2332a.  First, reading the statute as a whole, a person of ordinary intelligence would be on notice that the defendants' conduct was proscribed by a statute that criminalizes "teach[ing] or demonstrat[ing]" or "distribut[ing] information pertaining to, the manufacture or use of an explosive, destructive device, or weapon of mass destruction, with the intent that [the conduct] be used for, or in furtherance of, an activity that constitutes a Federal crime of violence."  18 U.S.C. § 842(p).  The defendants taught each other electrical skills, including soldering techniques and technical skills related to electrical work, such as how to properly connect electrical wires properly.  They taught each other about chemical compounds and sought out potassium gluconate, fertilizer, ammonium nitrate and other bomb components.  They reviewed and read the The Anarchist Cookbook and an article in a jihadist magazine called "Car Bombs Inside America" to learn how to make nitroglycerin, plastic explosives, and car bombs.  And they did this all within the context of discussions about infamous terrorist attacks, the best targets for a future terror attack, and a plan to make use of that knowledge "once we learn," in other words, for and in furtherance of a federal crime of violence.  The defendants cannot now claim surprise that their plan to teach and learn how to

build a bomb for the express purpose of detonating a bomb was made illegal by this statute. Here too, the defendants fail to explain how the statute could be vague given these facts.

Instead, the defendants again focus on undefined phrases in the statute.  (See Def. Br. at 15).  As with Section 2332a, each of the terms the defendants identify as vague in Section 842(p), given their ordinary meaning and placed within the context of the statute, can be readily understood by an ordinary reasonable person, and are not vague.  The phrase "to teach or demonstrate the making or use of" involve well-known and basic concepts (teaching and demonstration), that are known to virtually any person who has attended school or even many who have not.  The phrase "distribute by any means information pertaining to, in whole or in part, the manufacture or use," while perhaps unwieldy phrasing, is nonetheless clear. Conduct proscribed by the statute includes "distribution," a word whose ordinary definition is readily understood, of any information related to building or using an explosive when done with the intent of furthering a crime of violence.  That such language may be somewhat broad does not make it vague.  See, e.g., Malik v. McGinnis, No. 06 CIV. 3361 RJS GWG, 2010 WL 3239216, at *19 (S.D.N.Y. Aug. 16, 2010) ("broadness is different from vagueness, and a term within a statute may cover a broad range of conduct without being unconstitutionally vague") report and recommendation adopted, No. 06 CIV. 3361, 2010 WL 4840131 (S.D.N.Y. Nov. 17, 2010).  Regardless of the range of conduct covered, the defendants were on notice that the information distributed here (e.g., formulas to make explosive materials like nitroglycerin, how to build electronic components, how to avoid accidentally harming yourself when building a bomb) when done for the purpose of actually building a bomb, as was their intent, is clearly proscribed.

30

The defendants also argue that the statute is vague for failing to define "federal crime of violence."  That is also incorrect.  As the defendants eventually concede (see Def. Br. at 18), the Supreme Court has made clear that this statute, like many others, incorporates the definition of crime of violence under Title 18, United States Code, Section 16.  See Leocal v. Ashcroft, 543 U.S. 1 (2004) (specifically citing Section 842(p) for the proposition that "a number of statutes criminalize conduct that has as an element the commission of a crime of violence under § 16").

Finally, the defendants again claim that there is no scienter requirement in the statute.  This too is wrong.  The statute requires that the defendants have the specific intent of using the information to commit a crime of violence.  See United States v. Coronado, 461 F. Supp. 2d 1209, 1213 (S.D. Cal. 2006) ("The specific focus of the statute is not on mere teaching, demonstrating, or disseminating information on how to construct a destructive device, but upon teaching, demonstrating, or disseminating information with the specific intent that the knowledge be used to commit a federal crime of violence.").  And, as noted above, even if the statute did lack a scienter requirement, that would not on its own make the statute unconstitutionally vague.

## 2.   Section 842(p) Is Not Vague on Its Face

Finally, the defendants' argument that Section 842(p) is facially vague is also without merit.  As explained, supra, the defendants need to show that "all applications" of the statute are vague to succeed on a facial challenge.  The facts of the defendants' case illustrate that at least one circumstance, as applied, is not unconstitutionally vague.

