DMP:CRH/JMS
F.#2014R00196

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA | MEMORANDUM OF LAW |
| - against - | 15-CR-213 (SJ) |
| NOELLE VELENTZAS and ASIA SIDDIQUI also known as "Najma Samaa" and "Murdiyyah," | |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM OF LAW IN FURTHER OPPOSITION
TO DEFENDANT ASIA SIDDIQUI'S
MOTION TO SUPPRESS STATEMENTS MADE TO LAW ENFORCEMENT

                                                                                                 RICHARD P. DONOGHUE
                                                                                                 United States Attorney
                                                                                                 Eastern District of New York

Craig R. Heeren
Jennifer M. Sasso
Assistant United States Attorneys
(Of Counsel)

**PRELIMINARY STATEMENT**

The government writes in further opposition to the defendant Asia Siddiqui's motion to suppress statements made by the defendant during an interview shortly after she entered the United States from a foreign country. The interview—which consisted primarily of questions about the defendant's activities abroad and ties to terrorism—was a lawful border inquiry consistent with the national security interest in preventing the entry of foreign-based terrorists and preventing terrorist attacks within the United States. See Tabbaa v. Chertoff, 509 F.3d 89, 92–93 (2d Cir. 2007) (affirming border interviews and searches related to ties to terrorism and foreign terrorist).

At the last conference in this matter, on September 27, 2018, the defendant argued that her interview at LaGuardia Airport upon arrival from Canada was not a lawful border stop because she was a United States citizen, and should therefore be treated differently than a non-citizen who could be questioned at the border without a Miranda warning. See Hr'g Tr. at 7:22-24 (attached hereto as Exhibit A). The Court asked the defendant to provide any legal support for this claim. Id. at 8-9. The defendant has filed a supplemental submission, but it provides no precedent to support this dubious claim. To the contrary, the only relevant case cited by the defendant, the Second Circuit's decision in Tabbaa, stands for precisely the opposite position: the government may question and engage in routine searches at the border of anyone entering the country, including United States citizens, where the inquiry relates to the government's rational interest in securing the border from the national security threat of terrorism. See Tabbaa, 509 F.3d at 97-101 (holding that questioning at border of U.S. citizens about association with foreign terrorists, along with fingerprinting, frisking, and extended detention did not violate the citizens' constitutional rights). The few additional cases cited by

the defendant are not relevant and provide no legal support for a contrary argument. Accordingly, the defendant's motion to suppress should be denied.

## BACKGROUND[1]

I. Siddiqui's Ties To Terrorists And Foreign Terrorist Organizations

Between May 2013 and April 2015, Asia Siddiqui and her co-defendant Noelle Velentzas met regularly with each other and an undercover law enforcement officer (the "UC"), and conspired to create an explosive device to be detonated in a terrorist attack in the United States, specifically aimed at law enforcement. Siddiqui and Velentzas discussed various historical terrorist attacks and attempted attacks, researched how to execute similar attacks, and collected the material components needed to create such explosives.

In addition to engaging in a conspiracy to build and use explosives in a terrorist attack, Siddiqui also had multiple other interactions with individuals associated with terrorism. Between 2006 and 2009, Siddiqui became close with Samir Khan, who later became a prominent figure of Al Qa'ida in the Arabian Peninsula ("AQAP"), a designated foreign terrorist organization. Khan ran a blog in the United States called "InshallahShaheed," ("Martyr, God willing"), and later became the editor of Inspire magazine, through which AQAP disseminates propaganda and actively tries to recruit people throughout the world to join the terrorist cause. Khan wrote and published several works about homemade bombs and suicide bombing and called for attacks on the United States. For example, Khan published an article titled, "Make a Bomb in the Kitchen of Your Mom." Additionally, in or about 2009,

---

[1] A more detailed summary of facts relevant to this motion can be found in the Government's Memorandum of Law in Opposition to the Defendant's Motion to Suppress. See Docket Entry ("D.E.") # 86.

Siddiqui wrote a poem called "Take Me to the Lands Where the Eyes Are Cooled," which was published in a predecessor publication of Inspire. The poem Siddiqui penned calls for readers to engage in violent jihad and to destroy enemies of Islam. Later, in 2011, Siddiqui wrote a letter expressing her support for Mohammad Mohamud, a man who was in custody after he attempted to detonate a vehicle-borne improvised explosive device at a Christmas tree-lighting ceremony in Portland, Oregon.

