UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
UNITED STATES OF AMERICA,

                                           15-CR-213 (SJ)

            v.

                                           **MEMORANDUM**
NOELLE VELENTZAS and ASIA                              **AND ORDER**
SIDDIQUI,
        Also known as "Najma Samaa"
        And "Murdiyyah,"

                       Defendants.
-------------------------------------------------------------x
A P P E A R A N C E S:

RICHARD P. DONOGUE
UNITED STATES ATTORNEY
271 Cadman Plaza East
Brooklyn, NY 11201
By:    Jennifer Sasso
        Douglas Pravda
        Craig Heeren
        Michael Keilty
*Attorneys for the government*

LAW OFFICE OF SEAN M. MAHER, PLLC
233 Broadway
Suite 820
New York, NY 10279
By:    Sean Maher
*Attorney for Noelle Velentzas*

CONSTITUTIONAL LAW CENTER FOR
MUSLIMS IN AMERICA
833 East Arapaho Road
Suite 102
Richardson, TX 75081
By:    Charles D. Swift
*Attorney for Asia Siddiqui*

LINDA GAIL MORENO
P.O. Box 10985
Tampa, FL 33679
*Attorney for Asia Siddiqui*

**JOHNSON, U.S.D.J.:**

On April 30, 2015, defendants Noelle Velentzas ("Velentzas") and Asia Siddiqui ("Siddiqui") were charged in a three-count Indictment. (Dkt. No 16.) Both Velentzas and Siddiqui (collectively "Defendants") are charged in Count One (Conspiracy to Use a Weapon of Mass Destruction in violation of 18 U.S.C. 2332a(a)(2)) and Count Two (Teaching and Distributing Information Pertaining to the Making and Use of an Explosive, Destructive Device, and Weapon of Mass Destruction, in violation of 18 U.S.C. §§ 842(p)(2)(A), 844(a)(2)). Count Three of the Indictment charges Siddiqui with making a material false statement to the Federal Bureau of Investigation ("FBI") in violation of 18 U.S.C. § 1001(a)(2). Presently before the Court are Defendants' motion to dismiss Counts One and Two of the Indictment as both vague and overbroad and Siddiqui's motion to suppress the statements underlying Count Three. Based on the submissions of the parties, oral argument held on September 27, 2018, a suppression hearing held on February 5, 2019, and for the reasons stated below, the motions are denied.

## BACKGROUND

The facts and circumstances are drawn from the criminal complaint as well as the testimony presented at the February 5, 2019 hearing on Siddiqui's motion to suppress and on other judicial opinions, of which this Court has taken judicial notice.

Defendants were the subjects of an investigation conducted by the FBI's New York Joint Terrorism Task Force ("JTTF"). Through this investigation, the government learned that Defendants, both United States citizens and residents of Queens, held beliefs consistent with what has colloquially become referred to as "jihadist."[1] Specifically, in approximately 2006, Siddiqui became friends with Samir Khan ("Khan"). Khan was a United States citizen who published a blog and a magazine that promoted a terrorist agenda. Khan is alleged to have been a prominent figure in Al Qa'ida in the Arabian Peninsula ("AQAP"). Siddiqui is alleged to have grown close to him in 2006 and to have submitted her terrorism-inspired poetry to him for publication in Jihad Recollections, a jihadist English-language publication.

---

[1] The word "jihad" has many translations with varying reaches. See, e.g., Clay v. United States, 403 U.S. 698, 708 (1971) ("The Koran defines jihad as an injunction to the believers to war against non-believers."); see also id. at n.2 ("War, then, is here an integral part of the legal system; for in accordance with the doctrine of the jihad. . . the Islamic commonwealth must be expanding, relentlessly. . . until it becomes coterminous with humanity, at which time war will have been transposed into universal peace.") (internal quotations and citations omitted); see also American Freedom Def. Initiative v. Metropolitan Transp. Auth., 880 F. Supp. 2d 456 (S.D.N.Y. 2012) ("[Jihad] is defined as: a 'war or crusade for or against some doctrine, opinion, or principle; war to the death' and 'a religious war of Muslims against unbelievers, inculcated as a duty by the Qur'an and traditions,' Oxford English Dictionary (2d ed. 2012); a 'holy war waged on behalf of Islam as a religious duty,' Merriam–Webster's Collegiate Dictionary (11th ed.); 'a war or struggle against unbelievers,' New Oxford American Dictionary (3d ed. 2010); and 'the central doctrine that calls on believers to combat the enemies of their religion,' Britannica Concise Encyclopedia (15th ed. 2009).)

