IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    v.

                                               Case No.: 15-CR-213 (SJ)

NOELLE VELENTZAS,

Defendant.

## DEFENDANT'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

Defendant, Asia Siddiqui, by and through her attorneys, **Charles D. Swift and**

**Linda Moreno**, pursuant to Rule 32 of the Federal Rules of Criminal Procedure, and 18

U.S.C. §3553(a), respectfully submits the following Objections to the Draft Presentence

Investigation Report (hereinafter "PSR").[1]

### I.     INTRODUCTION

The defendant objects to portions of the factual summary as unsupported by evidence and

objects to the omission of material facts submitted by the defense to the probation officer. The

specific factual objections and asserted factual omissions are set forth in Section II.

The defendant also objects to the base offense guideline determination recommended by

the probation officer as unsupported by the evidence and law. Instead, for the reasons set forth in

Section III, the defense submits that because the evidence is insufficient to establish malice

aforethought on the part of Ms. Siddiqui necessary for the §2A1.5 Conspiracy to Commit Murder

guideline,  the correct base offense level for the underlying offense in this case for use of a Weapon

---

[1] The Exhibits listed in this document, the Defendant's Objections, reference the Exhibits attached to the Defendant's Sentencing Memorandum, filed under a separate docket number, to avoid unnecessary duplication.

of Mass Destruction is Arson; Property Damage by Use of Explosives found at §2K1.4(a)(1), which knowingly created a substantial risk of death or serious bodily injury to any person other than a participant in the offense.

The defendant also objects to the recommend application of the terrorism enhancement under § 3A1.4 to the defendant's offense calculations.  The terrorism enhancement requires evidence that the defendant, through his or her conduct, sought to injure or influence the government.  The PSR, in making its recommendation, fails to support its conclusions with either legal or factual analysis demonstrating that Ms. Siddiqui, through her conduct, sought to injure or influence the government or a related government interest. As explained in Part VI, the defendant respectfully submits that in the absence of a plan for use of the weapons and the defendant's clear reluctance to continue in the enterprise after the Undercover Officers attempts to have the group agree on a plan, there is insufficient evidence to conclude that she intended to target or influence the government through her acts.

Finally, in Section V, the defendant objects to the conclusion that a minor role deduction was not appropriate under the facts and objects to the omission of additional relevant facts which establish Ms. Siddiqui's minor role.

## II.    OBJECTIONS TO THE FACTS IN THE PSR AND ADDITIONAL FACTS

### a.  Objections to the facts and material omissions in the PSR

In her description of the offense conduct, the probation officer broadly characterizes Ms. Siddiqui and Ms. Velentzas's teaching and distributing information relating to the creation of an explosive devices as a "terrorist bomb plot", "terrorist plot", "terrorist scheme" and "plot to build a bomb for use in a terrorist attack". (PSR, para. 3, 5, 17, 25, 27).  The defendant objects to these

factual assertions because they are unsupported by specific facts concerning the agreement.[2] The

PSR offers no similar specific factual details regarding the alleged plot to support its assertions

that this was a terrorist plot,[3] nor explanation for these characterizations. Indeed, the facts

demonstrate that no plot to attack was ever conceived, nor was a "terrorist" intention or target ever

identified.

The defendant objects to the PSR's characterization of Ms. Siddiqui as a "co-equal"

participant in the offense in the absence of supporting facts setting out each defendant's

participation in the plot. (PSR, para. 27, 30). The defendant objects to the PSR's statement that

Ms. Siddiqui purchased cat litter, pest control chemicals, and a blow torch found in her parent's

basement from Home Depot as having no evidentiary basis (PSR, para. 22).[4] The defendant objects

to her family's home repair items stored in the basement being referred to as her having "stockpiled

bomb-making materials" because this is a mischaracterization. (PSR, para. 5. *See also*, Exhibit 1).

The defendant also objects to the exclusion of the fact that there is no evidence Ms. Siddiqui

did any research herself regarding explosives on any of her seized devices. This conduct was

---

[2] For example, in the World Trade Center bombing, the facts for sentencing include the fact that they had targeted the World Trade Center, that they had agreed to do so for the purpose of undermining the United States and U.S. Commerce and that they were aware that people would be inside the WTC at the time and could possibly be killed because of the attack.

