IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

Case No.: 15-CR-213 (SJ)

**NOELLE VELENTZAS,**

Defendant.

### DEFENSE SENTENCING MEMORANDUM

Defendant Asia Siddiqui ("Ms. Siddiqui") through counsel, respectfully submits this Sentencing Memorandum in connection with her sentencing by the Court on December 5, 2019. On August 23, 2019, Ms. Siddiqui entered a guilty plea before this Honorable Court to one count of Teaching and Distributing Information Related to the Use of an Explosive Device, in violation of 18 USC § 842(p)(2)(A) and 844(a)(2). Ms. Siddiqui accepts full responsibility for her actions, and through this memorandum seeks to provide the Court with information pertinent to her sentencing in the interests of justice under 18 USC § 3553(a).

### SENTENCING ANALYSIS

In accordance with *United States v. Booker*, 543 U.S. 220 (2005), the Court is directed to impose a sentence in accordance with 18 U.S.C. § 3553(a). In so doing, the Court is to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes of punishment set forth in 18 USC § 3553(a)(2). *Id*. (emphasis added); *see, e.g., Kimbrough v. United States*, 552 U.S. 85, 111 (2007) ("sufficient, but not greater than necessary" requirement is the "overarching instruction" of § 3553(a)). Those purposes include "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 USC §

1

3553(a)(2)(A); "to afford adequate deterrence to criminal conduct," *id.* § 3553(a)(2)(B); "to protect the public from further crimes of the defendant," id. § 3553(a)(2)(C); and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Id*. § 3553(a)(2)(D). In determining a sentence "sufficient, but not greater than necessary" to accomplish these purposes, courts must consider a number of factors, including (as relevant here) "the nature and circumstances of the offense and the history and characteristics of the defendant," *id*. § 3553(a)(1); the guidelines sentencing range and any applicable Sentencing Commission policy statements, *id.* § 3553(a)(4), (5); and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," *id*. at § 3553(a)(6).

Based on the above criteria the defendant respectfully submits for the reasons set forth below that a sentence of no more than 60 – 70 months is sufficient, but not greater than necessary in this case.

## I. SENTENCING FACTORS UNDER 18 USC § 3553(a)

### A. History and Characteristics of the Defendant

The Presentence Report ("PSR") provides a broad overview of Ms. Siddiqui's personal life and history from her childhood through to her arrest. (PSR at 52-79). Ms. Siddiqui was born in Riyadh, Saudi Arabia, in 1984. She was born with leg deformities from polio that required medical care and physiotherapy that was refused to her family as immigrants in Saudi Arabia. (Exhibit A1, A2, A5). Her parents were forced to send her to India for treatment where she lived with her grandmother for four years, separated from her family. In 1988, Ms. Siddiqui was brought to the United States to join the rest of her family. She suffered from many physical ailments, including constant ear infections that resulted in her partial deafness. (Exhibit A1, A5).

2

Upon joining her family, Ms. Siddiqui was initially rejected by her siblings. She was taunted and thought of as being adopted, because she was "dark skinned and had messy hair". (Exhibit A2, A3). Ms. Siddiqui is not light-skinned like her other family members, and in some parts of her Pakistani community was bullied and rejected for this. (Exhibit A2, A3, A5). As Ms. Siddiqui got older, between the ages of 8 and 16, she was sexually molested by an older cousin who was living with the family. (Exhibit A2). For cultural reasons, Ms. Siddiqui never told her parents about the abuse, as it would be too shameful and dishonorable.

Ms. Siddiqui was smart and ambitious in high school. Though she was shy and suffered from low self-esteem, she wanted to make something of herself. Her parents encouraged studying and pursuing higher education for Ms. Siddiqui and all of her siblings. (Exhibits A1, A3, A5, A6, A7). While she had wanted to study art and writing, her parents felt these would not be lucrative professions and pushed her towards teaching. Ms. Siddiqui loved children and teaching came naturally to her. She worked in various teaching positions throughout her early child education program. (Exhibits A1, A2, A6).

