

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DMP:CRH/JGH/JEA                     *271 Cadman Plaza East*
F. #2014R00196                      *Brooklyn, New York 11201*

December 18, 2019

<u>By ECF</u>

Shayna Bryant
Senior United States Probation Officer
Eastern District of New York
147 Pierrepont Street
Brooklyn, New York 11201

             Re:    United States v. Asia Siddiqui
                    <u>Criminal Docket No. 15-213 (S-2) (SJ)</u>

Dear Officer Bryant:

            The government writes in response to the defendant's letter, dated December 2, 2019 ("Def.'s PSR Letter") objecting to the Presentence Investigation Report ("PSR") prepared by the United States Probation Office ("Probation" or "USPO"). The government responds to the defendant's objections, corrections and additions as follows:

I.      <u>Response to Objections to Facts and Additional Facts</u>

            The government proposes that the PSR incorporate by reference the stipulated facts attached to the defendant's plea agreement (the "Stipulated Facts"), and confirm that those facts have been considered by Probation as part of its sentencing calculation. A copy of those facts, and exhibits to those facts, are attached hereto as Exhibit 1.

        A.      <u>The Defendant's Objections to Facts in the PSR</u>

            The defendant's objections to certain facts contained in the PSR are without merit and should be rejected by Probation.

            First, the defendant objects to the references to a "terrorist bomb plot," "terrorist plot," "terrorist scheme" and "plot to build a bomb for use in a terrorist attack." <u>See</u> Def.'s PSR Letter at 2-3. The PSR appropriately concludes that the terrorism enhancement is warranted based on the facts involved in this case. <u>See</u> PSR ¶ 47. As explained more fully below, that enhancement is warranted, and therefore it is appropriate to characterize the defendant's actions as terrorism-related.

The defendant also objects to the PSR's characterization of the defendant as a "co-equal" participant in the offense.  See Def.'s PSR Letter at 3.  As explained more fully below, the PSR correctly concludes that the defendant deserves neither an aggravating nor mitigating role adjustment.  See PSR ¶ 27.  It is therefore appropriate and accurate to call her a "co-equal" in the criminal activity.

The defendant also objects to the PSR statement that the defendant "purchased" certain items found in her home that could be used in explosive devices.  See Def.'s PSR Letter at 3.  The government does not oppose modifying paragraph 22 of the PSR to state the following, which is consistent with facts stipulated to by the defendant at the time of her plea:

> On or about February 22, 2015, Siddiqui, Velentzas and the UC met at Siddiqui's residence, which was located in a basement.  While there, Siddiqui showed Velentzas and the UC an article she had read about three girls who traveled to Syria to join ISIS.  During the discussion of the article, the UC stated "this could be us, but we old and she married."  Velentzas responded "you never know, there's other ways."  Later, when Siddiqui, Velentzas and the UC were leaving the residence, Velentzas noticed some items and asked "What's this, my nigga? What's this?"  When the UC asked, "What is it?" Velentzas responds, "Everything."   The UC repeated "Everything? What kind of everything?" Siddiqui stated, "I got everything," referencing the different bottles and canisters in view.  The UC noted that Siddiqui had propane and Siddiqui responded, "I got everything up in this joint."  Siddiqui then stated, "I already told you. If, if you guys want…I got everything up in this joint."  They continue looking around asking what different containers were, noting cat litter, pest control chemicals and a torch.  The UC stated "she got everything.  This is like the Home Depot," and Velentzas responded "The Home Depot where they don't ask you why you wanna buy."

See Exhibit 1 ¶ 31.

The defendant also objects to the statement in the PSR that the defendant "stockpiled bomb-making materials."  See Def.'s PSR Letter at 3.  The government does not object to modifying paragraph 5 of the PSR to say "and sought to acquire bomb-making materials."

The defendant also "objects to the exclusion of the fact that there is no evidence Ms. Siddiqui did any research herself regarding explosives on any of her seized devices."  See Def.'s PSR Letter at 3-4.  First, there is significant evidence that the defendant did her own research regarding explosives.  For example, the defendant kept and reviewed a copy of an Inspire[1] magazine article entitled "Car Bombs Inside America."  Second, the defendant also

---

[1] Inspire magazine was a magazine through which Al Qa'ida in the Arabian Peninsula ("AQAP") disseminated propaganda and actively tried to recruit Muslims throughout the

used her electronic devices to further the conspiracy.  For example, as the defendant herself notes in a different part of her objections, the defendant used her phone to look up information about the propane tanks in her basement.  <u>See</u> Def.'s PSR Letter at 7 ("Ms. Siddiqui responds that they could look up the UPC for the tanks on the phone to find out what they are.").  Third, setting aside that the defendant is factually incorrect, Probation is not obligated to include statements in the PSR about the supposed lack of certain types of evidence.  Any claims about what is purportedly absent in this case is a legal argument, not a fact to be included in the PSR. Accordingly, Probation should make no changes to the PSR based on this objection.

The defendant also objects—"as having no evidentiary basis"—to the PSR statement that "Ms. Siddiqui purchased cat litter, pest control chemicals and a blow torch found in her parent's basement from Home Depot."  Def.'s PSR Letter at 3.  The defendant is correct that the government has not asserted where these materials were purchased or by whom; the government does not object to the PSR being amended to clarify that fact.  However, there is no dispute that these materials were in fact in the defendant's residence.  Indeed, as noted above, the parties stipulated to the fact that on February 22, 2015, the defendant, Velentzas and the UC met at the defendant's residence, which was located in a basement.  When the defendant, Velentzas and the UC were leaving the residence that day, Velentzas noticed some items and asked "What's this, my nigga? What's this?"  When the UC asked, "What is it?" Velentzas responded, "Everything."   The UC repeated "Everything? What kind of everything?"  The defendant stated, "I got everything," referencing the materials described above.  When the UC noted that the defendant had propane, the defendant responded, "I got everything up in this joint."  The defendant then stated, "I already told you. If, if you guys want…I got everything up in this joint."  The three then continued looking around asking what different containers were, noting cat litter, pest control chemicals and a torch.  The UC stated "she got everything.  This is like the Home Depot," and Velentzas responded "The Home Depot where they don't ask you why you wanna buy."   <u>See</u> Exhibit 1 ¶ 31.

