

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP:CRH/JGH/JEA
F. #2014R00196

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 24, 2019

By ECF

Honorable Sterling Johnson Jr.
United States District Judge
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Asia Siddiqui
               Criminal Docket No. 15-213 (SJ)

Dear Judge Johnson:

      The government respectfully submits this letter regarding sentencing of the defendant Asia Siddiqui, scheduled for January 9, 2020. On August 23, 2019, the defendant pleaded guilty pursuant to a plea agreement to teaching and distributing information pertaining to the making and use of an explosive, destructive device, and weapon of mass destruction, intending that it be used to commit a federal crime of violence, specifically, use of a weapon of mass destruction, in violation of 18 U.S.C. §§ 842(p)(2)(A) and 844(a)(2).

      For the reasons set forth below, the government respectfully submits that the advisory United States Sentencing Guidelines ("Guidelines or "U.S.S.G.") sentence of 240 months' imprisonment is appropriate in this case.

I.    Background

      In brief, the defendant and her co-defendant, Noelle Velentzas, learned and taught each other how to create an explosive device to be detonated in a terrorist attack in the United States, specifically aimed at law enforcement. In a series of meetings with an undercover law enforcement officer (the "UC"), the defendant and Velentzas discussed various historical terrorist attacks, including the first World Trade Center bombing, the Oklahoma City Bombing, and the Boston Marathon attack, as well as attempted attacks like the 2010 attempted bombing of Times Square. They also researched how to execute similar attacks, including seeking out and collecting the material components needed to create the explosives used in those attacks. Pursuant to the plea agreement, the defendant has stipulated to a set of facts that describe this conduct in further detail (the "Stipulated Facts). The Stipulated Facts, which are

attached to the plea agreement, are also attached hereto as Exhibit 1. The government discusses below some of those facts pertinent to sentencing.

      A.      The Defendant's Relationships With and Support of Terrorists, and Her False Statements to the FBI

The evidence reflects that Siddiqui was motivated by her nearly decade-long support of individuals associated with foreign terrorist organizations like al-Qaeda. When questioned by law enforcement about her past support of these individuals and organizations, she lied and denied her prior conduct.

In approximately 2006, the defendant became close with Samir Khan, an individual who became a prominent figure of Al Qa'ida in the Arabian Peninsula ("AQAP"), a designated foreign terrorist organization. While living in the United States, Khan ran a blog called "InshallahShaheed" ("Martyr, God willing") and later became the editor of Inspire magazine. Inspire magazine was a magazine through which AQAP disseminated propaganda and actively tried to recruit Muslims throughout the world – including in the United States – to join cause with AQAP. Khan wrote and published several works regarding making homemade bombs and suicide bombing and called for attacks on the United States. Siddiqui submitted her poetry to Khan for publication. See PSR ¶ 8.

In or about 2009, Siddiqui wrote two poems and an article that were published in a magazine called Jihad Recollections, a predecessor publication of Inspire. See PSR ¶ 9. In one poem called "Take Me to the Lands Where the Eyes Are Cooled," Siddiqui wrote that she "drop[s] bombs" as she swings on a hammock and "[h]it[s] cloud nine with the smell of turpentine, nations wiped clean of filthy shrines." She also wrote that she "taste[s] the Truth through fists and slit throats" and that there is "[n]o excuse to sit back and wait – for the skies rain martyrdom." In a second poem called "The Sound of Motor," Siddiqui wrote "All I can think of is the cue to shoot devil's head and spurt its venom blood red." The poem was published in front of images of gravestones and a military vehicle damaged by an explosion.

Siddiqui's pro-jihadist motivations are also demonstrated in a letter expressing her ideological support for Mohammad Mohamud, who was arrested on November 26, 2010, after he attempted to detonate a vehicle-borne improvised explosive device at a Christmas tree-lighting ceremony in Portland, Oregon. On or about September 10, 2011, Siddiqui mailed a letter to Mohamud in his jail facility. Siddiqui asked for "Allaah" to "accept [Mohamud's] good deeds and sacrifices." See PSR ¶ 10.

On or about July 10, 2014, FBI Special Agents interviewed Siddiqui upon her inbound arrival at LaGuardia Airport in Queens, New York, on a flight originating in Toronto, Canada. The agents expressly advised her that it is a crime to lie to federal agents. During the interview, Siddiqui denied contributing to or publishing in any jihadist magazines. She also denied having any contact with Khan or any terrorist groups. See PSR ¶¶ 11.

On that same date, Siddiqui met with the UC and explained that FBI agents had questioned her at the airport. Siddiqui admitted that she had lied to the FBI. Siddiqui told the UC that she had known Khan even before he was deemed a terrorist. She explained that in 2006, she had sent a poem to Khan via his blog or website. Siddiqui stated that Khan published her poem and that her poem had become popular. See PSR ¶ 14.

>   B.   The Defendant and Her Co-Defendant Taught Themselves How to Build Explosive Devices

By mid-2014, the defendant and Velentzas met with each other and the UC on a regular basis, and discussed how to build an explosive device they could detonate on U.S. soil. Early on, the defendant and Velentzas confirmed the purpose of their research. On or about August 6, 2014, the defendant and Velentzas met, along with the UC, and discussed learning "science" in order to construct an explosive device. In response to a question from the UC about what was meant by "science," Velentzas motioned with her hands to simulate the explosion of a bomb in the presence of the defendant. Later that month, the defendant and Velentzas, in the presence of the UC, discussed other attempted plots to detonate explosives on American soil, including the 1993 World Trade Center bombing and the attempted bombing of the Herald Square subway station in Manhattan. See PSR ¶¶ 17-19. Over the next nine months, until their arrest in April 2015, the defendant and Velentzas conducted research on explosive devices used in these and other terrorist attacks and taught each other the steps in constructing such devices, all with the intention of using an explosive device in an attack.

