

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DMP:CRH/JGH/JEA
F. #2014R00196

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 16, 2022

By ECF

Honorable Sterling Johnson Jr.
United States District Judge
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

> Re:    United States v. Asia Siddiqui
>        Criminal Docket No. 15-213 (SJ)

Dear Judge Johnson:

The government respectfully submits this letter in opposition to the petitioner Asia Siddiqui's petition, pursuant to 28 U.S.C. § 2255, to set aside her sentence on the ground of ineffective assistance of counsel (the "Petition" or "Pet."). See ECF No. 162. The petitioner contends that her counsel was ineffective in failing to permit her to speak as she desired at sentencing, which included taking greater responsibility for her criminal conduct. This claim must fail because the petition is untimely by more than a year, because the defendant in fact was permitted to speak at sentencing and, in any event, there was no prejudice to the defendant. Therefore, the Petition should be denied.

I.    Background

      A.    The Offense Conduct

In brief, the petitioner and her co-defendant, Noelle Velentzas, learned and taught each other how to create an explosive device to be detonated in a terrorist attack in the United States, specifically aimed at law enforcement. In a series of meetings with an undercover law enforcement officer (the "UC"), the petitioner and Velentzas discussed various historical terrorist attacks, including the first World Trade Center bombing, the Oklahoma City Bombing, and the Boston Marathon attack, as well as attempted attacks like the 2010 attempted bombing of Times Square. They also researched how to execute similar attacks, including seeking out and collecting the material components needed to create the explosives used in those attacks. Pursuant to the plea agreement, the petitioner stipulated to a set of facts that describe this conduct in further detail (the "Stipulated Facts), which are attached to the plea agreement in this case.

1.  The Petitioner's Motivation to Build and Detonate an Explosive Device

The evidence reflects that Siddiqui was motivated by her nearly decade-long support of individuals associated with foreign terrorist organizations like al-Qaeda. When questioned by law enforcement about her past support of these individuals and organizations, she lied and denied her prior conduct.

In approximately 2006, the petitioner became close with Samir Khan, an individual who became a prominent figure of Al Qa'ida in the Arabian Peninsula ("AQAP"), a designated foreign terrorist organization. While living in the United States, Khan ran a blog called "InshallahShaheed" ("Martyr, God willing") and later became the editor of Inspire magazine. Inspire magazine was a magazine through which AQAP disseminated propaganda and actively tried to recruit Muslims throughout the world – including in the United States – to join cause with AQAP. Khan wrote and published several works regarding making homemade bombs and suicide bombing and called for attacks on the United States. Siddiqui submitted her poetry to Khan for publication. See Presentence Investigation Report ("PSR") ¶ 8.

In or about 2009, Siddiqui wrote two poems and an article that were published in a magazine called Jihad Recollections, a predecessor publication of Inspire. See PSR ¶ 9. In one poem called "Take Me to the Lands Where the Eyes Are Cooled," Siddiqui wrote that she "drop[s] bombs" as she swings on a hammock and "[h]it[s] cloud nine with the smell of turpentine, nations wiped clean of filthy shrines." She also wrote that she "taste[s] the Truth through fists and slit throats" and that there is "[n]o excuse to sit back and wait – for the skies rain martyrdom." In a second poem called "The Sound of Motor," Siddiqui wrote "All I can think of is the cue to shoot devil's head and spurt its venom blood red." The poem was published in front of images of gravestones and a military vehicle damaged by an explosion.

Siddiqui's pro-jihadist motivations are also demonstrated in a letter expressing her ideological support for Mohammad Mohamud, who was arrested on November 26, 2010, after he attempted to detonate a vehicle-borne improvised explosive device at a Christmas tree-lighting ceremony in Portland, Oregon. On or about September 10, 2011, Siddiqui mailed a letter to Mohamud in his jail facility. Siddiqui asked for "Allah" to "accept [Mohamud's] good deeds and sacrifices." See PSR ¶ 10.