Notably, the defendants do not cite any case that holds that Section 842(p), or even a similar statutory framework, is void for vagueness.  By contrast, the one court to

consider the question has unequivocally concluded that the statute is neither facially vague nor as applied to facts even less substantial than those involved in this case.  In United States v. Coronado, the defendant was charged with describing how he made an incendiary device using an apple juice container at a public lecture.  See 461 F. Supp. 2d at 1211.  After a careful analysis of the text and legislative history, the district court concluded that the statute "affords people of ordinary intelligence the opportunity to understand what conduct is prohibited and does not foster arbitrary, discriminatory, or capricious enforcement."[9] Id. at 1216.  The court emphasized the Supreme Court's holding as to a different statute that "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on the statute when it is surely valid in the vast majority of its intended applications," id. (quoting Hill v. Colorado, 530 U.S. 703 (2000), and concluded that such reasoning "applies with great force to the facial vagueness challenge" raised as to Section 842(p).  The court in Coronado finally concluded that Section 842(p) "survives a facial vagueness attack." Coronado, 461 F. Supp. 2d at 1216.   For the same reasons, the defendant's argument in this case should be rejected.

C.     Section 842(p) Is Not Overbroad

The defendants likewise cannot show that Section 842(p) is substantially overbroad.  The defendants spend nearly a page of their brief conjuring a Dystopian universe in which someone might be charged for teaching "first grade" or "Arabic," and asking if "entire

---

[9] The district court applied First Amendment principles to its analysis, giving even more deference to the defendant's argument.  As explained, supra, the Supreme Court has clarified that First Amendment principles are cabined to overbreadth challenges, and should not be incorporated into a vagueness analysis.

fields of human inquiry" are "verboten."  (Def. Br. at 16).  In focusing on the language "teach or demonstrate," the defendants appear to ignore the entire second half of the statute, which limit criminal penalties to individuals who teach or demonstrate information related to explosives for the specific intent of using that information in a crime of violence.  See 18 U.S.C. § 842(p).  As the district court in Coronado explained when it denied a similar overbreadth challenge, "[t]he specific focus of the statute is not on mere teaching, demonstrating, or disseminating information on how to construct a destructive device, but upon teaching, demonstrating, or disseminating information with the specific intent that the knowledge be used to commit a federal crime of violence."  Coronado, 461 F. Supp. 2d at 1213 (emphasis added).  Indeed, a predecessor statute to Section 842(p) applied similar "teaching" language to a criminal statute, see 18 U.S.C. § 231(a) (making it a crime to "teach[] or demonstrate[]" the "use, application or making of any firearm or explosive" knowing that it would be "unlawfully employed for use in … civil disorder"), and was found not overbroad by a number of different courts.  See Coronado, 461 F. Supp. 2d at 1213-14 (discussing United States v. Featherston, 461 F.2d 1119 (5th Cir. 1972) and National Mobilization Committee to End the War in VietNam v. Foran, 411 F.2d 934, 936 (7th Cir. 1969)).

In other words, a person teaching first grade will not be charged with violating this statute, because, unlike the defendants, that first grade teacher is not teaching lessons on how to build a car bomb or with the intent that his or her students use the information to commit an act of violence.  Section 842(p) is not overbroad and therefore the defendants' motion should be denied.

III.    Both Count One and Count Two State an Offense with Sufficient Specificity

Nearly three years after a grand jury returned an indictment in this case, the

33

defendants claim for the first time that Counts One and Two of that indictment fail to sufficiently state an offense under Federal Rule of Criminal Procedure 12(b).  To the contrary, these counts, which for purposes of this motion may be read in conjunction with the detailed complaint and voluminous discovery provided in this case, state offenses with sufficient specificity under Rule 12 and do not require dismissal.

Rule 12(b) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1). In other words, Rule 12 authorizes defendants to challenge the lawfulness of a prosecution on purely legal, as opposed to factual, grounds.  See United States v. Aleynikov, 676 F.3d 71, 75-76 (2d Cir. 2012) ("[A] federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute."). "The sufficiency of an indictment and the interpretation of a federal statute are both matters of law" reviewable on a motion to dismiss an indictment.  Id. at 76.  In considering the sufficiency of an indictment, the indictment "must be read to include facts which are necessarily implied by the specific allegations made." United States v. Ahmed, 94 F. Supp. 3d 394, 404 (E.D.N.Y. 2015) (quoting United States v. LaSpina, 299 F.3d 165, 177 (2d Cir. 2002)).  Additionally in its review, "the Court must accept all pertinent allegations in the indictment as true."  Ahmed, 94 F. Supp. 3d at 404 (citing Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 343 n.16 (1952)).