II.     The 2014 Border Interview Of Siddiqui

On or about July 10, 2014, Federal Bureau of Investigation ("FBI") agents and a member of Customs and Border Patrol ("CBP") interviewed Siddiqui upon her inbound arrival at LaGuardia Airport in Queens, New York, on a flight originating in Toronto, Canada. According to the defendant's own declaration, she was interviewed in an ordinary conference room. The defendant does not claim she was touched or held by any person. She does not claim, and there is no indication, that she was handcuffed or otherwise restrained, and no firearms were drawn or visible.

The interview consisted of questions consistent with Siddiqui's foreign travel, the purpose of her border crossing, and national security issues at the border. Specifically, Siddiqui was asked about the purpose of her time in Canada; where she lived there; why she was returning to the United States; and where she would be staying. Additionally, she was asked about contact with individuals "seeking to harm the U.S.," including any "U.S. designated terrorist and/or groups," whether she had ever supported or promoted any "radical Islamic agendas, " whether she knew anyone who wanted to commit violent jihad in the United States and whether she had any contact with AQAP or their related entities.

In response to questioning, Siddiqui lied about her past relationship with terrorists. Siddiqui denied contributing to or publishing in any jihadist magazines, and denied having any contact with Samir Khan or any terrorist groups. She did admit, however, that she had written letters and sent materials to Tarek Mehanna, who was convicted of providing material support to terrorists and other charges arising from his attempt to join an Iraqi militia in Yemen intending to fight against the United States and subsequent distribution of al Qaeda propaganda—as well as Aafia Siddiqui (no known relation), who was arrested in Afghanistan in 2008 where she was found in possession of recipes for conventional bombs and weapons of mass destruction, sodium cyanide and descriptions of New York City landmarks with references to a mass casualty attack.

After the interview, Siddiqui was allowed to leave the airport on her own volition and was picked up in a vehicle driven by the UC. Notably, Siddiqui spoke to both the UC and called her brother, and never indicated that she believed she was under arrest during the border interview. Indeed, all she said was that she was "nervous and thirsty" and thought she might get arrested someday in the future. Siddiqui did not state at that time that she had been restrained, believed she was in custody, had been fearful for her safety or threatened, or otherwise placed in harm's way. Finally, Siddiqui admitted that she lied to law enforcement about her past relationship with Khan, her history of publishing in his jihadist publication, and that she needed to go online and delete "stuff" from her email accounts.

## ARGUMENT

I. <u>Legal Standard</u>

As analyzed more extensively in the government's initial memorandum in opposition to the motion to suppress (<u>see</u> Mem. in Opp. to Mot. to Suppress (D.E. # 86)), the

border interview with Siddiqui did not amount to a custodial interrogation; her Fifth Amendment rights were not implicated, and Miranda warnings were not necessary. Ordinarily, pursuant to Miranda, a person must be advised of certain rights before being subject to a "custodial interrogation." Miranda v. Arizona, 384 U.S. 436, 444 (1966). For the warnings to be required, the Court must find both that (1) there was an interrogation of the defendant, and (2) the interrogation was while the defendant was in "custody." United States v. FNU LNU, 653 F.3d 144, 148 (2d Cir. 2011) (internal citation omitted). An individual is only in "custody" for the purposes of Miranda if "a reasonable person in the suspect's position would have understood h[im]self to be subjected to restraints comparable to those associated with formal arrest." United States v. Yilmaz, 508 Fed. App'x 49, 51 (2d Cir. 2013) (quoting FNU LNU, 653 F.3d at 154).

Questioning at an airport, particularly where a border crossing has occurred, requires unique consideration. In such a situation, "compulsory questioning — with no freedom to enter the United States and with nowhere else to go — inheres in the situation" and the traveler "has voluntarily submitted to some degree of confinement and restraint by approaching the border." FNU LNU, 653 F.3d at 153-54. As a result, "a reasonable traveler will expect some constraints as well as questions and follow-up about his or her citizenship, authorization to enter the country, destination, baggage, and so on." Id. at 154. The inquiry is holistic, and involves considering the circumstances of the suspect's encounter with authorities, including, among other things, duration, location, voluntariness, the presence of weapons or restraint of the defendant. See FNU LNU, 653 F.3d at 153. "[T]he circumstances also include, and especially so in border situations, the nature of the questions asked." Id. The

6

analysis is an objective one, based on what a reasonable person would believe. FNU LNU, 653 F.3d at 153.