Siddiqui's poem was entitled "Take Me to the Lands Where the Eyes Are Cooled." The poem referred to bombs and stated that Siddiqui would "hit cloud nine with the smell of turpentine, nations wiped clean of filthy shrines." (Dkt. No. 1. ¶ 12.) It went on to state that Siddiqui "tastes the Truth through fists and slit throats" and that "there is no excuse to sit back and wait – for the skies rain martyrdom." (Id. (internal citations omitted).)[2]

Siddiqui also penned letters to incarcerated persons either awaiting disposition of terrorism-related offenses or convicted of them. Mohamed Mohamud ("Mohamud"), a United States citizen residing in Oregon, was arrested in 2010 for plotting to detonate a bomb at a Portland Christmas Tree lighting ceremony.[3] On or around September 2011, while Mohamud was incarcerated, but prior to his conviction, Siddiqui wrote a letter to Mohamud expressing her support of him. The letter to Mohamud's facility was signed by "Murdiyyah," but bore the return address of "Najma Samaa, 9420 Guy R. Benson Blvd, Jamaica, NY, 11451." Evidence, including a Facebook-related IP address, indicates that both "Murdiyyah" and "Najma Samaa" are names associated with Siddiqui, and that 9420 Guy R. Benson

---

[2] Khan was killed by drone strike in 2011.

[3] United States v. Mohamud, 843 F.3d 420, 427 (9th Cir. 2016) (affirming, inter alia, jury's rejection of defendant's entrapment defense, affirming district court's denial of defendant's motion to suppress, and affirming rejection of defendant's Fourth Amendment claim).

Boulevard, Jamaica, NY 11451 is an address uncannily similar to that of York College, a school Siddiqui attended.[4]

Siddiqui also communicated her sympathy for Tarek Mehanna ("Mehanna") by corresponding with him by mail on several occasions.[5] In 2004, Mehanna traveled to the United Arab Emirates and Yemen in search of a terrorist training camp, translated terrorist-sympathetic documents from Arabic to English and published them online. Finally, Siddiqui communicated by mail with Aafia Siddiqui (no known relation to Asia Siddiqui), who is also an incarcerated United States citizen. Aafia Siddiqui is serving an 86-year term of incarceration for a variety of terrorism-related charges, including taking the M-4 rifle of a United States serviceman in Afghanistan, attempting to fire the weapon, and stating, during the struggle, inter alia, "I am going to kill all you Americans.  You are going to die by my blood," as well as "death to America" and "I will kill all you motherfuckers."[6]

**Siddiqui's Travel from Canada**

On July 10, 2014, Siddiqui boarded WestJet flight number 1210 leaving Toronto Pearson International Airport for LaGuardia Airport.  Upon arrival, she was met by FBI Special Agent Mustafa Shalabi ("Shalabi") and either two or four FBI or Customs and Border Protection ("CBP") officers.  Shalibi testified at the February 5,

---

[4] York College is located at 9420 Guy R. *Brewer* (not Benson) Boulevard, Jamaica, NY 11451. See *www.york.cuny.edu/about* (last visited on July 9, 2019).
[5] USA v. Mehanna, 735 F.3d 32, 41 (1st Cir. 2013).
[6] United States v. Siddiqui, 699 F.3d 690, 697 (2d Cir. 2012).

2019 hearing before this Court. At LaGuardia, Siddiqui was taken into a conference room and asked at least 19 questions over a thirty-minute period. Firearms were neither displayed nor drawn. In the room were Shalabi and the other two to four officers. According to Siddiqui, the CBP officers stood by the door and the FBI agents sat at a conference table with her.

Siddiqui had been in Canada for a year and was asked why. She stated that she was studying publishing at Ryerson University and was returning to New York to look for a job. She was then asked several questions about her potential ties to terrorists or terrorist organizations. In response to the agents' questions, Siddiqui denied being in contact with any individuals seeking to harm the United States, any terrorist groups, and denied supporting radical Islamic ideologies. She specifically denied publishing any materials in any Islamic magazines or knowing Khan. Siddiqui admitted using the name "Murdiyyah" on the Islamic Awakening website and admitted to sending communications to Mehanna and Aafia Siddiqui. She indicated that she was going home from the airport via taxi but left the interview and was picked up by an individual who, unbeknownst to Siddiqui at the time, was an undercover officer ("UC").

Siddiqui told the UC about the interview and said she thought she would be arrested "soon." She told the UC that the agents asked about her poetry and "everything [she] thought they would," including whether she knew anyone from Al Qaeda. She admitted to the UC that some of the answers she gave were not truthful.

**Velentzas**

By this time, Velentzas, had already been communicating and meeting with the UC for approximately one year. Velentzas, too, was unaware of the identity of the UC and participated in many recorded conversations with the UC.