[3] In the federal sentencing scheme, terrorism is a term of art defined by the presence of an offense that is enumerated as a federal crime of terrorism under 18 USC § 2332b(g)(5) and a showing of a factual intent to commit the crime in order to influence government conduct, both elements must be present.

[4] The only evidence of a purchase from Home Depot, discovered during the search of Ms. Siddiqui's home is a receipt for a wrench, pipe, and plug fuse dated February, 2014. (Exhibit O at Bates 000667). None of these items are listed as potential bomb-making materials. There is no evidence that the gas canisters listed as a potential bomb-making materials were purchased by Ms. Siddiqui. The propane tanks are obviously old and Ms. Siddiqui's brother and father both indicate that the materials were purchased as part of home repair projects conducted long before Ms. Siddiqui moved in. It is unknown how cat litter or insecticide could be used in an explosive device and there is no proof that Ms. Siddiqui purchased either item for use in a bomb as they are common household items.

almost exclusively performed by Ms. Velentzas and the UC. The defendant objects to the exclusion of facts related to Ms. Siddiqui's personal life.

The defendant further submits that in order for a dispassionate analysis of the offense conduct in this case to occur, the below additional facts concerning the genesis and development of the alleged plot and Ms. Siddiqui's role therein should be included in the probation report on the offense conduct.[5]

**b.** **Additional facts regarding the potential use of the weapon of mass destruction**

1. On August 6, 2016, Ms. Siddiqui, Ms. Velentzas, and the undercover officer's ("UC") agreement to learn how to build an explosive device as part of their religious duty to acquire knowledge for self-defense. (Exhibit E).

2. Between August and October, 2014, the group met approximately once a week and studied electricity. Ms. Siddiqui provided some of the materials for this study. Velentzas lead the study sessions. (Exhibit V at 1-4).

3. On or about October 26, 2014, Velentzas, in response to the UC's questions regarding a target for any device they might build, reaffirmed their commitment to use the device in self-defense stating, "You thinking about some next sh*t though? No, we're not talking about going out f*cking with people…You understand that right? You mind your own business but those people f*ck with you." (Exhibit I).

4. On November 23, 2014, the UC provided the group the Anarchist Cookbook. (Exhibit V at 4).

5. On November 23, 2014, Velentzas and the UC discussed what they were trying to accomplish with their studies. Velentzas explained that she would never want to hurt anyone but, as a Muslim, she must acquire this knowledge and be ready. Velentzas commented that the kufar have this knowledge and use it to hurt Muslims, and so the group needed to be prepared. According to Velentzas, when Allah decides the time, they will know whether one person, or two people, needs to act. She went on to state that at this juncture, they did not need to have those talks because it was too early. (Exhibit V at 4).

6. On December 24, 2014, the UC brought a copy of Inspire magazine with instructions on how to build a car bomb to their study session. The UC later provided this article to Siddiqui on December 30, 2014, with instructions that she provide it to Velentzas. Ms. Siddiqui

---

[5] The PTA includes stipulated facts by the defendant regarding the offense conduct. These facts cannot be contradicted, but can be expanded upon by all parties and do not bind the probation officer solely to those facts. The probation officer does not recite the stipulated facts in her draft report.

failed to provide the article to Velentzas. (Exhibit T).  Ms. Velentzas participated in these conversations but the transcripts show that Ms. Siddiqui was absent for many of these conversations and non-participative where she was present. (Exhibits N, O).

7.  On December 27, 2014, the UC told the group about a large police funeral that had been recently held. Velentzas responded by telling the UC that she was a "thinker" and by questioning the UC regarding details of the funeral. There was no agreement however that the group should attack a similar event. (Exhibit O).

c.  **Additional facts related to Ms. Siddiqui's participation in the offense conduct**

1.  Between August, 2014, and December 24, 2014, Ms. Siddiqui attended all of the groups study sessions. Ms. Siddiqui aided the groups sessions by providing a textbook and suggesting that they could learn the basics of electricity and chemistry by going to the library. (Exhibits E, F).