In 2005, Ms. Siddiqui began dating a man she had met while in school and going clubbing. While she enjoyed music and going out, Ms. Siddiqui is from a religious and culturally traditional family and she understood that she was to save herself for marriage. Unfortunately, the individual who she had been dating, rather than respecting her beliefs, raped her. As a result of the rape, Ms. Siddiqui became withdrawn and depressed. To protect herself, unlike her other siblings, she began covering her whole body and her face with the veil and shunning dating as a result of her trauma and disgust with her experience. (Exhibit A2).

After this assault, Ms. Siddiqui struggled in her academic pursuits but persevered and completed her bachelor's degree in 2010, it took her a few extra years but she graduated. (Exhibit

3

A1, A5). After the rape and her retreat into an isolated and covered life, Ms. Siddiqui began seeking friendship online. She found acceptance and non-threatening male interaction with Muslim men online, men who were religious and unmotivated by sex.

This is how Ms. Siddiqui first engaged with Samir Khan in 2006, an individual with whom she would later submit her poetry and publish in his online magazine, *Jihadist Recollections*. Ms. Siddiqui felt a similar comfort in writing to Muslim men in prison, like Tarek Mehanna. These men accepted her and valued her for her thoughts and her writing. During this time, Ms. Siddiqui found it difficult to find employment while wearing her long abaya and face veil. She continued to volunteer at Community Mediation Services in Jamaica, Queens, because she had volunteered there for so long and she enjoyed the satisfaction of being of service to others, especially children. (Exhibit A1, A2, A3).

Between 2008-2010, Ms. Siddiqui went with her father to Riyadh, Saudi Arabia, for a new job he had secured. By this time, there was mounting pressure for Ms. Siddiqui to be married. But she faced discrimination and rejection from her community for her dark skin tone and leg deformity. (Exhibit A1, A2). Suitors rejected Ms. Siddiqui on this basis, she was socially and culturally isolated. In Saudi Arabia, Ms. Siddiqui was miserable, constantly calling her sister and complaining about the restrictive lifestyle of women there and her longing to return to New York. (Exhibit A2).

After her return to New York, Ms. Siddiqui lived at home and was a significant support to her family, especially her two younger brothers. Ms. Siddiqui cared for them, cooked for them, cleaned the home and assisted them with schoolwork. (Exhibit A3, A6, A7). She took on the role of caretaker to assist her mother who had been diagnosed with high blood pressure and diabetes. (Exhibit A1, A5). Ms. Siddiqui culturally fell into the role of assisting, supporting and facilitating

4

her family, putting her own goals and ambitions on hold while her younger brothers attended college. (Exhibits A1, A3, A6, A7). Ms. Siddiqui's father describes her as kindhearted and believes if given a second chance she would continue being of service to others. (Exhibit A1). Her mother notes Ms. Siddiqui's charitable nature and her hard work saying Ms. Siddiqui sat for "several kinds of New York city exams for jobs and she did very well". Ms. Siddiqui's family has continued to receive job offers and offers to interview for Ms. Siddiqui from her arrest until now, the latest being a caseworker position with the city in July, 2019. (Exhibits A1, A5, W).

Between 2012 and 2014, Ms. Siddiqui studied in Canada for a certificate in publishing. She loved to write and wanted to pursue writing professionally. During this time, the undercover ("the UC") and Ms. Velentzas had just met Ms. Siddiqui in New York and she had befriended them. She was vulnerable, shy, without friends or a sense of belonging. The UC was pretty, well-spoken, a college student with a competitive internship who seemed primed for success. Ms. Velentzas was bold, outspoken, proud of her Muslim identity, and tough. Both of these women's personalities were alluring and impressive to Ms. Siddiqui and she became the quiet follower of the group, sometimes calling the UC to tell her she missed her. In August of 2014, Ms. Siddiqui returned to the United States from Canada. In the process of returning to the United States, she was met and questioned by FBI officers concerning her prior activities, including her publishing poetry in *Jihadish Recollections*, her relationship with Samir Khan, and her letters to Aafia Siddiqui and Tarek Mehanna. The interrogation left her shaken and under the belief that her arrest was almost assuredly going to follow.