---

world – including in the United States – to join cause with AQAP.  As reflected by the evidence in this case, <u>Inspire</u> also included instruction on how to make and use explosive devices in terrorist attacks.

B.    Government's Responses To Proposed Additional Facts

        The government responds to the defendant's proposed additional facts (highlighted with italics, for Probations convenience) as follows:

        *1.    On August 6, 2016, Ms. Siddiqui, Ms. Velentzas, and the undercover officer's ("UC") agreement to learn how to build an explosive device as part of their religious duty to acquire knowledge for self-defense. (Exhibit E).*

Government's Response:

        The government disagrees with the defendant's characterization of the excerpted portions of the August 6, 2014 transcript and recording (Defense Exhibit E).[2] The relevant facts of the August 6, 2014 recording are set forth in the Stipulated Facts at paragraph 12, which includes the relevant reference to self-defense.  The defendant's additional characterization of the recording and transcript is overbroad and inconsistent with the transcript.

        *2.    Between August and October, 2014, the group met approximately once a week and studied electricity. Ms. Siddiqui provided some of the materials for this study. Velentzas le[]d the study sessions. (Exhibit V at 1-4).*

Government's Response:

        The government does not object to the consideration of the information as stated.  However, to the extent Probation chooses to include this information in the PSR, the government respectfully requests that Probation add the following relevant context from the meeting between Velentzas and the UC on December 24, 2014, which are set forth in the Stipulated Facts at Paragraphs 24 and 25 and the transcript of the recorded meeting:

        During a meeting on December 24, 2014, the UC provided a copy of the Spring 2014 Inspire Magazine opened to the piece entitled "Car Bombs Inside America."  See Exhibit 1 ¶¶ 24-25.  Velentzas read and discussed the contents of several pages of the piece.  Velentzas also told the UC that the defendant "be actin' like she dumb but she's not" and "[s]he act like she just don't get stuff, but she gets it."  See Exhibit 2.  Velentzas then went on to describe the time she and the defendant were studying together and the defendant wrote down the notes using the actual scientific formula.  Id.  While discussing the Inspire Magazine on December 24, 2014, Velentzas also stated to the UC "It would be cool if we could study this with [the defendant], right?"  When the UC responded, "Yeah.  She said she wanted to but she's always gone," Velentzas responded, "Yeah, that's what I'm sayin'.  Asia say she wants to stay.

_____

[2] The defendant's letter refers to August 6, 2016, rather than 2014, which is likely a typographical error.

Sometimes she, she's weird, she'll just but out one day, we'll talk and she'll be like, yeah, we should really sit down and like really study, like she thought of it, like, like, you know, like she motivatin' you." See Exhibit 2. Velentzas also referred to the defendant as "the Engineer." Id.

*3.   On or about October 26, 2014, Velentzas, in response to the UC's questions regarding a target for any device they might build, reaffirmed their commitment to use the device in self-defense stating, "You thinking about some next sh\*t though? No, we're not talking about going out f\*cking with people...You understand that right? You mind your own business but those people f\*ck with you." (Exhibit I).*

Government's Response:

The government does not dispute the accuracy of the quoted statement made by Velentzas.   However, the government objects to including in the PSR the unfounded conclusion that this statement "reaffirmed their commitment to use the device in self-defense" as argument which is unsupported by the evidence.   There was no "commitment" by the defendant and Velentzas to use a bomb in "self-defense."   Such a conclusion is inconsistent with, among other evidence, the Stipulated Facts.   See Exhibit 1 ¶¶ 8, 9, 10, 14, 15, 16, 17, 18, 19, 20, 24, 25, 21, 26, 28, 29 and 30.

*4.   On November 23, 2014, the UC provided the group the Anarchist Cookbook. (Exhibit V at 4).*

Government's Response:

The government submits that this is not a material fact.   To the extent Probation chooses to include this information in the PSR, the government respectfully requests that Probation add the following relevant context:

On November 23, 2014, Velentzas asked the UC whether she had printed out a copy of "the Inspire Magazine," which the parties have stipulated is a publication used to disseminate AQAP propaganda and to recruit Muslims to join cause with AQAP.   See Def. Exhibit V; Exhibit 1 ¶ 1.   During this same meeting, the defendant, Velentzas and the UC continued to discuss the Anarchist Cookbook and referenced a prior discussion they had about a page of the book containing information on a fertilizer bomb.   See Def. Exhibit V; Exhibit 1 ¶ 21. At one point, Velentzas told the UC that she wanted to keep the book and asked if Siddiqui and the UC want to study with her.   At that point, the defendant said, "I love your enthusiasm" to which Velenztas replied, What enthusiasm? We must study this because they are killing Muslims."   The defendant then told Velentzas she intended the remark as a compliment and that "just because she does not seem enthusiastic does not mean she is not interested and she is insulted that Velentzas would think she would not want to study also."   See id.

5.    *On November 23, 2014, Velentzas and the UC discussed what they were trying to accomplish with their studies. Velentzas explained that she would never want to hurt anyone but, as a Muslim, she must acquire this knowledge and be ready. Velentzas commented that the kufar have this knowledge and use it to hurt Muslims, and so the group needed to be prepared. According to Velentzas, when Allah decides the time, they will know whether one person, or two people, needs to act. She went on to state that at this juncture, they did not need to have those talks because it was too early. (Exhibit V at 4).*

Government's Response:

The material portion of the information above is already included in the Stipulated Facts.  See Exhibit 1 ¶ 21.  To the extent Probation chooses to include any further portion of the defendant's proposal, the government respectfully requests that Probation add the following relevant context:

> Immediately after Velentzas' statement about needing to "be prepared," Velentzas then "told the story of Yahya Ayyash and how a Jewish man came into a mosque and shot up Muslims while they were praying, and when that happened Yahya Ayyash took action."  See Def. Exhibit V at 4-5; Exhibit 1 ¶ 21.  Velentzas went on to state that Ayyash's "taking action helped the Intafada and as a result, the Palestinians kept control of the Gaza Strip."  See Defense Exhibit V at VS0012868.  Yahya Ayyash, also known as "the Engineer," was a well-known bomb-maker for Hamas, a designated foreign terrorist organization.