In addition to planning with Velentzas, the defendant took independent steps towards their goal of learning how to build an explosive device. For example:

- On August 13, 2014, the defendant and the UC went to a public library to conduct research on how to make explosive devices. The defendant cited the earlier conversation about "science"—when Velentzas made clear through hand motions that she was interested in learning how to build an explosive device—and searched for chemistry books to study.

- The defendant reviewed course books with Velentzas from an electricity course she had taken. The defendant showed Velentzas and the UC a passage on electrolytic capacitors and pointed to a sentence reflecting that connecting positive wires to negative receivers and negative wires to positive receivers can cause a fire or explosion. On September 7, 2014, the defendant and her co-defendant discussed how to cause an explosion in this way without hurting themselves, unless they intended to do so—a reference to suicide bombing. However, Velentzas and the defendant implied that their goal was to learn how to blow up a bomb from afar rather than conduct a suicide bombing. See PSR ¶ 19.

- On November 2, 2014, the defendant, Velentzas and the UC went to Home Depot. There, they looked at copper wires, paint containers with the word "combustible," metal

- pipes, sodium chloride and heater fluid. Velentzas additionally looked at manure, commenting to the defendant and the UC that manure was used in the Oklahoma City bombing.[1]  See PSR ¶¶ 23, 33.

- On February 22, 2015, the UC and Velentzas met the defendant at her home. Velentzas pointed to four propane gas tanks in Siddiqui's apartment and asked what it was. Siddiqui stated "I got everything." When asked whether the tanks were propane, Siddiqui replied "I got everything up in this joint. I already told you. If you guys ... once we learn … I got everything up in this joint," referring to the materials needed to construct a bomb. Velentzas and the UC also saw a torch in Siddiqui's apartment. See PSR ¶¶ 22.

- Around March 1, 2015, the defendant told the UC that she had a copy of the car bomb instructions contained in a copy of Inspire magazine and that she wanted to study them. The defendant previously received the magazine with the car bomb instructions from the UC to ultimately give to Velentzas, at Velentzas' request. See Stipulated Facts ¶ 32.

- Also on March 1, 2015, the defendant showed the UC handwritten notes the defendant had taken on how to make explosive material. The UC photographed the defendant's handwritten notes, which were included in Exhibit C to the Stipulated Facts.[2]

The defendant learned this information so that she and Velentzas, Velentzas, could build and detonate an explosive device. The defendant participated in several meetings where the plans for this information were discussed. For example:

---

[1] The defendant's statement regarding the Oklahoma City Bombing is reflected in the audio recording and transcript of the UC's November 2, 2014 recording. The Oklahoma City bombing was a 1995 domestic terrorist bombing of the Alfred P. Murrah Federal Building in downtown Oklahoma City that killed 168 people and injured more than 680 others using a bomb that was made with ammonium nitrate, a fertilizer.

[2] As set forth in Paragraph 22 of the Stipulated Facts, Exhibit C includes both a copy of the UC's March 1, 2015 photographs of the defendant's handwritten notes on making explosive material as well as handwritten notes Velentzas took on or about November 24, 2014. See Exhibit C to Stipulated Facts. A description of Exhibit C in the Stipulated Facts omitted the description of these notes. The NYPD report describing the UC's March 1, 2015 meeting with the defendant and the UC's photographing of the defendant's notes is attached hereto as Exhibit 2.

- On May 23, 2013, the defendant told the UC that she was aware that Velentzas was obsessed with pressure cookers since the Boston Marathon attacks in 2013, and frequently made comments about pressure cookers.[3]

- In September 2014, during a meeting with the defendant, Velentzas suggested that she and the defendant (together with the UC) needed to learn how the science behind explosives worked so that they would not be like Faizal Shahzad and have a failed terrorist attack.[4] See PSR ¶ 18.

- During a November 2, 2014 meeting between the defendant, Velentzas, and the UC, Velentzas requested that the UC print out a portion of The Anarchist Cookbook, an open source guerrilla warfare manual that included instructions on how to build explosive and incendiary devices. See Stipulated Facts at ¶ 19.

- On or about February 22, 2015, the defendant, Velentzas and the UC discussed a news story about women traveling to join the Islamic State of Iraq and al-Sham ("ISIS")[5] in Syria. When the UC indicated that they would not be able to join and support ISIS in Syria, Velentzas responded "You never know, there is other ways …There's other ways to do that." See PSR ¶ 22.

    C.    The Defendant and Velentzas Discussed Law Enforcement as Targets for an Attack

Throughout the meetings between themselves and the UC, the defendant and Velentzas discussed viable targets for a terrorist attack, expressing a distinct preference for law enforcement targets, rather than civilian targets. For example, they criticized the attempted bombing of the Herald Square subway station in Manhattan because the victims would have been "just regular people." Velentzas stated that the Boston Marathon bombers had erred in

---

[3] The Boston Marathon bombing was a terrorist attack, followed by related shootings, that occurred when two pressure cooker bombs exploded during the Boston Marathon on April 15, 2013. The bombs killed three civilians and injured an estimated 264 others.