On or about July 10, 2014, FBI Special Agents interviewed Siddiqui upon her inbound arrival at LaGuardia Airport in Queens, New York, on a flight originating in Toronto, Canada. The agents expressly advised her that it is a crime to lie to federal agents. During the interview, Siddiqui denied contributing to or publishing in any jihadist magazines. She also denied having any contact with Khan or any terrorist groups. See PSR ¶¶ 11.

On that same date, Siddiqui met with the UC and explained that FBI agents had questioned her at the airport. Siddiqui admitted that she had lied to the FBI. Siddiqui told the UC that she had known Khan even before he was deemed a terrorist. She explained that in 2006, she had sent a poem to Khan via his blog or website. Siddiqui stated that Khan published her poem and that her poem had become popular. See PSR ¶ 14.

2

2. <u>The Petitioner and Her Co-Defendant Taught Themselves How to Build</u>
<u>Explosive Devices</u>

By mid-2014, the petitioner and Velentzas met with each other and the UC on a regular basis, and discussed how to build an explosive device they could detonate on U.S. soil. Early on, the petitioner and Velentzas confirmed the purpose of their research. On or about August 6, 2014, the petitioner and Velentzas met, along with the UC, and discussed learning "science" in order to construct an explosive device. In response to a question from the UC about what was meant by "science," Velentzas motioned with her hands to simulate the explosion of a bomb in the presence of the petitioner. Later that month, the petitioner and Velentzas, in the presence of the UC, discussed other attempted plots to detonate explosives on American soil, including the 1993 World Trade Center bombing and the attempted bombing of the Herald Square subway station in Manhattan. <u>See</u> PSR ¶¶ 17-19. Over the next nine months, until their arrest in April 2015, the petitioner and Velentzas conducted research on explosive devices used in these and other terrorist attacks and taught each other the steps in constructing such devices, all with the intention of using an explosive device in an attack.

In addition to planning with Velentzas, the petitioner took independent steps towards their goal of learning how to build an explosive device. For example:

- On August 13, 2014, the petitioner and the UC went to a public library to conduct research on how to make explosive devices. The petitioner cited the earlier conversation about "science"—when Velentzas made clear through hand motions that she was interested in learning how to build an explosive device—and searched for chemistry books to study.

- The petitioner reviewed course books with Velentzas from an electricity course she had taken. The petitioner showed Velentzas and the UC a passage on electrolytic capacitors and pointed to a sentence reflecting that connecting positive wires to negative receivers and negative wires to positive receivers can cause a fire or explosion. On September 7, 2014, the petitioner and her co-defendant discussed how to cause an explosion in this way without hurting themselves, unless they intended to do so—a reference to suicide bombing. However, Velentzas and the petitioner implied that their goal was to learn how to blow up a bomb from afar rather than conduct a suicide bombing. <u>See</u> PSR ¶ 19.

- On November 2, 2014, the petitioner, Velentzas and the UC went to Home Depot. There, they looked at copper wires, paint containers with the word "combustible," metal pipes, sodium chloride and heater fluid. Velentzas additionally looked at manure, commenting to the petitioner and the UC that manure was used in the Oklahoma City bombing. <u>See</u> PSR ¶¶ 23, 33.

- On February 22, 2015, the UC and Velentzas met the petitioner at her home. Velentzas pointed to four propane gas tanks in Siddiqui's apartment and asked what it was. Siddiqui stated "I got everything." When asked whether the tanks were propane, Siddiqui replied "I got everything up in this joint. I already told you. If you guys ... once we learn … I got everything up in this joint," referring to the materials needed to construct a bomb. Velentzas and the UC also saw a torch in Siddiqui's apartment. <u>See</u> PSR ¶¶ 22.

3

- Around March 1, 2015, the petitioner told the UC that she had a copy of the car bomb instructions contained in a copy of <u>Inspire</u> magazine and that she wanted to study them. The petitioner previously received the magazine with the car bomb instructions from the UC to ultimately give to Velentzas, at Velentzas' request. <u>See</u> Stipulated Facts ¶ 32.