Rule 7 of the Federal Rules of Criminal Procedure, which requires an indictment need only set forth a "plain, concise, and definite written statement of the essential facts constituting the offense."  Fed. R. Crim. P. 7(c)(1); United States v. Pirro, 212 F.3d 86, 98 (2d Cir. 2000) ("The Sixth Amendment's notice protection is implemented by the requirement of Rule 7(c)(1).").  The Second Circuit has instructed that an indictment is sufficient "if it, first,

contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."   United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998) (internal quotation marks omitted).   It is well settled that an indictment "need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."   Id.   See also United States v. Rubin, 743 F.3d 31, 38 (2d Cir. 2014).   Where an indictment does so, it is sufficiently specific to withstand a motion to dismiss.   See United States v. Citron, 783 F.2d 307, 314 (2d Cir. 1986); United States v. Aliperti, 867 F. Supp. 142, 144 (E.D.N.Y. 1994).   There is no requirement that an indictment set forth with specificity any particular factual element of the crimes charged.   See, e.g., United States v. Persico, 621 F. Supp. 842, 859 (S.D.N.Y. 1985).   As the Second Circuit has held, "When the charges in an indictment have stated the elements of the offense and provided even minimal protection against double jeopardy, this court has 'repeatedly refused, in the absence of any showing of prejudice, to dismiss . . . charges for lack of specificity.'"   United States v. Stringer, 730 F.3d 120, 124 (2d Cir. 2013) (internal citations omitted).   See also United States v. McClean, 528 F.2d 1250, 1257 (2d Cir. 1976).   Moreover, the government need not provide greater specificity on the face of an indictment in a case where the "[i]ndictment, coupled with the discovery information the government has thus far provided to defendants, sufficiently apprises [the defendants] of the crime charged and the general outline of the government's case against them."   United States v. Canty, 971 F. Supp. 687, 690 (N.D.N.Y. 1997).   See United States v. Walsh, 194 F.3d 37, 44 (2d Cir. 1999) (citing McClean, 528 F.2d at 1257).

A.   Count One Sufficiently States an Offense

The defendants assert that Count One fails to provide them with adequate notice to defend themselves.  Specifically, they contend that Count One fails to include: "[w]hat specific 'explosive device' [they] conspired to use; [h]ow the alleged 'explosive device' qualifies as a 'weapon of mass destruction' under § 2332a(c)(2) and § 921(p)(4); [h]ow [they] intended to use the alleged 'explosive device'; [w]hat person, persons, and/or property [they] conspired to use the 'explosive device' against; and [w]hen and where the alleged 'explosive device' was to be used."

Contrary to their assertions here, the defendants have been provided with sufficient information to permit them to defend against Count One – the date of the conspiracy, its participants, and the nature of the conspiracy, including the narrow type of weapon of mass destruction they contemplated.  Nearly three years ago, the defendants were charged in a detailed, almost-thirty-page complaint which outlined the charges in great specificity.  Over the course of the past several years, the defendants have been provided with volumes of discovery supporting the charges against which the defendants must defend themselves.  It is patently absurd to think that for nearly three years, with hundreds of hours of audio recordings, dozens of transcripts, thousands of pages of discovery, on top of the indictment and the complaint, the defendants have been unable to decipher what charges they are facing.

Specifically, Count One charges the defendants with conspiring to use "a weapon of mass destruction, to wit: an explosive device."  Notably in the context of a conspiracy charge, "[i]t is well settled that in an indictment for conspiring to commit an offense—in which conspiracy is the gist of the crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the

36

object of the conspiracy." United States v. Wydermyer, 51 F.3d 319, 325 (2d Cir. 1995) (quoting Wong Tai v. United States, 273 U.S. 77, 81 (1927)). "The rationale is that the crime of conspiracy is complete whether or not the substantive offense which was its object was committed. The indictment need only put the defendants on notice that they are being charged with a conspiracy to commit the underlying offense." Wydermyer, 51 F.3d at 326 (internal citation omitted).

An indictment which tracks even the language of the statute is sufficient under Rule 12. Rubin, 743 F.3d at 38; United States v. Collazo, No. 04 CR. 297, 2004 WL 2997843 (S.D.N.Y. Dec. 22, 2004) (also holding that the "Indictment need do little more than track the statutory language"). Here, that would include merely a charge that the defendants conspired to use a "weapon of mass destruction." Indeed, that term is defined by statute, in part, as any "destructive device," which is in turn defined by subsection 921(a)(4)(C) as including "(A) any explosive, incendiary or poison gas … bomb, grenade, rocket … missile … mine, or device similar to any of the devices described in the proceeding clause." While this alone would sufficiently define the term "weapon of mass destruction" so as to permit the defendants to defend themselves, the indictment is even more specific. It charges the defendants with the more narrow category of conspiring to use an "explosive device." This eliminates the majority of the other definitional categories of a weapon of mass destruction, including toxic poisonous chemical weapons; biological weapons; and radioactive weapons. Cf. McClean, 528 F.2d at 1257 (court held that the indictment "tracked the language of the statute, alleging that over a specified period of time and with respect to a telephone located at a specific address appellants 'willfully, knowingly and unlawfully did intercept and endeavor to intercept by means and use of an electronic device, that is a telephone wiretap, wire communications.'").