II. Siddiqui Was Subject To A Lawful Border Interview

During the September 27, 2018 conference, Siddiqui argued that she could not be questioned at LaGuardia as part of a border interview because she precleared customs in Canada. On the contrary, Siddiqui was interviewed at an international border because she arrived at LaGuardia Airport aboard an airplane from Toronto, Canada. "An airport is considered the functional equivalent of a border, and thus a search there may fit within the border search exception." United States v. Irving, 452 F.3d 110, 123 (2d Cir. 2006). The fact that the defendant tentatively precleared United States Customs while in Canada did not legally prohibit a subsequent border inquiry when she landed for the first time in the United States. Courts in this Circuit and elsewhere have upheld border searches of individuals and property even where there was customs preclearance in the foreign country. See, e.g., United States v. Hernandez, 639 F. Supp. 629, 632-33 (E.D.N.Y. 1986) (explaining that "[t]he pre-clearance center's status as a border point does not make the United States destination of pre-cleared flights not a border point. Both areas are and may be considered to be the functional equivalent of the border. Logic and precedent compel this conclusion."). Indeed, the Second Circuit, among others, have held that individuals who have cleared a customs area may still be treated as at the United States border when considering the applicability of border exceptions to law enforcement activity. See, e.g., United States v. Nieves, 609 F.2d 642, 647 (2d Cir. 1979) (holding that individual who had cleared customs but remained in an international arrivals building was still properly searched pursuant to border authority). Siddiqui was interviewed

7

shortly after she landed in the United States from a foreign country, and before she exited the airport. Such facts compel the conclusion that the interview was done at the border.

The interview questions posed to Siddiqui were logically related to the defendant's border crossing and other aspects of national security that would ordinarily be expected to be asked of people at the border. "It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." United States v. Flores-Montano, 541 U.S. 149, 153 (2004). The questions asked of Siddiqui pertained directly to the interest in safe borders and protecting territorial integrity: with whom and where a person spent their time abroad, contacts with foreign nationals, known terrorists, and support for the same. These are not inconceivable questions at the time an individual reenters the United States after a prolonged time away. See Tabbaa, 509 F.3d at 92–93. To the contrary, such questions would be expected as an appropriate part of a "routine customs inquiry" that is based upon "national self protection," see United States v. Silva, 715 F.2d 43, 46-47 (2d Cir. 1983), and the "the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country," see United States v. Ramsey, 431 U.S. 606, 616 (1977).

In addition to the nature of the questions, the defendant's experience in the private conference room as a whole demonstrates that a reasonable person would not have felt restrained to a degree comparable to formal arrest, and therefore Miranda was not required. A reasonable person who had just arrived at an airport in the United States aboard a plane from a foreign country would not believe that being asked to engage in a brief interview with law enforcement—with no restraints and no other overt signs of force or displays of authority apart from identification and notification of the consequences of lying to law enforcement—meant

8

that they were under arrest and in custody during that interview. See, e.g. United States v. Broughton, No. 13-CR-164 (KAM), 2013 WL 5744473 (E.D.N.Y. Oct. 23, 2013) (the defendant was not in "custody" in a private search room because a reasonable person in the defendant's situation "would not have believed she was under arrest at this point in her interaction with the CBP officers" given a brief detention period, routine interaction in the border context, and the fact that the defendant was not handcuffed).

    III.    Siddiqui's Status As A United States Citizen Does Not Make The Border Interview Unlawful

The defendant now claims that, while the border interview of Siddiqui would have been appropriate if she were a non-citizen, her status as a United States citizen renders such an inquiry an unlawful violation of the Constitution. Indeed, the defendant goes so far as to imply that, once a person is identified as a citizen, government officials at the border are not permitted to engage in any further questioning of any sort. See Def. Supp. Br. at 4 (D.E. # 97). ("Once that [ensuring the individual is in fact a U.S. citizen] is done, no further enquiry is required to ensure the integrity of the border because a U.S citizen has an absolute right to entry.") This argument is meritless and without legal support.