In conversations with the UC, Velentzas praised the September 11, 2001 attacks, the principle of martyrdom via terrorism, stated that she considered Osama Bin Laden ("Bin Laden") and Abdullah Azzam (his mentor) to be her heroes, displayed a photograph of Bin Laden on her cellular telephone that she used as her digital wallpaper, and interpreted the text of Qur'an in a manner that supported her beliefs. Both Velentzas and Siddiqui informed the UC that they were impressed with Tamerlan and Dzhokhar Tsarnaev's (the "Boston Marathon bombers") use of pressure cookers to carry out their attack, and frequently talked about pressure cookers and the items (such as ropes or an axe) that could be placed inside of them prior to detonation. Further, Defendants discussed the "science" of bomb-making, the risks of harming themselves in the process of making a bomb, and the ways in which they ought to be careful to evade law enforcement (such as by avoiding YouTube instructional videos, not purchasing large quantities of bleach, removing sim cards from their cellular telephones for fear of the government "tapping into their phones" and being wary of the possibility of the government placing recording devices in "Muslim places"). Additionally, Velentzas expressed a preference for government targets over civilian targets, criticizing the Boston Marathon bombers

for attacking civilians. She preferred attacking "the head, the neck, the shoulders" of the "snake…[not] the tail."

Defendants studied chemistry using library books and The Anarchist Cookbook, which was provided to Velenztas by the UC. Velentzas obtained a prepaid cellular phone and used it to view videos about soldering and circuitry, which she then began to practice. While she professed to hold martyrdom in the highest esteem, her preferred method was to construct a device detonated from afar. She also prepared to defend herself if she were to be pursued by law enforcement, in one instance, pulling a knife out of her bra and demonstrating to the UC how she would stab someone, adding, "Why can't we be some real bad bitches?" She also stated that people who read chemistry books over breakfast are people who "make history." Siddiqui shared passages from library books on chemistry that she borrowed.

Velentzas continued to collect items she intended to use to make an explosive device, including, inter alia, potassium gluconate, copper wires, pipes, sodium chloride, paint containers labeled "combustible," and manure, noting that Timothy McVeigh (the "Oklahoma City bomber") used manure in the 1995 explosion that he caused. On her prepaid cellular telephone, Velenztas researched other materials, including racing fuel, ammonium nitrate, Miracle-Gro fertilizer, and to the UC she began to discuss the use of a vehicle in which to pack the explosives, such as perpetrators of the Oklahoma City and 1993 World Trade Center bombings had each

used. Velentzas made reference to a different online magazine than the one on which Siddiqui's poem was featured, but which was also operated by Khan.

Velentzas, Siddiqui and the UC made trips to Home Depot to learn more about the items outlined in the coursebooks, and thereafter Velentzas continued to learn about transformers, alternating current and direct current, homemade grenades, pipe and pressure cooker bombs, copper wires, small and large metal pipes, bags of sodium chloride, and uses for bags of manure. She believed that many of these materials were used in the 1993 World Trade Center bombing. (Id. ¶ 37.) Velentzas went so far as to make her home available to practice making smaller explosives, over the objection of the UC.

On February 22, 2015, Velentzas and the UC arrived at Siddiqui's residence and found four propane gas tanks. Siddiqui told the others, "I got everything up in this joint." [7] (Id. ¶ 79.) Yet, Velentzas complained that Siddiqui was not keeping her properly informed of Siddiqui's plans, stating, "I'm gonna die for your ass and you don't communicate?" In March 2015, Velentzas showed the others videos of explosions and noted that the materials used in the videos could be purchased in supermarkets and enhanced to create larger explosions than they had anticipated. Defendants were arrested on April 1, 2015.

---

[7] While Velentzas and Siddiqui once lived together, by this time they held separate residences.

Defendants have filed a joint motion to dismiss Counts One and Two of the Indictment for vagueness and overbreadth, and Siddiqui has moved to suppress the statements she made at LaGuardia Airport.

## DISCUSSION

### I.    Motion to Dismiss Count One

Defendants move to dismiss Count One of the Indictment, which reads in pertinent part:

> "[D]efendants NOELLE VELENTZAS and ASIA SIDDIQUI …without lawful authority did knowingly and intentionally conspire to use a weapon of mass destruction, to wit: an explosive device, against persons and property within the United States."

Defendants claim that Count One should be dismissed because it is vague, overbroad, and fails to provide the requisite specificity under Federal Rules of Criminal Procedure 12(b)(3)(B)(iii), (v).  The Court will address each argument in turn.