2.  On November 2, 2014, Ms. Siddiqui, Velentzas and the UC went to Home Depot for the purpose of determining the feasibility of purchasing materials that could be used in an explosive device. During this trip, Ms. Siddiqui took care of Velentzas's minor child while the UC and Velentzas shopped. (Exhibit V).

3.  From the beginning of December Velentzas and the UC begin questioning Ms. Siddiqui's commitment to the group.  (Exhibit L, M).

4.  On December 3, 2014, in an accidental recording, the UC told another law enforcement officer that she was annoyed with Siddiqui for showing little interest in their "studying" and being completely aloof. (Exhibit L).

5.  On December 11, 2014, Ms. Siddiqui visits Dr. Shafiq Khokhar, a psychiatrist, who diagnoses her with Major Depressive Disorder and Social Anxiety and prescribed an anti-depressant and anxiolytic medication. (PSR, para 64-66).

6.  On December 12, 2014, Ms. Siddiqui moves out of Velentzas's house and back into her family residence. She began to distance herself from the group after she was able to move out of Ms. Velentzas' apartment and back into her family's home. (Exhibit V).

7.  On December 24, 2014, Velentzas and the UC review the Anarchist Cookbook and the Inspire magazine article to understand the specific requirements of constructing an explosive device. (Exhibit N).

8.  During their study, Velentzas notes Siddiqui's absence, saying "… it would be cool if we could study this with Asia, right?" The UC responded, "Yeah. She said she wanted to but she's always gone."  (Exhibit N).

5

9. Shortly thereafter, Ms. Siddiqui joins the session and attempts to help Velentzas and the UC understand the directions contained in the articles. Her attempt here serves as the basis for her plea to Count II. (See Factual Basis for Ms. Siddiqui's Plea).

10. On December 30, 2014, the UC meets privately with Ms. Siddiqui and gives her a copy of the Inspire magazine article to provide to Velentzas. (Exhibit V).

11. On January 5, 2015, Ms. Siddiqui starts working as a childcare provider at an afterschool daycare program. (Exhibit V).

12. On January 6, 2015, Siddiqui, Velentzas and the UC meet for dinner at Velentzas's house but do not study.

13. On January 8, 2015, the UC tells Velentzas that Ms. Siddiqui has not called her since she helped her move.

14. On January 11, 2015, the UC asks Velentzas how Ms. Siddiqui is doing and Velentzas responds that, "she is in her career".

15. On January 13, 2015, the UC again informs Velentzas that Ms. Siddiqui is not calling.

16. On January 18, 2015, the UC goes to Ms. Siddiqui's residence and picks her up and takes her to a restaurant with Velentzas. The group does not study at the restaurant. During the dinner at the restaurant, the group decides to study the following week.

17. On January, 22, 2015, Velentzas and the UC meet to study, but Ms. Siddiqui again does not attend.

18. On January, 25, 2015, the UC picks Ms. Siddiqui up to ensure she will be present for studying, during the study session Ms. Siddiqui suggests that they should study on their own.

19. On February 3, 2015, Velentzas and the UC meet without Ms. Siddiqui and continue studying explosive devices. (Exhibit P).

20. On February 8, 2015, the UC against meets privately with Ms. Siddiqui and encourages her to rejoin the groups studies. (Exhibit Q).

21. On February 17, 2015, Velentzas and the UC meet without Ms. Siddiqui.

22. On February 22, 2015, the UC and Velentzas go to Ms. Siddiqui's house unannounced to meet with her. During their visit, Velentzas makes note of the home repair materials stored outside of Ms. Siddiqui's basement apartment and claims that Ms. Siddiqui has been holding out on them. Ms. Siddiqui jokes that she has a Home Depot in the basement. (Exhibit S, X).

23. On February 24, 2015, the UC meets with Ms. Siddiqui. During their conversation, Ms. Siddiqui states that she is not comfortable with science and she wants to focus on her poetry.