When Ms. Siddiqui moved back to New York she was unable to resume living in her parents' home. The upstairs was rented out to tenants and the basement apartment where her brother was living was too small for her to stay in long-term. Consequently her brother asked her

5

to find somewhere else to stay. (Exhibit A3). Ms. Siddiqui moved in with Velentzas in July, 2014. Apart from the need for some place to stay at no cost, Ms. Siddiqui was happy to have some company while she was unemployed and looking for work in education and publishing. When she was not looking for work, Ms. Siddiqui helped out Velentzas by babysitting her younger daughter and by sharing her food stamps with Velentzas to help offset the cost of her staying there. (Exhibit A2, V).

### B. Nature and Circumstances of the Offense

While Ms. Siddiqui was living with Velentzas they met with the UC. The UC had been encouraging Velentzas to engage in jihad training suggesting at different points that Velentzas accompany her to a shooting range or to play paintball. Velentzas had rejected each of these suggestions because she didn't have the funds for them. In August, 2014, however, Velentzas suggested an alternative way to train for jihad and that was to learn about explosive devices which culminated in the underlying offense. (Exhibit E). To understand the nature of the offense and Ms. Siddiqui's role in it, a summary is appropriate. Each of these summaries are supported either by transcripts of recorded conversations or the UC's summary of the meeting where the UC failed to record the meeting.

### Timeline of the Offense

**August 6, 2014** – Velentzas, Ms. Siddiqui, UC Agreement to learn about explosives for self-defense along with martial arts. (Exhibit E).

**September 7, 2014** - Velentzas, Ms. Siddiqui and UC discuss basics of electricity and possible uses in explosives.

**October 26, 2014** - UC discusses prisons and attacks, Velentzas clarifies they are not talking about "f*cking with people" and that the UC should mind her own business. Ms. Siddiqui present, but silent. (Exhibit I).

**November 2, 2014** – the UC tells Velentzas she downloaded the Anarchist Cookbook. At the UC's suggestion, Velentzas, Ms. Siddiqui and the UC visit Home Depot to determine the feasibility of purchasing materials that could be used in explosives. During the visit,

6

Velentzas and the UC look at different materials, while Ms. Siddiqui takes care of Velentzas's minor child during this visit. (Exhibit V).

**November 16, 2014** - the UC criticizes Ms. Siddiqui's lack of interest and Ms. Siddiqui said it was the push she needed to start running again. (Exhibit V).

**November 20, 2014** - the UC provides Inspire article and Velentzas instructs Ms. Siddiqui and the UC to read it. (Exhibit V at 4).

**November 23, 2014** - Velentzas, Ms. Siddiqui and UC discuss what they are trying to accomplish. Velentzas stated it was too early for any plan and she would not want to hurt anyone. (Exhibit V).

**December 8, 2014** – Ms. Siddiqui moves out of Velentzas's apartment and back into her family residence. She begins to distance herself from the group. (Exhibit L, M)

**December 12, 2014** – Ms. Siddiqui seeks psychiatric treatment for her stress and depression. Dr. Shafiq Khokhar diagnoses her with Major Depressive Disorder and Social Anxiety and prescribes appropriate medications.

**December 24, 2014** - the UC provided Spring issue of Inspire to Velentzas. Velentzas studied it. (Exhibit N).

**December 24, 2014** - the UC asked Velentzas what type of explosive was most practical, Velentzas replied nitroglycerin. Siddiqui not present. (Exhibit N).

**December 24, 2014** – Later in the conversation Siddiqui arrives and helps the UC and Velentzas read and try to understand the Anarchist Cookbook. (Exhibit N)

**December 27, 2014** UC discusses the large police funeral with Velentzas and Ms. Siddiqui. There is no discussion or agreement about the group targeting any similar event. (Exhibit O).