6.    *On December 24, 2014, the UC brought a copy of Inspire magazine with instructions on how to build a car bomb to their study session. The UC later provided this article to Siddiqui on December 30, 2014, with instructions that she provide it to Velentzas. Ms. Siddiqui failed to provide the article to Velentzas. (Exhibit T). Ms. Velentzas participated in these conversations but the transcripts show that Ms. Siddiqui was absent for many of these conversations and non-participative where she was present. (Exhibits N, O).*

Government's Response:

The government refers Probation to its prior response to proposed additional fact #2, above, which provides additional context about this meeting.  The government objects as immaterial to the statement regarding the defendant's absence at particular times.  The government does not object to Probation including a statement indicating that Velentzas and the UC met on several occasions without the defendant present, and the defendant and the UC met on several occasions without Velentzas present.

7.    *On December 27, 2014, the UC told the group about a large police funeral that had been recently held. Velentzas responded by telling the UC that she was a "thinker" and*

*by questioning the UC regarding details of the funeral. There was no agreement however that the group should attack a similar event. (Exhibit O).*

Government's Response:

       This information is already included in the Stipulated Facts, and therefore does not need to be added in the manner requested.  See Exhibit 1 ¶ 28.

       *8.   Between August, 2014, and December 24, 2014, Ms. Siddiqui attended all of the groups study sessions. Ms. Siddiqui aided the groups sessions by providing a textbook and suggesting that they could learn the basics of electricity and chemistry by going to the library. (Exhibits E, F).*

Government's Response:

       The government does not object to this statement.  However, the government refers Probation to its prior response to proposed additional fact #2, above, which provides additional context about the December 24, 2014 meeting.

       *9.   On November 2, 2014, Ms. Siddiqui, Velentzas and the UC went to Home Depot for the purpose of determining the feasibility of purchasing materials that could be used in an explosive device. During this trip, Ms. Siddiqui took care of Velentzas' minor child while the UC and Velentzas shopped. (Exhibit V). From the beginning of December Velentzas and the UC begin questioning Ms. Siddiqui's commitment to the group.  (Exhibit L, M).*

Government's Response:

       The government has no objection to the inclusion of the first two sentences of the defendant's proposed additional facts but again notes that the material portion of this information is already contained in the Stipulated Facts.  See Exhibit 1 ¶¶ 27, 28, 31, 32. However, with regard to the claim that "[f]rom the beginning of December Velentzas and the UC begin questioning Ms. Siddiqui's commitment to the group," the government objects that such claim mischaracterizes the facts set forth in the Stipulated Facts.  See id.

       *10.   On December 3, 2014, in an accidental recording, the UC told another law enforcement officer that she was annoyed with Siddiqui for showing little interest in their "studying" and being completely aloof. (Exhibit L).*

Government's Response:

       The government objects to the proposed addition as both immaterial and an inaccurate characterization of the relevant conversation.  To the extent Probation considers adding this information, the government does not object to the following modification:

       On December 3, 2014, the UC, in a conversation with another law enforcement officer, stated that the defendant "sometimes she gets confident and she'll say

certain things like we got to study.  Other times, we get together and we're talking about something important, and she's completely aloof."

See Exhibit 2.

11.     On December 11, 2014, Ms. Siddiqui visits Dr. Shafiq Khokhar, a psychiatrist, who diagnoses her with Major Depressive Disorder and Social Anxiety and prescribed an anti-depressant and anxiolytic medication. (PSR, para 64-66).

Government's Response:

The government submits that no change or additional information needs to be added to the PSR, because this fact is already included in the PSR.  See PSR ¶ 64.

12.     On December 12, 2014, Ms. Siddiqui moves out of Velentzas's house and back into her family residence. She began to distance herself from the group after she was able to move out of Ms. Velentzas' apartment and back into her family's home. (Exhibit V).

Government's Response:

The government submits that this is not a material fact and objects to the proposed addition as an inaccurate characterization of relevant conversations.  In addition, as noted below, on January 8, 2015, Velentzas (with the UC) assisted the defendant in moving from Velentzas's apartment to the defendant's new apartment, and met on several occasions after that, indicating that they remained close and continued the conspiracy.

13.     On December 24, 2014, Velentzas and the UC review the Anarchist Cookbook and the Inspire magazine article to understand the specific requirements of constructing an explosive device. (Exhibit N).

Government's Response:

The defendant stipulated to the relevant facts from this date.  The government does not object to any or all of the following, which is taken from the Stipulated Facts:

On or about December 24, 2014, the UC provided a copy of the Spring 2014 issue of Inspire magazine to Velentzas, which was previously requested by Velentzas on November 20, 2014.  Velentzas flipped through the pages and once she saw a page titled "Car Bombs Inside America," she started to read from that page and others.  For the next several hours, Velentzas read and discussed the contents of the magazine.

During that same conversation on December 24, 2014, the UC mentioned the Boston Marathon bombing.  Velentzas then read aloud the following from the magazine: "Choosing a place and time is a crucial factor for success in any operation.  Even if the enemy…within, you will point us in general and specific

8

targets.  America, he said.  Britain, France.  To the field target of the kind of bomb you have…regarding the individual…event, election, campaign, festival."  Velentzas then commented "See that's where Al-Qaida fucked up though like, they always pick, they always, they encourage people to pick these random places.  So then you got the guy that did the thing in Boston, and the world was like, what the hell is up with that, because the people were just running in sports.  You know?"  The UC responded "if you wanna kill a snake you, you try to go for the head, not the, you know, not the tail."  Velentzas then said "Exactly.  I still believe that.  The head.  You go for the head, the neck, the shoulders, but not the tail."

On or about that same date, after the UC asked Velentzas what she thought would be the most practical way to build an explosive.  Velentzas stated a practical option would be to build a nitroglycerin bomb.  Prior to answering the UC's question, Velentzas had the UC place both of their phones in the kitchen and shut the kitchen door.

See Exhibit 1 ¶¶ 24-26.

14.     *During their study, Velentzas notes Siddiqui's absence, saying "... it would be cool if we could study this with Asia, right?" The UC responded, "Yeah. She said she wanted to but she's always gone."  (Exhibit N).*

Government's Response:

The government submits that this is not a material fact.  To the extent Probation chooses to include this information in the PSR, the government respectfully requests that Probation add the following relevant context:

In response to the UC, Velentzas added that the defendant stated that they "should really sit down and like really study, like she thought of it . . . like she motivatin' you" and then "when you studyin' she busy."