[4] Faizal Shahzad committed an attempted Times Square car bombing. In 2010, Shahzad drove to Times Square a Nissan Pathfinder loaded with improvised explosive and incendiary devices. He attempted to detonate these devices, but they failed to explode.

[5] ISIS is a foreign terrorist organization that, since 2013, has claimed credit for numerous terrorist activities, including seizing Mosul, a city in northern Iraq, launching rocket attacks on eastern Lebanon in March 2014, the November 2015 terrorist attacks in Paris, France, and the March 2016 suicide bombings in Brussels, Belgium, among many others. These terrorist activities are part of ISIS's broader goal of forming an Islamic state or "caliphate" in Iraq and Syria.

attacking regular people. By contrast, Velentzas praised Mohammed Shnewer, who was "charged with quite an admirable thing … conspiring to attack Fort Dix in New Jersey," which was a plot against military targets. On or about December 21, 2014, Velentzas and the UC discussed the recent murder of two New York City Police Department ("NYPD") officers in Brooklyn. Velentzas stated that the murder showed it was easy to kill a police officer. She added that killing a police officer is easier than buying "food," because sometimes one has to wait in line to buy "food." Velentzas explained that if so much time and effort is spent on studying how to make an explosive, it is better to go for the enemy directly rather than civilians. She stated that it would be better to attack "the head, the neck, the shoulders" of the "snake" (i.e., enemy), referring to those who harm Muslims, but not "the tail." See PSR ¶ 16.

On or about December 27, 2014, the UC noted to the defendant and Velentzas that there had been more than 25,000 police officers together in one place at the funeral for NYPD Officer Rafael Ramos, who had been killed sitting in his police car. Velentzas complimented the UC on coming up with an attractive potential target. Velentzas asked the UC several times whether there were any "regular people" (i.e., civilians) at the funeral and how far away they were from the police during the funeral. See PSR ¶ 16.

### D. The Defendant's Possession of Bomb-Making Supplies and Instructions

The defendant was arrested on April 2, 2015. That same day, law enforcement executed a search warrant at the defendant's residence. During the search, law enforcement agents recovered several items, including the Inspire magazine article "Car Bombs Inside America" as well as three 400 gram propane gas tanks. See PSR ¶ 24. Notably, as mentioned above, the defendant had advised Velentzas and the UC in February 2015 that "I got everything up in this joint," saying that once they were ready to build an explosive device, she had everything they needed to make it. Furthermore, and also as set forth above, approximately one month before her 2015 arrest, the UC took photographs of the defendant's notes on how to make explosive material.

### E. The Defendant's Charges and Guilty Plea

The defendant was subsequently charged in an indictment with conspiring to use a weapon of mass destruction against persons and property within the United States, in violation of Title 18, United States Code, Section 2332a(a)(2), teaching and distributing information pertaining to the making and use of an explosive, destructive device and weapon of mass destruction, in violation of Title 18, United States Code, Section 842(p), and making material false, fictitious and fraudulent statements in a matter involving international and domestic terrorism, in violation of Title 18, United States Code, Section 1001. On August 23, 2019, the defendant pleaded guilty pursuant to a plea agreement to teaching and distributing information pertaining to the making and use of an explosive, destructive device, and weapon of mass destruction, intending that it be used to commit a federal crime of violence, specifically, use of a weapon of mass destruction, in violation of 18 U.S.C. §§ 842(p)(2)(A) and 844(a)(2). See PSR ¶¶ 1, 25-27.

II.   Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In doing so, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted). "When a factor is already included in the calculation of the [G]uidelines sentencing range, a judge who wishes to rely on that same factor to impose a sentence above or below the range must articulate specifically the reasons that this particular defendant's situation is different from the ordinary situation covered by the [G]uidelines calculation." United States v. Sindima, 488 F.3d 81, 87 (2d Cir. 2007) (quotation omitted, alterations in original). "[W]here the sentence is outside an advisory Guidelines range, the court must also state 'the specific reason' for the sentence imposed, in open court as well as in writing – 'with specificity in a statement of reasons form' that is part of the judgment." United States v. Aldeen, 792 F.3d 247, 251-252 (2d Cir. 2015), as amended (July 22, 2015) (quoting 18 U.S.C. § 3533(c)(2)).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct; [and]
>
> (C) to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in most effective manner." 18 U.S.C. § 3553(a)(2)(D). "The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title

18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts. To the extent there remain any open issues as to the correct Guidelines range, the Court should first make any necessary finding to arrive at the correct range. Nevertheless, however the Court arrives at the correct Guidelines range, it still must fashion a sentence that meets the criteria of Section 3553(a) under the specific facts of this case.

III. The Advisory Guidelines Sentencing Range

    A. The PSR's Guidelines Sentencing Range

In the PSR, the United States Probation Office ("Probation" or "USPO") calculated the defendant's advisory Guidelines sentencing range as follows:

| | | |
|---|---|---|
| Base Offense Level (U.S.S.G. § 2 K1.3(c), 2X1.1, 2K1.4(c), 2A1.5) | | 33 |
| Plus: | Terrorism Enhancement (§ 3A1.4(a)) | +12 |
| Less: | Acceptance of Responsibility (§ 3E1.1(a)) | -2 |
| Less: | Timely Acceptance of Responsibility (§ 3E1.1(b)) | -1 |
| Total Offense Level | | <u>41</u> |

(PSR ¶¶ 35-44, 81). Probation also correctly notes that the government and the defendant agreed to an additional one-level reduction, pursuant to U.S.S.G. § 5K1.1, for global disposition of the case. Despite the defendant's lack of criminal history, Probation likewise correctly determined that the defendant's criminal history category is VI because the offense involved, or was intended to promote, a federal crime of terrorism. See U.S.S.G. § 3A1.4(b). Thus, the defendant's advisory Guidelines range is 360 months to life imprisonment. (PSR ¶¶ 81, 92). Because the count of conviction has a statutory maximum sentence of 20 years, the defendant's effective Guidelines range is 240 months' imprisonment. (PSR ¶¶ 80-81).