- Also on March 1, 2015, the petitioner showed the UC handwritten notes the petitioner had taken on how to make explosive material. The UC photographed the petitioner's handwritten notes.

        The petitioner learned this information so that she and Velentzas could build and detonate an explosive device. The petitioner participated in several meetings where the plans for this information were discussed. For example:

- On May 23, 2013, the petitioner told the UC that she was aware that Velentzas was obsessed with pressure cookers since the Boston Marathon attacks in 2013, and frequently made comments about pressure cookers.

- In September 2014, during a meeting with the petitioner, Velentzas suggested that she and the petitioner (together with the UC) needed to learn how the science behind explosives worked so that they would not be like the person who attempted but failed to commit a car bombing in Times Square, and themselves have a failed terrorist attack. <u>See</u> PSR ¶ 18.

- During a November 2, 2014 meeting between the petitioner, Velentzas, and the UC, Velentzas requested that the UC print out a portion of <u>The Anarchist Cookbook</u>, an open source guerrilla warfare manual that included instructions on how to build explosive and incendiary devices. <u>See</u> Stipulated Facts at ¶ 19.

- On or about February 22, 2015, the petitioner, Velentzas and the UC discussed a news story about women traveling to join the Islamic State of Iraq and al-Sham ("ISIS"), a designated foreign terrorist organization, in Syria. When the UC indicated that they would not be able to join and support ISIS in Syria, Velentzas responded "You never know, there is other ways …There's other ways to do that." <u>See</u> PSR ¶ 22.

        3.   <u>The Petitioner and Her Co-Defendant Discussed Law Enforcement as Targets for an Attack</u>

        Throughout the meetings between themselves and the UC, the petitioner and Velentzas discussed viable targets for a terrorist attack, expressing a distinct preference for law enforcement targets, rather than civilian targets. For example, they criticized the attempted bombing of the Herald Square subway station in Manhattan because the victims would have been "just regular people." Velentzas stated that the Boston Marathon bombers had erred in attacking regular people. By contrast, Velentzas praised Mohammed Shnewer, who was "charged with quite an admirable thing … conspiring to attack Fort Dix in New Jersey," which was a plot against military targets. On or about December 21, 2014, Velentzas and the UC discussed the then-recent

murder of two New York City Police Department ("NYPD") officers in Brooklyn.  Velentzas stated that the murder showed it was easy to kill a police officer.  She added that killing a police officer is easier than buying "food," because sometimes one has to wait in line to buy "food."  Velentzas explained that if so much time and effort is spent on studying how to make an explosive, it is better to go for the enemy directly rather than civilians.  She stated that it would be better to attack "the head, the neck, the shoulders" of the "snake" (i.e., enemy), referring to those who harm Muslims, but not "the tail."  See PSR ¶ 16.

On or about December 27, 2014, the UC noted to the petitioner and Velentzas that there had been more than 25,000 police officers together in one place at the funeral for NYPD Officer Rafael Ramos, who had been killed sitting in his police car.  Velentzas complimented the UC on coming up with an attractive potential target.  Velentzas asked the UC several times whether there were any "regular people" (i.e., civilians) at the funeral and how far away they were from the police during the funeral.  See PSR ¶ 16.

### 4. The Petitioner's Possession of Bomb-Making Supplies and Instructions

The petitioner was arrested on April 2, 2015.  That same day, law enforcement executed a search warrant at the petitioner's residence.  During the search, law enforcement agents recovered several items, including the Inspire magazine article "Car Bombs Inside America" as well as three 400 gram propane gas tanks.  See PSR ¶ 24.  Notably, the petitioner had previously advised Velentzas and the UC in February 2015 that "I got everything up in this joint," saying that once they were ready to build an explosive device, she had everything they needed to make it.  Furthermore, and also as set forth above, approximately one month before her 2015 arrest, the UC took photographs of the petitioner's notes on how to make explosive material.