Moreover, the complaint and discovery in this case further refines the universe of explosive devises against which the defendants must defend.  The government has provided discovery about which chemicals and electrical components the defendants researched, obtained and attempted to use.  The government has also provided recordings in which the defendants discussed particular types of explosives including car bombs, electrically wired explosives, chemical explosives, explosives using such household items as ammonium and fertilizer, to name a few very specifically.  See, e.g., United States v. McVeigh, 940 F. Supp. 1571, 1575 (D. Colo. 1996) ("'[A]n explosive bomb placed in a truck' and designed for use as a weapon meets the definition of a weapon of mass destruction.").  Indeed, the facts as outlined above—which entirely originate from the complaint and the discovery in this case—belie the defendants' contentions.  The defendants have "confuse[d] sufficiency of the indictment with the discovery to which [a] Defendant is entitled."  United States v. Conteh, No. 6-116, 2006 WL 3103329, at *2 (S.D.N.Y. Nov. 1, 2006) (citing Walsh, 194 F.3d at 45).  As in Conteh, defendants here do "not contest that the Government has produced extensive discovery, setting out further facts relating to the charge."  2006 WL 3103329, at *2.  The discovery in this case expressly addresses each of the questions raised in the defense motion, thus obviating their motion entirely.

B.      Count Two Sufficiently States an Offense

The defendants similarly assert that Count Two fails to provide them with adequate notice to defend themselves for failing to include: "[w]hat specific acts Ms. Velentzas is charged with committing; [w]hat specific information Ms. Velentzas is charged with distributing; [w]hat specific demonstrations Ms. Velentzas is charged with committing; [w]hen, where, how, and to whom did Ms. Velentzas commit any illegal teaching, information

38

distribution, or demonstrations; [h]ow was any teaching, information distribution, or demonstration committed by Ms. Velentzas intended to further a Federal crime of violence; [h]ow would any teaching, information distribution, or demonstration committed by Ms. Velentzas actually further a Federal crime of violence; and [w]hat 'explosive, destructive device, and weapon of mass destruction' did Ms. Velentzas "teach and demonstrate the making and use of.'"  However, for many of the reasons stated above, in Section III.A., the defendants' arguments must fail.

Yet again, Count Two roundly provides the defendants with the applicable date range, participants in the teaching and distribution, as well as the narrow type of teaching and demonstration they engaged in (the teaching and demonstration of "the making and use of an explosive, destructive device, and weapon of mass destruction") and the type of information they distributed (information pertaining to "the manufacture and use of an explosive, destructive device, and weapon of mass destruction"), and the purpose for which they engaged in that activity (to further a federal crime of violence, specifically, the use of a weapon of mass destruction).  This specific language, coupled with the details set forth in the complaint and the mass of discovery in this case, apprises the defendants of the crimes against which they must defend.  Cf. McClean, 528 F.2d at 1257; Walsh, 194 F.3d at 44; Canty, 971 F. Supp. at 690.  As outlined in the fact section above, the defendants have ample material establishing what information they shared, distributed, taught and demonstrated in order to create a weapon of mass destruction.

C.     Count Two Sufficiently Charges the Defendants with a "Crime of Violence"

The defendants next argue that Count Two fails to state an offense, because of the overbreadth issue – see supra – and because a violation of § 2332a(a)(2) cannot serve as a

requisite "crime of violence" to support a charge under § 842(p) (2)(A).  For the reasons stated supra, Section 2332a is not unconstitutionally overbroad, so their corresponding argument that Count Two must fall should be dismissed.

As to the defendants' second argument, Section 2332a(a)(2) does constitute a federal crime of violence and thus supports the charge.  The defendants cite no case law in support of this proposition and ignores the Second Circuit authority—discussed below—expressly referring to Section 2332a as a "crime of violence."   Accordingly, the defendants' motion must fail.