As the defendant concedes, the Second Circuit decision in Tabbaa is the "leading case dealing with terrorism concerns and border stops." Def.'s Supp. Br. at 2-3. Tabbaa stands for the proposition that stops, searches and questioning at the border for the purpose of "preventing potential terrorists from entering the United States" is well within the plenary border authority of the government, and not a violation of a defendant's constitutional rights. See 509 F.3d at 92. Indeed, the decision clearly forecloses the defendant's line of reasoning about citizenship as a factor in the analysis. In Tabbaa, the government set up a

9

"special inspection operation" to screen individuals about terrorist associations, which resulted in U.S. citizens being "detained by CBP officials for several hours, questioned, patted-down, fingerprinted, and photographed" in a manner consistent with screening for suspected terrorists. Id. The Circuit not only found that such conduct directed towards U.S. citizens was appropriately within the government's ordinary border search powers and requires no reasonable suspicion, but that even extended detention of these citizens was appropriate because "CBP's ability to threaten with extended detention those who do not comply with lawful screening measures is an important aspect of the longstanding right of the sovereign to protect itself at the border, and therefore is reasonable simply by virtue of the fact that it occurs at the border...." Id. at 100 (internal citations, quotations and brackets omitted). The defendant's sole attempt to distinguish Tabbaa is to claim that it only pertains to the Fourth Amendment. Even though the plaintiff's challenge was based on claims under the Fourth Amendment, the analysis in Tabbaa specifically included the government's lawful border authority to detain and question U.S. citizens, in addition to conducting pat downs and other forms of searches. See id. at 92. In other words, as Tabbaa demonstrates, a U.S. citizen like Siddiqui is appropriately subject to the same national-security related border measures as a non-citizen, including questioning about their relationship to terrorists and terrorist activity.

        The remainder of the defendant's supplemental briefing is an attempt to rebut Tabbaa and cobble together some support for the theory that citizens should not be questioned about their terrorist contacts and affiliations when they attempt to cross the border. But the few cases cited by the defendant do not support this conclusion. The defendant relies primarily on one case, Lyttle v. United States, 867 F. Supp. 2d 1256, 1278 (M.D. Ga. 2012), for the claim that "the use of the process to regulate the admission and removal of aliens" constitutes

10

an "unauthorized exercise of the political branch power" when it is applied to citizens. This case, however, involved a <u>Bivens</u> lawsuit by a U.S. citizen who was detained for more than a month and then deported to Mexico after being incorrectly identified as a non-citizen. The case says nothing about the scope of questioning permitted as part of a border stop by law enforcement (of a citizen or non-citizen), and therefore provides no support for the defendant's argument.[2]

The defendant's reliance on <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873 (1975), is similarly misplaced. Rather than being about a stop and interview at the border, that case held that "<u>[e]xcept at the border and its functional equivalents</u>, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." 422 U.S. at 884 (emphasis added). The other case cited by the defendant, <u>Nguyen v. I.N.S.</u>, likewise lends no support to her claim. See <u>Nguyen v. I.N.S.</u>, 533 U.S. 53, 67 (2001) (holding that Congress could condition citizenship on the gender of the parent of the child).

Lastly, the defendant argues that the government's questions were related to "general safety concerns" and therefore not appropriate inquiries of a person at the border. See

---

[2] Indeed, the language quoted by the defendant is actually a misleading partial quote of a sentence where the Court explained that a <u>Bivens</u> action could proceed because the immigration process provides insufficient remedies for citizens. See <u>Lyttle v. United States</u>, 867 F. Supp. 2d 1256, 1278 (M.D. Ga. 2012) ("Defendants' argument, however, again fails to make the distinction between the use of the immigration process to regulate the admission and removal of aliens, a legitimate exercise of the power of the political branch of government, and the use of that process to detain and remove citizens, an unauthorized exercise of political branch power unless additional constitutional protections are provided to safeguard against the wrongful removal of a citizen from his own country.")

11

Def.'s Supp. Br. at 5. The questions asked of the defendant, which are described above, self-evidently are not about "general safety concerns," but rather are precisely the type of border protection granted to the Executive Branch by the Constitution. Part of the government's plenary border power involves identifying individuals who want to engage in terrorist activity against the United States and keeping them out of the country. Asking a person entering the United States about their contacts with terrorists—even if that person cannot herself be denied entry—can provide critical information that helps the government meet this imperative obligation to secure the border.

## CONCLUSION

It was within the government's border authority to ask questioning pertaining to national security, and a reasonable person in the defendant's position would expect to be questioned upon crossing the border about her foreign travel and any potential associations with terrorists. Accordingly, the government respectfully requests that the Court deny the defendant's motion to suppress without a hearing.

Dated:   Brooklyn, New York
         October 26, 2018

                                          RICHARD P. DONOGHUE
                                          United States Attorney
                                          Eastern District of New York

By:   /s/ Craig R. Heeren
       Craig R. Heeren
       Jennifer M. Sasso
       Assistant U.S. Attorneys
       (718) 254-7000