### A. Vagueness As Applied

A law is unconstitutionally void-for-vagueness if it does not "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983).

When First Amendment freedoms are not implicated by a statute, Courts assess vagueness challenges on an "as-applied" basis, dealing squarely with the particular facts of a defendant's case. See United States v. Farhane, 634 F.3d 127,

138 (2d Cir. 2011). Under an "as-applied review of the 'notice' requirement . . .
courts ask whether the challenged statute, as written, provides notice sufficient to
alert ordinary people as to what conduct is prohibited." Id. at 139 (internal citations,
quotations, and brackets omitted). The statute must provide "sufficiently definite
warning as to the proscribed conduct when measured by common understanding and
practices." Id. (internal quotation marks omitted). Moreover, a statute should provide
"sufficiently clear standards" to prevent arbitrary enforcement. Id. (internal citations
omitted).

Yet, even a statute lacking such clear standards will survive an as-applied
challenge "if the conduct at issue falls within the core of the statute's prohibition, so
that the enforcement before the court [is] not the result of the unfettered latitude that
law enforcement officers and factfinders might have in other, hypothetical
applications of the statute." Id. at 139-40 (citations and internal quotation marks
omitted).

In this case, Defendants put forth several hypotheticals to demonstrate the
statute's vagueness in other instances, but do not truly contend with the
circumstances at issue in this case to demonstrate that they lacked notice due to the
statute's vagueness. Yet, the complaint alleges that Defendants, in the presence of an
undercover officer, discussed learning how to build an explosive device using
pressure cookers. They made several references to past terrorist attacks in the United

States and did not want to the make mistakes of unsuccessful terrorists. (Compl. ¶ 18.)

In November 2014, Defendant Velentzas discussed reading The Anarchist Cookbook, which included instructions on how to build explosives, and acquired materials referenced in the book. Defendant Siddiqui acquired propane gas tanks, fertilizers, pipes, a pressure cooker, and soldering tools. The Complaint further alleges that the Defendants wished to specifically target law enforcement. Albeit, the statute here is not a shining example of master legislative craftsmanship, Defendants are hard-pressed to argue that it did not afford people "of ordinary intelligence a reasonable opportunity to know" that plotting to use pressure cookers and other materials to cause harm to law enforcement was illegal. Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).

Defendants argue that the statute's lack of a scienter requirement renders it vague. Certainly, a "scienter requirement may mitigate a law's vagueness, especially where the defendant alleges inadequate notice." Copeland v. Vance, 893 F.3d 101, 121 (2d Cir. 2018). "But the absence of a scienter element, without more, does not make a law unconstitutionally vague; the inquiry remains whether the statute gives adequate notice to the public and provides sufficient guidance to those charged with enforcing it." Id. Despite the many innocuous examples put forward by the defendants (such as "using" an explosive device as an image during a political advertisement), their arguments fail to show how there would be any confusion about

the statute's prohibition on gathering materials and learning how to combine them to plan an attack against law enforcement. Therefore, this argument is without merit.

### B. Facial Vagueness/Overbreadth

Defendants also argue that the statute is facially vague. When First Amendment protections are implicated, however, a more stringent facial vagueness test applies. See United States v. Taleb-Jedi, 566 F. Supp. 2d 157, 180 (E.D.N.Y. 2008) (citing Village of Hoffman Estates v. Flipside, 455 U.S. 489, 499 (1982)). Facial challenges can be maintained "if a law rfeaches a substantial amount of constitutionally protected conduct." Kolender, 461 U.S. at 358 n. 8 (internal citation and quotation marks omitted). Thus, a law may be invalidated if it "will have a substantial chilling effect on protected conduct." Farrell v. Burke, 449 F.3d 470, 497 (2d Cir. 2006).

Moreover, "[a]ll overbreadth challenges are … facial challenges." United States v. Thompson, 896 F.3d 155, 163 (2d Cir. 2018). A law is overbroad if it "punishes a substantial amount of protected free speech, judged in relation to its plainly legitimate sweep." Farhane, 634 F.3d at 136 (citing Virginia v. Hicks, 539 U.S. 113, 118-19 (2003)) (internal brackets omitted)). An overbreadth finding "invalidates all enforcement of a challenged law, unless it can be saved by a limiting construction." Id. (emphasis omitted). Courts must "rigorously enforce[ ] the burden on the challenging party to demonstrate 'substantial' infringement of speech." Id. at 136-37 (citing United States v. Williams, 553 U.S. 285, 292 (2008)).