24. On March 1, 2015, the UC visited Ms. Siddiqui at her home. While at her home, the UC discovers that Ms. Siddiqui has not distributed the Inspire magazine article to Velentzas as instructed. The UC also tells Ms. Siddiqui that she wants to check the materials that Ms. Siddiqui has and asks about the propane tanks. Ms. Siddiqui responds that they could look up the UPC for the tanks on the phone to find out what they are. The UC had to read them to find out they were propane and not butane like Velentzas had suggested (Exhibit T, X).

25. On March 17, 2015, the UC and Ms. Siddiqui discussed her career goals and future plans, Ms. Siddiqui also talks about her boyfriend, Cristian Maldonado, a non-Muslim. Finally, she expresses concerns the FBI's interest in her because of the people she had associated with has derailed her pursuit of her goals. (Exhibit V).

## III.   OBJECTIONS TO THE PSR'S GUIDELINES CALCULATIONS

**Defendant objects to the misapplication of USSG § 2A1.5 (Conspiracy to Commit Murder) to calculate the base offense level instead of U.S.S.G. § 2K1.4(a)(1) (Arson; Property Damage by Use of Explosives)**

The defendant objects to the incorrect application of the U.S.S.G. § 2A1.5 (Conspiracy to Commit Murder) guideline to calculate Ms. Siddiqui's base offense level.  Ms. Siddiqui's crime of conviction is 18 U.S.C. § 842 (p)(2)(A) "Teaching and Distributing Information Pertaining to Explosive Devices". The starting point in the Guidelines for 18 U.S.C. § 842(p)(2)(A) is § 2K1.3(a) (Prohibited Transactions Involving Explosive Materials) which would provide a base offense level of 18. However, because the charged offense necessarily includes an underlying federal crime of violence, the base level of the offense must also consider whether a cross reference is appropriate. *See* §2K1.3(c). The PSR properly identifies the initial cross-reference to the Attempt, Solicitation, or Conspiracy guideline based on Count 1 of the indictment, (conspiracy to use a weapon of mass destruction).

The PSR, however, incorrectly further cross-references to the Conspiracy to Commit Murder guideline under §2A1.5. See (PSR, para. 29, 35) stating, "In this case, since the defendants

conspired to kill others in a bomb plot, the guideline is USSG §2A1.5." While the charged offense

does not limit the guidelines consideration to the charged offense, it does require a factual predicate

for an analogous offense as opposed to a conclusory statement. *See United States v. Nichols*, 169

F.3d 1255, 1275-76 (10th Cir. 1999).[6] The PSR does not support this statement with a factual

basis. Like *Nichols,* the defendant's relevant conduct includes a conspiracy to use a weapon of

mass destruction, rather than the actual use or attempted use of a weapon of mass destruction.

However, unlike *Nichols*, the factual background of the offense lacks an agreement on how the

device was going to be used. From the onset, Velentzas insisted the device would be used in self-

defense or used if someone messed with them, rather than on a particular target. (Exhibit E, I).

Likewise, when the UC tried to suggest governmental targets, Velentzas expressed interest, but

not agreement. Ms. Siddiqui was present, but voiced no opinion. Even as late as February, after

Ms. Siddiqui was no longer participating, Velentzas was stating that she was not sure what she

would do, fully acknowledging that any device may never be used. Under these circumstances, it

is speculative to conclude that the agreement to use an explosive device contained sufficient malice

aforethought to constitute murder.

Further unlike *Nichols*, there is no agreement on the type of explosive device to be used,

preventing an assumption that death is clearly foreseeable and intended. Finally, of course, death

did not result and indeed there is nothing to indicate that death was an imminent possibility, absent

---

[6] In *Nichols*, the Court of appeals held that although Terry Nichols was convicted acquitted of the crime
of use of a weapon of mass destruction and only convicted of a conspiracy to use a weapon of mass
destruction, he was properly sentenced under the first degree murder guideline. Finding that "1) the object
of the conspiracy was to use a weapon of mass destruction against the Murrah building and the persons
inside, (2) death resulted from the conspiracy, and (3) the deaths were a foreseeable result of Mr. Nichols'
conduct. Considering the record as a whole, we think there was sufficient information from which the
district court could infer that it was more likely than not Mr. Nichols harbored the malice and
premeditation necessary to bring the case under section 2A1.1 of the Guidelines."*Id*.