**December 30, 2014** – the UC met privately with Ms. Siddiqui and gave her a copy of Inspire article to distribute to Velentzas. (Exhibit V).

**January 5, 2015** – Ms. Siddiqui starts working at an afterschool daycare program. (Exhibit V).

**January 6, 2015** – Ms. Siddiqui, Velentzas and the UC meet for dinner but do not study.

**January 8, 2015** – the UC tells Velentzas that Ms. Siddiqui had not called her since she moved out.

**January 11, 2015** – the UC and Velentzas meet, Ms. Siddiqui is absent.

**January 13, 2015** – the UC and Velentzas meet, Ms. Siddiqui is absent and they note she is not calling.

7

**January 18, 2015** – the UC goes to Siddiqui's residence and takes her to a restaurant to have dinner with Velentzas, they do not study.

**January 22, 2015** – Velentzas and the UC meet to study, Ms. Siddiqui again is absent.

**January 25, 2015** – the UC picks up Ms. Siddiqui to ensure she is present for studying, Ms. Siddiqui suggest they study on their own.

**February 3, 2015** – the UC and Velentzas meet and study, Ms. Siddiqui is absent. (Exhibit P).

**February 8, 2015** – the UC again meets privately with Ms. Siddiqui and encourages her to rejoin the groups studies. (Exhibit Q).

**February 17, 2015** – the UC and Velentzas meet without Ms. Siddiqui.

**February 22, 2015** – the UC and Velentzas go to Ms. Siddiqui's house unannounced. Velentzas notes the home repair materials stored in the basement and jokes Ms. Siddiqui has been holding out on them. (Exhibit S, X)

**March 1, 2015** – the UC visits Ms. Siddiqui privately at her home. The UC discovers Ms. Siddiqui did not distribute the Inspire article to Velentzas as instructed. The UC inquires about the home repair materials and Ms. Siddiqui responds that they could look up the UPC codes to find out what the materials were (ie. Propane tanks instead of butane). (Exhibit T, X)

**March 17, 2015** – the UC and Ms. Siddiqui discuss her career goals and future plans, Ms. Siddiqui talks a lot about her boyfriend, Crisitian Maldonado, a non-Muslim. She expresses concerns that the FBI's interest in her because of her past online associations has derailed her pursuit of her goals. (Exhibit V).

The defendant respectfully submits that the above timeline reveals three key points with respect to Ms. Siddiqui's participation in the offense conduct. First, Ms. Siddiqui's role in the group's study of explosive devices was inconsequential. When she was present she was largely silent and her participation was limited to encouraging words. Unlike Velentzas, she did not lead the group discussions, request that the UC provide study materials, or study on her own. Second, that Ms. Siddiqui's participation diminshed as the potential for the actual use of the device became more concrete. Indeed, the UC first complains about Ms. Siddiqui's lack of attention in November, 2014, thereafter not only does Ms. Siddiqui not increase her participation in the group's discussions, instead she is increasingly absent from those discussions culminating in Ms.

8

Siddiqui's suggestion that they should study on their own after repeated attempts to have her rejoin the group. Finally, the impact of the stress that the group 's activities is having on Ms. Siddiqui is evidenced by her seeking mental health treatment and her diagnosis with depression and anxiety. (PSR 64-66).

The government from the onset has argued that Ms. Siddiqui's stated desire to study on her own and her access to home repair items in her family's basement demonstrates that, despite her lack of interest, practical knowledge and pursuit of employment, she had an intent to commit an independent attack. A serious review of the evidence however quickly disposes of such a possibility. Ms. Siddiqui did not distribute the Inspire magazine because she wanted to use it for herself but rather because she had no interest in participating in the plan. She was unaware of the type of gas in the propane tanks and an inspection of those tanks shows that they had been utilized for home repair and were not being held in storage for a bomb. (Exhibit T, X). To construct a bomb from what Ms. Siddiqui had in her basement would have required the expertise of the fictional MacGuyver, and the claim that she was going to independently build her own explosive device is equally fictional.