See Exhibit 2.

15.     *On December 30, 2014, the UC meets privately with Ms. Siddiqui and gives her a copy of the Inspire magazine article to provide to Velentzas. (Exhibit V).*

Government's Response:

The government does not object to consideration of this information, but respectfully requests that Probation include the following additional facts:

On December 24, 2014, the UC showed the defendant a copy of the Inspire magazine that she had printed out.  When the UC showed the defendant a page with a picture of Samir Khan, the defendant stated that she "was madly in love

with him" and that she was investigated by the government because of saving Khan's articles in her email.

See Exhibit 2.

16.    On January 5, 2015, Ms. Siddiqui starts working as a childcare provider at an afterschool daycare program. (Exhibit V).

Government's Response:

The government submits that this is not a material fact and, in any event, this fact is already included in the PSR.  See PSR ¶ 70.

17.    On January 6, 2015, Siddiqui, Velentzas and the UC meet for dinner at Velentzas's house but do not study.

Government's Response:

The government submits that this is not a material fact and objects to the proposed addition as an inaccurate characterization of the relevant conversation.  On that date, the defendant was picked up by the UC at approximately 1:30 p.m. and spent less than an hour at Velentzas's apartment.  The UC then drove Velentzas and the defendant on errands.

18.    On January 8, 2015, the UC tells Velentzas that Ms. Siddiqui has not called her since she helped her move.

Government's Response:

The government submits that this is not a material fact and objects to the proposed addition as an inaccurate characterization of the relevant conversation.  On that date, the UC and Velentzas helped the defendant move from Velentzas's apartment to the defendant's new apartment in the basement of her family member's home.

19.    On January 11, 2015, the UC asks Velentzas how Ms. Siddiqui is doing and Velentzas responds that, "she is in her career".

Government's Response:

The government submits that this is not a material fact. To the extent Probation chooses to include this information in the PSR, the government respectfully requests that Probation add the following relevant context:  At that time, the defendant had worked at the afterschool daycare program for less than a week.

*20.     On January 13, 2015, the UC again informs Velentzas that Ms. Siddiqui is not calling.*

Government's Response:

The government submits that this is not a material fact. To the extent Probation chooses to include this information in the PSR, the government respectfully requests that Probation add the following relevant context:  In response to the UC telling Velentzas that the defendant had not called her, Velentzas responded in surprise, stating "wow."

*21.     On January 18, 2015, the UC goes to Ms. Siddiqui's residence and picks her up and takes her to a restaurant with Velentzas. The group does not study at the restaurant. During the dinner at the restaurant, the group decides to study the following week.*

Government's Response:

The government does not object to the inclusion of this fact, provided the following additional relevant facts are included:

> During that same meeting, Velentzas attempted to show the defendant and the UC a video of a person committing a suicide attack with a vehicle-based explosive device.  Velentzas could not locate the video, but described the attack, described the size of the hole caused by the explosion, and called it the "coolest thing I ever saw."

See Exhibit 2.

*22.     On January, 22, 2015, Velentzas and the UC meet to study, but Ms. Siddiqui again does not attend.*

Government's Response:

The government submits that this is not a material fact.  The government does not object to Probation including a statement indicating that Velentzas and the UC met on several occasions without the defendant present, and the defendant and the UC met on several occasions without Velentzas present.

*23.     On January, 25, 2015, the UC picks Ms. Siddiqui up to ensure she will be present for studying, during the study session Ms. Siddiqui suggests that they should study on their own.*

Government's Response:

The government does not object to consideration of this information, but respectfully requests that Probation include the following additional fact: Siddiqui brought her notebook with her for the purpose of studying "chemical reactions."

11

24.    *On February 3, 2015, Velentzas and the UC meet without Ms. Siddiqui and continue studying explosive devices. (Exhibit P).*

Government's Response:

The government does not object to consideration of this information, but respectfully requests that Probation include the following additional facts:

On that same date, Velentzas and the UC discussed the defendant's commitment to operational security and her prior attempts to avoid discussions of their criminal activity on the phone. Specifically, Velentzas noted that, when she asked the defendant to discuss getting study materials from the UC, the defendant stated "no you can't say stuff like that even over the phone not even that." Velentzas further stated "Asia [referring to the defendant] won't even ask you to bring study materials over the phone she'll run it to meet you in person remember." Noting that the defendant had recently spoken openly about their planning, Velentzas discussed the defendant's prior use of coded language, saying "I gotta tell her 'Asia you know you used to be the type that wouldn't even ask for a book on the phone indirectly saying bring that, bring onions or something.'"

See Exhibit 2.

25.    *On February 8, 2015, the UC against meets privately with Ms. Siddiqui and encourages her to rejoin the groups studies. (Exhibit Q).*

Government's Response:

The government does not object to consideration of this information, but respectfully requests that Probation include the following additional facts:

When the UC met with the defendant, the defendant acknowledged that she was supposed to bring the UC a chemistry book, stating "Oh the chemistry book oh okay, yeah I have to bring you that."

Later that same day, on February 8, 2015, the UC met with both the defendant and Velentzas. During that meeting, the defendant discusses with Velentzas and the UC a video that shows a Jordanian pilot being burned to death by ISIS members. The defendant, who questions the video's authenticity, notes that even if the video is fake, it is a technique used for "scaring your enemy." Later that same day, the defendant tried to find the video online for the UC.

See Exhibit 2.

12

        26.     *On February 17, 2015, Velentzas and the UC meet without Ms. Siddiqui.*

Government's Response:

        The government submits that this information is not material.  As noted above, the government respectfully submits that Probation should include a single statement reflecting that on occasion the defendant and Velentzas each met separately with the UC.