    B. A Base Offense Level of 33 Is Correct Because The Defendant Intended to Kill People With An Explosive Device

The defendant has indicated that she disputes the base offense level calculation in the PSR. Probation has considered this objection and has concluded that a base offense level of 33 is correct. See PSR Addendum. The government agrees that, consistent with the PSR, the base offense level in this case is 33. The government reaches this conclusion based on the following:

1. The Statutory Index directs that Section 2K1.3 of the Guidelines (Unlawful receipt, possession, or transportation of explosive materials; prohibited transactions involving explosive materials) be applied in the first instance.[6] See App'x A to U.S.S.G.

2. Section 2K1.3(a) provides for a base offense level of 18 for anyone convicted under § 842(p)(2). However, Section 2K1.3(c) states that if a defendant is "convicted under 18 U.S.C. § 842(p)(2)" to apply Section 2X1.1 (Attempt, Solicitation or Conspiracy) "in respect to that other offense if the resulting offense level is greater than that determined above." In this case, the "other offense" is the use of weapon of mass destruction in violation of 18 U.S.C. § 2332a(a)(2).

3. Section 2X1.1(a) directs the use of the base offense level from the guideline for the substantive offense. Per the Statutory Index to the Guidelines, the use of weapon of mass destruction under § 2332a(a)(2) is analyzed using Sections 2A6.1, 2K1.4 or 2M6.1. See App'x A to U.S.S.G. Neither Sections 2M6.1 nor 2A6.1 apply to these facts.[7] Accordingly, the appropriate starting point for analysis is Section 2K1.4 for "arson [or] property damage by use of explosives."

4. Section 2K1.4(a) provides for a base offense level of 24 if the offense "created a substantial risk of death or bodily injury." However, Section 2K1.4(c) states that "[i]f death results, or the offense was intended to cause death or serious bodily injury, apply the most analogous guideline from Chapter Two, Part A (Offenses Against the Person)" if the resulting offense level is greater (emphasis added).

5. Since the defendant and Velentzas made statements reflecting their intent to kill or seriously harm people with their bomb, Section 2A1.5 (Conspiracy or Solicitation to Commit Murder) should be applied, which leads to a base offense level of 33. See U.S.S.G. § 2A1.5(a).

Notably, the defendant largely agrees with this analysis. The defendant concedes that a base offense level of at least 24 is appropriate based on Section 2K1.4(a) and the underlying offense of use of a weapon of mass destruction. See Def.'s Objections to Presentence Investigation Report (Docket Entry No. 132) ("Def.'s PSR Letter") at 10 ("the

---

[6] Although the Statutory Index directs the use of either Section 2K1.3 or 2M6.1 for a conviction under § 842(p)(2), Section 2M6.1 only applies to activity involving nuclear, biological or chemical weapons. See App. Note 1 to Section 2M6.1.

[7] As previously noted, Section 2M6.1 only applies to activity involving nuclear, biological or chemical weapons. Section 2A6.1 involves "threatening or harassing communications," which is not supported by the facts of this case.

9

defendant agrees…the use of any device would create a substantial risk of death, and that she was aware of the risk").

The defendant's only dispute is whether Section 2A1.5 (Conspiracy or Solicitation to Commit Murder) should be applied and raise the base offense level to 33. (Id. at 7-10.) As noted above, the Guidelines directs the application of "the most analogous guideline" to the relevant offense—here the use of a weapon of mass destruction. The defendant and Velentzas researched explosives for the purpose of using a weapon of mass destruction, and the defendant and Velentzas repeatedly compared their plans to other terrorist attacks that caused scores of murders. There is no question that the guideline for conspiring to commit murder is the most analogous given these facts.

The defendant claims that Section 2A1.5 should not apply because the defendant did not have the requisite "intent to kill" another person. See Def.'s PSR Letter at 8, 10. Murder is "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a), meaning that there must be an intent to kill another person.

The defendant had that intent. The defendant did not research how to build a bomb because she was generally interested in how bombs work. She has admitted, pursuant to her guilty plea, that she was studying how to make an explosive device "with the intent that…[the device] be used for, or in furtherance of, an activity that constitutes a Federal crime of violence." 18 U.S.C. § 842(p)(2)(A). Since a crime of violence is an offense that includes the "use of physical force against the person or property of another," at a bare minimum the defendant's intent was that an explosive device would be detonated against a person or property. Given the nature of how an explosive device is used, the likelihood of killing someone is already significant.

The stipulated facts in this case confirm that the defendant intended for any bomb she and Velentzas made to kill people. The focus of conversations between the defendant and Velentzas are prior examples of terrorist attacks and jihadist propaganda that promoted the use of explosives to kill people. The defendant discussed watching videos of hostages being tortured and killed by ISIS members. The defendant and Velentzas discussed the attempted car bombing of Times Square by Faizal Shahzad, which would have killed scores of people if it had detonated properly. And, notably, the defendant similarly studied car bomb instructions. Finally, the defendant's own past statements, such as her descriptions in Jihad Recollections about "slit throats," waiting for "skies [to] rain martyrdom," and "the cue to shoot devil's head and spurt its venom blood red" all indicate that her ultimate intent for the explosives was to kill others.