### B.   Procedural History and Sentencing

On April 1, 2015, the petitioner was charged by complaint, and on April 30, 2015, charged in an indictment with conspiring to use a weapon of mass destruction against persons and property within the United States, in violation of Title 18, United States Code, Section 2332a(a)(2), teaching and distributing information pertaining to the making and use of an explosive, destructive device and weapon of mass destruction, in violation of Title 18, United States Code, Section 842(p), and making material false, fictitious and fraudulent statements in a matter involving international and domestic terrorism, in violation of Title 18, United States Code, Section 1001.  On August 23, 2019, the petitioner pleaded guilty pursuant to a plea agreement to teaching and distributing information pertaining to the making and use of an explosive, destructive device, and weapon of mass destruction, intending that it be used to commit a federal crime of violence, specifically, use of a weapon of mass destruction, in violation of 18 U.S.C. §§ 842(p)(2)(A) and 844(a)(2).  See PSR ¶¶ 1, 25-27.

On January 9, 2020, the petitioner was sentenced by the Court to 180 months' imprisonment, followed by three years' supervised release.  See Judgment, ECF No. 144.  Both counsel for the petitioner, Linda Moreno and Charles Swift, spoke on behalf of the petitioner.  See Sent. Tr. at 3-13.  Ms. Moreno highlighted Siddiqui's positive history and characteristics, while Mr. Swift argued that the Court should find a lower guidelines range under the U.S. Sentencing Guidelines (the" Guidelines" or "U.S.S.G.") than the government or the U.S. Probation Office

("Probation" or "USPO") had calculated.  Id.  The petitioner was given the opportunity to speak on her own behalf, and spoke at length.  See Sent. Tr. at 13-17.  The petitioner admitted to knowing and communicating with Khan, and publishing poetry in his radical publication.  Id. at 13-14.  The petitioner admitted to introducing her co-defendant to the third person they believed was conspiring to build a bomb with them, but who in reality was the UC.  Id. at 15.  Notably, the petitioner's statement took substantial responsibility for her role in the criminal offense.  Id.  The petitioner also made clear that she wanted to receive an appropriate sentence, stating she was "sorry for all the trouble I have caused" and that "I deserve this time."  Id. at 15-16.

Prior to pronouncing sentence, the Court noted that it had "thought very hard about this sentence," including considering the mitigating factors in the petitioner's sentencing submissions and objections to the Guidelines range made by the petitioner.  Id. at 24.  The Court ultimately concluded the particular enhancements, Section 2A1.5 (Conspiracy or Solicitation to Commit Murder) and Section 3A1.4(b) (the terrorism enhancement) both applied to this case.  See id. at 24-25.  The Court also rejected the petitioner's request for a minor role adjustment.  Id. at 25.  After pronouncing sentence, the Court noted that defense counsel had done "a good job" in the case.  Id. at 25-26.  The petitioner was advised of her right to appeal.  See id. at 27.

The judgment was entered against the petitioner on January 14, 2020.  The petitioner did not file any direct appeal of the sentence.

C.    The Instant Petition

The petitioner's claim for relief is based on ineffective assistance of counsel. Specifically, the petitioner argues that counsel were ineffective because they did not "honor my request to take full responsibility of my role" and improperly blamed her co-defendant for being more responsible for the criminal conduct.  See Pet. at 3.[1]  The petitioner states that she wanted to make clear at sentencing that she was more responsible than her co-defendant for the criminal conduct.  Pet. at 10.  She further states that she told her counsel that she wanted to take "full responsibility," that her counsel agreed and said "own it," but that they did not honor her request and instead dictated the allocution that the petitioner ultimately gave at sentencing.  Id. at 11.  The petitioner states that she "played the worse role and got the lesser blame and time," which constitutes the error caused by her attorneys' purported ineffective assistance.  Id.  The petitioner also claims that she was denied due process in that, following her sentence, counsel failed to send her copies of her legal documents related to the case.  See Pet. at 4, 8.  The petitioner appears to request a resentencing based on these issues.