As outlined in Title 18, United States Code, Section 16, the term "crime of violence" means—

> (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
> (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

As the Supreme Court has held, in assessing whether a crime constitutes a "crime of violence" under Section 16, a court must "look to the elements and the nature of the offense … rather than to the particular facts relating to petitioner's crime."  Leocal v. Ashcroft, 543 U.S. 1, 7 (2004).  The Court went on to note that Section 16(b) "covers offenses that naturally involve a person acting in disregard of the risk that physical force might be used against another in committing an offense."  Id. at 10.  "The reckless disregard in § 16 relates not to the general conduct or to the possibility that harm will result from a person's conduct, but to the risk that the use of physical force against another might be required in committing a crime."  Id.

Section 2332a has been held to constitute such a crime of violence.  In United States v. Khalil, the Second Circuit addressed the matter of how to sentence a defendant who

was convicted for a violation of Section 2332a and a violation of Title 18, United States Code, Section 924(c) (possession of a firearm in furtherance of a crime of violence).  214 F.3d 111 (2d Cir. 2000).  The Second Circuit expressly referred to a violation of Section 2332a as a "crime of violence," without qualification.  Id. at 120-21 ("Section 2332a provides that violation of the weapons-of-mass-destruction prohibitions is punishable by up to life imprisonment, or, if death resulted, it is punishable by death.  See 18 U.S.C. § 2332a(a). Congress obviously did not intend the crime of violence to be merged into the firearm offense….").  See also United States v. Spring, 108 Fed. App'x 116, 123 (4th Cir. 2004) (summary order) (describing "two counts of threatening to use a weapon of mass destruction in violation of 18 U.S.C. § 2332a" as "offenses that constitute 'crimes of violence under § 4B1.2" of the Sentencing Guidelines); United States v. Tsarnaev, 157 F. Supp 3d 57, 76-77 (D. Mass. 2016) (rejecting the defendant's argument "that the crimes of use of a weapon of mass destruction, bombing of a place of public use, and malicious destruction of property by fire or explosive are not by their nature 'violent' enough to be considered 'crime[s] of violence,'" in relation to defendant's conviction under Section 2332a(c)(2))); United States v. Stein, No. 16-10141-02, 2017 WL 930713, at *5 (D. Kan. Mar. 9, 2017) (referring to "all three of the counts" the defendant was charged with as "crimes of violence" under the Bail reform Act, including Sections 2332a(a)(2)(A), (B) and (D)).  Cf. United States v. Crawford, No. 16-CR-4261, 2017 WL 4994459 (2d Cir. Nov. 1, 2017) (upholding conviction on other grounds of violations of 2332a(a) and 842(p)(2), which charged the defendant with "knowingly teach[ing] and demonstrate[ing] the making and use of a weapon of mass destruction").

Similarly, in United States v. Alahmedalabdaloklah, the court held that a violation of Section 2332a(1) and (3), both of which charge substantially the same crime of

using a weapon of mass destruction against a person or place, constitutes a crime of violence. No. 12-1263, 2017 WL 2988236, at *4 (D. Ariz. July 13, 2017).  The court used a categorical approach, "which requires determination for each statute whether it punishes conduct that is not encompassed within the term 'crime of violence' as defined by the 'risk-of-force clause.' That is, does the statute punish any conduct that does not involve 'a substantial risk that physical force may be used in the course of committing the offense'?"  Id.  The court went on to reason that the "kind of conduct that a violation of § 2332a(a)(1) and/or (3) involves in the ordinary case is the use, attempt to use, or conspiracy to use a weapon of mass destruction against a person and/or property.  The ordinary case under § 2332a(a)(1) or (3) necessarily involves 'a substantial risk that physical force may be used in the course of committing the offense.'"  Id.   The court proceeded to conclude that Sections "2332a(a)(1) and (3) do not punish any conduct outside of the definition of 'crime of violence' under the risk-of-force clause."  Id.  Finally, the court stated that "[i]t does not create any uncertainty regarding how to estimate the amount of risk or how much risk is 'substantial.'  If a person uses, attempts to use, or conspires to use a weapon of mass destruction or an explosive against a person or property, there certainly is a substantial risk that physical force may be used."  Id.

The defendants' conspiracy to detonate an explosive device presented a substantial risk that physical force might be used, in conjunction with their efforts to harm persons and property within the United States.  As such, the defendants' unsupported argument should be dismissed and their motion denied.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court

deny the defendant's motion to dismiss in full.

Dated:       Brooklyn, New York
             February 12, 2018

                              RICHARD P. DONOGHUE
                              United States Attorney
                              Eastern District of New York

                     By:     /s/ Jennifer M. Sasso
                              Jennifer M. Sasso
                              Alexander A. Solomon
                              Craig R. Heeren
                              Assistant U.S. Attorneys
                              (718) 254-7000