Typically, "[t]he first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." United States v. Williams, 553 U.S. 285, 293 (2008). Next, courts examine whether the statute, as construed, "criminalizes a substantial amount of protected expressive activity." Id. at 297. Nevertheless, a party claiming overbreadth "need not show that the challenged regulation injured his or her First Amendment interests in any way." Farrell, 449 F.3d at 499. Thus, an overbreadth analysis and a facial vagueness analysis are quite similar. Id. ("Thus, the analysis of the merits of an overbreadth challenge is essentially the same as the analysis . . . in the facial vagueness context."). Yet, "[r]arely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." Hicks, 539 U.S. at 124.

Here, Defendants challenge the validity of 18 U.S.C. § 2332(a), which criminalizes a person who "without lawful authority, uses, threatens, or attempts or conspires to use, a weapon of mass destruction . . . against any person or property within the United States, and . . . such property is used in interstate or foreign commerce or in an activity that affects interstate or foreign commerce." Defendants argue that the terms "use," "without lawful authority," and "against" are all unconstitutionally vague, especially given the statute's lack of a *mens rea* requirement.

The "starting point in statutory interpretation is the statute's plain meaning." United States v. Dauray, 215 F.3d 257, 260 (2d Cir. 2000). The plain meaning of statutory terms "'does not turn solely on dictionary definitions of the statute's component words,' but is also determined by 'the specific context in which that language is used, and the broader context of the statute as a whole.'" United States v. Rowland, 826 F.3d 100, 108 (2d Cir. 2016) (citing Yates v. United States, 135 S. Ct. 1074, 1081 (2015)).

A statutory term must be construed "in accord with its ordinary or natural meaning." Smith v. United States, 508 U.S. 223, 228 (1993). The Supreme Court has construed "use" to mean "[t]o convert to one's service," "to employ," "to avail oneself of," and "to carry out a purpose or action by means of." Bailey, 516 U.S. at 145 (quoting Smith, 508 U.S. at 228-29), superseded by statute on other grounds, 18 U.S.C. § 924(c)(1)(A).

The Fifth Circuit deemed the "without lawful authority" provision as an affirmative defense meant "to except from criminal prosecution those persons whose conduct falls within the scope of their employment." United States v. Wise, 221 F.3d 140, 149 (5th Cir. 2000).[8] The Court accepts this definition.

---

[8] "Without lawful authority" has been defined in other contexts. In relation to the Identity Theft and Assumption Deterrence Act, 18 U.S.C. § 1028, the Seventh Circuit Jury Instructions defines "without lawful authority" as "without authorization recognized by statute or regulation." Fed. Crim. Jury Instr. 7th Cir. 1028[5] (2012 ed.).

The term "against" has many definitions, however, given the structure of the statute, the most relevant one here is "in opposition or hostility to." See Webster's Dictionary, http://unabridged.merriam-webster.com/unabridged/against (last visited July 9, 2019).

Recognizing that a statute is to be considered in all its parts when construing any one of them, See Dauray, 215 F.3d at 262, the statute here covers the use, or "active employment," of a weapon of mass destruction. See Bailey, 516 U.S. at 143. It also covers threats—statements "expressing an intention to inflict bodily harm to someone of such a nature as could reasonably induce fear as distinguished from idle, careless talk, exaggeration or something said in a joking manner"— to use weapons of mass destruction. See United States v. Malik, 16 F.3d 45, 51 (2d Cir. 1994). See also United States v. Taylor, No. 02 CR.73 RPP, 2003 WL 22073040, at *4 (S.D.N.Y. Sept. 5, 2003). Furthermore, it includes conspiracies to use weapons of mass destruction, including "joining with another person in an agreement the objective of which was the use of a weapon of mass destruction, and . . . communication of an intent to inflict harm or loss on another by means of such a weapon." United States v. Khalil, 214 F.3d 111, 120 (2d Cir. 2000), in opposition or hostility to the persons or property within the United States.

In light of this construction, it is clear that this statute does not substantially infringe or criminalize a substantial amount of protected activity. "Many long-established criminal proscriptions . . . such as laws against conspiracy . . . criminalize

speech . . . that is intended to induce or commence illegal activities." Williams, 553

U.S. at 298. Such speech is "undeserving of First Amendment protection." Id.; See

United States v. Awan, 459 F. Supp. 2d 167, 178 (E.D.N.Y. 2006) (noting

"conspiracy to commit violence" is not protected by the First Amendment).

Therefore, the Defendants overbreadth challenge fails. Similarly, given that no

protected conduct is implicated here, the Defendants "can prevail on their vagueness

claim only if they show that the statute was vague as applied to them," which the

court has already decided it is not. Thus, the facial challenges must also fail.