intervention. Contrary to the factual assertion in the PSR, defendants Velentzas and Siddiqui had not stockpiled bombing materials or attempted to acquire them. Velentzas's purchases were not per se bomb making materials but more akin to an experiment to help her practice the basic of circuitry which the group had been studying.  Ms. Siddiqui actually acquired nothing, but instead merely moved back into the basement of her parent's house where home repair items where present.  There is no evidence that she did so in order to obtain access to these items or that the items could have actually been used to construct a bomb.  In short, all the elements that supported the conclusion that Nichols possessed malice aforethought in conjunction with his conspiracy with Timothy McVeigh to use a weapon, are absent here. Accordingly, probations conclusion that the murder is the most analogous offense, is erroneous as there was no plan for a target, no plan for a specific device, and no present ability to conduct an attack to provide evidence of malice aforethought.

The government, on the other hand, correctly identifies the correct cross-reference for the alleged conspiracy the conspiracy charged in count 1 as 2K1.4 (Arson; Property Damage by Use of Explosives).  The arson guideline is used as opposed to the weapon of mass destruction guideline found at §2M6.1, when the weapon of mass destruction is not nuclear, biological, or chemical. *See* Application Note 1 of USSG §2M6.1; *see also United States v. Wright, et. al.,* 1:12 CR 0238 (N.D. Oh.).

Relying on the §2K1.4(c)(1) cross-reference, which applies if "the offense was intended to cause death or serious bodily injury," the government, however, contends that a further cross reference to the §2A1.5 Conspiracy to Commit Murder guideline is appropriate in this case.  Thus the government ultimately gets to the same place as probation by different route.  The government's final destination of the murder guideline, however is likewise flawed because of the

lack of evidence of an intent to kill.  While a specific target is not necessary to conclude that there

is an intent to kill,[7] there nevertheless must be an intent to kill evidenced by the conspiracy.  Here,

as set forth above, there is no agreement that the group will use the device to kill because there is

no plan for its use nor agreement to build a device that would clearly result in death.  Without

agreement as to what the device will be or how the device will be used, it cannot be said that the

conspiracy encompassed the intent to kill.

In the absence of a specific intent to kill, under the § 2K1.4(a)(1) (Arson; Property Damage

by Use of Explosives) guidelines, the Court must consider whether the underlying offense

nevertheless created a "substantial risk of death or serious bodily injury to any person other than a

participant in the offense, and that risk was created knowingly." 18 U.S.C.S. app. § 2K1.4(a)(1).

Courts have almost uniformly defaulted to this guideline with respect to conventional explosive

devices, in the absence of a specific intent to kill, because of the inherent dangers to life they pose,

regardless of their composition or intended use. *See e.g*., *United States v. Price*, 65 F.3d 903, 9

Fla. L. Weekly Fed. C 547 (11th Cir. 1995). Accordingly, the defendant agrees that despite the

fact that there was no plan for what device to construct or how the device would be used, the use

of any device would create a substantial risk of death, and that she was aware of the risk.  Indeed,

it was this fear that lead her to become depressed and to curtail her involvement.

## IV.    OBJECTION TO THE APPLICATION OF THE TERRORISM ENHANCEMENT (U.S.S.G § 3A1.4)

U.S.S.G. §3A1.4 provides for a 12 level increase in the offense level, and automatic placement

in criminal history category VI if a defendant's "offense is a felony that involved or was intended

to promote a federal crime of terrorism." Application Note 1 defines a "federal crime of terrorism"

---

[7] See *United States v. Aldawsari*, 740 F.3d 1015, 1020-21 (5th Cir. 2014)(concluding that in the absence of a specific target the consideration of many targets was sufficient to satisfy the intent to kill requirement.

by referencing 18 U.S.C. §2332b(g)(5). 18 U.S.C. §2332b(g)(5) provides a two pronged definition for a "federal crime of terrorism." To qualify as a federal crime of terrorism an offense must be a violation of any one of a list of enumerated statutes found in 18 U.S.C. §2332b(g)(5)(B). In addition to being an enumerated offense, the second prong requires that it also be an offense that is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. §2332b(g)(5)(A).