**C. Sentencing Guidelines Range**

Defendant Siddiqui in her objections to the draft PSR objected to both a base offense level calculated using §2A1.5 (Conspiracy to Commit Murder) and the application of the §3A1.4 terrorism enhancement to her offense. Under Ms. Siddiqui's proposed guidelines calculation, she would have a total offense level of 18 with a criminal history of I with a guidelines range of 27-33 months. If the Court were to reject the terrorism enhancement but accept the base offense level for Conspiracy to Commit Murder under the §2A1.5 guideline, and accept that Ms. Siddiqui's proposed minor role deduction, Ms. Siddiqui would have a total offense level of 27 with a criminal

history of I and a guidelines range of 70-87 months. If the Court accepts all of the PSR's recommendations, then she would have a total offense level of 41 with a criminal history of VI resulting in a recommended guidelines range of 240 months because of the statutory maximum. As illustrated in these different ranges, the primary effecting element in this case is the presence of the §3A1.4 terrorism enhancement. The defendant respectfully submits that this Court, like other Courts, should find that the terrorism enhancement provides little real guidance because it arbitrarily distorts the seriousness of the offense and the threat posed by the defendant and, as outlined in the objections, is inapplicable without a factual basis for the specific intent required.

In this case, as illustrated by the potential variances in the guideline range, the terrorism enhancement dictates a maximum sentence, despite the UC's instrumental role in the conduct the relatively minor actions of Ms. Siddiqui, and the lack of any real threat of harm. This is unreasonable considering the relevant conduct. In fact, this case is a textbook example of why *United States v. Booker,* 543 U.S. 220, 259-60 (2005) and its progeny hold that the Guidelines are merely one factor for the Court to consider at sentencing, along with the other factors enumerated in § 3553(a). This discretion to vary from the Guidelines is important in order to impose a just sentence in accordance with 18 USC §3553(a). Indeed, as the Supreme Court emphasized in *Nelson v. United States*, 129 S. Ct. 890 (2009), "[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." 129 S. Ct. at 892.[1]

---

[1] While the Supreme Court's ruling in *Rita v. United States*, 551 U.S. 338 (2007) established that a within Guidelines sentence can be presumptively reasonable, *id*. at 347, that presumption is restricted to appellate review, and "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Id*. at 351 (citing *United States v. Booker*, 543 U.S. 220, 259-60 (2005)). *See Nelson*, 129 S. Ct. 890, 892 (wherein the Court twice remanded the Fourth Circuit's decision(s) that affirmed a sentence even though the District Court had stated that while the Guidelines were not mandatory, they enjoyed a presumption of "reasonableness" and reiterated "district judges, in considering how the various statutory sentencing factors apply to an individual

Accordingly, while the court must still consider the Guidelines, *see* 18 USC § 3553(a)(4), nothing in the statute provides any reason to treat that calculation as more controlling of the final sentencing decision than any of the other factors a court must consider under § 3553(a) as a whole. *See United States v. Menyweather*, 431 F.3d 692, 701 (9th Cir. 2005); *United States v. Lake*, 419 F.3d 111, 114 (2d Cir. 2005), explaining *United States v. Crosby*, 397 F.3d 103, 111 13 (2d Cir. 2005). In addition to lacking any presumption of reasonableness, the advisory Guidelines do not occupy any superior position among the factors listed in § 3553(a) that a court must consider in imposing sentence.

### D. The Need to Avoid Unwarranted Sentence Disparities

The United States Sentencing Commission advises that its statistical analysis uses arson offenses as an analogy to explosive offenses. This is because basic explosives are far less serious and dangerous than "weapons of mass destruction" as defined in 18 U.S.C. 2332a(c)(2)(B), (C), and (D).[2] For the purposes of sentencing, this is why 2M6.1 cannot apply as it is reserved for those more serious and dangerous "weapons of mass destruction". The basics of electricity and the single bag of fertilizer, two small and used home repair propane tanks, and the articles provided by the UC, at most amount to use of a small explosive device. The Arson guideline in 2K1.4(a)(1) is the most analogous guideline for such an offense. The average national sentence for arson offenses in 2017 was 67 months.