        27.     *On February 22, 2015, the UC and Velentzas go to Ms. Siddiqui's house unannounced to meet with her. During their visit, Velentzas makes note of the home repair materials stored outside of Ms. Siddiqui's basement apartment and claims that Ms. Siddiqui has been holding out on them. Ms. Siddiqui jokes that she has a Home Depot in the basement. (Exhibit S, X).*

Government's Response:

        The government objects to the defendant's characterization of events on February 22, 2015.  The defendant stipulated to the relevant facts from this date, including relevant quotes from the defendant.  The government does not object to any or all of the following, which is taken from the Stipulated Facts:

> On or about February 22, 2015, Siddiqui, Velentzas and the UC met at Siddiqui's residence, which was located in a basement.  While there, Siddiqui showed Velentzas and the UC an article she had read about three girls who traveled to Syria to join ISIS.  During the discussion of the article, the UC stated "this could be us, but we old and she married."  Velentzas responded "you never know, there's other ways."  Later, when Siddiqui, Velentzas and the UC were leaving the residence, Velentzas noticed some items and asked "What's this, my nigga? What's this?"  When the UC asked, "What is it?" Velentzas responds, "Everything."  The UC repeated "Everything? What kind of everything?" Siddiqui stated, "I got everything," referencing the different bottles and canisters in view.  The UC noted that Siddiqui had propane and Siddiqui responded, "I got everything up in this joint."  Siddiqui then stated, "I already told you. If, if you guys want…I got everything up in this joint."  They continue looking around asking what different containers were, noting cat litter, pest control chemicals and a torch.  The UC stated "she got everything.  This is like the Home Depot," and Velentzas responded "The Home Depot where they don't ask you why you wanna buy."

See Exhibit 1 ¶ 31.

28.      *On February 24, 2015, the UC meets with Ms. Siddiqui. During their conversation, Ms. Siddiqui states that she is not comfortable with science and she wants to focus on her poetry.*

Government's Response:

The government objects to the proposed addition as an inaccurate characterization of the relevant conversation.  The defendant indicated that she was better at poetry than science, unlike Velentzas.  Accordingly, the government does not object to the following modification:

On February 24, 2015, the UC met with the defendant. During that meeting, the defendant stated she wanted to read more poetry because it was hard for her to read science-based materials.

See Exhibit 2.

29.      *On March 1, 2015, the UC visited Ms. Siddiqui at her home. While at her home, the UC discovers that Ms. Siddiqui has not distributed the Inspire magazine article to Velentzas as instructed. The UC also tells Ms. Siddiqui that she wants to check the materials that Ms. Siddiqui has and asks about the propane tanks. Ms. Siddiqui responds that they could look up the UPC for the tanks on the phone to find out what they are. The UC had to read them to find out they were propane and not butane like Velentzas had suggested (Exhibit T, X).*

Government's Response:

The government objects to the defendant's characterization of events that occurred on March 1, 2015.  The defendant stipulated to the relevant facts from this date. Specifically, the defendant stipulated that "Around March 1, 2015, Siddiqui stated that she had a copy of the car bomb instructions from Inspire magazine.  The magazine with these instructions were previously provided to Siddiqui by the UC to ultimately give to Velentzas, at Velentzas' request."  See Exhibit 1 ¶ 32.

To the extent Probation wishes to consider adding additional facts related to this meeting, the government proposes the following, which is consistent with the recording made by the UC of that meeting:

On that same date, March 1, 2015, the defendant told the UC that she hides her notebooks that contained information related to their study of explosive devices, stating "I don't keep my notebook outside like that."  The defendant further stated that she would "give [the UC] the chemistry book since you're here."  In discussing the best way to hide their research materials, the defendant also told the UC "If we're meant to get in trouble we're meant to get in trouble like that's really all it is."

14

During that same conversation, referring to the fact that the defendant had supplies that could be useful for building an explosive device, the defendant stated "I already told [Velentzas]…girl everything is in my house," but that she didn't know exactly what each item was, and did not want her brother to be aware of her plans.

During that same conversation, on March 1, 2015, the defendant explained that she had kept a copy of the car bomb instructions from <u>Inspire</u> magazine because "I want to look at it myself."

Later that same day, the defendant discussed with the UC a person named "Mustafa," who the defendant agreed was "the love of [her] life," but explained that he had "martyred" himself in Somalia.

> 30. On March 17, 2015, the UC and Ms. Siddiqui discussed her career goals and future plans, Ms. Siddiqui also talks about her boyfriend, Cristian Maldonado, a non-Muslim. Finally, she expresses concerns the FBI's interest in her because of the people she had associated with has derailed her pursuit of her goals. (Exhibit V).

The government objects to this fact as immaterial. To the extent Probation considers including this information, the government submits that it should also include the following information as necessary context:

During that same conversation, the defendant stated that she "was in love with Samir Khan before he proposed" to her, and that she became attracted to "Abu Yusuf" when she realized that his "content" went "hand in hand" with Samir Khan's "content." Samir Khan was an individual who became a prominent figure of Al Qa'ida in the Arabian Peninsula ("AQAP"), a designated foreign terrorist organization. In addition to publishing the defendant's poetry, Khan wrote and published several works regarding making homemade bombs and suicide bombing and called for attacks on the United States.

<u>See</u> Def. Exhibit V at VS0012943.

II.     <u>The PSR's Guidelines Calculations Are Accurate</u>

The defendant objects to the Guidelines Calculation in the PSR. <u>See</u> Def.'s PSR Letter at 7-10.

A.     <u>A Base Offense Level of 33 Is Correct Because The Defendant Intended to Kill People With An Explosive Device</u>

The government agrees that the Base Offense Level in this case is 33. <u>See</u> PSR ¶ 35. The government reaches this conclusion based on the following:

1. The Statutory Index directs that Section 2K1.3 of the Guidelines (Unlawful receipt, possession, or transportation of explosive materials; prohibited transactions involving explosive materials) be applied in the first instance.[3]  See App'x A to U.S.S.G.

2. Section 2K1.3(a) provides for a base offense level of 18 for anyone convicted under § 842(p)(2).  However, Section 2K1.3(c) states that if a defendant is "convicted under 18 U.S.C. § 842(p)(2)" to apply Section 2X1.1 (Attempt, Solicitation or Conspiracy) "in respect to that other offense if the resulting offense level is greater than that determined above."  In this case, the "other offense" is the use of weapon of mass destruction in violation of 18 U.S.C. § 2332a(a)(2).