Accordingly, the preponderance of the evidence in this case clearly supports the conclusion that the defendant intended to commit murder with the explosive devices that she was studying to build, and the most analogous guideline is Section 2A1.5 (Conspiracy or Solicitation to Commit Murder), which provides for a base offense level of 33.

10

C.  The Terrorism Enhancement Is Correctly Applied

The defendant also disputes the application of the terrorism enhancement. See Def.'s PSR Letter at 10-17. Probation has considered this objection and has concluded that the terrorism enhancement should apply. See PSR Addendum. The terrorism enhancement under Section 3A1.4 applies "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." A "federal crime of terrorism" is a crime that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is a violation of one or more enumerated federal statutes. See 18 U.S.C. § 2332b(g)(5).

For the purposes of applying the enhancement, the offense of conviction need not be on the enumerated list in Section 2332b because the enhancement applies both to crimes that "involved," or were also "intended to promote," a federal crime of terrorism. See, e.g., United States v. Awan, 607 F.3d 306 (2d Cir. 2010) (reversing district court decision not to apply enhancement to defendant convicted of conspiracy to provide material support to conspiracy to commit murder, kidnapping and maiming, and holding that the phrase "intended to promote" in Section 3A1.4 "must be applicable…where the defendant's offense or relevant conduct does not include a federal crime of terrorism) (emphasis in original). The defendant does not dispute that this prong of the enhancement applies in this case because the offense of conviction intended to promote the use of a weapon of mass destruction, which is on the enumerated list of terrorism crimes. See Def.'s PSR Letter at 12 ("the underlying offense of use of a weapon of mass destruction is listed and therefore, the defense concedes that [the defendant] is eligible for the enhancement if the second prong is met").

The defendant argues instead that that the enhancement should not apply because the government has failed to prove by a preponderance of the evidence[8] that the defendant herself—separate from her co-defendant Velentzas—had the "individualized subjective intent to influence the government in conjunction with the commission of [her] crime." See Def.'s PSR Letter at 11-12.

---

[8] The defendant argues that a higher burden of proof is necessary to apply the terrorism enhancement, but concedes that there is no law to support this claim. See Def.'s PSR Letter at 11-12 (arguing that "the proof should be higher" based on dicta in an unrelated Supreme Court decision that actually affirmed the preponderance standard in sentencing, but conceding that "the guidelines do not specify that the standard of proof is beyond the ordinary preponderance of the evidence standard" and admitting that the burden to apply the enhancement is "at a minimum by a preponderance of the evidence"). The Court should reject this argument and, as it does in every case under the Guidelines, apply enhancements supported by a preponderance of the evidence. See, e.g., United States v. Norris, 281 F.3d 357, 359 (2d Cir. 2002) ("[T]he applicable standard of proof for enhancements is preponderance of the evidence.").

11

This argument is contrary to binding Second Circuit precedent. In <u>United States v. Awan</u>, 607 F.3d 306, 317 (2010), the Second Circuit expressly held that the government does <u>not</u> have to prove that the defendant herself committed an offense that was calculated to influence the conduct of government:

> Under the "intended to promote" prong, however, so long as the defendant's offense was intended to encourage, further, or bring about a federal crime of terrorism as statutorily defined, the defendant himself does not have to commit an offense listed in § 2332b(g)(5)(B), <u>and the defendant's offense need not itself be "calculated" as described in § 2332b(g)(5)(A)</u>.

<u>Awan</u>, 607 F.3d at 314 (emphasis added). To read this language more narrowly in the manner that the defendant argues would "defy common sense" according to the Circuit, because then the terrorism enhancement "would not apply to defendants who clearly 'intend to promote' federal crimes of terrorism committed by <u>other persons</u>." <u>Id.</u> at 315 (emphasis in original). Using an example even further afield from conduct supporting terrorism than the defendant's conduct, the Second Circuit illustrated why this is the case:

> For example…a defendant, motivated solely by pecuniary gain, might sell weapons to a terrorist organization. It would be absurd to conclude that such a defendant's criminal conduct could not be subject to a § 3A1.4 enhancement because it was not itself a listed offense that is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A).

<u>Id.</u> Accordingly, even if the Court were to credit the defendant's argument in its entirety—that she intended to promote the use of a weapon of mass destruction, but only Velentzas wanted to commit a crime calculated to influence the government—the Second Circuit has affirmatively concluded that the enhancement applies in precisely such a circumstance.

The facts in this case clearly support the conclusion that the defendant and Velentzas's conduct here was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." "The conventional meaning of 'calculated' is 'devised with forethought'" and, therefore, "if a defendant's purpose in committing an offense is to 'influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct,' the first requirement of section 2332b(g)(5)(A) is satisfied." <u>United States v. Stewart</u>, 590 F.3d 93, 137 (2d Cir. 2009). As reflected in more detail in the stipulated facts attached to the plea, the following is proof that the defendants' conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct":

1. The overarching decision by the defendant and Velentzas to research and obtain materials for explosives similar to various historically significant terrorist attacks, including the World Trade Center bombing, the Boston Marathon bombing, the failed Times Square bombing and the Oklahoma City bombing. All of these attacks

were calculated to influence or affect the conduct of the government, and the fact that the defendants were modeling their own plans after these attacks means that they had the same intent.