The government advised both Ms. Moreno and Mr. Swift of the petitioner's claims of ineffective assistance, and offered the opportunity to respond should they believe it appropriate to do so.  Counsel advised that they disagree with the petitioner's factual recitations.  However, counsel indicated that, absent an order from the Court determining that privilege has been waived,

---

[1] Unless otherwise indicated, page numbers refer to the ECF page number for the entire set of materials, which is reflected at the top of the filing in red.

they do not believe they are permitted to assume any waiver and comment further. They do not take any position with regard to the legal issues being raised.

II.      Discussion

The petitioner's petition should be denied. First, the application is time-barred as it was filed more than a year since the judgment became final in this case. Second, even if the petition were not time-barred, the petitioner's claims of ineffective assistance must fail because defense counsels' conduct was objectively reasonable and, in any event, there was no prejudice to the petitioner.

A.      The Petitioner's Application Is Time-Barred

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a one-year limitations period for petitioners seeking federal habeas corpus relief from a conviction under federal law. See 28 U.S.C. § 2255(f). Thus, all defendants are required to file any petition under 28 U.S.C. § 2255 petitions within one year from:

> (1) the date on which the judgment of conviction becomes final;
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action; (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Id.

First, Siddiqui's petition was not filed within one year of the date on which the judgment of conviction became final. Her judgment was entered on January 14, 2020, and her conviction became final on January 28, 2020, when she failed to file a notice of appeal within 14 days after entry of the judgment. See Fed. R. App. P. 4(b)(1)(A); Moshier v. United States, 402 F.3d 116, 118 (2d Cir. 2005) (unappealed federal criminal judgment becomes final when time for filing direct appeal expires). Siddiqui filed her current petition on April 19, 2022, more than two years after her conviction became final. Thus, her petition is barred by the one-year statute of limitations under 28 U.S.C. § 2255.

Second, Siddiqui does not claim that her petition was filed within one year of the date on which the right asserted was initially recognized by the Supreme Court, and the government is unaware of any such right that would make this provision applicable.

Third, Siddiqui's petition was not filed within one year of the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of

due diligence.  Siddiqui was present at sentencing, and made the allocution herself.  To the extent her claim is true—that she was prohibited by defense counsel from allocuting in a manner that she wanted at sentencing—she knew that at sentencing and could have filed this petition at any point thereafter.   Thus, the facts on which the instant petition are based were known to the petitioner more than two years ago in 2020.

Siddiqui appears to suggest that the Petition should not be time-barred on equitable grounds, based on her claim that defense counsel failed to provide her with legal documents related to the case.  A court may equitably toll the date by which a Section 2255 petition must be filed under "rare and exceptional circumstances." Green v. United States, 260 F.3d 78, 82 (2d Cir. 2001).  To warrant equitable tolling, a petitioner must show "(1) that [s]he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in [her] way." Diaz v. Kelly, 515 F.3d 149, 153 (2d Cir. 2008) (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)). Nothing in Siddiqui's moving papers suggests that she has diligently pursued her right to seek Section 2255 relief or that extraordinary circumstances prevented her from filing her petition on time. As indicated above, no particular legal documents were needed to make the petitioner's claim. Siddiqui was present at sentencing and, if her claim were true, knew at that time that defense counsel prevented her from providing statements that she wanted to make to the sentencing court. Additionally, the petitioner filed a motion for return of property on October 29, 2021, nearly seven months ago.  The fact that she was following her case and filed such a motion many months ago shows that petitioner was not diligently pursuing her rights on this matter as required. Ultimately, there is no reason why these claims could not timely have been raised through a Section 2255 petition within the one-year period under AEDPA.