### C. Failure to State an Offense and Provide Specificity

The Defendants argue that Count One of the indictment should be dismissed

pursuant to Rule 12(b)(3)(B) because it fails to state an offense and because it lacks

the required specificity. See Fed. R. Crim. P. 12(b)(3)(B)(iii),(v).

An indictment must include "a plain, concise, and definite written statement

of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "An

indictment is sufficient if it 'first, contains the elements of the offense charged and

fairly informs a defendant of the charge against which he must defend, and, second,

enables him to plead an acquittal or conviction in bar of future prosecutions for the

same offense.'" United States v. Stringer, 730 F.3d 120, 124 (2d Cir. 2013) (quoting

Hamling v. United States, 418 U.S. 87, 117 (1974)). Under Circuit precedent, "an

indictment need 'do little more than to track the language of the statute charged and

state the time and place (in approximate terms) of the alleged crime.'" Id. (quoting United States v. Pirro, 212 F.3d 86, 91 (2d Cir. 2000)).

The language of the indictment tracks the language of the statute, which is sufficient for purposes of specificity. One of the statutory definitions of a "weapon of mass destruction" is "any destructive device," defined in 18 U.S.C. § 921. Section 921 includes in its definition of a destructive device "any explosive, incendiary, or poison gas" bomb, grenade, rockets, missiles, mines, and other similar devices. 18 U.S.C. § 921(a)(4). Furthermore, the statute includes "any combination of parts either designed or intended for use in converting any device into any destructive device described" above. 18 U.S.C. § 921(a)(4)(c).

Defendants argue that the specific type of explosive device must be defined in order to prepare a trial defense. However, the terms of the indictment and in the statute are specific enough to put the Defendants on notice and prevent any fear of double jeopardy. See Stringer, 730 F.3d at 124 (noting that dismissal for lack of specificity was inappropriate when indictment "stated the elements of the offense and provided even minimal protection against double jeopardy"). Moreover, the criminal complaint spells out, at great length, the goals of the alleged conspiracy, and its alleged targets. Therefore, the Court denies the motion to dismiss Count One on these grounds.

## II.    Motion to Dismiss Count II

The Defendants make similar challenges concerning vagueness and

overbreadth to 18 U.S.C. § 842(p)(2)(A). The statute makes it unlawful to

> teach or demonstrate the making or use of an explosive, a
> destructive device, or a weapon of mass destruction, or to distribute
> by any means information pertaining to, in whole or in part, the
> manufacture or use of an explosive, destructive device, or weapon of
> mass destruction with the intent that the teaching, demonstration, or
> information be used for, or in furtherance of, an activity that
> constitutes a Federal crime of violence.

### A.    As-Applied Challenge

As noted above, the defendants retrieved and sent to one another materials

such as The Anarchist Cookbook and Inspire Magazine containing information on

how to create and use explosives. They took and shared notes on these matters. They

shared videos of different elements being mixed together to create explosions. They

met to discuss and share information from textbooks and coursework that Siddiqui

had received while in school. They learned about how connecting positive and

negative wires and receivers could create explosions, but wanted to learn how to do

so without mimicking former terrorists who failed in their attempts. (Compl. ¶ 26.)

The complaint is clear that both Defendants sought to "teach and demonstrate the

making or use of an explosive." Thus, taken together, and in light of their efforts to

evade detection, the Court finds that the statute was not void-for-vagueness as

applied to the defendants.

## B. Facial Vagueness/Overbreadth

The Defendants argue that the statutory prohibition on teaching or demonstrating the use of explosives, destructive devices, and weapons of mass destruction in addition to its prohibition on the "distribut[ion] by any means information pertaining to … the manufacture or use of" the aforementioned weapons and explosives, without further definition, makes the bounds of the statute's prohibitions inapprehensible. (See Def. Mot. to Dismiss at 15, Dkt. No 84.) The Court disagrees and finds that this statute is neither vague nor overbroad.

It is true that when a statute implicates certain speech or conduct that might in some circumstances be protected, vagueness scrutiny is more exacting. See California Teachers Ass'n v. State Bd. Of Educ., 271 F.3d 1141, 1150 (9th Cir. 2001). However, the fear of the statute not providing people with adequate notice is "insubstantial and remote" here:

> The statute affords people of ordinary intelligence the opportunity to understand what conduct is prohibited and does not foster arbitrary, discriminatory, or capricious enforcement.[3] This is particularly true in light of the statute's intent requirement that such teaching or demonstration must be carried out with the intent to commit a federal crime of violence.