The guidelines do not specify that the standard of proof is beyond the ordinary preponderance of the evidence standard. However, given the draconian nature of the enhancement's application, there is case law support that the proof should be higher. In *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S. Ct. 2411, 91 L. Ed. 2d 67 (1986), the Supreme Court implied that sometimes a higher standard of proof beyond the preponderance of the evidence may be warranted in cases where the sentencing enhancement in question is "a tail which wags the dog of the substantive offense." *Id.* at 88. The terrorism enhancement, falls within this category because in most, if not all cases, its application has the practical effect of doubling the sentence or, in this case, recommending the statutory maximum. Indeed, courts have struggled with the draconian aspect of the enhancement as well as the proof requirements.

What there does seem to be is universal agreement that in order to apply the terrorism enhancement, the sentencing guidelines require a showing that the defendant had the individualized subjective intent to influence the government in conjunction with the commission of their crime.[8]

---

[8] *See* James P. McLoughlin Jr., Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations, 28 Law & Ineq. 51 (2010). Available at: http://scholarship.law.umn.edu/lawineq/vol28/iss1/2 . *See also* Punishing Terrorists: Congress, The Sentencing Commission, The Guidelines, And The Courts, 23 Cornell J.L. & Pub. Pol'y 517 (2014). (Attached as Exhibits-- and -- respectively).

Ms. Siddiqui's offense of conviction, 18 U.S.C. §842(p)(2)(a), is not on the list of enumerated offenses. The Second Circuit however has held that the terrorism guidelines can be applied to crimes where the underlying offense is among the enumerated offenses. In this case, the underlying offense of use of a weapon of mass destruction is listed and therefore, the defense concedes that Ms. Siddiqui is eligible for the enhancement if the second prong is met.

The same however cannot be said for the second prong of the test. Under the second prong, the burden is on the government to show, at a minimum by a preponderance of the evidence, that Ms. Siddiqui had the "specific intent" to commit an offense that was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *United States v. Awan*, 607 F.3d 306, 317 (2nd Cir. 2010) citing 18 U.S.C. 2332b(g)(5)(A); cf. *United States v. Noble,* 246 F.3d 946, 953 (7th Cir. 2001), *United States v. Starks*, 309 F.3d 1017, 1026 (7th Cir. 2002), *United States v. Johnson*, 227 F.3d 807, 813 (7th Cir. 2000) ("During sentencing, the Government must prove the facts underlying the base offense or an enhancement by a preponderance of the evidence.").

The government cannot meet this burden. As discussed above, the government and probation concede as much in calculating the base offense. Section 2M6.1(a)(1) is applicable if the offence was committed with the intent to injure the United States or aid a foreign nation or foreign terrorist organization. The terrorism enhancement similarly contains the requirement that the offense is, "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." As written, the test for the terrorism enhancement is actually narrower than the base offense level for use of a weapon of mass destruction with an intent to injure the United States. *See e.g*. *United States v. Awan*, 607 F.3d 306, 317 (2nd Cir. 2010) citing 18 U.S.C. 2332b(g)(5)(A), concluding that a conviction for a material

12

support of terrorism does not in all cases meet the test for the terrorism enhancement. In the absence of evidence of an intent to injure the United States, there is likewise the absence of an intent to influence.

Further, even if an intent to influence the United States can be ascribed to Velentzas in this case, based on her statements, the same cannot be said for Ms. Siddiqui. The Second Circuit, in *U.S. v. Stewart, et al.*, 590 F.3d 93 (2d Cir. 2009), rejected the argument that co-conspirators actions "calculated to influence or affect the conduct of government," could satisfy the requirement of section 2332b(g)(5)(A) for an individual defendant. Holding that, "section 2332b(g)(5)(A) describes a motivational requirement, a "specific intent." Accordingly, the Court found that it would be improper conflate an individual defendant's acts with his co-defendants' mental states. Thus, even if the Court finds that Ms. Siddiqui's base offense level is murder based on her knowledge of the other participant's intent for the use of the device and that Velentazs's intend to use the weapon to injure or retaliate against the government, the Court must find that Ms. Siddiqui shared this intent.  The evidence does not support such a finding.