---

defendant 'may not presume that the Guidelines range is reasonable.'" 129 S. Ct. at 892, quoting *Gall*, 552 U.S. at 50); *see also id*. ("[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable").

[2] "Weapon of Mass Destruction" for the purposes of the sentencing guidelines is defined as "any weapon that is designed or intended to cause death or serious bodily injury through the release, dissemination, or impact of toxic or poisonous chemicals, or their precursors; any weapon involving a biological agent, toxin, or vector; or any weapon that is designed to release radiation at a level dangerous to human life. See Application Note 1, 2M6.1 and 18 U.S.C. 2332a(c).

11

Defendant Siddiqui proposes that an analogous case for the Court to consider is *United States v. Wright, et. al.*, 1:12CR0238 (N.D. Oh.) (*see also United States v. Wright*, 747 F.3d 399, 405 (6th Cir. 2014). The defendants in Wright were all members of the Occupy Movement, who began with political protests and then later, with the encouragement of an FBI agent, conspired to attack financial institutions, bridges, and police in the Cleveland area. In carrying out their plans, the conspirators prepared for over several months to blow up a bridge. The defendants purchased what they believed were explosives from an informant and actually placed the explosives at the base of the Route 82 Bridge outside Cleveland. The defendants then attempted to blow up the bridge with a detonator accessed via cellular phones. The defendants took all actions necessary to commit an act of terrorism through detonating a weapon of mass destruction, only to be foiled because they mistakenly had been given fake explosives. One defendant—Stafford—was convicted after trial and the remaining four defendants pled guilty. During sentencing, the Court determined that the terrorism enhancement was applicable to the defendants conduct because the conduct was intended to influence government and/or retaliate against government conduct. The Court nevertheless ordered sentences significantly below what was called for with the application terrorism enhancement. Defendant Stafford, who went to trial, received a sentence of 10 years. The remaining defendants who pled guilty received sentences of 11.5 years, 9.75 years, 8 years and 1 month, and 6.75 years.[3]

The government undoubtedly will take issue with *Wright* as an analogous case pointing out that the Court rejected the Chapter Two (Offenses Against the Person) Murder guideline as the appropriate base offence level and utilized, as the defense proposes here, §2K1.4(a). Even if the Court were to adopt the §2A1.5 Conspiracy to Commit Murder guideline, the defense submits that

---

[3] The above facts were taken from the Sixth Circuit's decision on Stafford's appeal, *United States v. Stafford*, 782 F.3d 786 (6th Cir. 2015).

*Wright* represents the most analogous conduct. Like the defendants in *Wright*, Ms. Siddiqui and Ms. Velentzas's criminal conduct originated in political dissent. They were both frequent attenders of political protests, tried to support prisoners and saw *dawah*, spreading the message of Islam, as their primary mission.

The primary difference lies in the fact that unlike the defendants in *Wright*, Ms. Siddiqui and Velentzas did not select a target. The government will likely argue that the lack of selection means that the target could have been persons, rather than property, and therefore they warrant a greater sentence. But that argument cuts both ways because the fact that they had not selected a target leaves open the possibility that they would have selected property as a target instead of persons. Further, unlike in *Wright*, where the defendants demonstrated the willingness to commit the attack by actually building the bomb and attempting to detonate, the defendants here demonstrated no such willingness or ability. In fact, during the course of the alleged conspiracy they did not demonstrate the willingness to carry out the attack that the *Wright* conspirators presented. Accordingly, *Wright* is an apt, if imperfect, analogous case.

This is true because the present facts differ from almost all other reported "terrorism" cases involving the use of a weapon of mass destruction, wherein the weapon was used or attempted to be used. In each of those cases, the Court could be confident that the attackers desired the attack to occur as evidenced by the actions in pushing the button or amassing the materials necessary to conduct the attack, or by relying on the defendant's statements of who they wanted to attack and listing potential targets. *See United States v. Alhaggagi*, 2019 U.S. Dist. LEXIS 37889, *16, 2019 WL 1102991 (N.D. Cal. March 8, 2019); *United States v. Aldawsari*, 740 F.3d 1015 (5th Cir.). None of those facts are present here.