3. Section 2X1.1(a) directs the use of the base offense level from the guideline for the substantive offense.  Per the Statutory Index to the Guidelines, the use of weapon of mass destruction under § 2332a(a)(2) is analyzed using Sections 2A6.1, 2K1.4 or 2M6.1.  See App'x A to U.S.S.G.  Neither Sections 2M6.1 nor 2A6.1 apply to these facts.[4]  Accordingly, the appropriate starting point for analysis is Section 2K1.4 for "arson [or] property damage by use of explosives."

4. Section 2K1.4(a) provides for a base offense level of 24 if the offense "created a substantial risk of death or bodily injury."

5. However, Section 2K1.4(c) states that "[i]f death results, or the offense was intended to cause death or serious bodily injury, apply the most analogous guideline from Chapter Two, Part A (Offenses Against the Person)" if the resulting offense level is greater (emphasis added).

6. Since the defendant and her co-conspirator made statements reflecting their intent to kill or seriously harm people with their bomb, Section 2A1.5 (Conspiracy or Solicitation to Commit Murder) should be applied, which leads to a base offense level of 33.  See U.S.S.G. § 2A1.5(a).

Notably, the defendant largely agrees with this analysis.  The defendant concedes that a base offense level of at least 24 is appropriate based on Section 2K1.4(a) and the underlying offense of use of a weapon of mass destruction.  See Def.'s PSR Letter at 10

---

[3] Although the Statutory Index directs the use of either Section 2K1.3 or 2M6.1 for a conviction under § 842(p)(2), Section 2M6.1 only applies to activity involving nuclear, biological or chemical weapons.  See App. Note 1 to Section 2M6.1.

[4] As previously noted, Section 2M6.1 only applies to activity involving nuclear, biological or chemical weapons.  Section 2A6.1 involves "threatening or harassing communications," which is not supported by the facts of this case.

("the defendant agrees…the use of any device would create a substantial risk of death, and that she was aware of the risk").

The defendant's only dispute is whether Section 2A1.5 (Conspiracy or Solicitation to Commit Murder) should be applied and raise the base offense level to 33. (Id. at 7-10.)  As noted above, the Guidelines directs the application of "the most analogous guideline" to the relevant offense—here the use of a weapon of mass destruction. The defendant and her co-conspirator researched explosives for the purpose of using a weapon of mass destruction, and the defendant and her co-conspirator repeatedly compared their plans to other terrorist attacks that caused scores of murders.  There is no question that the guideline for conspiring to commit murder is the most analogous given these facts.

The defendant claims that Section 2A1.5 should not apply because the defendant did not have the requisite "intent to kill" another person.  See Def.'s PSR Letter at 8, 10. Murder is "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a), meaning that there must be an intent to kill another person.

The defendant had that intent.  The defendant did not research how to build a bomb because she was generally interested in how bombs work.  She has admitted, pursuant to her guilty plea, that she was studying how to make an explosive device "with the intent that…[the device] be used for, or in furtherance of, an activity that constitutes a Federal crime of violence." 18 U.S.C. § 842(p)(2)(A).  Since a crime of violence is an offense that includes the "use of physical force against the person or property of another," at a bare minimum the defendant must admit that her intent was that an explosive device would be detonated against a person or property.  Given the nature of how an explosive device is used, the likelihood of killing someone is already significant.

The stipulated facts in this case confirm that the defendant intended for any bomb she and her co-conspirator made to kill people.  The focus of conversations between the defendant and her co-conspirator are prior examples of terrorist attacks and jihadist propaganda that promotes the use of explosives to kill people.  The defendant discussed watching videos of hostages being tortured and killed by ISIS members.  The defendant and her co-conspirator discussed the attempted car bombing of Times Square by Faizal Shahzad, which would have killed scores of people if it had detonated properly.  And, notably, the defendant similarly studied car bomb instructions.  Finally, the defendant's own past statements, such as her descriptions in Jihad Recollections about "slit throats", waiting for "skies [to] rain martyrdom," and "the cue to shoot devil's head and spurt its venom blood red" all indicate that her ultimate intent for the explosives was to kill others.

Accordingly, the preponderance of the evidence in this case clearly supports the conclusion that the defendant intended to commit murder with the explosive devices that she was studying to build, and that it was therefore appropriate for Probation to conclude that Section 2A1.5 is "the most analogous guideline" to the relevant offense.

17

B.    The Terrorism Enhancement Is Correctly Applied

The defendant also disputes the application of the terrorism enhancement.  See Def.'s PSR Letter at 10-17.  The terrorism enhancement under Section 3A1.4 applies "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism."  A "federal crime of terrorism" is a crime that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is a violation of one or more enumerated federal statutes.  See 18 U.S.C. § 2332b(g)(5).

For the purposes of applying the enhancement, the offense of conviction does not have to be on the enumerated list in Section 2332b, because the enhancement applies both to crimes that "involved," or were also "intended to promote," a federal crime of terrorism. See, e.g., United States v. Awan, 607 F.3d 306 (2d Cir. 2010) (reversing district court decision not to apply enhancement to defendant convicted of conspiracy to provide material support to conspiracy to commit murder, kidnapping and maiming, and holding that the phrase "intended to promote" in Section 3A1.4 "must be applicable…where the defendant's offense or relevant conduct does not include a federal crime of terrorism) (emphasis in original).  The defendant does not dispute that this prong of the enhancement applies in this case because the offense of conviction intended to promote the use of a weapon of mass destruction, which is on the enumerated list of terrorism crimes.  See Def.'s PSR Letter at 12 ("the underlying offense of use of a weapon of mass destruction is listed and therefore, the defense concedes that [the defendant] is eligible for the enhancement if the second prong is met").

The defendant argues instead that that the enhancement should not apply because the government has failed to prove by a preponderance of the evidence[5] that the defendant herself—separate from her co-conspirator Velentzas—had the "individualized subjective intent to influence the government in conjunction with the commission of [her] crime."  See Def.'s PSR Letter at 11-12.