2. The defendant and Velentzas stated belief in the propriety and righteousness of suicide attacks. For example, Siddiqui wrote posts for Samir Khan's magazine praising violent jihad and wrote in support of attempted vehicle-born improvised explosive device defendant Mohammad Mohamud. Velentzas praised the attacks of September 11, 2001 and stated that being a martyr through a suicide attack guarantees entrance into heaven. Velentzas also described viewing a video of a suicide bombing in Syria or Iraq and said it was "cool." Their statements of support and favor for politically-motivated violence further shows their intent.

3. Velentzas' praise for an "admirable" attempted terrorist attack on Fort Dix, New Jersey.

4. Velentzas' statement, in the context of various terrorist attacks that killed civilians, that it would be better to attack "the head, the neck, the shoulders" of the "snake," an obvious reference to directly attacking the government, rather than civilians.

5. Both the defendant and Velentzas's association with, and idolization of, various terrorist figures including Samir Khan, Abdullah Azzam and Usama Bin Ladin, all of whom engaged in crimes unambiguously calculated to influence or affect the conduct of government by intimidation or coercion.

6. Both the defendant and Velentzas's review of car bomb instructions in Inspire magazine, a propaganda magazine for a foreign terrorist organization that has engaged in numerous criminal acts that have been calculated to influence or affect the conduct of government.

Even if the conduct that Probation considered was further limited to just the defendant herself, that evidence still proves that she intended to commit an offense calculated to influence or affect the conduct of government by intimidation or coercion. The defendant wanted to use the explosive device she was learning to build to influence the U.S. government. Her state of mind is reflected in her conduct before she began to research bombs. She was in regular contact with Samir Khan, a committed jihadi radical and associate of a foreign terrorist organization. Khan published several magazines, such as Inspire, that incorporated jihadist propaganda specifically designed to influence governments by intimidation or coercion. For example, in the same magazine where the defendant published one of her poems, Jihadi Recollections, Khan published an article attributed to Osama Bin Ladin, titled "Four Practical Steps to Expand the Global Jihad," an article titled "Principles of Guerilla Warfare," and a downloadable item called "Ambush at Bardal" which is described as a look at "an ambush in Somalia which resulted in many Kuffar [non-believers] left dead from the Mujahideen [warriors]." See Exhibit 3. Khan also wrote and published several works regarding making homemade bombs and suicide bombing and called for attacks on the United States. The poems

13

submitted by the defendant to Khan's journal were consistent with this same message. The defendant's poems described acts of martyrdom, called for "nations [to be] wiped clean of filthy shrines," and talked about "shoot[ing] devil's head." Her poems were superimposed with the images of gravestones and military vehicle damaged by an explosion. The defendant's own writings and relationships with associates of a terrorist organization make plain that her research into explosive devices was another step in a plan to commit an act that would influence the U.S. government.

The defendant's conduct provides further proof. As noted above, the defendant kept and reviewed an article on how to make a car bomb that came from an issue of Inspire magazine. A car bomb is a common method of terrorist attacks, and the fact that the instructions were from a jihadist propaganda magazine further confirms that the purpose of any such bomb would have been to influence the government. Moreover, the defendant's intended purpose for a car bomb was made clear when, on September 1, 2014, the defendant discussed how to make explosions and also discussed the attempted bombing of Times Square by Faizal Shahzad, who also attempted to build and detonate a car bomb in a terrorist attack. See Stipulated Facts at ¶ 15.

Finally, even if, contrary to Second Circuit precedent, the Court looked only at the defendant's intent to justify the enhancement, Velentzas' statements and conduct would still be relevant to the analysis of the defendant's intent. Velentzas' statements about why they were learning about explosives is circumstantial evidence of the defendant's own intent in this case. Velentzas made comments on several occasions in the presence of the defendant regarding the use of an explosive device in a terror attack, similar to other historical terrorist acts. On September 7, 2014, for example, Velentzas discussed with the defendant the 1993 World Trade Center bombing in the context of discussing how to detonate a bomb from a distance. See Stipulated Facts at ¶ 16. It is reasonable to conclude, based on the statements of the defendant's close friend and co-defendant about the goals of their research, that the defendant shared those goals and likewise wanted to build an explosive to commit a terrorist attack.

Accordingly, both binding precedent and the facts of this case support the application of the terrorism enhancement.

D. No Role Reduction Is Appropriate

The defendant also argues that she should receive a three-level role reduction. See Def.'s PSR Letter at 14-17. The Court should reject this argument.

Pursuant to Section 3B1.2 of the Guidelines, a defendant's offense level may be reduced by 2 to 4 levels if the defendant was a minor participant (2 levels), minimal participant (4 levels) or somewhere in between (3 levels). The reduction may be applied only where the defendant is "substantially less culpable than the average participant in the criminal activity." See U.S.S.G. § 3B1.2, App. Note 3(A) (emphasis added). A "minimal" participant is a person who is "plainly among the least culpable of those involved" and involves things such as "a

14

defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others." Id. at App. Note 4. A "minor" participant is "less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." Id. at App. Note 5. The mitigating role determination is fact-specific and based on the totality of the circumstances. Id. at Note 3(C). The burden is on the defendant to prove by a preponderance of the evidence that a reduction should be applied. See, e.g., United States v. Garcia, 920 F.2d 153, 156 (2d Cir. 1990). A court is expected to consider the following "non-exhaustive" list of factors for consideration of the reduction:

(i) the degree to which the defendant understood the scope and structure of the criminal activity;

(ii) the degree to which the defendant participated in planning or organizing the criminal activity;

(iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v) the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. § 3B1.2, App. Note 3(C).