B.      The Petitioner's Counsel Was Not Ineffective, Nor Was the Conduct Prejudicial

1.  Legal Standard

Even if the petitioner's claims were not time-barred, her petition should be denied on the merits because she has failed to meet the Strickland standard for ineffective assistance warranting relief.   To establish constitutional ineffectiveness, a defendant must satisfy the Strickland standard, proving "(1) that [her] attorney's performance fell below an objective standard of reasonableness, and (2) that as a result [she] suffered prejudice." E.g., United States v. Jones, 482 F.3d 60, 76 (2d Cir. 2006) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). With respect to first requirement, a court "must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . viewing the actions in light of the law and circumstances confronting counsel at the time." Harrington v. United States, 689 F.3d 124, 129 (2d Cir. 2012) (internal quotation marks omitted).  With respect to the second requirement, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.  The two-part "Strickland standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.  The "ultimate

focus of the inquiry" is "whether . . . the result of the particular proceeding is unreliable because of a breakdown in the adversarial process." Id. at 670, 696.

Counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690. The Court in deciding an ineffective assistance of counsel claim need not address both prongs if the petitioner makes an insufficient showing on either one. See Strickland, 466 U.S. at 697. In particular, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies." Id. at 697.

2.   The Petitioner's Ineffective Assistance Claim Should Be Denied

The petitioner's claim that she was unable to accept responsibility at sentencing in the manner she desired is without merit.

First, the Supreme Court has foreclosed this argument as a proper basis for collateral review. Specifically, in Hill v. United States, 368 U.S. 424, 428 (1962), the Supreme Court concluded that "[t]he failure of a trial court to ask a defendant represented by an attorney whether he has anything to say before sentence is imposed is not of itself an error of the character or magnitude cognizable under a writ of habeas corpus. It is an error which is neither jurisdictional nor constitutional." See also Bousley v. United States, 523 U.S. 614, 627-28 n.2 (1998) (Stevens, J., concurring) (noting the continued validity of Hill). Thus, because this is "not itself an error that can be raised by collateral attack," Hill, 368 U.S. at 426, petitioner's counsel cannot be found to be ineffective for failing to adequately permit the petitioner to convey the statements she wished to make.

Second, the petitioner's claim is unsupported by any affidavit or evidence that would indicate she was denied the opportunity to speak at sentencing. In fact, the evidentiary record is entirely to the contrary. Pursuant to Rule 32(i)(4), the Court provided Siddiqui with the opportunity to speak before imposing sentence. Siddiqui spoke at length and in great detail, and spent significant time taking responsibility for her role in the criminal scheme. The detailed nature of the allocution, which references the defendant's feelings, her family, and her personal experience over the course of many years, are all contrary to the suggestion that she was limited by defense counsel in what she could say. There is also no evidence in the sentencing transcript to indicate that defense counsel attempted to limit the petitioner's statements, such as cutting her off and prompting her with specific language.

Finally, the petitioner's claim should be denied because she cannot establish any prejudice at sentencing. The thrust of the petitioner's claim is that she was more culpable than her co-defendant, and wanted to admit to more serious conduct than she did at sentencing. Logically, any such activity would likely lead to a greater sentence, not a lesser sentence, and therefore cannot be shown to have prejudiced her. The sentencing court's decisions during the sentencing hearing also reflect that the statement she gave, and any omissions of greater responsibility, did not influence the Court to give a lower sentence than was warranted. Among other things, the Court specifically declined to find that the defendant was a minor participant, indicating that her statement satisfactorily demonstrated that she was, in fact, similarly culpable to her co-defendant.

9

III.     Conclusion

         Accordingly, for the foregoing reasons, the government respectfully requests that the Court deny the petitioner's motion.

<div style="margin-left: 50%;">

Respectfully submitted,

BREON PEACE
United States Attorney

By:    /s/ Craig R. Heeren
        Craig R. Heeren
        Josh Hafetz
        Jonathan E. Algor
        Assistant U.S. Attorneys
        (718) 254-7000

</div>

cc:    Defense counsel (by ECF)