United States v. Coronado, 461 F. Supp. 2d 1209, 1216–17 (S.D. Cal. 2006). The plain language and ordinary meaning of the words make it abundantly clear the type of speech criminalized, and any potential vagueness implications are mitigated by the statute's final clauses, limiting liability to those with violent intentions, which are not protected by the Constitution. Coronado, 461 F. Supp. 2d at 1213 ("It is only

when the teaching or demonstration of a destructive device is coupled with specific intent to commit a federal crime of violence that an individual runs afoul of the statute."). Even if teaching, demonstrating, or distributing information about math, physics, chemistry, or the myriad subjects referenced by the Defendant's brief is protected, See Mot. to Dismiss at 16, doing so with violent intent is not.

The Defendants further argue that the phrase "crime of violence" is also vague. However, both parties acknowledge that the Supreme Court has indicated that Courts should treat the phrase as it is treated in 18 U.S.C. § 16. See Local v. Ashcroft, 543 U.S. 1 n.4 (2004). Section 16 defines crime of violence as

> an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16. Thus, the meaning of the phrase is sufficiently defined and fits within the scope of the prohibitions under § 842. See Khalil, 214 F.3d at 121-22 (specifically noting § 2332a as a crime of violence). Therefore, this portion of the motion is denied.

### C.   Sufficiency and Specificity

Under the standards stated, supra, the Court finds that Count Two is sufficiently pleaded and includes sufficient specificity to protect against any fear of double jeopardy. Count Two tracks the language and informs the Defendants in great

detail that they are charged with teaching and sharing information for the purposes of creating a weapon of mass destruction. Additionally, the Court finds that § 2332a(a)(2) is a crime of violence under § 842(p)(2)(A) and therefore the Indictment sufficiently states a criminal offense. Therefore, the Court denies the motion to dismiss Count Two.

### III.    Motion to Suppress

Siddiqui separately moves to suppress the statements she made at LaGuardia airport on July 10, 2014 as in violation of the Fourth Amendment and pursuant to Miranda v. Arizona, 384 U.S. 436 (1966).  As to Siddiqui's Fourth Amendment challenge, she argues that as a United States Citizen who had already cleared customs in Toronto, the questioning was outside the bounds of the "border exception" to the warrant requirement.  She additionally argues that the questioning violated the Fifth Amendment to the Constitution because she was custodially interrogated without the benefit of the Miranda warnings.

### A. Fourth Amendment Challenge

Neither the government nor defendant have cited a binding criminal case from this Circuit on the precise scope of inbound questioning by the FBI when the United States Citizen passenger was cleared on the Canadian side of the border.  The most analogous case is Tabbaa v. Chertoff, 509 F.3d 89 (2d Cir. 2007).    There, CBP received intelligence that "raised 'specific concerns about national and international

conferences'" including a "Reviving the Islamic Spirit" conference in Toronto. Id. at 93. In December 2004, CBP prepared an "Intelligence Driven Special Operation" directing officials to identify all individuals crossing the United States/Canada border in Buffalo, New York who had attended the conference and to question them about its purpose and content. Id. at 94. The Tabbaa plaintiffs were stopped upon entry, frisked, fingerprinted, photographed and had their cars searched. Id. They brought an action pursuant to the First and Fourth Amendments challenging the constitutionality of the searches. As to the Fourth Amendment, the Circuit upheld the searches because the "questions [asked were] not materially different than the types of questions border officials typically ask prospective entrants in an effort to determine the places they have visited and the purpose and duration of their trip." Id. at 99; see also United States v. Martinez-Fuerte, 428 U.S. 543, 566 (1976) (permitting "brief questioning routinely conducted at permanent [border] checkpoints"). This Court finds that, because national security is of paramount importance to a sovereign nation, the questions posed to Siddiqui at the airport were not so materially outside the scope of border security questions to rise to the level of unconstitutional "seizure" for Fourth Amendment purposes any more than the searches and seizures endured by the plaintiffs in Tabbaa. Just as the agents in Tabbaa were notified of a potential national security concern surrounding the "Reviving the Spirit" conference, Agent Shalabi, too, was aware of a potential concern, given Siddiqui "contact with numerous terrorist operators," published

jihadist poetry in an online magazine, and year-long relocation to a place outside of the United States.  (See generally Tr. of 2/5/19 hearing at 2-10.)