During the course of the alleged conspiracy, Ms. Siddiqui did not make any statements to suggest that she was supportive of an attack against the government or to affect government conduct. Further, Ms. Siddiqui's conduct demonstrates that she did not support conducting a terrorist attack with the device.  Unlike Velentzas who maintained the possibilities of becoming a martyr or imprisoned, Ms. Siddiqui expressed the desire for a peaceful future. Most notably however, after the UC and Velentzas discussed the police funeral on December 27, 2014, Ms. Siddiqui's attendance drops dramatically. From January, 2015, to March, 2015, Ms. Siddiqui misses multiple study sessions and during the only session she attended, after being picked up by the UC, she suggested that they study separately. Further, Ms. Siddiqui tells the other members of

the group that she is suffering from anxiety and depression and stops calling Velentzas and the UC. In fact, if it were not for the efforts of the undercover, Ms. Siddiqui would have disappeared altogether. Based on her actions, even if it can be concluded that Ms. Velentzas intended to use the weapon at some point to conduct a terrorist attack, it cannot be reasonably concluded that Ms. Siddiqui did. Although, Ms. Siddiqui's actions are not sufficient to show that she withdrew from the conspiracy, as she did not make her withdrawal clear to the group, they are sufficient to make clear that she did not share the intent to influence the government. And, it is her intent that matters for the enhancement.

## V.   MS. SIDDIQUI SHOULD RECEIVE A 3 LEVEL REDUCTION FOR HER MINOR ROLE IN THE OFFENCE

The defendant objects to the PSR's finding that Ms. Siddiqui was a "co-equal participant" and that no "mitigating role adjustment is warranted". (PSR, para. 27).  The defense respectfully submits that Ms. Siddiqui should receive an adjustment for her minor role in the offense under § 3B1.2. The determination whether to apply a "minor role" or "minimal role" adjustment, 2 or 3 level decrease, respectively, is a fact-based determination based on the totality of the circumstances based largely on the facts of each particular case. Application Note 3(C), USSG § 3B1.2. (Mitigating Role).

Ms. Siddiqui is the least culpable individual in the instant offense. Her minor involvement with any studying or teaching and her continued demonstrated lack of interest in the topic distinguish her conduct from that of Velentzas and the UC. Ms. Siddiqui's role in the offense was to read to the group parts of the Inspire magazine article provided by the UC and to attempt to explain part of the chemistry studying to the group. Ms. Siddiqui's minor role in the offense merits a three level reduction under U.S.S.G. §3B1.2.  To determine if her role would make a minor

reduction appropriate her conduct must be compared to that of the average participant to determine

if she is "substantially less culpable." The Court considers five factors in this determination:

     i.      the degree to which the defendant understood the scope and structure of the criminal activity; -- *concede, factor precludes minimal*

     ii.      degree to which defendant participated in planning or organizing the criminal activity;

     iii.     the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

     iv.     the nature and extent of the defendant's participation in the commission of the criminal activity; and

     v.     the degree to which the defendant stood to benefit from the criminal activity. Application Note 3(c) USSG § 3B1.2. (Mitigating Role).

Application Note 3(c) also explains that the fact a defendant performs an essential or indispensable

role in the criminal activity is not determinative and that such a defendant may receive an

adjustment if they are "substantially less culpable". (See also *United States v. Castillo*, 277 F.

App'x 77, 79-80 (2d Cir. 2008)) (where the Court reversed the district court's decision to refuse a

minor reduction, stating that while the defendant was not a minimal participant, he was a minor

participant based on the factors outlined above and because of the lack of importance of his actions

to the success of the venture.)

     The defendant concedes that the first factor would weigh against her having a minor role

in the offense as Ms. Siddiqui did understand the scope and structure of the offense conduct.