Within the conspiracy, Ms. Siddiqui is most like, the defendant Hayne, who received the 6.75-year sentence in *Wright,* down from a guidelines range of 262 to 327 months. *Wright*, 747 F.3d at 410. This defendant's sentence was less because of the relatively minor role he played due to him joining the conspiracy late. In Ms. Siddiqui's case she was an early participant whose participation faded over time and the defense submits is therefore worthy of an even greater reduction in sentence as she demonstrated little threat.

## II. PURPOSES UNDER 18 USC § 3553(a)(2)

### A. Seriousness Of The Offense, To Promote Respect For The Law, And To Provide Just Punishment For The Offense

The offense of conviction, 18 U.S.C. 842(p)(2)(A) 'Teaching and Distributing Material Related to the Use of Explosives' is a serious offense. Just punishment for this offense, however, requires consideration of Ms. Siddiqui's actual conduct. As the timeline of the offense and the stipulated facts show, Ms. Siddiqui was not a leader, nor a major contributor nor even an enthusiastic participant. Ms. Siddiqui more often than not was the babysitter, focusing on Velentzas's child rather than the group's study of explosive materials. She did not seek or distribute the Inspire magazine articles or the Anarchist Cookbook. She did not read or research any of the topics by herself. Her offense conduct consisted of participating in the UC and Velentzas study of the Anarchist Cookbook where she read portions of the book aloud and offered her understanding of what it meant. Contrary to assertions by the government and probation, she did not acquire or store explosive materials. She merely moved into a basement that had home repair items in it. As evidenced by Exhibit T, because of her lack of study, she did not even know what the home repair materials in her basement were or whether they could be used in a bomb. (Exhibit T).

Further, after it became apparent to Ms. Siddiqui that Veletzas and the UC shared an intent to use the weapon of mass destruction she developed significant mental health issues. (PSR 64-66). In December, 2014, Ms. Siddiqui was suffering from such severe stress and depression after living with Velentzas and participating in Velentzas's and the UC's discussions that she sought psychiatric treatment from Dr. Shafiq Khokhar. She met with Dr. Khokhar every single week after moving out of Velentzas's apartment, from December, 2014, until her arrest in April, 2015. Her psychiatric treatment throughout the last 4 months of the offense conduct and her resulting diagnoses of Major Depressive Disorder and Social Anxiety are evidence of the immense impact the offense had on her. (PSR 64-66, Exhibit A2).

The attribution of Ms. Siddiqui's depression to the stress she felt from her association with Velentzas and the UC is demonstrated by the fact that once she was detained at the MCC, Ms. Siddiqui recovered from her depression and social anxiety without further mental health treatment. This recovery is counter to the normal experience where prisoners become depressed and anxious after their arrest, not before. For these reasons, although the offense is serious, just punishment is not served by having Ms. Siddique serve significantly more time for her offense of conviction.

**B. Deterrence and Protection of the Public**

As this Court is well aware, the MCC over the past few years has not been a model facility. Despite this fact, Ms. Siddiqui has been a model detainee. Ms. Siddiqui has flourished during her time in detention. (Exhibits B, C). She has taken classes, befriended and comforted her cellmates, been dependable and helpful to her Unit Team, been of great service to the Chapel and has been a positive model inmate. This improvement has been noticed by the Federal Bureau of Prisons. (Exhibit B, C).