This argument is contrary to binding Second Circuit precedent.  In United States v. Awan, 607 F.3d 306, 317 (2010), the Second Circuit expressly held that the government

---

[5] The defendant argues that a higher burden of proof is necessary to apply the terrorism enhancement, but concedes that there is no law to support this claim.  See Def.'s PSR Letter at 11-12 (arguing that "the proof should be higher" based on dicta in an unrelated Supreme Court decision that actually affirmed the preponderance standard in sentencing, but conceding that "the guidelines do not specify that the standard of proof is beyond the ordinary preponderance of the evidence standard" and admitting that the burden to apply the enhancement is "at a minimum by a preponderance of the evidence").  Probation should reject this argument and, as it does in every case under the Guidelines, apply enhancements supported by a preponderance of the evidence.  See, e.g., United States v. Norris, 281 F.3d 357, 359 (2d Cir. 2002) ("[T]he applicable standard of proof for enhancements is preponderance of the evidence.").

does <u>not</u> have to prove that the defendant herself committed an offense that was calculated to influence the conduct of government:

> Under the "intended to promote" prong, however, so long as the defendant's offense was intended to encourage, further, or bring about a federal crime of terrorism as statutorily defined, the defendant himself does not have to commit an offense listed in § 2332b(g)(5)(B), <u>and the defendant's offense need not itself be "calculated" as described in § 2332b(g)(5)(A)</u>.

<u>Awan</u>, 607 F.3d at 314 (emphasis added).  To read this language more narrowly in the manner that the defendant argues would "defy common sense" according to the Circuit, because then the terrorism enhancement "would not apply to defendants who clearly 'intend to promote' federal crimes of terrorism committed by <u>other persons</u>." <u>Id.</u> at 315 (emphasis in original). Using an example even further afield from conduct supporting terrorism than the defendant, the Second Circuit illustrated why this was the case:

> For example…a defendant, motivated solely by pecuniary gain, might sell weapons to a terrorist organization.  It would be absurd to conclude that such a defendant's criminal conduct could not be subject to a § 3A1.4 enhancement because it was not itself a listed offense that is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A).

<u>Id.</u>  Accordingly, even if Probation were to credit the defendant's argument in its entirety—that she intended to promote the use of a weapon of mass destruction, but only her co-conspirator wanted to commit a crime calculated to influence the government—the Second Circuit has affirmatively concluded that the enhancement applies in precisely such a circumstance.

The facts in this case clearly support the conclusion that the defendant and her co-conspirator's conduct here was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  "The conventional meaning of 'calculated' is 'devised with forethought'" and, therefore, "if a defendant's purpose in committing an offense is to 'influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct,' the first requirement of section 2332b(g)(5)(A) is satisfied."  <u>United States v. Stewart</u>, 590 F.3d 93, 137 (2d Cir. 2009).  As reflected in more detail in the stipulated facts attached to the plea, the following is proof that the defendants' conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct":

1. The overarching decision by the defendant and her co-conspirator to research and obtain materials for explosives similar to various historically significant terrorist attacks, including the World Trade Center bombing, the Boston Marathon bombing, the failed Times Square bombing and the Oklahoma City bombing.  All of these attacks were calculated to influence or affect the conduct of the government, and

19

the fact that the defendants were modeling their own plans after these attacks means that they had the same intent.

2. The defendant and her co-conspirator stated belief in the propriety and righteousness of suicide attacks. For example, Siddiqui wrote posts for Samir Khan's magazine praising violent jihad and wrote in support of attempted vehicle-born improvised explosive device defendant Mohammad Mohamud. Velentzas praised the attacks of September 11, 2001 and stated that being a martyr through a suicide attack guarantees entrance into heaven. Velentzas also described viewing a video of a suicide bombing in Syria or Iraq and said it was "cool." Their statements of support and favor for politically-motivated violence further shows their intent.

3. Velentzas' praise for an "admirable" attempted terrorist attack on Fort Dix, New Jersey.

4. Velentzas' statement, in the context of various terrorist attacks that killed civilians, that it would be better to attack "the head, the neck, the shoulders" of the "snake," an obvious reference to directly attacking the government, rather than civilians.

5. Both the defendant and her co-conspirator's association with, and idolization of, various terrorist figures including Samir Khan, Abdullah Azzam and Usama Bin Ladin, all of whom engaged in crimes unambiguously calculated to influence or affect the conduct of government by intimidation or coercion.

6. Both the defendant and her co-conspirator's review of car bomb instructions in Inspire magazine, a propaganda magazine for a foreign terrorist organization that has engaged in numerous criminal acts that have been calculated to influence or affect the conduct of government.

Even if the conduct that Probation considered was further limited to just the defendant herself, that evidence still proves that she intended to commit an offense calculated to influence or affect the conduct of government by intimidation or coercion. The defendant wanted to use the explosive device she was learning to build to influence the U.S. government. Her state of mind is reflected in her conduct before she began to research bombs. She was in regular contact with Samir Khan, a committed jihadi radical and associate of a foreign terrorist organization. Khan published several magazines, such as Inspire, that incorporated jihadist propaganda specifically designed to influence governments by intimidation or coercion. For example, in the same magazine where the defendant published one of her poems, Jihadi Recollections, Khan published an article attributed to Osama Bin Ladin, titled "Four Practical Steps to Expand the Global Jihad," an article titled "Principles of Guerilla Warfare," and a downloadable item called "Ambush at Bardal" which is described as a look at "an ambush in Somalia which resulted in many Kuffar [non-believers] left dead from the Mujahideen [warriors]." See Exhibit 3. Khan also wrote and published several works regarding making homemade bombs and suicide bombing and called for attacks on the United States. The poems submitted by the defendant to Khan's journal were consistent with this same message. The

defendant's poems described acts of martyrdom, called for "nations [to be] wiped clean of filthy shrines," and talked about "shoot[ing] devil's head."  Her poems were superimposed with the images of gravestones and military vehicle damaged by an explosion.  The defendant's own writings and relationships with associates of a terrorist organization make plain that her research into explosive devices was another step in a plan to commit an act that would influence the U.S. government.

The defendant's conduct throughout the conspiracy provides further proof.  As noted above, the defendant kept and reviewed an article on how to make a car bomb that came from an issue of Inspire magazine.  A car bomb is a common method of terrorist attacks, and the fact that the instructions were from a jihadist propaganda magazine further confirms that the purpose of any such bomb would have been to influence the government.  Moreover, the defendant's intended purpose for a car bomb was made clear when, on September 1, 2014, the defendant discussed how to make explosions and also discussed the attempted bombing of Times Square by Faizal Shahzad, who also attempted to build and detonate a car bomb in a terrorist attack.  See Exhibit 1 ¶ 15.