Here, the defendant cannot prove by a preponderance of the evidence that she was "substantially less culpable" than her co-defendant Velentzas. Where, as is the case here, a defendant is aware of the scope of the criminal activity and willing to participate however necessary to carry out the crime, no mitigating role is appropriate even if the defendant ultimately played a lesser role than other participants. See United States v. Rahman, 189 F.3d 88, 159–60 (2d Cir. 1999) (denying role adjustment to terrorism defendant where facts showed that each defendant was "found to have been willing to do what it was that was necessary for him to do to accomplish the goals of the conspiracy"); see also United States v. Batista, 732 F.Supp.2d 82, 89 (E.D.N.Y. 2010) (denying role adjustment to defendant who "provided a valuable and unique service to the conspiracy that helped the conspiracy avoid detection by law enforcement, and [who] had knowledge of the scope and structure of the illicit enterprise"). Regardless of whether Velentzas took a more active role, the facts demonstrate that the defendant was willing to do things, such as providing chemistry texts and sharing bomb-making materials found in her home, in order to commit the offense. In such circumstance, no mitigating role is appropriate.

Additionally, all of the factors also weigh against application of any role reduction. The scope and structure of the criminal activity was straightforward, and the

defendant concedes that this factor weighs against her. See Def.'s PSR Letter at 15. The defendant's participation in planning and organizing was likewise consistent with a relatively equal role in the criminal activity. Velentzas and the defendant both conducted research on explosives and shared information with each other about their studies. Both met together and discussed historical terrorist attacks as comparisons for their own conduct. Both discussed acquiring items to be used for an explosive device, including traveling together to Home Depot and reviewing potential bomb-making materials at the defendant and Velentzas's houses. The defendant also retained significant decision-making authority. It was the defendant's decision to retain a copy of car bomb-making instructions, rather than give them to Velentzas, so that the defendant could study those instructions. It was the defendant's decision to engage in conduct designed to evade law enforcement, such as declining to discuss their activity over the phone and speaking in coded terms. The acts performed by the defendant also weigh against a mitigating role. The defendant offered up materials found in her home for use in making an explosive, stating "I already told you. If, if you guys want…I got everything up in this joint." She also obtained and provided chemistry books for use by the group to learn more about making explosives. Finally, based on the defendant's past support of jihadi terrorists like Samir Khan, the evidence supports the conclusion that she would have also considered any terrorist attack conducted based on their work to be a benefit. The PSR described the defendant as a co-equal in the criminal conduct because, as the facts demonstrate, she equally shared in the conduct and planning of the criminal activities. No mitigating role adjustment is appropriate.

IV.     The Section 3553(a) Factors

The government respectfully submits that a Guidelines sentence of 240 months' imprisonment is appropriate in this case.

First, the offense of conviction is gravely serious. For nearly two years, the defendant and Velentzas studied and taught each other how to create an explosive device to be used in a terrorist attack in the United States. There is no dispute about this; the defendant has pleaded guilty to the crime and in doing so, has acknowledged that the offense involved "more than the intent to simply learn how to make [an explosive device], there was an intent to build an actually use one." PSR ¶ 33. Indeed, as set forth above and throughout the PSR, the defendant and Velentzas taught each other chemistry and electrical skills directly related to creating explosives and building detonating devices, shopped for and acquired materials to be used in a bomb or an improvised explosive device, discussed similar devices used in past terrorist incidents like the Boston Marathon Bombing and the Oklahoma City bombing, and researched potential targets of an attack, focusing on law enforcement.

Moreover, the defendant did not just research and learn about terrorist attacks; she studied and made her own notes on making explosive material and possessed materials that could be used in such an attack. Indeed, approximately a month prior to her arrest, the defendant had advised Velentzas and the UC that "I got everything up in this joint," referring to the materials needed to construct a bomb. This included three 400 gram propane gas tanks, as well as other materials that could be used to make a bomb. In short, the defendant's conduct

following through on her efforts to teach and learn how to make an explosive device warrants a significant sentence.

Moreover, the defendant's minimization of her participation in the offense and her attempt to downplay the seriousness of what she has already pleaded guilty to is belied by the undisputed facts and, in particular, her own words. As her recorded statements make clear, for years the defendant and Velentzas followed and expressed a violent, warped version of Islam which, in their view, demanded that they teach each other and learn how to build a bomb and with the *intent to use it*. This is reflected, for example, in the defendant's conversation with Velentzas in September 2014 during which the two discussed the attempted terrorist car-bombing of Times Square and stated that they "don't wanna be like Faisal Shahzad" where "he had a whole car…ready to go like…and that shit didn't blow up." PSR ¶ 18. The import of this discussion is unmistakable; when the defendant and Velentzas were ready to use the explosive device they were planning to build, they wanted it to *actually explode*. And it is further reflected in the defendant's own statement to Probation that two months later, on November 2, 2014, she, Velentzas and the UC went to Home Depot "for the purpose of determining whether we could purchase the items needed to produce an explosive device." PSR ¶ 33. The defendant and Velentzas meant what they said; they intended to build a bomb and to use it in support of their jihadist ideology. Had they succeeded in executing a bombing like the prior terrorist attacks they repeatedly discussed and celebrated, the result would have been catastrophic. Accordingly, the seriousness of this offense alone warrants a Guidelines sentence.