B. **Fifth Amendment Challenge**

Next, Siddiqui argues that her Fifth Amendment rights were violated because she was not given a Miranda warning at any point during the interview.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U. S. Const. Amend. V. "To protect the Fifth Amendment right against self-incrimination, the Supreme Court in Miranda v. Arizona ruled that police may not interrogate a suspect who has been taken into custody without first warning the person 'that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" United States v. Newton, 369 F.3d 659, 668 (2d Cir. 2004); see also Georgison v. Donelli, 588 F.3d 145, 155 (2d Cir. 2009) ("It is well settled that Miranda requires all individuals who are under arrest, or otherwise in police custody, to be informed prior to interrogation, inter alia, of their right to remain silent and to have an attorney present during questioning."). Analysis of "custody," for purposes of Miranda, involves whether a reasonable person in the suspect's position would have understood himself to be subjected to restraints comparable to those associated with a formal arrest. See id., 588 F.3d at 155 (quoting Berkemer v. McCarty, 468 U.S. 420, 441, 104 S.Ct. 3138,

82 L.Ed.2d 317 (1984)).    In the context of arriving at an airport—"in which compulsory questioning inheres in the situation and the traveler has voluntarily submitted to some degree of confinement and restraint by approaching the border"— a reasonable traveler will expect some constraints and questioning. United States v. FNU LNU, 653 F.3d 144, 153–54 (2d Cir. 2011).

The Court must view the totality of the circumstances, including "the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; whether officers told the suspect he was free to leave or under suspicion." FNU LNU, 653 F.3d at 153 (citations omitted). Additionally, in the border context, a relevant consideration is the nature of the questions being asked. Id.

In this case, Special Agent Mustafa Shalabi ("Shalabi") testified that three officers were in the room with Siddiqui (Shalabi, along with FBI Special Agent Nicholas Hanak and CBP Officer Jeff Rockman), the conference-sized room door was closed and unlocked, Siddiqui was not handcuffed, not told she was under arrest, and that the interview lasted approximately 30 minutes.    Siddiqui claims there were five officers, that she was not asked to be interviewed but rather immediately escorted by them to the interview, that she was not told that she was free to leave, and that she thought she would be arrested.

In totality, this Court finds that Siddiqui was not "in custody" for <u>Miranda</u> purposes during the July 10, 2014 interview.  Even assuming, <u>arguendo,</u> Siddiqui was not told she was free to leave, and that there were five officers rather than three (the only significant circumstances in dispute), she was neither handcuffed nor restrained, weapons were not drawn, she declined the opportunity to take a break during the interview, and its duration of 30 minutes is a reasonable one at the border. While the government draws the Court's attention to comments made by Siddiqui after she left the airport as proof she did not believe she was in custody for <u>Miranda</u> purposes, the test, as stated, <u>supra,</u> is not subjective. <u>See</u> <u>FNU LNU,</u> 653 F.3d at 151 ("Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned) (citing <u>Stansbury v. California,</u> 511 U.S. 318, 323 (1994)); <u>see also</u> <u>Georgison,</u> 588 F.3d at 155 ("The ultimate question is how a reasonable [person] in the suspect's position would have understood the situation.") (internal citation omitted).

Defendant cites <u>United States v. Djibo,</u> 151 F. Supp. 3d 297 (E.D.N.Y. 2015), in which this Court granted a motion to suppress because CBP agents concluded their search for unlawful quantities of currency thought to be hidden in the defendant's bags only to thereafter permit a Homeland Security Investigation Agent to intercept the defendant and ask him for the passcode to his cellular telephone (found in the bag). In finding Djibo to be "in custody" for <u>Miranda</u> purposes, this Court noted the

aberrations leading up to Djibo's airport arrest, including, <u>inter alia</u>, him being asked to fill out an inbound passenger declaration form (despite him attempting to leave the United States), and the CBP Agents' failure to find any undeclared currency or other contraband in his luggage yet permitting HSI to detain him and request access to his cellular telephone.  15 F. Supp. 3d at 306.  Indeed, in <u>USA v. Silva</u>, 715 F.2d 43 at 48 (2d Cir. 1983), the Second Circuit held that Miranda is required when "the questioning of the official becomes an interrogation that is custodial in nature <u>and</u> is one in which 'information is sought for the purpose of using it against a person in a criminal proceeding" (emphasis added).  In making this declaration, <u>Silva</u> relied on a Fifth Circuit case, <u>USA v. Henry</u>, 604 F.2d 908, 915 (5th Cir. 1979), which held that "when the questioning of the officials becomes an interrogation that is custodial in nature in which information is sought for the purpose of using it against someone in a criminal proceeding," <u>Miranda</u> is required.  Thus, the triggering of <u>Miranda</u> relies on two components, and in the instant case, as stated, <u>supra</u>, there was no "custodial interrogation" of Siddiqui.  Therefore, a <u>Miranda</u> warning was not required.

### CONCLUSION

For the foregoing reasons, Defendants' motions are DENIED.


SO ORDERED.

Dated:  July 16, 2019
      Brooklyn, New York            Sterling Johnson, Jr., U.S.D.J.