Because of this she is not eligible for the 4 level reduction. However, the remaining four factors

all weigh strongly in favor of Ms. Siddiqui warranting a minor role 3 level reduction. With regards

to the second factor, Ms. Siddiqui's participation in the criminal activity was limited and

consistently lacked any real interest or dedication. The undercover officer, in an accidental

recording from December 3, 2014, complained to another agent about Ms. Siddiqui's lack of

interest stating, "I'm just like, I'm like it just could, you know, be a little annoying sometimes,

because she says one thing and then does another. So I'm like, you know, if she's not into the

conversation, then she just shouldn't be there. She should go do her own thing." (Exhibit L). The additional facts above and the attached transcripts show that Ms. Siddiqui was not a vocal participant for the conversations that she was present for, she did not solicit either the Inspire magazine article or Anarchist cookbook. Ms. Siddiqui was taken to Home Depot with the other two women, but she did not discuss the items there or show any interest in items at the store. After Ms. Siddiqui moves out from Velentzas's apartment, she rarely meets with the two women, who frequently complain about her lack of involvement or interest. (Exhibits K, L, M, O, Q, S, V). For these reasons, Ms. Siddiqui's limited participation in the group warrant a minor role reduction.

Regarding the third factor, Ms. Siddiqui was the passive follower of the group, evidenced by her failure to initiate any of the conversations about studying or explosives. She was not a leader, and in fact, in a discussion about each of their roles in the group, Ms. Siddiqui assigned herself the role of memorizing verses of the Quran, while noting Velentzas was the teacher and the undercover was the time manager and in charge of money. (Exhibit K at 58). The undercover and Velentzas initiate all of the discussions about explosives and studying electricity and chemistry. They provide the materials and they pursue Ms. Siddiqui when she becomes distant. The facts above and the attached transcripts demonstrate Ms. Siddiqui was not a decision-making authority in the group.

The fourth and fifth factors weigh strongly in favor of Ms. Siddiqui receiving a reduction for her minor role in the offense because she did not stand to benefit from the offense conduct and the nature of her participation, as outline above was reluctant and in the context of engaging with friends. The PSR characterizes the used repair items in Ms. Siddiqui's basement as "stockpiling of bomb making materials", but this is a mischaracterization. Exhibit X shows these materials and Ms. Siddiqui will offer testimony from family members who also lived in the basement that explain

16

how long the small propane tanks had been there, along with the soldering materials and pipes and the piles of old textbooks from college and graduate study by various members of the household.

In the instant case, Ms. Siddiqui's role is minor when compared to the conduct of Velentzas, who took the initiative to solicit the Anarchist Cookbook, read the Inspire magazine article, to continuously attempt to organize the group to study, to study electricity and chemistry independently of the group, distributed the magazine as well as procured fertilizer and flux independently. For all five factors, Velentzas's offense conduct is more involved and it is clear she organized the study sessions and spent time studying and researching independently. This demonstrates that Ms. Siddiqui was a minor participant and her conduct was the least culpable. For these reasons, 3 points should be deducted for her minor role in the offense.

## VI.    CONCLUSION

For the above reasons, defendant Siddiqui through counsel, prays that the Court reject the above disputed facts and consider the defendant's proposed additional factual conduct and supporting evidence.  The Defendant further prays that the Court reject the recommended base level offense under §2A1.5 recommended in the PSR and by the government, and find that the base offense level for the offense is more properly found at §2K1.4(a)(1). The defendant also prays that the Court reject the PSR and government recommendations that the §3A1.4 terrorism enhancement is applicable to the offense conduct and find that Ms. Siddiqui is eligible for a 3 level adjustment for her minor role in the offence in addition to her 3 level reduction for acceptance of responsibility.

Respectfully Submitted this 2nd day of December, 2019.

                                                                        /s/ Charles D. Swift

Charles D. Swift
*Attorney for Asia Siddiqui*
Constitutional Law Center for
Muslims in America
833 E. Arapaho Rd, Suite 102
Richardson, TX  75081
Phone: (972) 914-2507
Fax: (972) 692-7454

Linda Moreno
*Attorney for Asia Siddiqui*
511 Avenue of the Americas, No. 312
New York, NY 10011
Office: (813) 247-4500
Fax: (855) 725-7454

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of December, 2019, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of

electronic filing to all counsel of record.

*/s/ Charles D. Swift*
Charles D. Swift
*Attorney for Asia Siddiqui*