Ms. Siddiqui's case manager in prison, her chaplain and two cellmates from her time in prison write highly of their interactions with her and her behavior as an inmate. (Exhibit B, C). She is described as "very responsible and dependable" and an "extremely hard worker assisting whenever needed" by her case manager, Ms. Olivares. (Exhibit C). Reverend Steve Mun, the prison's Chaplain, notes that Ms. Siddiqui "has done a wonderful job" in her role assisting in Chapel and that she is "up for a Certificate of Appreciation" for her service. Reverend Mun describes Ms. Siddiqui as a "positive model for other inmates". (Exhibit B). Ms. Siddiqui's former cellmates also wrote on her behalf stating she was helpful and caring towards them, assisting them through depression and even giving one of her cellmates her own sneakers so she could go to the gym. Everyone wishes Ms. Siddiqui a bright future and hopes she receives a second chance. (Exhibits A1, A2, A3, A4, A5, A6, A7, A8, A9, B, C).

Ms. Siddiqui had no criminal history and never posed any danger to anyone, even during the instant offense conduct. Since her arrest, Ms. Siddiqui has not had any mental health issues. (PSR 66). She has not needed or received any mental health treatment in the last 5 years and she has been a model inmate in that time. She is not an extremist. She is a simple woman, the type whose mentors only worried that she could be a danger to herself, never anyone else. (Exhibit A4). For these reasons, the Defense submits that signifiant additional time is not necessary under 18 U.S.C. § 3553(a)(2).

**C. The Need for Care, Treatment or Training of Defendant is Not Implicated**

Ms. Siddiqui was shocked and overwhelmed with grief when she was first arrested. She beat herself up for her stupidity and felt deep sorrow at losing all she had begun to build in her life in the months before her arrest. Her job, her boyfriend, her family, relationships, and her freedom. Accepting that loss has taken time, but Ms. Siddiqui knew she should have had the strength of

16

character to walk away from her "friends" and report their behavior, instead of meekly tagging along and hoping nothing would happen. She did not have the courage or sense of self-worth at that time to shun the only company she had. But in prison, Ms. Siddiqui has learned to stand up for herself and for others. She looked after her cellmates. (Exhibit A). She wrote to the Court to request medical care numerous times. The Court heard her and she received that care. Ms. Siddiqui is a stronger person now, she has learned a difficult lesson and faced great loss as a consequence of her crime, a just punishment for her offense. But Ms. Siddiqui's gentle nature, her kindness and generosity towards others has sustained a sense of hope in her. She has no history of drug use or alcohol consumption. She has no criminal history with the exception of the current conviction and she is full of remorse, eager to move forward in her life. The defense respectfully submits that no greater punishment is necessary to achieve the purposes of sentencing here. Perhaps there is still time for Ms. Siddiqui to have a family of her own, a desire she has shared with her current cellmate, who shares the same hope for Ms. Siddiqui. (Exhibit C). For these reason a sentence that requires Ms. Siddique to serve significant additional time is not necessary for her care and treatment, and indeed likely counter-productive.

### III. MS. SIDDIQUI'S SENTENCING RECOMMENDATIONS AND REQUESTED FINDINGS

#### A. Term of Time Served (60-70 months) is the Appropriate Sentence

For the reasons set forth above, the defendant recommends a sentence of 60-70 months. This sentence reflects the seriousness of the crime, which may well be understated if utilizing the guidelines under 2K1.4(a)(1) without a terrorism enhancement and is reflective of a sentence under the 2A1.5 Conspiracy to Commit Murder guideline without a terrorism enhancement or, under the Arson guideline with a terrorism enhancement. In short, it represents the median of any guideline

17

approach does not create sentencing disparities under the facts of this case and for the reasons set forth above is sufficient but not greater than necessary.

    **B. No Fine Should Be Imposed**

Respectfully Submitted this 2nd day of December, 2019.

*/s/ Charles D. Swift*
Charles D. Swift
*Attorney for Asia Siddiqui*
Constitutional Law Center for
Muslims in America
833 E. Arapaho Rd, Suite 102
Richardson, TX 75081
Phone: (972) 914-2507
Fax: (972) 692-7454

Linda Moreno
*Attorney for Asia Siddiqui*
511 Avenue of the Americas, No. 312
New York, NY 10011
Office: (813) 247-4500
Fax: (855) 725-7454

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of December, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*/s/ Charles D. Swift*
Charles D. Swift
*Attorney for Asia Siddiqui*