Even if, contrary to Second Circuit precedent, the Court could only look at the defendant's intent to justify the enhancement, Velentzas' statements and conduct would still be relevant to that analysis.  Velentzas' statements about why they were learning about explosives is circumstantial evidence of the defendant's own intent in this case.  Velentzas made comments on several occasions in the presence of the defendant regarding the use of an explosive device in a terror attack, similar to other historical terrorist acts.  On September 7, 2014, for example, Velentzas discussed with the defendant the 1993 World Trade Center bombing in the context of discussing how to detonate a bomb from a distance.  See Exhibit 1 ¶ 16.  It is reasonable to conclude, based on the statements of the defendant's close friend and co-conspirator about the goals of their research, that the defendant shared those goals and likewise wanted to build an explosive to commit a terrorist attack.

Accordingly, both binding precedent and the facts of this case precedent support the application of the terrorism enhancement.  The defendant's objection should be denied.[6]

C.      No Role Reduction Is Appropriate

The defendant also argues that she should receive a three-level role reduction. See Def.'s PSR Letter at 14-17.  This argument should also be rejected.  Probation's conclusion

_____

[6] The defendant also argues that the government and Probation "concede" that they cannot show intent because neither applies Section 2M6.1, which is applicable if the offense was committed with "the intent to injure the United States or aid a foreign nation or foreign terrorist organization."  See Def.'s PSR Letter at 12.  As explained previously, Section 2M6.1 was not applied not because of any lack of intent, but because it only applies to activity involving nuclear, biological or chemical weapons.  See App. Note 1 to Section 2M6.1.

that the defendant was a "co-equal" in the crime with her co-conspirator is accurate, and therefore no reduction (or aggravating role enhancement) is appropriate in this case.

Pursuant to Section 3B1.2 of the Guidelines, a defendant's offense level may be reduced by 2 to 4 levels if the defendant was a minor participant (2 levels), minimal participant (4 levels) or somewhere in between (3 levels). The reduction may be applied only where the defendant is "substantially less culpable than the average participant in the criminal activity." See U.S.S.G. § 3B1.2, App. Note 3(A) (emphasis added). A "minimal" participant is a person who is "plainly among the least culpable of those involved" and involves things such as "a defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others." Id. at App. Note 4. A "minor" participant is "less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." Id. at App. Note 5. The mitigating role determination is fact-specific and based on the totality of the circumstances. Id. at Note 3(C). The burden is on the defendant to prove by a preponderance of the evidence that a reduction should be applied. See, e.g., United States v. Garcia, 920 F.2d 153, 156 (2d Cir. 1990). A court is expected to consider the following "non-exhaustive" list of factors for consideration of the reduction:

    (i)   the degree to which the defendant understood the scope and structure of the criminal activity;

    (ii)  the degree to which the defendant participated in planning or organizing the criminal activity;

    (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

    (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

    (v)  the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. § 3B1.2, App. Note 3(C).

Here, the defendant cannot prove by a preponderance of the evidence that she was "substantially less culpable" than her co-conspirator Velentzas. Where, as is the case here, a defendant is aware of the scope of the criminal activity and willing to participate however necessary to carry out the crime, no mitigating role is appropriate even if the defendant ultimately played a lesser role than other participants. See United States v. Rahman, 189 F.3d 88, 159–60 (2d Cir. 1999) (denying role adjustment to terrorism defendant where facts showed that each defendant was "found to have been willing to do what it was that was necessary for him to do to accomplish the goals of the conspiracy"); see also United States v. Batista, 732 F.Supp.2d 82, 89 (E.D.N.Y. 2010) (denying role adjustment to defendant who "provided a

22

valuable and unique service to the conspiracy that helped the conspiracy avoid detection by law enforcement, and [who] had knowledge of the scope and structure of the illicit enterprise"). Regardless of whether her co-conspirator took a more active role, the facts demonstrate that the defendant was willing to do things, such as providing chemistry texts and sharing bomb-making materials found in her home, in order to commit the offense.  In such circumstance, no mitigating role is appropriate.

Additionally, all of the factors also weigh against application of any role reduction.  The scope and structure of the criminal activity was straightforward, and the defendant concedes that this factor weighs against her.  See Def.'s PSR Letter at 15.  The defendant's participation in planning and organizing was likewise consistent with a relatively equal role in the criminal activity.  Velentzas and the defendant both conducted research on explosives and shared information with each other about their studies.  Both met together and discussed historical terrorist attacks as comparisons for their own conduct.  Both discussed acquiring items to be used for an explosive device, including traveling together to Home Depot and reviewing potential bomb-making materials at the defendant and her co-conspirator's houses.  The defendant also retained significant decision-making authority.  It was the defendant's decision to retain a copy of car bomb-making instructions, rather than give them to her co-conspirator, so that the defendant could study those instructions.  It was the defendant's decision to engage in conduct designed to evade law enforcement, such as declining to discuss their activity over the phone and speaking in coded terms.  The acts performed by the defendant also weigh against a mitigating role.  The defendant offered up materials found in her home for use in making an explosive, stating "I already told you. If, if you guys want…I got everything up in this joint."  She also obtained and provided chemistry books for use by the group to learn more about making explosives.  Finally, based on the defendant's past support of jihadi terrorists like Samir Khan, the evidence supports the conclusion that she would have also considered any terrorist attack conducted based on their work to be a benefit.  The PSR described the defendant as a co-equal in the criminal conduct because, as the facts demonstrate, she equally shared in the conduct and planning of the criminal activities.  No mitigating role adjustment is appropriate.

III.     Conclusion

        For the foregoing reasons, the government respectfully submits that (1) Probation add only those facts that are material and with the necessary context provided by the evidence; (2) the Guidelines calculation of 33 as a base offense level is accurate; (3) the terrorism enhancement is applicable; and (4) a role reduction is not warranted.

        Respectfully submitted,

        RICHARD P. DONOGHUE
        United States Attorney

By:   /s/ Craig R. Heeren
        Craig R. Heeren
        Josh Hafetz
        Jonathan E. Algor
        Assistant U.S. Attorneys
        (718) 254-7000

cc:   Defense counsel (by ECF)
       USPO Shayna Bryant (by email)

24