A sentence of 240 months' imprisonment is also necessary "to afford adequate deterrence to criminal conduct" 18 U.S.C. § 3553(a)(2)(B) and to protect the public from future crimes of the defendant. Id. at § 3553(a)(2)(C). These needs are especially important in the context of a terrorism offense. Terrorism is a crime with high recidivism rates and rehabilitation is notoriously difficult. See, e.g., United States v. Meskini, 319 F.3d 88, 91-92 (2d Cir. 2003) (noting the link between "the difficulty of deterring and rehabilitating" terrorists and the conclusion that "terrorists and their supporters should be incapacitated for a longer period of time"). As Second Circuit Judge John M. Walker has stated, "[i]n no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life." United States v. Stewart, 590 F.3d 93, 181 (2d Cir. 2009) (Walker, J., concurring). Indeed, in this case there is a strong demand for both individual and general deterrence.

The defendant has already demonstrated a commitment to promoting and waging violent jihad, both in her words and her actions, making specific deterrence and the need to protect the public important factors requiring a Guidelines sentence. The defendant's commitment to a twisted manipulation of Islam for violent purposes was apparent at least as early as 2009, when she submitted and published two poems full of brutally violent and extremist language in "Jihad Recollections," the publication of AQAP member and propagandist Samir Khan. See PSR ¶ 9. While the defendant's poetry itself – including such lines as "All I can think of is the cue to shoot devil's head and spurt its venom blood red,"

published alongside images of gravestones and an exploded military vehicle – is not alone grounds for any punishment, here the defendant's words take on a heightened meaning because she has already put those same hateful sentiments into action by teaching and learning the skills to build an explosive device with the intent to use it.

Moreover, the defendant has also already shown herself to lie and deceive to avoid detection by law enforcement and to hide her support for violent jihad. When questioned in July 2014 by law enforcement officers about the extremist AQAP propagandist Samir Khan, the defendant repeatedly lied about her contacts with him and her poems published his magazine. See PSR ¶ 11. The defendant made these false statements shortly before she began teaching and distributing information pertaining to the making and using a bomb with the intention of using it. The defendant must be deterred – and the public protected – from her committing further actions in support of violent jihad.

Relatedly, the defendant's claim that the offense was merely part of a self-defense commitment with Velentzas to protect their faith must be rejected. This claim contradicts the overwhelming evidence and defies reason. The defendant has admitted that there was "more than the intent to simply learn how to make [an explosive device], there was an intent to build and actually use one." PSR ¶ 33. Bombs are not defensive weapons. The terrorist bombing attacks that Velentzas and Siddiqui discussed with admiration and modeled for comparison to their own studies were *not defensive bombings*. And while it is true that their conversations sometimes reflected a preference for avoiding civilian casualties, there was no such sentiment for members of law enforcement and the military, whom the defendant and Velentzas clearly viewed as legitimate targets for an explosive attack. See, e.g., PSR ¶¶ 15, 16, 20; Stipulated Facts ¶¶ 23, 28.

Again, it is only the defendant's warped world view that leads to her claim that teaching and planning to build an explosive device with the intent of using it was a defensive action. The defendant and Velentzas made this explicit on November 23, 2014, when discussing The Anarchist Cookbook and their plans for their own bomb. During this discussion,

> Velentzas, Siddiqui and the UC also discussed what they were ultimately trying to accomplish with their studies. Velentzas said that they do not need a plan, because plans are foiled or stopped. According to Velentzas, it was premature to discuss a plan and, when the appropriate time arises, they would know by the way of Allah. Velentzas later explained that she would never want to hurt anyone but, as a Muslim, she must acquire this knowledge and be ready. Velentzas also noted that the kufar have this knowledge and use it to hurt Muslims, and so the group needed to be prepared. Velentzas then told a story about Ayyash, the Hamas bomb-maker, taking action after a Jewish man shot Muslims in a mosque. According to Velentzas, when Allah decides the time, they will know whether one person, or two

18

>people, needs to act. She went on to state that at this juncture, they did not need to have these talks because it was too early.

Stipulated Facts at ¶ 21.

The reference to Yahya Ayyash is telling. Also known as "the Engineer," Ayyash was Hamas's chief bomb-maker until his death in 1996. Prior to that, he built bombs used in numerous suicide attacks that killed at least 60 people and injured hundreds. Thus, in the defendant's and Velentzas's perverted view of Islam, their work learning and planning to build and use an explosive device was like that of Ayyash; when they perceived themselves or other Muslims under attack, striking back with a bomb was a form of "self-defense." That is terrorism, not a defensive action.

Finally, this is a case where general deterrence also demands the Guidelines sentence. Given the gravity of the offense and the potential catastrophic damage that might have occurred had the defendant and Velentzas achieved their aim of detonating a bomb like the attacks they idealized, this Court should make clear to anyone contemplating similar actions that such an offense will be punished severely.

V.  Conclusion

In short, the need for punishment for Siddiqui's offense, the need for specific as well as general deterrence and the need to protect the public calls for a significant sentence. The government respectfully requests that the Court impose a sentence of 240 months' imprisonment.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:  /s/ Craig R. Heeren
Craig R. Heeren
Josh Hafetz
Jonathan E. Algor
Assistant U.S. Attorneys
(718) 254-7000

cc:  Defense counsel (by ECF)
USPO Shayna Bryant (by email)