Pg 1/5

RECEIVED
JUL 07 2022
PRO SE OFFICE

June 27, 2022

Dear Honorable Judge Johnson,

This is my response to the government's concerns in opposition to my petition 28 U.S.C. § 2255 (See Docket #162) raised in its letter (See Docket #163).

## Rare & Exceptional Circumstances

My petition was filed over two years after the conviction was final. The government writes, "To warrant equitable tolling, a petitioner must show [1] that [s]he has been ~~pursuing~~ pursuing her rights diligently, and [2] that some extraordinary circumstance stood in [her] way." [3]

Regarding the first condition, I had been reaching out to my lawyers around the time of sentencing and after inquiring about my sentencing memo and related documents (such as my PSR, my family's letters to the judge). When I transferred on March 3rd, 2020 out of MCC-NY and arrived in FCI Aliceville on March 26, 2020, I continued to reach out to them, but arrived at the newly enforced COVID lockdown where I was unable to make copies due to extraordinary conditions which I will mention shortly. In addition, I have no access to Mr. Swift or his firm through email as they do not allow email for incarcerated clients. In all this time, they could have informed me how I could order the paperwork myself. Instead, they pacified me, "We will send it to you." I gave them leeway due to COVID and still nothing yet. Due to the passing of the CARES Act, my call attempts to counsel were no longer logged in the TRULINCS system due to calls being free starting April 2020, further limiting proof of my diligence. (See Exhibit A₁-A₃).

Regarding the second condition, I have had two major extraordinary circumstances stand in the way: (1) the arrival of COVID with all its restrictions inside federal prisons, in my case FCI Aliceville, and (2) FCI Aliceville's Health Services withholding my medical rights regarding the eye equipment FBOP and FBOP-approved eye specialists have prescribed me for the past three years.

As for COVID, upon its arrival, the whole world has gone through a crisis. Arriving at FCI Aliceville, I only received two pens out of all my writing equipment in my property. We were put on an indefinite national lockdown with commissary restricted to $50 monthly spending limit with emergency items like pen and paper out of stock for over 6 months, and staff were out of their supplies too. We were locked in 23 hours a day with only one hour to use the phone, shower, email, get compulsory items like toilet paper, pads, water, and cleaning supplies with 40-80 inmates at a time in long lines for the few phones, showers, and computers that worked out of the rest. Unit Team staff were unavailable to guide, help, answer questions, make copies, etc. When short-staffed, we would miss our entire time out. It was frustrating. Major political events further restricted and complicated the lockdowns allowing each inmate only 10 minutes out every other day strictly to shower—incidents such as the George Floyd demonstrations, the elections, the Capitol riot, the inauguration, and internal issues inside federal prisons leading to investigations, etc. And now we are again on COVID lockdown, Code Red Modified operations, with no hot water machine in our unit for 3 months now (See Exhibit B₁ - B₁₄). The current Modified schedule is better than it was for the last two years, with Recreation only one hour a week. But due to modified operations, we have no indoor/equipment use and cancellation due to short-staffing and the heat index. Due to the need of physical therapy for my deformed legs, I need the indoor equipment.

As for FCI Aliceville's Health Services withholding my rights to receive contact lenses as prescribed by FBOP-approved eye specialists due to my eye condition falling within those approved by the FBOP Clinical and Ophthalmology Guidance, I have been preoccupied with the pursuit to receive my rightfully prescribed eye equipment. My vision has plummeted to -11 according to the last specialist I saw in 2021, but FCI Aliceville refuses to give me my medical records (See Exhibit $C_1$, $C_1_7$)

The other issues such as my request for the return of my laptop, and the dental emergencies because I have not received a full dental care since my arrest also were sought (See Exhibit $D_1$-$D_4$).

## Explicating Ineffective Assistance of Counsel

We now come to the Strickland Standard for ineffective assistance to counsel. The government states that I must prove : (1) that my attorney's performance fell below an objective standard of reasonableness, and (2) that as a result, I suffered prejudice.

On June 17, 2020 I received some of my documents through a personal contact as my lawyers have still not fulfilled their promise. I wrote the initial motion very uninformed. With these documents, I will explicate my points.

Upon reviewing my counsel's "Objection to Presentence Investigation Report", the letter "Re: Defense Request for Relief in Light of Adjournment of Sentencing," and "Defense Sentencing Memorandum" (See Docket #'s 132, 136, 133) and the government's Sentencing Memorandum (See Docket #140), I declare my counsel committed coercion (Model Penal Code 212.5), fraud on the court, misrepresentation with the nature of deception, and actual fraud, actionable by law. (ICC 3305 (2)(c))

My counsel deceived me in order to relinquish my legal rights in the 5th, 6th, and 14th Amendments to exert my innocence before an actual jury and the public. Counsel made false representation with the intention to deceive, to present false facts to the court and the public which caused me to lose my freedom with an impartial jury. The facts as written and the underlined text in the counsel's Objections to the PSR and the Defense Sentencing Memo (See Exhibits $E_1$-$E_2$) are neither my words, nor was it ever discussed or presented to me prior, during or after sentencing although I made several attempts to obtain the attached exhibition (See Exhibits $A_1$-$A_3$). This is an egregious act of injustice. It is reckless, it is untrue and brings extensive fraud upon the public and this Honorable Court which means that this sentence cannot stand and must be vacated and remanded for further proceedings.

My co-defendant and I have suffered a measurable harm, injury, and loss of life and liberties to include our freedom based upon these untruths as underlined in Exhibits $E_1$ and $E_2$. The court sentenced us based upon these lies, deceptions, and fraud presented to this court in the unsubstantiated "Defendant's Objections to the PSR" and the Defense Sentencing Memo. Any false claim about Velentzas being witnessed by me to have committed any aspect of a crime directly put me in a dangerous **place** by **counsel** both as her co-conspirator and as a silent approver, and my lawyers knew this. I never witnessed Velentzas with the intent to build a device and I never feared she would. As for the biggest lie of all — she did not commit a crime in front of me and cause me the depression I suffered.

It is prejudicial error because the government uses these fabricated arguments in their own defense when submitting the Sentencing Memorandum (Docket #140). For example, on the 1st

pg 3/5

line of page 9, the government justifies the base offense level of 33 by quoting the fabricated Objection to the PSR (Exhibit E, p. 10), "the defendant agrees ... the use of any device would create a substantial risk of death, and that she was aware of the risk." The part the counsel fabricated right after was the most damaging: "Indeed, it was this fear that lead her to become depressed and to curtail her involvement." I will disprove this shortly (See Exhibit E.)

The government does it again two pages later. On pages 11 to 12, it refers to the fabricated letter, "The defendant argues instead that the enhancement should not apply because the government has failed to prove by a preponderance of the evidence that the defendant herself— separate from her co-defendant Velentzas—had the "individualized subjective intent to influence the government in conjunction with the commission of [her] crime." See Def.'s PSR Letter at 11-12." The government continues, "This argument is contrary to binding Second Circuit precedent, ... The Second Circuit expressly held that the government does not have to prove that the defendant herself committed an offense to influence ..." and says, "To read this language more narrowly in the manner that the defendant argues would "defy common sense" according to the Circuit."

And again, when my counsel fabricated that I played a minor role, the government quoted counsel's fraudulent objections to prove that I am aware my role is not minor, but rather minimal if counsel was saying one of the "non-exhaustive" factors apply to me, as on the bottom of page 15 (Docket #140), the government writes, "The scope and the structure of the criminal activity was straightforward, and the defendant concedes that this factor weighs against her. See Def.'s PSR Letter at 15." Counsel fraudulently writing that I understood this was all the blame I needed to be culpable.

Lastly, when the government says on page 17, "... to downplay the seriousness of what she has already pleaded guilty to is belied by the undisputed facts and, in particular, her own words," it mentions on page 18, "the defendant has already shown herself to lie and deceive to avoid detection" and that by taking the plea, "The defendant has admitted that there was "more than the intent to simply learn."" When the government says I have already shown I lie and deceive to avoid detection, that is exactly what I was doing when I took the plea. I was trying to hide my counsel's coercion by trying to sound confident when I was really scared of all the things counsel had just told me before entering the court room. And the government is referring to my counsel's objections to the PSR when it brings up my lying and deceiving to avoid detection. Indeed my counsel, in its objections to the PSR and the Defense Sentencing Memorandum (See Exhibits E₁-E₂), lied and deceived in order to avoid detection.

I had chosen Swift because he claimed he had faith in me to go to trial and said he would encourage me to speak in court. Then he coerced me to take a plea saying I will not win trial being one of the few Jihadi writers in English. Rather than addressing how my rights would be relinquished, counsel said if I took a plea, I would get time served and could finally take care of my medical issues. I have requested my medical records via FOIA as FCI Aliceville has not provided them (See Exhibit C₁₇). I was facing sleepless nights for months, discomfort, and often drowsy on Benadryl shots for attorney conferences. I was under great duress.

When I did not like how Swift prepared the Stipulated Facts, he said that they are in the discovery anyway. But those were the very statements I was going to fight if we went to trial— to show what was under all the verbiage, between the lines, in the audios but off camera (as the UC did not wear a body camera to prove she was not merely manipulating the conversations) The audio was partial anyway because it was happening only when the UC was around.

Right before taking my plea before the judge, Swift threatened me that I will not be getting any more pleas after this, so I better accept it whether I like the wording or not. Swift took me back to my childhood—took advantage of my ignorant state and made me believe I was helpless in my situation. If I was not coerced, I would never have taken the plea. Fighting for justice against slander is pertinent to freedom and success.

Counsel never said it would use my name in slander, fraud, and defamation upon taking the plea, but that was counsel's intention all along as the plea is just that. It states in the footnote of counsel's letter "Re: Defense Request for Relief in Light of Adjournment of Sentencing" that counsel had these fraudulent objections ready by October 11, 2019 even before the PSR, and way out of knowledge (See Docket # 136.) When and with whom had they discussed these objections because it had not been with me.

My counsel used and wrote these documents in pure mockery of my mental health and state of mind. They went above and beyond in their fabrications in order to inflict irreversible pain on me which is cruel and unusual punishment. They could have at least given me the opportunity to tell my true circumstance and spared me of their unjustified fabrications, slander and further defamation. These documents are full of lies I don't have enough time to correct as your time is limited. These lies are so severe in nature, they by themselves cause so much prejudicial error, but in the context of fraud on the court, cause an even greater interference with the judicial process—that they our sentences to be vacated.

One such lie deserves to be cleared. In the middle of page 10 (See Exhibit E) of counsel's objections to PSR, counsel wrote that I was aware of the risk of the use of a device and "Indeed it was this fear that lead her to become depressed and to curtail involvement." Similarly in the Defense Sentencing Memo (See Exhibit E₂) page 15, counsel lied that "after it became apparent to Ms. Siddiqui that Velentzas and the UC shared an intent to use the weapon of mass destruction she developed significant mental health issues [...] The attribution of Ms. Siddiqui's depression to the stress she felt from her association with Velentzas and the UC is demonstrated by the fact that once she was detained at the MCC, Ms. Siddiqui recovered." This could not be further from the truth and is misproven simply by looking at the medical form I filled out at Dr. Khokhar's mental health clinic on December 12, 2014 (See Exhibit F.) Next to "Closest person in my life" on the form, I could have written one of several people's names, my best friends of 20+ years, my sister, the UC, my boyfriend, or my beloved mother & s. I wrote "Noelle Velentzas" and her cell phone number. Noelle and her whole family were good to me in the short time I got close to her, and got to know her. Due to the way my counsel slandered her, I feel obliged to clear her name. I was never depressed when I was around

pg 5/5

Noelle, the total opposite. I loved her, and still do. She was the most wonderful friend I ever had. She understood the elderly and the disabled, the poor and the needy. She helped me understand my disabled brother, his mental health deterioration, and how to help him improve. She helped me get over my family problems (which was the real root of my depression, see Exhibit F₁-F₃) while also putting a roof over my head. And she always told me how beautiful, smart, and good of a person I was, something I was deprived of all my life. This truth contradicts my counsel's entire fraud.

My lawyers were never interested in me or the truth about me. While I was busy diligently preparing for trial (See Exhibit G), they were preparing for my demise. When telling the Court how hard my life had been due to abuse, they did not explicate the UC. And lying that I had a good time incarcerated begs that I can and should do a long time in prison. I was raped by several of my cellmates and threatened by several of them too. SIS in MCC-NY overheard me tell my sister one incident. SIS in FCI Aliceville overheard me tell my friend Susana Roman another one. My former lawyer Mr. Dunn had been aware of bunky threats and advances. If only my current lawyers cared but they did not. They knew Unit 2 Secretary Stacy Harris was harrassing and targetting me in MCC-NY, but they did not want me to complain or take action, and omitted the difficult time I had in the memorandum. I once sent a letter informing you about the situation, but I believe it was intercepted by MCC-NY staff. (See Exhibit H)

Please vacate this sentence based on ineffective assistance of counsel and grant me new counsel for further proceedings and accept my rare and exceptional circumstances for the delay. Thank you for your time.

Sincerely,

Asia Siddiqui

#85797053

EXHIBIT A1

Date: 06/18/2022
Time: 03:10:57 PM

Location: ALI

## Federal Bureau of Prisons
## TRULINCS Account Transactions - TRUFONE
## Personal Inmate Information

**Inmate No: 85797053   Inmate Name: SIDDIQUI, ASIA**          **Available Balance: $0.00**

| Date/Time | Transaction Type | Dialed Digits | Minutes | Amount |
|---|---|---|---|---|
| 1/29/2020 6:42:33 PM | Call | 3477205728 | 15 | -$0.90 |
| 1/27/2020 12:55:50 PM | Call | 6034893177 | 15 | -$3.15 |
| 1/27/2020 12:17:29 PM | Local Transfer | 118 | | $10.00 |
| 1/27/2020 11:44:29 AM | Call | 9729142507 | 5 | -$1.05 |
| 1/26/2020 6:36:25 PM | Call | 9292041445 | 4 | -$0.24 |
| 1/23/2020 8:36:57 PM | Call | 9727509655 | 9 | -$1.89 |
| 1/21/2020 3:22:51 PM | Call | 9727509655 | 5 | -$1.05 |
| 1/18/2020 11:46:25 AM | Call | 3474076828 | 9 | -$0.54 |
| 1/16/2020 6:46:54 PM | Call | 9179353396 | 15 | -$0.90 |
| 1/14/2020 12:26:22 PM | Call | 6034893177 | 15 | -$3.15 |
| 1/13/2020 12:13:09 PM | Call | 9729142507 | 15 | -$3.15 |
| 1/12/2020 5:34:18 PM | Local Transfer | 118 | | $20.00 |
| 1/11/2020 5:40:03 PM | Call | 9292041445 | 7 | -$0.42 |
| 1/9/2020 3:23:00 PM | Call | 3474076828 | 3 | -$0.18 |
| 1/9/2020 1:57:51 PM | Call | 9179353396 | 15 | -$0.90 |
| 1/8/2020 3:20:23 PM | Call | 9179353396 | 9 | -$0.54 |
| 1/7/2020 5:19:12 PM | Call | 9729142507 | 3 | -$0.63 |
| 1/5/2020 7:07:56 PM | Call | 9179353396 | 15 | -$0.90 |
| 1/5/2020 5:19:56 PM | Call | 9292041445 | 15 | -$0.90 |
| 1/5/2020 2:55:55 PM | Call | 3476033190 | 15 | -$0.90 |
| 1/3/2020 12:36:24 PM | Call | 9729142507 | 4 | -$0.84 |
| 1/1/2020 1:56:37 PM | Call | 9179353396 | 15 | -$0.90 |

Date: 06/18/2022
Time: 03:28:30 PM

Location: ALI

# Federal Bureau of Prisons
## TRULINCS Account Transactions - TRUFONE
### Personal Inmate Information

| Inmate No: 85797053 | Inmate Name: SIDDIQUI, ASIA | | Available Balance: $0.00 | |
|---|---|---|---|---|

| Date/Time | Transaction Type | Dialed Digits | Minutes | Amount |
|---|---|---|---|---|
| 2/24/2020 9:13:40 PM | Call | 9727509655 | 7 | -$1.47 |
| 2/24/2020 12:39:59 PM | Call | 9292041445 | 2 | -$0.12 |
| 2/22/2020 11:35:44 AM | Call | 9179353396 | 15 | -$0.90 |
| 2/19/2020 10:49:49 AM | Call | 9729142507 | 7 | -$1.47 |
| 2/18/2020 9:18:18 PM | Call | 9179353396 | 11 | -$0.66 |
| 2/18/2020 5:53:44 PM | Call | 3473032114 | 9 | -$0.54 |
| 2/18/2020 12:12:49 PM | Call | 3474076828 | 4 | -$0.24 |
| 2/17/2020 9:17:22 PM | Call | 3477205728 | 12 | -$0.72 |
| 2/17/2020 7:34:36 PM | Call | 9292041445 | 3 | -$0.18 |
| 2/17/2020 2:02:55 PM | Call | 3474076828 | 1 | -$0.06 |
| 2/16/2020 6:54:30 PM | Call | 3476033190 | 15 | -$0.90 |
| 2/16/2020 5:08:24 PM | Call | 3474076828 | 2 | -$0.12 |
| 2/16/2020 3:27:00 PM | Call | 6067762410 | 3 | -$0.63 |
| 2/16/2020 2:23:54 PM | Call | 3474076828 | 2 | -$0.12 |
| 2/13/2020 9:11:53 PM | Call | 3096571758 | 1 | -$0.21 |
| 2/10/2020 1:18:25 PM | Call | 9729142507 | 5 | -$1.05 |
| 2/9/2020 6:07:31 PM | Call | 9292041445 | 2 | -$0.12 |
| 2/9/2020 1:38:37 PM | Call | 3473032114 | 6 | -$0.36 |
| 2/5/2020 8:56:07 PM | Call | 3476033190 | 15 | -$0.90 |
| 2/3/2020 9:23:02 PM | Call | 9179353396 | 6 | -$0.36 |
| 2/3/2020 1:18:13 PM | Call | 3862211322 | 1 | -$0.21 |
| 2/1/2020 5:46:43 PM | Call | 3474076828 | 15 | -$0.90 |

Copy

Exhibit A₃

Date: 3/22/21

Dear Mr. Swift & C.L.C.M.A.,

I pray you are well. I would like to know, how will I get my laptop back as promised by the prosecutors in court? My intellectual property within it are of priceless value to me.

Secondly, I would like a copy of my sentencing memo and the characters my family members and friends wrote for me. I have been waiting for it but realize you must have long forgotten about it.

Lastly, I was also waiting for color prints of the following photos as I have none of myself since my arrest. Their file names are:

- Main File (415 M-NY-307336-156258) → images → files → Folder 75 → Phones → NY0015164_181 → NY0015164 xry → report_agent → Android Generic → Files → Pictures → 20150209_213544~2.jpg ✱
    → 20150210_234059~2.jpg ✱

- Main File (415M-NY-307336-156258) → images → files → Folder 75 → 20a04a8224a28d64 ✱

Thank you,
Asia Siddiqui

Exhibit B₁



U.S. Department of Justice
Federal Bureau of Prisons
Federal Correctional Institution
P.O. Box 445
Aliceville, Alabama 35442

June 6, 2022

MEMORANDUM FOR INMATE POPULATION

FROM:           Garrett, Warden
                FCI Aliceville

SUBJECT:        Increased Modifications to Operations

Effective Tuesday, June 7, 2022, FCI Aliceville will resume
increased modifications due to the COVID.  This is due to a
surge in the positive cases within the community.  This will
affect the daily operations of the institution as listed below:

- All inmates will be required to wear a face covering except
  at outside recreation and when you are in your cell.  It is
  imperative you maintain proper social distancing while
  participating in outdoor recreation.
- Programming will continue by unit and class sizes will be
  limited to ensure social distancing.
- UNICOR will continue to work under the current procedures.
- In-person visitation will continue at this time.  The
  barriers previously used to ensure no contact with the
  visitors will be placed in the visitation room.
- All three meals will be fed in the Dining Hall; however,
  inmates are expected to sit every other seat to ensure there
  is space between each of you.
- Commissary will follow the schedule established under
  modified operations and inmates will be afforded an
  opportunity to shop every other week.

We will continue to monitor COVID within the community as well
as at the institution.  The goal is to resume normal operations
to the extent allowable.  As always, you need to adhere to CDC
guidelines and wear your mask.  Continue to clean in the units
and the housing areas.  Wipe down surfaces continuously, wash
your hands frequently, and maintain proper social distancing
while out of the cells.  You need to wipe down the phones and
keyboards prior to touching them.  Additionally, do not touch
your hands to your face unless you have recently washed them.

To date, I am not aware of any current inmates testing positive
for COVID.  The steps taken are for your safety and the safety
of the staff.  Your continued patience is appreciated.

SIDDIQUI, ASIA  85797053

## June 5 – 11, 2022

| | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
| 6:00 a.m. | C1 Rec<br>A1 Edu<br>6:00-7:00 | A1 Lower Commissary | A1 Upper Commissary | SHU Commissary | | | B3 Rec<br>C3 Edu<br>6:00-7:00 |
| 7:00 a.m. | | C2 Lower Commissary | C4 Upper Commissary | | | | |
| 7:15 a.m. | C2 Rec<br>A2 Edu<br>7:15-8:15 | | | | | | B4 Rec<br>C4 Edu<br>7:15-8:15 |
| 8:00 a.m. | | A4 Medical<br><br><br><br>B4 Edu<br>8:00-10:00 | B2 Medical<br>A1 Foundation<br>A3 Edu<br>C1 Rec/WASP<br>A4 Chap<br>8:00-10:00 | A2 Medical<br><br>B4 Foundation<br>C2 Edu<br>B2 Rec/WASP<br>8:00-10:00 | C3 Medical<br><br>B3 Edu<br>A1 Rec/WASP<br>B4 Chap<br>8:00-10:00 | B4 Medical<br><br><br>A4 Rec/WASP<br>8:00-10:00 | |
| 8:30 a.m. | C3 Rec<br>A3 Edu<br>8:30-9:30 | C2 Upper Commissary | C4 Lower Commissary | | | | A1 Rec<br>B1 Edu<br>8:30-9:30 |
| 9:00 a.m. | | A3 Medical | C4 Medical | A1 Medical | C2 Medical | B3 Medical | |
| 10:00 a.m. | | A2 Medical | C3 Medical | B4 Medical | C1 Medical | B2 Medical | |
| 10:30 – Noon; Lunch | | | Med. Pickup | Med. Pickup | Med. Pickup | Med. Pickup | |
| 12:00 p.m. | C4 Rec<br>A4 Edu<br>12:00-1:00<br><br>A1 & A2 Chap<br>12:00-1:30 | A1 Medical<br>C1 Lower Commissary<br><br>A1 Edu<br>12:00-2:00 | C2 Medical<br>C3 Upper Commissary<br>C2 Rec/WASP<br>C4 Chap<br>12:00-2:00 | B3 Medical<br>B1 Commissary<br>B3 Rec/WASP<br>C2 Chap<br>12:00-2:00 | A4 Medical<br><br>A2 Rec/WASP<br>B3 Chap<br>12:00-2:00 | B1 Medical<br><br>B1 Edu<br>C3 Rec/WASP<br>12:00-2:00 | A2 Rec<br>B2 Edu<br>12:00-1:00 |
| 1:00 p.m. | | B4 Medical | C1 Medical | B2 Medical | A3 Medical | C4 Medical | |
| 1:15 p.m. | B1 Rec<br>C1 Edu<br>1:15-2:15 | | | | | | A3 Rec<br>B3 Edu<br>1:15-2:15 |
| 1:30 p.m. | | C1 Upper Commissary | C3 Lower Commissary | | | | |
| 2:00 p.m. | C1 & A3 Chap<br>2:00-3:30 | B3 Medical<br><br>A2 Edu<br>2:00-3:30 | A4 Medical<br>C1 Edu<br>B1 Rec/WASP<br>B2 Chap<br>2:00-3:30 | B1 Medical<br>B2 Edu<br>B4 Rec/WASP<br>B1 Chap<br>2:00-3:30 | A2 Medical<br>A4 Edu<br>A3 Rec/WASP<br>C1 Chap<br>2:00-3:30 | C3 Medical<br>C4 Rec/WASP<br>C4 Edu<br>2:00-3:30 | |
| 2:30 p.m. | B2 Rec<br>C2 Edu<br>2:30-3:30 | | | | | | A4 Rec<br>B4 Edu<br>2:30-3:30 |
| 3:00 p.m. | | B1 Medical | A3 Medical | C4 Medical | A1 Medical | C2 Medical | |
| 5:00 p.m. | | A Unit Evening Meal | | B Unit Evening Meal | | C Unit Evening Meal | |
| 6:00 p.m. | | C1 Rec<br>6:00-7:45 | A1 Rec<br>6:00-7:45 | A2 Rec.<br>6:00-7:45 | A3 Rec<br>6:00-7:45 | | |

Exhibit B

## June 12- 18, 2022

| | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
| 6:00 a.m. | C1 Rec<br>A1 Edu<br>6:00-7:00 | A2 Lower<br>Commissary | A2 Upper<br>Commissary | A3 Lower<br>Commissary | | | B3 Rec<br>C3 Edu<br>6:00-7:00 |
| 7:00 a.m. | | B2 Lower<br>Commissary | B3 Lower<br>Commissary | A3 Upper<br>Commissary | | | |
| 7:15 a.m. | C2 Rec<br>A2 Edu<br>7:15-8:15 | | | | | | B4 Rec<br>C4 Edu<br>7:15-8:15 |
| 8:00 a.m. | | A4 Medical<br><br>B4 Edu<br>8:00-10:00 | C1 Medical<br>A1 Foundation<br>A3 Edu<br>C1 Rec/WASP<br>A4 Chap<br>8:00-10:00 | A2 Medical<br><br>B4 Foundation<br>C2 Edu<br>B2 Rec/WASP<br>8:00-10:00 | B3 Medical<br><br>B3 Edu<br>A1 Rec/WASP<br>B4 Chap<br>8:00-10:00 | C4 Medical<br><br>A4 Rec/WASP<br>8:00-10:00 | |
| 8:30 a.m. | C3 Rec<br>A3 Edu<br>8:30-9:30 | B2 Upper<br>Commissary | B4 Upper<br>Commissary | | | | A1 Rec<br>B1 Edu<br>8:30-9:30 |
| 9:00 a.m. | | A3 Medical | B4 Medical | A1 Medical | B2 Medical | C3 Medical | |
| 10:00 a.m. | | A2 Medical | B3 Medical | C4 Medical | A4 Medical | C2 Medical | |
| 10:30 – Noon; Lunch | | | Med. Pickup | Med. Pickup | Med. Pickup | Med. Pickup | |
| 12:00 p.m. | C4 Rec<br>A4 Edu<br>12:00-1:00<br><br>A1 & A2 Chap<br>12:00-1:30 | A1 Medical<br>B4 Lower<br>Commissary<br><br>A1 Edu<br>12:00-2:00 | B2 Medical<br>A4 Upper<br>Commissary<br>C2 Rec/WASP<br>C4 Chap<br>12:00-2:00 | C3 Medical<br><br>B3 Rec/WASP<br>C2 Chap<br>12:00-2:00 | B1 Medical<br><br>A2 Rec/WASP<br>B3 Chap<br>12:00-2:00 | C1 Medical<br><br>B1 Edu<br>C4 Rec/WASP<br>12:00-2:00 | A2 Rec<br>B2 Edu<br>12:00-1:00 |
| 1:00 p.m. | | C4 Medical | B1 Medical | C2 Medical | A3 Medical | B4 Medical | |
| 1:15 p.m. | B1 Rec<br>C1 Edu<br>1:15-2:15 | | | | | | A3 Rec<br>B3 Edu<br>1:15-2:15 |
| 1:30 p.m. | | B4 Upper<br>Commissary | A4 Lower<br>Commissary | | | | |
| 2:00 p.m. | C1 & A3 Chap<br>2:00-3:30 | C3 Medical<br><br>A2 Edu<br>2:00-3:30 | A4 Medical<br>C1 Edu<br>B1 Rec/WASP<br>B2 Chap<br>2:00-3:30 | C1 Medical<br>B2 Edu<br>B4 Rec/WASP<br>B1 Chap<br>2:00-3:30 | A2 Medical<br>A4 Edu<br>A3 Rec/WASP<br>C1 Chap<br>2:00-3:30 | B3 Medical<br><br>C4 Edu<br>2:00-3:30 | |
| 2:30 p.m. | B2 Rec<br>C2 Edu<br>2:30-3:30 | | | | | | A4 Rec<br>B4 Edu<br>2:30-3:30 |
| 3:00 p.m. | | C2 Medical | A3 Medical | B4 Medical | A1 Medical | B2 Medical | |
| 5:00 p.m. | | A Unit<br>Evening Meal | | B Unit<br>Evening Meal | | C Unit<br>Evening Meal | |
| 6:00 p.m. | | C1 Rec<br>6:00-7:45 | A1 Rec<br>6:00-7:45 | A2 Rec<br>6:00-7:45 | A3 Rec<br>6:00-7:45 | | |

Exhibit B3

SIDDIQUI, ASIA  85797053



Exhibit B4

U.S. Department of Justice
Federal Bureau of Prisons
Federal Correctional Institution
P.O. Box 445
Aliceville, Alabama 35442

June 16, 2022

MEMORANDUM FOR INMATE POPULATION

FROM:          C. Garrett, Warden
               FCI Aliceville

SUBJECT:       Increased Modifications to Operations

As you are aware, FCI Aliceville is at Operations Level 3, Red,
due to an increase in the community transmission rate.
Therefore, effective Monday, June 20, 2022 we will modify
visitation to implement procedures previously established due to
the pandemic.  Refer to the attached Modified Visitation
Privileges memorandum dated September 30, 2020.  While in
Level 3, Red, we will not have visitation on federal holidays,
to include Juneteenth.

We continue to monitor COVID within the community as well as the
institution.  We do not have any inmates that have tested
positive for COVID.  Continue to clean in the units and the
housing areas.  Wipe down surfaces continuously, wash your hands
frequently, and maintain proper social distancing while out of
the cells.  You need to wipe down the phones and keyboards prior
to touching them.  Additionally, do not touch your hands to your
face unless you have recently washed them.

The steps taken are for your safety and the safety of the staff.
Your continued patience is appreciated.

SIDDIQUI, ASIA  85797053

## June 19 - 25, 2022

| | Sunday | Monday (Holiday) | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
| 6:00 a.m. | C1 Rec<br>A1 Edu<br>6:00-7:00 | | A1 Lower Commissary | A1 Upper Commissary | SHU Commissary | . | B3 Rec<br>C3 Edu<br>6:00-7:00 |
| 7:00 a.m. | | | C2 Lower Commissary | C4 Upper Commissary | | | |
| 7:15 a.m. | C2 Rec<br>A2 Edu<br>7:15-8:15 | | | | | | B4 Rec<br>C4 Edu<br>7:15-8:15 |
| 8:00 a.m. | | | B2 Medical<br>B2 Foundation<br>A3 Edu<br>C1 Rec/WASP<br>A4 Chap<br>8:00-10:00 | A2 Medical<br>B4 Foundation<br>C2 Edu<br>B2 Rec/WASP<br>8:00-10:00 | C3 Medical<br>B3 Edu<br>A1 Rec/WASP<br>B4 Chap<br>8:00-10:00 | B4 Medical<br>A4 Rec/WASP<br>8:00-10:00 | |
| 8:30 a.m. | C3 Rec<br>A3 Edu<br>8:30-9:30 | | C2 Upper Commissary | C4 Lower Commissary | | | A1 Rec<br>B1 Edu<br>8:30-9:30 |
| 9:00 a.m. | | | C4 Medical | A1 Medical | C2 Medical | B3 Medical | |
| 10:00 a.m. | | | C3 Medical | B4 Medical | C1 Medical | B2 Medical | |
| 10:30 – Noon; Lunch | | | Med. Pickup | Med. Pickup | Med. Pickup | Med. Pickup | |
| 12:00 p.m. | C4 Rec<br>A4 Edu<br>12:00-1:00<br><br>A1 & A2 Chap<br>12:00-1:30 | | C2 Medical<br>C1 Lower Commissary<br>C2 Rec/WASP<br>C4 Chap<br>12:00-2:00 | B3 Medical<br>C3 Upper Commissary<br>B3 Rec/WASP<br>C2 Chap<br>12:00-2:00 | A4 Medical<br>B1 Commissary<br>A2 Rec/WASP<br>B3 Chap<br>12:00-2:00 | B1 Medical<br><br>B1 Edu<br>C3 Rec/WASP<br>12:00-2:00 | A2 Rec<br>B2 Edu<br>12:00-1:00 |
| 1:00 p.m. | | | C1 Medical | B2 Medical | A3 Medical | C4 Medical | |
| 1:15 p.m. | B1 Rec<br>C1 Edu<br>1:15-2:15 | | | | | | A3 Rec<br>B3 Edu<br>1:15-2:15 |
| 1:30 p.m. | | | C1 Upper Commissary | C3 Lower Commissary | | | |
| 2:00 p.m. | C1 & A3 Chap<br>2:00-3:30 | | A4 Medical<br>C1 Edu<br>B1 Rec/WASP<br>B2 Chap<br>2:00-3:30 | B1 Medical<br>B2 Edu<br>B4 Rec/WASP<br>B1 Chap<br>2:00-3:30 | A2 Medical<br>A4 Edu<br>A3 Rec/WASP<br>C1 Chap<br>2:00-3:30 | C3 Medical<br>C4 Rec/WASP<br>C4 Edu<br>2:00-3:30 | |
| 2:30 p.m. | B2 Rec<br>C2 Edu<br>2:30-3:30 | | | | | | A4 Rec<br>B4 Edu<br>2:30-3:30 |
| 3:00 p.m. | | | A3 Medical | C4 Medical | A1 Medical | | C2 Medical |
| 5:00 p.m. | | A Unit<br>Evening Meal | | B Unit<br>Evening Meal | | C Unit<br>Evening Meal | |
| 6:00 p.m. | | C1 Rec<br>6:00-7:45 | A1 Rec<br>6:00-7:45 | A2 Rec<br>6:00-7:45 | A3 Rec<br>6:00-7:45 | | |

Exhibit B5

SIDDIQUI, ASIA  85797053

## June 26- July 2, 2022

| | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
| 6:00 a.m. | C1 Rec<br>A1 Edu<br>6:00-7:00 | A2 Lower<br>Commissary | A2 Upper<br>Commissary | A3 Lower<br>Commissary | | | B3 Rec<br>C3 Edu<br>6:00-7:00 |
| 7:00 a.m. | | B2 Lower<br>Commissary | B3 Lower<br>Commissary | A3 Upper<br>Commissary | | | |
| 7:15 a.m. | C2 Rec<br>A2 Edu<br>7:15-8:15 | | | | | | B4 Rec<br>C4 Edu<br>7:15-8:15 |
| 8:00 a.m. | | A4 Medical<br><br><br>B4 Edu<br>8:00-10:00 | C1 Medical<br>B2 Foundation<br>A3 Edu<br>C1 Rec/WASP<br>A4 Chap<br>8:00-10:00 | A2 Medical<br><br>B4 Foundation<br>C2 Edu<br>B2 Rec/WASP<br>8:00-10:00 | B3 Medical<br><br>B3 Edu<br>A1 Rec/WASP<br>B4 Chap<br>8:00-10:00 | C4 Medical<br><br><br>A4 Rec/WASP<br>8:00-10:00 | |
| 8:30 a.m. | C3 Rec<br>A3 Edu<br>8:30-9:30 | B2 Upper<br>Commissary | B3 Upper<br>Commissary | | | | A1 Rec<br>B1 Edu<br>8:30-9:30 |
| 9:00 a.m. | | A3 Medical | B4 Medical | A1 Medical | B2 Medical | C3 Medical | |
| 10:00 a.m. | | A2 Medical | B3 Medical | C4 Medical | A4 Medical | C2 Medical | |
| 10:30 – Noon;<br>Lunch | | | Med. Pickup | Med. Pickup | Med. Pickup | Med. Pickup | |
| 12:00 p.m. | C4 Rec<br>A4 Edu<br>12:00-1:00<br><br>A1 & A2 Chap<br>12:00-1:30 | A1 Medical<br>B4 Lower<br>Commissary<br>A1 Edu<br>12:00-2:00 | B2 Medical<br>A4 Upper<br>Commissary<br>C2 Rec/WASP<br>C4 Chap<br>12:00-2:00 | C3 Medical<br><br>B3 Rec/WASP<br>C2 Chap<br>12:00-2:00 | B1 Medical<br><br>A2 Rec/WASP<br>B3 Chap<br>12:00-2:00 | C1 Medical<br><br>B1 Edu<br>C4 Rec/WASP<br>12:00-2:00 | A2 Rec<br>B2 Edu<br>12:00-1:00 |
| 1:00 p.m. | | C4 Medical | B1 Medical | C2 Medical | A3 Medical | B4 Medical | |
| 1:15 p.m. | B1 Rec<br>C1 Edu<br>1:15-2:15 | | | | | | A3 Rec<br>B3 Edu<br>1:15-2:15 |
| 1:30 p.m. | | B4 Upper<br>Commissary | A4 Lower<br>Commissary | | | | |
| 2:00 p.m. | <br><br>C1 & A3 Chap<br>2:00-3:30 | C3 Medical<br><br>A2 Edu<br>2:00-3:30 | A4 Medical<br>C1 Edu<br>B1 Rec/WASP<br>B2 Chap<br>2:00-3:30 | C1 Medical<br>B2 Edu<br>B4 Rec/WASP<br>B1 Chap<br>2:00-3:30 | A2 Medical<br>A4 Edu<br>A3 Rec/WASP<br>C1 Chap<br>2:00-3:30 | B3 Medical<br><br>C4 Edu<br>2:00-3:30 | |
| 2:30 p.m. | B2 Rec<br>C2 Edu<br>2:30-3:30 | | | | | | A4 Rec<br>B4 Edu<br>2:30-3:30 |
| 3:00 p.m. | | C2 Medical | A3 Medical | B4 Medical | A1 Medical | B2 Medical | |
| 5:00 p.m. | | A Unit<br>Evening Meal | | B Unit<br>Evening Meal | | C Unit<br>Evening Meal | |
| 6:00 p.m. | | C1 Rec<br>6:00-7:45 | A1 Rec<br>6:00-7:45 | A2 Rec<br>6:00-7:45 | A3 Rec<br>6:00-7:45 | | |

Exhibit B6

SIDDIQUI, ASIA  85797053

## July 3-9, 2022

| | Sunday | Monday (Hoilday) | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
| 6:00 a.m. | C1 Rec<br>A1 Edu<br>6:00-7:00 | | A1 Upper Commissary | SHU Commissary | | | B3 Rec<br>C3 Edu<br>6:00-7:00 |
| 7:00 a.m. | | | C4 Upper Commissary | | | | |
| 7:15 a.m. | C2 Rec<br>A2 Edu<br>7:15-8:15 | | | | | | B4 Rec<br>C4 Edu<br>7:15-8:15 |
| 8:00 a.m. | | | B2 Medical<br>B2 Foundation<br>A3 Edu<br>C1 Rec/WASP<br>A4 Chap<br>8:00-10:00 | A2 Medical<br>B4 Foundation<br>C2 Edu<br>B2 Rec/WASP<br>8:00-10:00 | C3 Medical<br>B3 Edu<br>A1 Rec/WASP<br>B4 Chap<br>8:00-10:00 | B4 Medical<br>A4 Rec/WASP<br>8:00-10:00 | |
| 8:30 a.m. | C3 Rec<br>A3 Edu<br>8:30-9:30 | | C4 Lower Commissary | | | | A1 Rec<br>B1 Edu<br>8:30-9:30 |
| 9:00 a.m. | | | C4 Medical | A1 Medical | C2 Medical | B3 Medical | |
| 10:00 a.m. | | | C3 Medical | B4 Medical | C1 Medical | B2 Medical | |
| 10:30 – Noon; Lunch | | | Med. Pickup | Med. Pickup | Med. Pickup | Med. Pickup | |
| 12:00 p.m. | C4 Rec<br>A4 Edu<br>12:00-1:00<br><br>A1 & A2 Chap<br>12:00-1:30 | | C2 Medical<br>C3 Upper Commissary<br>C2 Rec/WASP<br>C4 Chap<br>12:00-2:00 | B3 Medical<br>B1 Commissary<br>B3 Rec/WASP<br>C2 Chap<br>12:00-2:00 | A4 Medical<br>A2 Rec/WASP<br>B3 Chap<br>12:00-2:00 | B1 Medical<br>B1 Edu<br>C3 Rec/WASP<br>12:00-2:00 | A2 Rec<br>B2 Edu<br>12:00-1:00 |
| 1:00 p.m. | | | C1 Medical | B2 Medical | A3 Medical | C4 Medical | |
| 1:15 p.m. | B1 Rec<br>C1 Edu<br>1:15-2:15 | | | | | | A3 Rec<br>B3 Edu<br>1:15-2:15 |
| 1:30 p.m. | | | C3 Lower Commissary | | | | |
| 2:00 p.m. | C1 & A3 Chap<br>2:00-3:30 | | A4 Medical<br>C1 Edu<br>B1 Rec/WASP<br>B2 Chap<br>2:00-3:30 | B1 Medical<br>B2 Edu<br>B4 Rec/WASP<br>B1 Chap<br>2:00-3:30 | A2 Medical<br>A4 Edu<br>A3 Rec/WASP<br>C1 Chap<br>2:00-3:30 | C3 Medical<br>C4 Rec/WASP<br>C4 Edu<br>2:00-3:30 | |
| 2:30 p.m. | B2 Rec<br>C2 Edu<br>2:30-3:30 | | | | | | A4 Rec<br>B4 Edu<br>2:30-3:30 |
| 3:00 p.m. | | | A3 Medical | C4 Medical | A1 Medical | C2 Medical | |
| 5:00 p.m. Dinner | | | | | | | |
| 6:00 p.m. | | C1 Rec<br>6:00-7:45 | A1 Rec<br>6:00-7:45 | A2 Rec<br>6:00-7:45 | A3 Rec<br>6:00-7:45 | | |

Exhibit B7

SIDDIQUI, ASIA  85797053

Exhibit B₈



**U.S. Department of Justice**
**Federal Bureau of Prisons**
**Federal Correctional Institution**
P.O. Box 445
Aliceville, Alabama 35442

September 30, 2020

**MEMORANDUM FOR INMATE POPULATION**

SUBJECT:   Modified Visitation Privileges

Effective October 3, 2020, the Bureau of Prisons (BOP) will begin allowing visitation on a modified basis.  While visitation will re-begin, there will be several procedural changes that will be strictly monitored and enforced.  It will be your responsibility to ensure not only you, but also your family and loved ones adhere to new procedures in place.

- All inmates must wear a government issued face covering.
- **All visitors must wear a plain surgical mask**.  Masks will not be issued to visitors; they must arrive with a mask.  Visitors without the required plain surgical mask will not be granted visitation.
- Visits will be **Non-Contact Only**.  Inmates will not be allowed to touch or embrace visitors under any circumstance.  Any breaches will result in immediate termination of the visit.
- There will be a maximum of 3 visitors allowed per inmate.
- Visitation will be on Saturday & Sunday only, from 7:45 am to 3:00 pm.
- Each housing unit will visit separately (eg, A1, A2, etc..)
- A clear vinyl screen will separate inmates from visitors.
- Inmates will be required to submit an electronic copout to Unit Team indicating the names of visitors and the date and time they wish to visit.  The electronic copout must be submitted by Wednesday prior to the visit.  Unit team will assign inmates to a visitation timeslot and place the inmate on callout on a first come, first serve basis. **Accommodations will not be made for visitors who arrive late or were not approved to visit on specific dates and times.**  Inmates with computer restrictions will be allowed to submit a paper copout to unit team.

## ALL ABOVE INFORMATION IS SUBJECT TO CHANGE

SIDDIQUI, ASIA  85797053

FCI ALICEVILLE VISITATION SCHEDULE

**6/25/2022**

| Task | Start | End |
|------|-------|-----|
| A1 | 8:00 | 9:00 |
| Cleaning | 9:00 | 9:15 |
| A1 | 9:15 | 10:15 |
| Cleaning | 10:15 | 10:30 |
| A1 | 10:30 | 11:30 |
| Cleaning | 11:30 | 11:45 |
| A2 | 11:45 | 12:45 |
| Cleaning | 12:45 | 1:00 |
| A2 | 1:00 | 2:00 |
| Cleaning | 2:00 | 2:15 |
| A2 | 2:15 | 3:15 |
| Cleaning | 3:15 | 3:30 |

**6/26/2022**

| Task | Start | End |
|------|-------|-----|
| A3 | 8:00 | 9:00 |
| Cleaning | 9:00 | 9:15 |
| A3 | 9:15 | 10:15 |
| Cleaning | 10:15 | 10:30 |
| A3 | 10:30 | 11:30 |
| Cleaning | 11:30 | 11:45 |
| A4 | 11:45 | 12:45 |
| Cleaning | 12:45 | 1:00 |
| A4 | 1:00 | 2:00 |
| Cleaning | 2:00 | 2:15 |
| A4 | 2:15 | 3:15 |
| Cleaning | 3:15 | 3:30 |

**7/2/2022**

| Task | Start | End |
|------|-------|-----|
| B1 | 8:00 | 9:00 |
| Cleaning | 9:00 | 9:15 |
| B1 | 9:15 | 10:15 |
| Cleaning | 10:15 | 10:30 |
| B1 | 10:30 | 11:30 |
| Cleaning | 11:30 | 11:45 |
| B2 | 11:45 | 12:45 |
| Cleaning | 12:45 | 1:00 |
| B2 | 1:00 | 2:00 |
| Cleaning | 2:00 | 2:15 |
| B2 | 2:15 | 3:15 |
| Cleaning | 3:15 | 3:30 |

**7/3/2022**

| Task | Start | End |
|------|-------|-----|
| B3 | 8:00 | 9:00 |
| Cleaning | 9:00 | 9:15 |
| B3 | 9:15 | 10:15 |
| Cleaning | 10:15 | 10:30 |
| B3 | 10:30 | 11:30 |
| Cleaning | 11:30 | 11:45 |
| B4 | 11:45 | 12:45 |
| Cleaning | 12:45 | 1:00 |
| B4 | 1:00 | 2:00 |
| Cleaning | 2:00 | 2:15 |
| B4 | 2:15 | 3:15 |
| Cleaning | 3:15 | 3:30 |

**7/9/2022**

| Task | Start | End |
|------|-------|-----|
| C1 | 8:00 | 9:00 |
| Cleaning | 9:00 | 9:15 |
| C1 | 9:15 | 10:15 |
| Cleaning | 10:15 | 10:30 |
| C1 | 10:30 | 11:30 |
| Cleaning | 11:30 | 11:45 |
| C2 | 11:45 | 12:45 |
| Cleaning | 12:45 | 1:00 |
| C2 | 1:00 | 2:00 |
| Cleaning | 2:00 | 2:15 |
| C2 | 2:15 | 3:15 |
| Cleaning | 3:15 | 3:30 |

**7/10/2022**

| Task | Start | End |
|------|-------|-----|
| C3 | 8:00 | 9:00 |
| Cleaning | 9:00 | 9:15 |
| C3 | 9:15 | 10:15 |
| Cleaning | 10:15 | 10:30 |
| C3 | 10:30 | 11:30 |
| Cleaning | 11:30 | 11:45 |
| C4 | 11:45 | 12:45 |
| Cleaning | 12:45 | 1:00 |
| C4 | 1:00 | 2:00 |
| Cleaning | 2:00 | 2:15 |
| C4 | 2:15 | 3:15 |
| Cleaning | 3:15 | 3:30 |

**7/16/2022**

| Task | Start | End |
|------|-------|-----|
| A2 | 8:00 | 9:00 |
| Cleaning | 9:00 | 9:15 |
| A2 | 9:15 | 10:15 |
| Cleaning | 10:15 | 10:30 |
| A1 | 10:30 | 11:30 |
| Cleaning | 11:30 | 11:45 |
| A1 | 11:45 | 12:45 |
| Cleaning | 12:45 | 1:00 |
| A3 | 1:00 | 2:00 |
| Cleaning | 2:00 | 2:15 |
| A3 | 2:15 | 3:15 |
| Cleaning | 3:15 | 3:30 |

**7/17/2022**

| Task | Start | End |
|------|-------|-----|
| A4 | 8:00 | 9:00 |
| Cleaning | 9:00 | 9:15 |
| A4 | 9:15 | 10:15 |
| Cleaning | 10:15 | 10:30 |
| B2 | 10:30 | 11:30 |
| Cleaning | 11:30 | 11:45 |
| B2 | 11:45 | 12:45 |
| Cleaning | 12:45 | 1:00 |
| B1 | 1:00 | 2:00 |
| Cleaning | 2:00 | 2:15 |
| B1 | 2:15 | 3:15 |
| Cleaning | 3:15 | 3:30 |

**7/23/2022**

| Task | Start | End |
|------|-------|-----|
| B4 | 8:00 | 9:00 |
| Cleaning | 9:00 | 9:15 |
| B4 | 9:15 | 10:15 |
| Cleaning | 10:15 | 10:30 |
| B3 | 10:30 | 11:30 |
| Cleaning | 11:30 | 11:45 |
| B3 | 11:45 | 12:45 |
| Cleaning | 12:45 | 1:00 |
| C1 | 1:00 | 2:00 |
| Cleaning | 2:00 | 2:15 |
| C1 | 2:15 | 3:15 |
| Cleaning | 3:15 | 3:30 |

**7/24/2022**

| Task | Start | End |
|------|-------|-----|
| C2 | 8:00 | 9:00 |
| Cleaning | 9:00 | 9:15 |
| C2 | 9:15 | 10:15 |
| Cleaning | 10:15 | 10:30 |
| C4 | 10:30 | 11:30 |
| Cleaning | 11:30 | 11:45 |
| C4 | 11:45 | 12:45 |
| Cleaning | 12:45 | 1:00 |
| C3 | 1:00 | 2:00 |
| Cleaning | 2:00 | 2:15 |
| C3 | 2:15 | 3:15 |
| Cleaning | 3:15 | 3:30 |

**15 inmates per time slot**

Exhibit B9

SIDDIQUI, ASIA  85797053

## SPC ALICEVILLE JUNE-JULY VISITATION SCHEDULE

**6/25/2022 D**

| Task | Start | End |
|---|---|---|
|  | 8:00 | 9:00 |
| Cleaning | 9:00 | 9:15 |
|  | 9:15 | 10:15 |
| Cleaning | 10:15 | 10:30 |
|  | 10:30 | 11:30 |
| Cleaning | 11:30 | 11:45 |
|  | 11:45 | 12:45 |
| Cleaning | 12:45 | 1:00 |
|  | 1:00 | 2:00 |
| Cleaning | 2:00 | 2:15 |
|  | 2:15 | 3:15 |
| Cleaning | 3:15 | 3:30 |

**6/26/2022 D**

| Task | Start | End |
|---|---|---|
|  | 8:00 | 9:00 |
| Cleaning | 9:00 | 9:15 |
|  | 9:15 | 10:15 |
| Cleaning | 10:15 | 10:30 |
|  | 10:30 | 11:30 |
| Cleaning | 11:30 | 11:45 |
|  | 11:45 | 12:45 |
| Cleaning | 12:45 | 1:00 |
|  | 1:00 | 2:00 |
| Cleaning | 2:00 | 2:15 |
|  | 2:15 | 3:15 |
| Cleaning | 3:15 | 3:30 |

**7/2/2022 E**

| Task | Start | End |
|---|---|---|
|  | 8:00 | 9:00 |
| Cleaning | 9:00 | 9:15 |
|  | 9:15 | 10:15 |
| Cleaning | 10:15 | 10:30 |
|  | 10:30 | 11:30 |
| Cleaning | 11:30 | 11:45 |
|  | 11:45 | 12:45 |
| Cleaning | 12:45 | 1:00 |
|  | 1:00 | 2:00 |
| Cleaning | 2:00 | 2:15 |
|  | 2:15 | 3:15 |
| Cleaning | 3:15 | 3:30 |

**7/3/2022 E**

| Task | Start | End |
|---|---|---|
|  | 8:00 | 9:00 |
| Cleaning | 9:00 | 9:15 |
|  | 9:15 | 10:15 |
| Cleaning | 10:15 | 10:30 |
|  | 10:30 | 11:30 |
| Cleaning | 11:30 | 11:45 |
|  | 11:45 | 12:45 |
| Cleaning | 12:45 | 1:00 |
|  | 1:00 | 2:00 |
| Cleaning | 2:00 | 2:15 |
|  | 2:15 | 3:15 |
| Cleaning | 3:15 | 3:30 |

**7/9/2022 D**

| Task | Start | End |
|---|---|---|
|  | 8:00 | 9:00 |
| Cleaning | 9:00 | 9:15 |
|  | 9:15 | 10:15 |
| Cleaning | 10:15 | 10:30 |
|  | 10:30 | 11:30 |
| Cleaning | 11:30 | 11:45 |
|  | 11:45 | 12:45 |
| Cleaning | 12:45 | 1:00 |
|  | 1:00 | 2:00 |
| Cleaning | 2:00 | 2:15 |
|  | 2:15 | 3:15 |
| Cleaning | 3:15 | 3:30 |

**7/10/2022 D**

| Task | Start | End |
|---|---|---|
|  | 8:00 | 9:00 |
| Cleaning | 9:00 | 9:15 |
|  | 9:15 | 10:15 |
| Cleaning | 10:15 | 10:30 |
|  | 10:30 | 11:30 |
| Cleaning | 11:30 | 11:45 |
|  | 11:45 | 12:45 |
| Cleaning | 12:45 | 1:00 |
|  | 1:00 | 2:00 |
| Cleaning | 2:00 | 2:15 |
|  | 2:15 | 3:15 |
| Cleaning | 3:15 | 3:30 |

**7/16/2022 E**

| Task | Start | End |
|---|---|---|
|  | 8:00 | 9:00 |
| Cleaning | 9:00 | 9:15 |
|  | 9:15 | 10:15 |
| Cleaning | 10:15 | 10:30 |
|  | 10:30 | 11:30 |
| Cleaning | 11:30 | 11:45 |
|  | 11:45 | 12:45 |
| Cleaning | 12:45 | 1:00 |
|  | 1:00 | 2:00 |
| Cleaning | 2:00 | 2:15 |
|  | 2:15 | 3:15 |
| Cleaning | 3:15 | 3:30 |

**7/17/2022 E**

| Task | Start | End |
|---|---|---|
|  | 8:00 | 9:00 |
| Cleaning | 9:00 | 9:15 |
|  | 9:15 | 10:15 |
| Cleaning | 10:15 | 10:30 |
|  | 10:30 | 11:30 |
| Cleaning | 11:30 | 11:45 |
|  | 11:45 | 12:45 |
| Cleaning | 12:45 | 1:00 |
|  | 1:00 | 2:00 |
| Cleaning | 2:00 | 2:15 |
|  | 2:15 | 3:15 |
| Cleaning | 3:15 | 3:30 |

**7/23/2022 D**

| Task | Start | End |
|---|---|---|
|  | 8:00 | 9:00 |
| Cleaning | 9:00 | 9:15 |
|  | 9:15 | 10:15 |
| Cleaning | 10:15 | 10:30 |
|  | 10:30 | 11:30 |
| Cleaning | 11:30 | 11:45 |
|  | 11:45 | 12:45 |
| Cleaning | 12:45 | 1:00 |
|  | 1:00 | 2:00 |
| Cleaning | 2:00 | 2:15 |
|  | 2:15 | 3:15 |
| Cleaning | 3:15 | 3:30 |

**7/24/2022 D**

| Task | Start | End |
|---|---|---|
|  | 8:00 | 9:00 |
| Cleaning | 9:00 | 9:15 |
|  | 9:15 | 10:15 |
| Cleaning | 10:15 | 10:30 |
|  | 10:30 | 11:30 |
| Cleaning | 11:30 | 11:45 |
|  | 11:45 | 12:45 |
| Cleaning | 12:45 | 1:00 |
|  | 1:00 | 2:00 |
| Cleaning | 2:00 | 2:15 |
|  | 2:15 | 3:15 |
| Cleaning | 3:15 | 3:30 |

**7/30/2022 E**

| Task | Start | End |
|---|---|---|
|  | 8:00 | 9:00 |
| Cleaning | 9:00 | 9:15 |
|  | 9:15 | 10:15 |
| Cleaning | 10:15 | 10:30 |
|  | 10:30 | 11:30 |
| Cleaning | 11:30 | 11:45 |
|  | 11:45 | 12:45 |
| Cleaning | 12:45 | 1:00 |
|  | 1:00 | 2:00 |
| Cleaning | 2:00 | 2:15 |
|  | 2:15 | 3:15 |
| Cleaning | 3:15 | 3:30 |

**7/31/2022 E**

| Task | Start | End |
|---|---|---|
|  | 8:00 | 9:00 |
| Cleaning | 9:00 | 9:15 |
|  | 9:15 | 10:15 |
| Cleaning | 10:15 | 10:30 |
|  | 10:30 | 11:30 |
| Cleaning | 11:30 | 11:45 |
|  | 11:45 | 12:45 |
| Cleaning | 12:45 | 1:00 |
|  | 1:00 | 2:00 |
| Cleaning | 2:00 | 2:15 |
|  | 2:15 | 3:15 |
| Cleaning | 3:15 | 3:30 |

**11 inmates per time slot**

Exhibit B10

SIDDIQUI, ASIA  85797053

Exhibit B"

**TRULINCS  85797053 - SIDDIQUI, ASIA - Unit: ALI-C-B**

-----------------------------------------------------------------------------------------

FROM: 85797053
TO: Trust Fund
SUBJECT: ***Request to Staff*** SIDDIQUI, ASIA, Reg# 85797053, ALI-C-B
DATE: 06/07/2022 10:19:47 AM

To: Willis
Inmate Work Assignment: n/a

Dear Mr. Willis, Can we get the Law Library back on our Unit computers for the Modified Lockdowns please? Thank you.

Exhibit B12

BP-A0148
JUNE 10

**INMATE REQUEST TO STAFF** CDFRM

U.S. DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF PRISONS

| TO:(Name and Title of Staff Member) Edgeworth, Case Manager | DATE: 4/5/22 |
|---|---|
| FROM: Asia Siddiqui | REGISTER NO.: 85797 053 |
| WORK ASSIGNMENT: n/a | UNIT: C2 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.

Dear Mr. Edgeworth / Unit Team,

The hot water machine is broken and we Ramadan participants are getting dry uncooked oatmeal and powdered vegan milk for our breakfast meal to prepare ourselves at 3am with hot water. Please can the hot water problem be fixed as soon as possible. Thank you for your time.

(Do not write below this line)

DISPOSITION:

| Signature Staff Member | Date |
|---|---|
| | |

Record Copy - File; Copy - Inmate

PDF

Prescribed by P5511

This form replaces BP-148.070 dated Oct 86 and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR Privacy FOLDER

**SECTION 6**

Exhibit B13

BP-A0148
JUNE 10

**INMATE REQUEST TO STAFF** CDFRM

**U.S. DEPARTMENT OF JUSTICE**          **FEDERAL BUREAU OF PRISONS**

| TO: (Name and Title of Staff Member) Facilities | DATE: 4/5/22 |
|---|---|
| FROM: Asia Siddiqui | REGISTER NO.: 85797053 |
| WORK ASSIGNMENT: n/a | UNIT: C2 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.

Dear Facilities,

The hot water machine is broken in our Unit C2, and those of us participating in Ramadan are receiving dry uncooked oatmeal and powdered vegan milk to prepare 3am before we start our fast, with _hot_ water. Please can the hot water problem be fixed as soon as possible. Thank you!

(Do not write below this line)

DISPOSITION:

| Signature Staff Member | Date |
|---|---|

Record Copy - File; Copy - Inmate

PDF

Prescribed by P5511

This form replaces BP-148.070 dated Oct 86 and BP-S148.070 APR 94

Exhibit B4

**TRULINCS 85797053 - SIDDIQUI, ASIA - Unit: ALI-C-B**

--------------------------------------------------------------------------------

FROM: 85797053
TO: C Unit Team
SUBJECT: ***Request to Staff*** SIDDIQUI, ASIA, Reg# 85797053, ALI-C-B
DATE: 06/15/2022 08:04:20 PM

To: Edgeworth, Case Manager
Inmate Work Assignment: n/a

Dear Unit Team, When will we get a hot water machine in here? It has been almost 3 months without one. In addition, since we are back on lockdown due to Covid, if there is a Covid outbreak, we need to be able to make hot tea, hot soup, and hot foods to heal from the cold, flu, or Covid itself. Thank you for taking this into consideration.

Exhibit G

## 3. REFRACTION

Indications for prescription eyewear for inmates are listed below.

### INDICATIONS FOR EYEGLASSES

- **Inmates with corrected visual acuity of 20/40** or better in the worse eye do not need refraction, except as noted below. **Inmates who have visual acuity worse than 20/40 or who complain of headache or other symptoms** potentially related to vision, may request refraction for eyeglasses by copout.

- **Inmates with vision requirements better than 20/40** (e.g., town drivers, those in vision-intensive vocational or educational programs, or those in job assignments requiring constant reading or depth perception such as working on a slicing machine or with dangerous power tools) may be referred for refraction.

- **Eyeglasses may be replaced once every 24 months (consistent with Medicaid) and is at the institution's discretion.** Generally, if the change in refraction is less than 0.5 diopters for either distance or near correction, eyeglasses should not need replacement. If an inmate only needs readers that are available in Commissary, he or she may purchase them there. Currently, there is no mechanism for inmates to purchase their own prescription eyeglasses.

### INDICATIONS FOR CONTACT LENSES

By BOP policy, contact lenses ordinarily are authorized only when medically necessary and are not prescribed for cosmetic reasons.

**Examples of conditions for which contact lenses may be approved include:**

- Keratoconus (unilateral or bilateral) with best spectacle correction worse than 20/60–20/80 range.

- Unilateral aphakia (post-cataract with no lens implant) with the aphakic eye having best corrected visual acuity of 20/100 or better. Contact lenses are not required if the eye is amblyopic (lazy eye) or has extensive macular damage.

- Corneal trauma resulting in significant corneal toricity (astigmatism) or central scarring.

- Greater than 4.0 diopters of anisometropia (difference in prescription power) between the eyes, provided that an amblyopia (lazy eye) or strabismus (squint) is not present.

- Severe refractive error (myopia greater than -10.00D, hyperopia greater than +10.00), but only if it is documented that contact lenses provide better vision.

NOTES:

- ▸ Because contact lenses may cause eye complications, prior to prescribing the lenses, confirm that there is sufficient time remaining on the inmate's sentence to ensure a proper and healthy fit. If an inmate with contact lenses leaves prior to a final fitting, *do not* send the contact lenses with him or her if reliable eye care cannot be assured.

- ▸ Prescriptions for contact lenses are not to be provided to an inmate who wants to order them from the private sector.

- ▸ Bandage contact lenses that are ordered/provided by an ophthalmology consultant are exempt from these criteria.

Exhibit C2

TRULINCS 85797053 - SIDDIQUI, ASIA - Unit: NYM-B-A

---

FROM: 85797053
TO: Sick Call
SUBJECT: ***Request to Staff*** SIDDIQUI, ASIA, Reg# 85797053, NYM-B-A
DATE: 02/07/2020 02:14:13 PM

To: Yonnone
Inmate Work Assignment: Showers

Dear Staff, I saw the FBOP eye doctor June AND July 2019 and was prescibed contacts (2-year supply) AND solution, and he mentioned I'd be getting new glasses too, and I have not received them yet. May they be sent to the next facility I am transfered to (Aliceville, AL)? This is what I was promised for my long wait. Thank you so much for everything you guys have done.

Exhibit C3

April 5, 2020

copy

Dear Mr. Swift,

I arrived at Aliceville FCI on March 26, 2020. We were told we will be in quarantine for 14 days. I don't know what the updated status is on that (if it's going to be for longer). The institution is on lockdown, so phone use is limited. I pray all is well with you. Are you quarantining as well?

The reason for this letter is to discuss my eye equipment status. MCC-NY Medical had promised they would mail my contact lenses to FCI Aliceville as soon as they receive them. I was prescribed a 2-year supply of contact lenses and solution in July 2019. I was still waiting to receive them in March 2020 when on the 3rd, I was transferred. I had received my last supply in ~~2018~~ 2018 when I was prescribed 2 years' worth but only given a one year supply promised to recieve more the next yearly checkup. In July 2019, I was again prescribed a 2-year supply. I want to mention the reason I am prescribed contacts is due to my eye condition where I have reached -10 prescription in severe Myopia. Contacts are recommended as eye glasses increase rapid degeneration and cornea deformity (bulging due to distance of glasses from eye). I'm legally blind. To my dismay, MCC-NY did not receive my lenses and the ones I have are getting old. Mr Yamane (Medical Assistant Director) and Captain Thomas (Head Director) said they had sent Aliceville inmates and inmates who transferred out of MCC-NY their Medical items before. Without your help reaching out to MCC-NY, I don't know how this urgent Problem will be resolved. I am scared of how I will move forward herean f I don't receive proper and immediate care as my need to see trumps all other issues. Without proper eye equipment, I will be prevented from all duties. Regards,

Exhibit C4

ALI 1330.17
October 15, 2012
Attachment A

## INFORMAL RESOLUTION REQUEST (IRR) FORM

| Inmate Name | Siddiqi | Register Number | 85797-053 | 2312 |

### INFORMAL RESOLUTION PROCESS

Briefly state the specific complaint, including details and facts which support your request and the date on which the basis for your complaint occurred, your recommended resolution, and the actions you have taken and to whom you have spoken to resolve your complaint in Section 1.  Return the form to your Correctional Counselor or other Unit Team staff designated by the Unit. If all efforts at informal resolution fail, you will be issued a BP-9 form in which you may proceed in accordance with our policies and outlined in the institution supplement. The informal resolution process is not in any manner intended to prohibit you from pursuing complaints through this program. It is intended to ensure that all parties attempt to informally resolve an issue prior to initiating the formal process of filing an Administrative Remedy.

**SECTION 1**
Briefly state your specific complaint, recommended solution, and actions you have taken to resolve:   (Please Print)

Due to my transfer, the issuance of my past prescription was intermittent. I saw Dr. Li through April 8, 2020 I've been prescribed contacts, solution and case for 2 years now by senior optometrist for the FBOP, Dr. James Weyand, OD and gave another sick call form. I was told by staff he will not order me contact solution because Dr. Weyand did not explain in details why he prescribed me contacts. I am being punished for his lack of note-taking which I had no control over.

**SECTION 2**
Date Received by Counselor for Response: _____
Summary of fact-finding:

Actions taken to resolve informally: _____

Explain reasons for no resolution: _____

Date IRR form Issued to Inmate: 05/11/20     Unit Team Name (print): _____
Date IRR form Returned to Staff: _____     Unit Team Name (print): _____
Date Inmate Issued BP-9: _____     Unit Team Name (print): _____
Date Unit Manager/Camp Administrator Reviewed & Signature: _____

**SECTION 3**
On _____ (date), this issue was informally resolved.   Inmate Signature

Distribution:   (1) If complaint is informally resolved, forward the original, signed and dated by the inmate, to the Correctional Counselor for filing.   (2) If complaint is NOT informally resolved, forward original, attached to BP-9, to the Coordinator's office for processing by the Clerk.

[right margin handwritten:] eye power is plummeting and wearing eye-glasses — and had reached EBOP-certified levels. My contacts Dr. Weyand told me in 2017. He denied me contact before then — and suddenly after degeneration himself prescribed me to preserve my cornea from further damage — Eye glasses were ordered in advance only as to avoid if at all my eyes get infected as a backup temporary assistance upon my request. I need contact solution for the current contacts and a renewal every 2 months while we resolve the matter for the contacts/lens order. Please Thank you for understanding.

Exhibit C5

## INFORMAL RESOLUTION ATTEMPT

June 23, 2020

Inmate Siddiqi
Reg No.: 85797-053

BP 8 Medical

This is in response to the attached complaint in which you state
medical did not give me my contact solutions. I have a
prescription for contacts and contact solution.


Per medical,  A review of her medical record does not indicate a
medical requirement for contact lenses and further reveals her last
prescription in 2019 was written for eyeglasses.  She may not have
prescription contact lenses (or any other contact lenses, for that
matter) unless there is a medical necessity for them.  If she feels
her eyeglasses are inadequate, she may submit a sick call request so
she can be evaluated by the optometrist.




if you are not satisfied with this decision, you may appeal to
the Warden on an Administrative Remedy Form BP-229


_____                    6/23/2020
J. Hart, Correctional Counselor                          Date

Exhibit C

**U.S. DEPARTMENT OF JUSTICE**
Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: **Siddiqui Asia**        **85797 053**     **C2 231 L**    **Aliceville**
LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION

**Part A– INMATE REQUEST** I was never order or given eyeglasses in 2010.
I am being denied contacts because of an additional presciption of glasses.
I forgot to renew my contact solution presciption in NYM,
before leaving to come here. According to paperwork, you
will see I have been prescribed contact lenses since
2017 and 2-year supplies since 2018. My July 2019
visit presciption was of 2-year supply AND contact
solution with it I am only requesting contact
solution as I have over a year supply of contacts still.
7/1/20 _____ Not for additional
DATE        eyewear. Please help!        SIGNATURE OF REQUESTER

**Part B– RESPONSE**

Received

JUL – 6 2020

Wardens Office

_____        _____
DATE                    WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

**ORIGINAL: RETURN TO INMATE**        CASE NUMBER: |03|3+++

CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION

SUBJECT: _____

_____        _____
DATE                    RECIPIENT'S SIGNATURE (STAFF MEMBER)

BP–229(13)
APRIL 1982

Exhibit C7

RECEIPT - ADMINISTRATIVE REMEDY

DATE: AUGUST 15, 2020

FROM: ADMINISTRATIVE REMEDY COORDINATOR
      ALICEVILLE FCI

TO  : ASIA SIDDIQUI, 85797-053
      ALICEVILLE FCI     UNT: C UN'    QTR: C02-231L

THIS ACKNOWLEDGES THE RECEIPT OF THE ADMINISTRATIVE REMEDY REQUEST
IDENTIFIED BELOW:

REMEDY ID      : 1031377-F1
DATE RECEIVED  : JULY 6, 2020
RESPONSE DUE   : JULY 26, 2020
SUBJECT 1      : MEDICAL CARE - DELAY OR ACCESS TO
SUBJECT 2      :

Exhibit C₈

## REQUEST FOR ADMINISTRATIVE REMEDY

**Administrative Remedy No. 1031377-F1**
**Part B - Response**

This is in response to your Request for Administrative Remedy No. 1031377-F1, received on July 6, 2020, wherein you state you are being denied contacts because of an additional prescription for eyeglasses.   For resolution, you request a prescription for contact solution.

A review of your medical record and consultation with staff reveals you were evaluated by on optometrist at MCC New York on September 25, 2019 due to your request for prescription eyeglasses and contact lenses.   The provider wrote a prescription for eyeglasses for you.

Program Statement 6031.04, <u>Patient Care</u>, Paragraph 27(b), states, "Contact lenses will only be prescribed when, in the clinical judgement of a Bureau of contract optometrist or ophthalmologist, with the concurrence of the Clinical Director and Health Services Administrator, an eye-refractive error is best treated with the prescription of contact lenses.   Generally these cases are limited to a diagnosis of keratoconus and certain inmates with artificial lens implants."   The Program Statement further states, "Unless contact lenses are medically necessary, HSU staff will inform the inmate that an appointment will be made with the institution's optometrist for an eyeglass prescription. Once the glasses are received, the contact lenses must be returned to the inmate's personal property or mailed home.   HSA's will ensure adequate contact lens supplies are available for inmates authorized contact lenses (those who must wear contacts as opposed to glasses), non-sentenced inmates, or those awaiting eyeglasses."

A further review of your medical record and consultation with staff reveals you do not have a diagnosis of keratoconus or artificial lens implants and your last optometry exam at MCC New York resulted in a prescription for eyeglasses, thus confirming eyeglasses are medically appropriate for you.

A further review of your medical record and consultation with staff reveals you were evaluated by the Clinical Director on April 8, 2020, at your 14-day Physician's Evaluation. The provider ordered a new specialty consult for you to see the contract optometrist.   Due to the COVID-19 pandemic, the contract optometrist has stopped seeing patients and will return once the pandemic has resolved or it has been otherwise deemed safe for inmates to resume on-site clinic care.

Finally, a prescription for contact lens solution has been written for you under the guidance provided by PS 6031.04.   You will need to submit a Sick Call request monthly to renew this until you receive eyeglasses.

Accordingly, your Request for Administrative Remedy is granted, in that a prescription for contact lens solution has been written for you pending the receipt of eyeglasses. **If you**

Exhibit C 8

are dissatisfied with this response, you may appeal to the Regional Director at the **Southeast Regional Office, 3800 Camp Creek Parkway, S.W., Building 2000, Atlanta, Georgia 30331.   Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.**

Katina Heckard, Acting Warden

7-14-20

Date

Exhibit C9

# Bureau of Prisons
# Health Services
# Clinical Encounter

| | |
|---|---|
| Inmate Name:  SIDDIQUI, ASIA | Reg #:  85797-053 |
| Date of Birth:  01/23/1984 | Sex:  F    Race:  WHITE    Facility:  NYM |
| Encounter Date:  07/24/2019 15:16 | Provider:  Weyand, James OD    Unit:  B01 |

Optometry - Optometry Exam encounter performed at Health Services.

**SUBJECTIVE:**

   **COMPLAINT 1        Provider: Weyand, James OD**

   **Chief Complaint: Eyes/Vision Problems**
   **Subjective:    ROUTINE EYE EXAM**
   **USING NO EYE DROPS**
   **SOFT CONTACTS ARE WORKING**
   **GREAT!!!**
   **NEED MORE CONTACTS**
   **Pain:       No**

**Vision Screen on 07/24/2019 15:15**

   Blindness:

   | | | | |
   |---|---|---|---|
   | Distance Vision: | Right Eye: 20/400 | Left Eye: 20/400 | Both Eyes: 20/400 |
   | Near Vision: | Right Eye: 20/400 | Left Eye: 20/400 | Both Eyes: 20/400 |

   With Corrective Lenses

   | | | | |
   |---|---|---|---|
   | Distance Vision: | Right Eye: 20/20 | Left Eye: 20/20 | Both Eyes: 20/20 |
   | Near Vision: | Right Eye: 20/20 | Left Eye: 20/20 | Both Eyes: 20/20 |

   Present Glasses - Distance                    Refraction - Distance

   | | Sphere | Cylinder | Axis | Add | | Sphere | Cylinder | Axis | Add |
   |---|---|---|---|---|---|---|---|---|---|
   | R: | | | | | R: | -8.00 | | | |
   | L: | | | | | L: | -9.00 | | | |

   | | | |
   |---|---|---|
   | Color Test: | Normal | |
   | Tonometry: | L: 11 | R: 11 |

   Comments:    MEDICALLY NEEDS NEW SCL
   OD -8.00 ACCUVE OASIS
   OS -9.00 ACCUVE OASIS
   ORDER 4 BOXES EACH EYE, NEW SCL CASE AND SOLUTIONS

**OBJECTIVE:**

Exam:
   Eyes
      General
         Yes: PERRLA
      Color Vision
         Yes: Within Normal Limits
      Eye Tests
         Yes: Cover-Uncover Test Normal
      Visual Fields
         Yes: Normal Fields
      Slit Lamp

Exhibit C9

| | | | |
|---|---|---|---|
| Inmate Name:  SIDDIQUI, ASIA | | Reg #:  85797-053 | |
| Date of Birth:   01/23/1984 | Sex:  F   Race:  WHITE | Facility:  NYM | |
| Encounter Date:  07/24/2019 15:16 | Provider:  Weyand, James OD | Unit:  B01 | |

**Exam:**

    Yes: Normal Exam

    **Periorbital/Orbital/Lids**

        Yes: Normal Appearing

    **Eyebrows**

        Yes: Normal Appearing

    **Conjunctiva and Sclera**

        Yes: Within Normal Limits

    **Cornea and Lens**

        Yes: Normal Appearing

    **Iris**

        Yes: Normal Appearing

    **Pupils**

        Yes: Normal Appearing

    **Fundus Exam**

        Yes: Grossly Normal Retina

**Exam Comments**

    FLUORESCEIN GTTS OU
    C/D OD.3/.4
        OS.3/.4

**ASSESSMENT:**

    Myopia, 367.1 - Current

**PLAN:**

**Disposition:**

    Follow-up at Sick Call as Needed

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 07/24/2019 | Counseling | Compliance - Treatment | Weyand, James | Verbalizes Understanding |

        PLEASE ORDER MORE CONTACTS

**Copay Required:** No        **Cosign Required:** Yes

**Telephone/Verbal Order:** No

Completed by Weyand, James OD on 07/24/2019 15:21

Requested to be cosigned by  Beaudouin, Robert MD.

Cosign documentation will be displayed on the following page.

Exhibit C9

## Bureau of Prisons
## Health Services
## Cosign/Review

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | SIDDIQUI, ASIA | | | Reg #: | 85797-053 |
| Date of Birth: | 01/23/1984 | Sex: | F | Race: | WHITE |
| Encounter Date: | 07/24/2019 15:16 | Provider: | Weyand, James OD | Facility: | NYM |

Cosigned by Beaudouin, Robert MD on 07/24/2019 20:51.

Exhibit G0

## Bureau of Prisons
## Health Services
## Clinical Encounter

| | | | |
|---|---|---|---|
| Inmate Name: SIDDIQUI, ASIA | | Reg #: | 85797-053 |
| Date of Birth: 01/23/1984 | Sex:     F    Race:  WHITE | Facility: | NYM |
| Encounter Date: 04/04/2018 12:18 | Provider: Weyand, James OD | Unit: | B01 |

Optometry - Optometry Exam encounter performed at Health Services.

**SUBJECTIVE:**

   **COMPLAINT 1        Provider:** Weyand, James OD

   **Chief Complaint:** Eyes/Vision Problems

   **Subjective:**    ROUTINE EYE EXAM
                      NEED MORE SOFT CONTACTS
                      VISION IS GREAT IN BOTH EYES

   **Pain:**          No

**Vision Screen on 04/04/2018 12:18**

   Blindness:

   Distance Vision:   OD: 20/400        OS: 20/400          OU: 20/400

   Near Vision:       OD: 20/400        OS: 20/400          OU: 20/400

   With Corrective

   Distance Vision:   OD: 20/20         OS  20/20           OU: 20/20

   Near Vision:       OD: 20/20         OS: 20/20           OU: 20/20

| Present Glasses - Distance | | | | | Refraction - Distance | | | |
|---|---|---|---|---|---|---|---|---|
| **Sphere** | **Cylinder** | **Axis** | **Add** | | **Sphere** | **Cylinder** | **Axis** | **Add** |
| R: | | | | | R:  -8.00 | | | |
| L: | | | | | L:  -9.00 | | | |

   Color Test:    Normal

   Tonometry:   L:  10      R:  10

   Comments:     MEDICALLY NEEDS SCL
                 OD -8.00 8.8 ACCUVE OASIS
                 OS -9.00 8.8 ACCUVE OASIS
                 4 BOXES EACH EYE, NEW SCL CASE AND SOLUTIONS

**OBJECTIVE:**

**Exam:**
   **Eyes**
      **General**
         Yes: PERRLA
      **Color Vision**
         Yes: Within Normal Limits
      **Eye Tests**
         Yes: Cover-Uncover Test Normal

Exhibit C₁₀

| | | | | |
|---|---|---|---|---|
| Inmate Name: SIDDIQUI, ASIA | | | Reg #: 85797-053 | |
| Date of Birth: 01/23/1984 | Sex: F   Race: WHITE | | Facility: NYM | |
| Encounter Date: 04/04/2018 12:18 | Provider: Weyand, James OD | | Unit: B01 | |

## Exam:

**Visual Fields**
Yes: Normal Fields

**Slit Lamp**
Yes: Normal Exam

**Periorbital/Orbital/Lids**
Yes: Normal Appearing

**Eyebrows**
Yes: Normal Appearing

**Conjunctiva and Sclera**
Yes: Within Normal Limits

**Cornea and Lens**
Yes: Normal Appearing

**Iris**
Yes: Normal Appearing

**Pupils**
Yes: Normal Appearing

**Fundus Exam**
Yes: Grossly Normal Retina

## Exam Comments

FLUORESCEIN GTTS OU
C/D OD.3/.4
OS.3/.4

## ASSESSMENT:

Myopia, H5210 - Current

## PLAN:

## Disposition:

Follow-up at Sick Call as Needed

## Other:

PLEASE ORDER NEW SOFT CONTACT LENSES

## Patient Education Topics:

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 04/04/2018 | Counseling | Access to Care | Weyand, James | Verbalizes Understanding |

Exhibit C10

| | | | |
|---|---|---|---|
| Inmate Name: SIDDIQUI, ASIA | | | Reg #: 85797-053 |
| Date of Birth: 01/23/1984 | Sex: F | Race: WHITE | Facility: NYM |
| Encounter Date: 04/04/2018 12:18 | Provider: Weyand, James OD | | Unit: B01 |

**Spec Rx:** **Completed on** 04/04/2018 12:23
    **Sphere Right:** -8.00
    **Sphere Left:** -9.00

**Copay Required:** No      **Cosign Required:** Yes
**Telephone/Verbal Order:** No

Completed by Weyand, James OD on 04/04/2018 12:25
Requested to be cosigned by Beaudouin, Robert MD.
Cosign documentation will be displayed on the following page.

Exhibit C10

## Bureau of Prisons
## Health Services
## Cosign/Review

| Inmate Name: | SIDDIQUI, ASIA | | | Reg #: | 85797-053 |
|---|---|---|---|---|---|
| Date of Birth: | 01/23/1984 | Sex: | F | Race: | WHITE |
| Encounter Date: | 04/04/2018 12:18 | Provider: | Weyand, James OD | Facility: | NYM |

**Cosigned by Beaudouin, Robert MD on 04/11/2018 13:07.**

Exhibit C11

# INSTITUTIONAL EYE CARE, LLC

LAB PHONE: (570) 523-3493          FAX: (570) 524-2817

| PATIENT | DATE | CONTRACT | ORDER # |
|---|---|---|---|
| SIDDIQUI, ASIA | 07/19/2018 | MCCNY | 263307 |

| PATIENT ID | INSTITUTION |
|---|---|
| 85797-053 | MCCNY - METROPOLITAN CORRECTIONAL CENTER NY |

|  | SPHERE | CYLINDER | AXIS | PRISM | BASE |
|---|---|---|---|---|---|
| OD | -8.00 |  |  |  |  |
| OS | -9.00 |  |  |  |  |
|  | ADD | HEIGHT | DIST PD | NEAR PD | SEG STYLE |
| OD |  |  |  |  |  |
| OS |  |  |  |  |  |

| LENS TYPE |  | LENS TINT |  | LENS COLOR |  |
|---|---|---|---|---|---|
| Contacts |  | Clear |  |  |  |
| FRAME |  | FRAME COLOR |  | EYE SIZE |  |
| No Frame |  |  |  |  |  |

## NOTES

REPLENISH SOLUTION $19.80
CONTACTS $215.94
ACUVUE OASIS CONTACTS 2 BOXES PER EYE/8.8

| CHARGES | | | |
|---|---|---|---|
| LENSES: | $ 0.00 | PRISM: | $ 0.00 |
| FRAME: | $ 0.00 | TRANSITION: | $ 0.00 |
| OVERSIZE: | $ 0.00 | PHOTOGRAY: | $ 0.00 |
| TINT/PGX: | $ 0.00 | HIGH INDEX: | $ 0.00 |
| POLYCARB: | $ 0.00 | CASE: | $ 0.00 |
| DIOPTERS: | $ 45.00 | ADDITIONAL: | $ 235.74 |
| CREDIT: | - $ 0.00 | ENGRAVING: | $ 0.00 |
| DISCOUNT: | - $ 45.00 | REPAIR: | $ 0.00 |
| PREPAY: | - $ 0.00 | | |
| S/H: | $ 2.75 | | |
| TOTAL DUE: | $ 238.49 | | |

**VISION SAFETY NOTICE**

- Your lenses meet or exceed American Nation Standard Z80.1 and FDA requirement 21CFR Sec 801.410 for impact resistance but are not unbreakable or shatterproof. Of all the materials that lenses can be made from polycarbonate is the most impact resistant.

- If struck with sufficient force, the lenses can break into sharp pieces that can cause serious injury to the eye, or blindness. Even if the lenses do not break, the force of impact may cause the lenses or spectacle frame to contact the eye or surrounding area causing injury.

- The continued impact resistance of your lenses depends on how well you protect them from physical shocks and abuse. For your own protection, scratched or pitted lenses should be replaced immediately.

- If your occupational or recreational activities expose you to the risk of flying objects or physical impacts, your eye safety requires special safety spectacles with safety lenses, side shields, goggles and/or a full face shield.

- Polycarbonate Warning: Any order with Polycarbonate product contains a chemical known to the state of California to cause birth defects or other reproductive harm.

Exhibit Q̣₁



**U.S. DEPARTMENT OF JUSTICE**

**Federal Bureau of Prisons**

*Metropolitan Correctional Center*

150 Park Row
New York, New York 10007

August 4, 2017

**From:**    Sam Georgy, Health Services Administrator.

**Subject:**    Contact Lens Receipt

**To:**    Siddiqui, Asia # 85797-053

Inmate Name:  Siddiqui, Asia # 85797-053        Register #   85797-053

Unit      Unit 2                Date Received Glasses:   8-4-17

I received 48 contact lens – 9.00 and 8.8 Acnevue Oasys contact lens

Inmate signature:                Date:  8/4/17

Staff issuing glasses signature:                Date:

Received 12/2/21

Exhibit C₁₂ 131

BP-A0148
JUNE 10

**INMATE REQUEST TO STAFF** CDFRM

U.S. DEPARTMENT OF JUSTICE | FEDERAL BUREAU OF PRISONS

| TO: (Name and Title of Staff Member) Ms. Farrior/Medical Records | DATE: 11/1/21 |
|---|---|
| FROM: Asia Siddiqui | REGISTER NO.: 85797-053 |
| WORK ASSIGNMENT: | UNIT: 02 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.

Dear Ms. Farrior, When my eyeglasses prescription dipped to -10 in 2017, the FBOP eye doctor said I will be prescribed contact lenses as I suffer from severe myopia and the FBOP provides contact lenses for my -10 vision. -10 eyeglass lens prescription converts to -9 in contact lens prescription. Please see attached paperwork for details. (Do not write below this line) Thank you for all that you do.

DISPOSITION:

Per the Clinical Director, you are not authorized contact lenses.

| Signature Staff Member Ms. Farrior, HIT | Date 11-30-2021 |
|---|---|

Record Copy - File; Copy - Inmate

PDF                        Prescribed by P5511

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

Pg 1/3!

Original Copy

Exhibit G3

BP-A0148
JUNE 10

**INMATE REQUEST TO STAFF** CDFRM

U.S. DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF PRISONS

| TO: (Name and Title of Staff Member) Ms Welles, Health Service Administrator | DATE: 12/5/21 |
|---|---|
| FROM: Asia Siddiqui | REGISTER NO.: 85797 053 |
| WORK ASSIGNMENT: n/a | UNIT: C2 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.

Dear Ms. Welles, When I was sent out to the eye doctor in September 2021, he said I need contact lenses "for functionality, not vanity." I suffer from severe refractive error Myopia and my levels have plunged below the -10 level required to have contact lenses in the FBOP. The only requirement that is not being met is that the eye doctors automatically assume the FBOP will honor their prescription - so they don't detail that the contact lenses are better for my vision.

(Do not write below this line)

(continued) →

DISPOSITION:
A REVIEW OF YOUR MEDICAL RECORDS SHOWS AN OPHTHALMOLOGY SPECIALIST HAS NOT DIAGNOSED YOU WITH A CONDITION WHICH MANDATES THE USE OF CONTACT LENSES. ADDITIONALLY, THE OPHTHALMOLOGIST DID INDICATE YOU COULD WEAR EYEGLASSES.

| Signature Staff Member CB | Date 8 DEC 21 |
|---|---|

Record Copy - File; Copy - Inmate

PDF

Prescribed by P5511

This form replaces BP-148.070 dated Oct 86 and BP-S148.070 APR 94

**SECTION 6**

pg 2/3) based on my severe myopia. I dropped to a -10 in lens power by 2017 so the FBOP optometrist in NYM, Dr. James Weyand, changed my glasses prescription to contact lenses. In 2019, after I was again prescribed contact lenses in July, I made a huge mistake. After getting a stye in my eye, in my ignorance, I requested if he could also order me glasses — as if I was in the free world and could have multiple corrective devices. Although Dr. Weyand also wrote the glasses prescription after my several attempts, he was so hesitant, he wrote the glasses prescription wrong. Glasses prescriptions for myopia are one level higher in power than contact lenses (ie: -9 contact lenses are -10 eyeglasses). Instead of converting it, he kept it the prescription of the contact lenses, stating that he hoped my contact prescription would not be refused. The only accurate prescription was for the contacts — I never received any of the eyewear, and upon arriving to ALI, had a hard time getting my contact solution renewed for the contacts I still had from the previous year (same prescription). Dr Li said he would order eyewear for me only after he sent me to an optometrist here. The optometrist I saw in September 2021 prescribed contacts and was about to order them for me too, but Officer Hutchins told him this institution would order the eyewear based on his prescription. She was present when I asked him to write down if the contacts are necessary to which he replied, "You need contact lenses for functionality, not vanity." In addition, with my severe refractive error, I am supposed to wear contact lenses for a greater ratio of the day, upto 16 hours, and glasses for the remainder of the time before bed. So the contact lenses are not only necessary as glasses for long term use, are damaging (causing my cornea to bulge over time, causing deformity) and also don't give full vision — the tremendously blurry periphery reduces my ability to see objects angularly closest to me limiting my acuity and safety but the contact lenses don't leave any blind spots as they have full coverage of one's visual region due to being placed directly on the iris. When wearing glasses with my severe myopia, I have to push the lenses as close to my eyeballs as possible as glasses are designed to sit half an inch from the eyes. So glasses cannot be worn with comfort by a person with severe myopia (such as myself) due to the constant effort put in positioning and cleaning the glasses throughout the day, preventing from performing a smooth continuous task.

(Continued on next page)

(original copy)

Exhibit C₁₃

Original Copy

Pg 3/3

These problems may sound petty, but they are cruel, unusual punishment. If I could benefit from glasses with ease and equally to the contact lenses, no FBOP doctor would prescribe me contact lenses. Dr Woyand initially did not prescribe them to me for 2 years. I completely agree that incarceration is to strip us of unnecessary luxuries and vain pursuits. Please help me get my right to see without compromising my vision. If glasses did not compromise my vision, I would not be pleading to you right now to honor the eye doctor's prescription for contact lenses. Hope to hear from you soon. Thank you.

Exhibit G4

Original Copy

BP-A0148
JUNE 10
U.S. DEPARTMENT OF JUSTICE

**INMATE REQUEST TO STAFF** CDFRM

FEDERAL BUREAU OF PRISONS

| TO:(Name and Title of Staff Member) Ms Farrior, Medical Records | DATE: 12/5/21 |
|---|---|
| FROM: Asia Siddiqui | REGISTER NO.: 85797 053 |
| WORK ASSIGNMENT: n/a | UNIT: C2 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.

Dear Ms. Farrior,

I need all my eye exam medical records from April 2015 to August 2017; and I need all my medical records from July 2019 to December 2021. Thank you.

(Do not write below this line)

DISPOSITION:

| Signature Staff Member | Date |
|---|---|
| | |

Record Copy - File; Copy - Inmate

PDF                                                   Prescribed by P5511

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

Exhibit C15        Original Copy

BP-A0148                    INMATE REQUEST TO STAFF CDFRM
JUNE 10
U.S. DEPARTMENT OF JUSTICE                        FEDERAL BUREAU OF PRISONS

| TO:(Name and Title of Staff Member) Medical Records | DATE: 4/28/22 |
|---|---|
| FROM: Asia Siddiqui | REGISTER NO.: 85797 053 |
| WORK ASSIGNMENT: n/a | UNIT: C2 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.

Dear Medical Records,

I need all my medical records from April 2015 to August 2017, and from July 2019 to May 2022 pertaining my eye exams. This is my second written request in 5 months. It is urgent. Thank you.

(Do not write below this line)

DISPOSITION:

| Signature Staff Member | Date |
|---|---|
| | |

Record Copy - File; Copy - Inmate

PDF                              Prescribed by P5511

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER        **SECTION 6**

URGENT (3 Attempt) Original Copy

Exhibit C16

BP-A0148
JUNE 10

**INMATE REQUEST TO STAFF** CDFRM

## U.S. DEPARTMENT OF JUSTICE FEDERAL BUREAU OF PRISONS

| TO:(Name and Title of Staff Member) Medical Records | DATE: 5/3/22 |
|---|---|
| FROM: Asia Siddiqui | REGISTER NO.: 85797 053 |
| WORK ASSIGNMENT: n/a | UNIT: C2 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.

I need my medical records for the eye doctor appointment (medical trip) I went to in August-September 2021 — my eye exam and the eye specialist's notes. Thank you.

(Do not write below this line)

DISPOSITION:

| Signature Staff Member | Date |
|---|---|

Record Copy - File; Copy - Inmate

PDF                                    Prescribed by P5511

This form replaces BP-148.070 dated Oct 86 and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER          **SECTION 6**

**FOIA**                         Exhibit C17

# PRIVACY ACT REQUEST
## AND                                Copy
# FREEDOM OF INFORMATION ACT REQUEST

Freedom of Information Officer            Date: _6/2/2022_

_Federal Bureau of Prisons_
_Department of Justice_
_Attn: FOIA_
_320 First St. N.W._
_Washington, D.C. 20534_

Pursuant to <u>Title 5 U.S.C.A. § 552 Freedom Of Information Act</u>; and the <u>Privacy Act</u>; I hereby request access to and copies of the following information, documentation and all related materials. _I need my medical records from June 2019 to June 2022._

Pursuant to the <u>Freedom of Information Act</u> and the <u>Privacy Act</u>, I hereby request waiver of fees and costs if any. Pursuant to the <u>Freedom of Information Act</u>, unless an extension of time to respond is timely requested, a response is due within ten (10) days from the date of this request.

Submitted By: _____, Requestor
                        (Written Name)

        _Asia Siddiqui_
                (Typed or Printed Name)
Reg. No.: _85797 053_
UNIT: _C2_
        _FCi Aliceville_
        _P.O. Box 4000_
        _Aliceville, AL 35442_

STATE OF _____)
                                                    ) SS:
COUNTY OF _____)

## SUPPORTING CERTIFICATION OF REQUESTOR

I, _Asia Siddiqui_____, pursuant to <u>Title 28 U.S.C.A. § 1746</u>, upon my oath before God and under the penalty of perjury of the laws of the United States of America, do hereby certify and State that:

I am the requestor and the signer of this Privacy Act request and Freedom of Information Act Request: and

Further I sayeth not.
This _2nd_____ day of _June_____, _2022_, A.D.
By: _____, Certifier / Requestor
                (Written Name)
        _Asia Siddiqui_____, Certifier/Requestor
        (Printed or Typed Name)

(CW/1197                              **PLEASE RETURN COPY WITH RESPONSE**

**FOIA**   Exhibit D:

# PRIVACY ACT REQUEST
## AND   COPY
# FREEDOM OF INFORMATION ACT REQUEST

Freedom of Information Officer                Date: _6/2/22_

_FOIA_
_OIG_
_920 Pennsylvania Ave._
_Washington, D.C. 20530_

_____

_____

Pursuant to <u>Title 5 U.S.C.A. § 552 Freedom Of Information Act</u>; and the <u>Privacy Act</u>; I hereby request access to and copies of the following information, documentation and all related materials. _I need the record/inventory of all the items/evidence and discovery that were taken from my dad's house at 161-33 84th Road/Jamaica, NY 11432 upon my arrest on April 2nd, 2015 by the Federal Bureau of Investigation (FBI)_

_____

_____

Pursuant to the <u>Freedom of Information Act</u> and the <u>Privacy Act</u>, I hereby request waiver of fees and costs if any.  Pursuant to the <u>Freedom of Information Act</u>, unless an extension of time to respond is timely requested, a response is due within ten (10) days from the date of this request.

Submitted By: _____, Requestor
                    (Written Name)

_Asia Siddiqui_
                (Typed or Printed Name)
Reg. No.: _85797 053_
UNIT: _C2_
_FCI Aliceville_
_P.O. Box 4000_
_Aliceville, AL 35442_

STATE OF _____ )
                                                 ) SS:
COUNTY OF _____ )

## SUPPORTING CERTIFICATION OF REQUESTOR

I, _Asia Siddiqui_, pursuant to <u>Title 28 U.S.C.A. § 1746</u>, upon my oath before God and under the penalty of perjury of the laws of the United States of America, do hereby certify and State that:

I am the requestor and the signer of this Privacy Act request and Freedom of Information Act Request: and

Further I sayeth not.
This _2nd_ day of _June_, _2022_, A.D.
By: _____, Certifier / Requestor
                (Written Name)
_Asia Siddiqui_, Certifier/Requestor
        (Printed or Typed Name)

(CW/1197                          **PLEASE RETURN COPY WITH RESPONSE**

Exhibit D₂

**TRULINCS 85797053 - SIDDIQUI, ASIA - Unit: ALI-C-B**

--------------------------------------------------------------------------------

FROM: 85797053
TO: C Unit Team
SUBJECT: ***Request to Staff*** SIDDIQUI, ASIA, Reg# 85797053, ALI-C-B
DATE: 06/15/2022 09:24:35 PM

To: Edgeworth, Case Manager
Inmate Work Assignment: n/a

Dear Mr. Edgeworth, When can I see my discovery in Education with your supervision as you have stated? I have been waiting since October 2021. I am working on my case as I have mentioned before and it is urgent to address the government with more accuracy and exhibit references. Thank you so much.

Exhibit D₃

**TRULINCS 85797053 - SIDDIQUI, ASIA - Unit: ALI-C-B**

---------------------------------------------------------------------------

FROM: 85797053
TO:
SUBJECT: Laptop
DATE: 12/01/2021 06:49:54 PM

Peace be upon you Brother,

Please contact the prosecutors on my case for my laptop. In the summer of 2019 when I took my plea, the prosecutors promised to return me my laptop, and again promised it on the day of my sentencing in January 2020. Recently when my lawyers contacted the prosecutors for my laptop, they were told that the government returned a laptop to my ex-lawyer already.

In 2015 when I was arrested, my father's brand new unused boxed touchscreen laptop, the Lenovo Think Pad Laptop, was confiscated by the Feds along with my old-fashioned cracked refurbished Lenovo laptop which was purchased in 2010. The brand new touch-screen 2015 Lenovo Think Pad Laptop was returned to my father in the following months (late 2015) via my ex-lawyer Thomas Dunn. The laptop that the Feds kept and promised to return to me when I took my plea in 2019 and at my sentencing in 2020 is the old-fashioned cracked refurbished (2010) Lenovo laptop which belongs to me and was part of my discovery. My dad's new unused Lenovo laptop cost $1600 and was returned around 4 years before my plea, so the laptop the government promised to return to me at the plea and sentencing is the old cracked refurbished 2010 Lenovo which cost $500-$600 but consists of all my intellectual property which is priceless. It has still not been returned.

Please, can the government return me the promised laptop?--my 2010 Lenovo. The prosecutors' names are Jennifer Sasso, Douglas Pravda, Craig Heeren, Michael Keilty, Richard P. Donogue, US Attorneys.

Case # 15-CR-213 (EJ)

Exhibit D4        231L

BP-A0148
JUNE 10
U.S. DEPARTMENT OF JUSTICE

**INMATE REQUEST TO STAFF** CDFRM

FEDERAL BUREAU OF PRISONS

| TO:(Name and Title of Staff Member)<br>Dental | DATE:<br>4/20/20 |
|---|---|
| FROM:<br>Asra Siddiqui | REGISTER NO.:<br>85797-053 |
| WORK ASSIGNMENT:<br>N/A | UNIT: |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary. Your failure to be specific may result in no action being
taken. If necessary, you will be interviewed in order to successfully respond to your
request.

I need to be signed up for the routine healthcare Dental
plan, where I get my cavities filled and teeth cleaned.
I've been incarcerated for 61 months and lost 2 teeth
from cavities due to dental neglect in the previous facility
I was signed up for my cavities to be filled, but transferred
here before my turn ever came. Thank you for your time
and for understanding.

(Do not write below this line)

DISPOSITION:

you are on the waiting list as of
09-28-2018
when your name comes to the top of
the list you will be added to the callout.

| Signature Staff Member | Date<br>05-05-2020 |
|---|---|

Record Copy - File; Copy - Inmate

PDF

**M. HEATHERLY**
**CERTIFIED DENTAL ASSISTANT**
**FCI ALICEVILLE, AL**

Prescribed by P5511

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER

**SECTION 6**

Exhibit E

# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    **v.**

                             **Case No.: 15-CR-213 (SJ)**

NOELLE VELENTZAS,

Defendant.

## DEFENDANT'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

Defendant, Asia Siddiqui, by and through her attorneys, **Charles D. Swift and Linda Moreno**, pursuant to Rule 32 of the Federal Rules of Criminal Procedure, and 18 U.S.C. §3553(a), respectfully submits the following Objections to the Draft Presentence Investigation Report (hereinafter "PSR").[1]

### I.    INTRODUCTION

The defendant objects to portions of the factual summary as unsupported by evidence and objects to the omission of material facts submitted by the defense to the probation officer. The specific factual objections and asserted factual omissions are set forth in Section II.

The defendant also objects to the base offense guideline determination recommended by the probation officer as unsupported by the evidence and law. Instead, for the reasons set forth in Section III, the defense submits that because the evidence is insufficient to establish malice aforethought on the part of Ms. Siddiqui necessary for the §2A1.5 Conspiracy to Commit Murder guideline, the correct base offense level for the underlying offense in this case for use of a Weapon

---

[1] The Exhibits listed in this document, the Defendant's Objections, reference the Exhibits attached to the Defendant's Sentencing Memorandum, filed under a separate docket number, to avoid unnecessary duplication.

of Mass Destruction is Arson; Property Damage by Use of Explosives found at §2K1.4(a)(1), which knowingly created a substantial risk of death or serious bodily injury to any person other than a participant in the offense.

The defendant also objects to the recommend application of the terrorism enhancement under § 3A1.4 to the defendant's offense calculations. The terrorism enhancement requires evidence that the defendant, through his or her conduct, sought to injure or influence the government. The PSR, in making its recommendation, fails to support its conclusions with either legal or factual analysis demonstrating that Ms. Siddiqui, through her conduct, sought to injure or influence the government or a related government interest. As explained in Part VI, the defendant respectfully submits that in the absence of a plan for use of the weapons and the defendant's clear reluctance to continue in the enterprise after the Undercover Officers attempts to have the group agree on a plan, there is insufficient evidence to conclude that she intended to target or influence the government through her acts.

Finally, in Section V, the defendant objects to the conclusion that a minor role deduction was not appropriate under the facts and objects to the omission of additional relevant facts which establish Ms. Siddiqui's minor role.

## II.   OBJECTIONS TO THE FACTS IN THE PSR AND ADDITIONAL FACTS

### a.   Objections to the facts and material omissions in the PSR

In her description of the offense conduct, the probation officer broadly characterizes Ms. Siddiqui and Ms. Velentzas's teaching and distributing information relating to the creation of an explosive devices as a "terrorist bomb plot", "terrorist plot", "terrorist scheme" and "plot to build a bomb for use in a terrorist attack". (PSR, para. 3, 5, 17, 25, 27). The defendant objects to these

2

factual assertions because they are unsupported by specific facts concerning the agreement.[2] The PSR offers no similar specific factual details regarding the alleged plot to support its assertions that this was a terrorist plot,[3] nor explanation for these characterizations. Indeed, the facts demonstrate that no plot to attack was ever conceived, nor was a "terrorist" intention or target ever identified.

The defendant objects to the PSR's characterization of Ms. Siddiqui as a "co-equal" participant in the offense in the absence of supporting facts setting out each defendant's participation in the plot. (PSR, para. 27, 30). The defendant objects to the PSR's statement that Ms. Siddiqui purchased cat litter, pest control chemicals, and a blow torch found in her parent's basement from Home Depot as having no evidentiary basis (PSR, para. 22).[4] The defendant objects to her family's home repair items stored in the basement being referred to as her having "stockpiled bomb-making materials" because this is a mischaracterization. (PSR, para. 5. *See also*, Exhibit 1).

The defendant also objects to the exclusion of the fact that there is no evidence Ms. Siddiqui did any research herself regarding explosives on any of her seized devices. This conduct was

---

[2] For example, in the World Trade Center bombing, the facts for sentencing include the fact that they had targeted the World Trade Center, that they had agreed to do so for the purpose of undermining the United States and U.S. Commerce and that they were aware that people would be inside the WTC at the time and could possibly be killed because of the attack.

[3] In the federal sentencing scheme, terrorism is a term of art defined by the presence of an offense that is enumerated as a federal crime of terrorism under 18 USC § 2332b(g)(5) and a showing of a factual intent to commit the crime in order to influence government conduct, both elements must be present.

[4] The only evidence of a purchase from Home Depot, discovered during the search of Ms. Siddiqui's home is a receipt for a wrench, pipe, and plug fuse dated February, 2014. (Exhibit O at Bates 000667). None of these items are listed as potential bomb-making materials. There is no evidence that the gas canisters listed as a potential bomb-making materials were purchased by Ms. Siddiqui. The propane tanks are obviously old and Ms. Siddiqui's brother and father both indicate that the materials were purchased as part of home repair projects conducted long before Ms. Siddiqui moved in. It is unknown how cat litter or insecticide could be used in an explosive device and there is no proof that Ms. Siddiqui purchased either item for use in a bomb as they are common household items.

3

almost exclusively performed by Ms. Velentzas and the UC. The defendant objects to the exclusion of facts related to Ms. Siddiqui's personal life.

The defendant further submits that in order for a dispassionate analysis of the offense conduct in this case to occur, the below additional facts concerning the genesis and development of the alleged plot and Ms. Siddiqui's role therein should be included in the probation report on the offense conduct.[5]

### b. Additional facts regarding the potential use of the weapon of mass destruction

1. On August 6, 2016, Ms. Siddiqui, Ms. Velentzas, and the undercover officer's ("UC") agreement to learn how to build an explosive device as part of their religious duty to acquire knowledge for self-defense. (Exhibit E).

2. Between August and October, 2014, the group met approximately once a week and studied electricity. Ms. Siddiqui provided some of the materials for this study. Velentzas lead the study sessions. (Exhibit V at 1-4).

3. On or about October 26, 2014, Velentzas, in response to the UC's questions regarding a target for any device they might build, reaffirmed their commitment to use the device in self-defense stating, "You thinking about some next sh*t though? No, we're not talking about going out f*cking with people…You understand that right? You mind your own business but those people f*ck with you." (Exhibit I).

4. On November 23, 2014, the UC provided the group the Anarchist Cookbook. (Exhibit V at 4).

5. On November 23, 2014, Velentzas and the UC discussed what they were trying to accomplish with their studies. Velentzas explained that she would never want to hurt anyone but, as a Muslim, she must acquire this knowledge and be ready. Velentzas commented that the kufar have this knowledge and use it to hurt Muslims, and so the group needed to be prepared. According to Velentzas, when Allah decides the time, they will know whether one person, or two people, needs to act. She went on to state that at this juncture, they did not need to have those talks because it was too early. (Exhibit V at 4).

6. On December 24, 2014, the UC brought a copy of Inspire magazine with instructions on how to build a car bomb to their study session. The UC later provided this article to Siddiqui on December 30, 2014, with instructions that she provide it to Velentzas. Ms. Siddiqui

---

[5] The PTA includes stipulated facts by the defendant regarding the offense conduct. These facts cannot be contradicted, but can be expanded upon by all parties and do not bind the probation officer solely to those facts. The probation officer does not recite the stipulated facts in her draft report.

failed to provide the article to Velentzas. (Exhibit T). Ms. Velentzas participated in these conversations but the transcripts show that Ms. Siddiqui was absent for many of these conversations and non-participative where she was present. (Exhibits N, O).

7. On December 27, 2014, the UC told the group about a large police funeral that had been recently held. Velentzas responded by telling the UC that she was a "thinker" and by questioning the UC regarding details of the funeral. There was no agreement however that the group should attack a similar event. (Exhibit O).

c. **Additional facts related to Ms. Siddiqui's participation in the offense conduct**

1. Between August, 2014, and December 24, 2014, Ms. Siddiqui attended all of the groups study sessions. Ms. Siddiqui aided the groups sessions by providing a textbook and suggesting that they could learn the basics of electricity and chemistry by going to the library. (Exhibits E, F).

2. On November 2, 2014, Ms. Siddiqui, Velentzas and the UC went to Home Depot for the purpose of determining the feasibility of purchasing materials that could be used in an explosive device. During this trip, Ms. Siddiqui took care of Velentzas's minor child while the UC and Velentzas shopped. (Exhibit V).

3. From the beginning of December Velentzas and the UC begin questioning Ms. Siddiqui's commitment to the group. (Exhibit L, M).

4. On December 3, 2014, in an accidental recording, the UC told another law enforcement officer that she was annoyed with Siddiqui for showing little interest in their "studying" and being completely aloof. (Exhibit L).

5. On December 11, 2014, Ms. Siddiqui visits Dr. Shafiq Khokhar, a psychiatrist, who diagnoses her with Major Depressive Disorder and Social Anxiety and prescribed an anti-depressant and anxiolytic medication. (PSR, para 64-66).

6. On December 12, 2014, Ms. Siddiqui moves out of Velentzas's house and back into her family residence. She began to distance herself from the group after she was able to move out of Ms. Velentzas' apartment and back into her family's home. (Exhibit V).

7. On December 24, 2014, Velentzas and the UC review the Anarchist Cookbook and the Inspire magazine article to understand the specific requirements of constructing an explosive device. (Exhibit N).

8. During their study, Velentzas notes Siddiqui's absence, saying "... it would be cool if we could study this with Asia, right?" The UC responded, "Yeah. She said she wanted to but she's always gone." (Exhibit N).

5

9. Shortly thereafter, Ms. Siddiqui joins the session and attempts to help Velentzas and the UC understand the directions contained in the articles. Her attempt here serves as the basis for her plea to Count II. (See Factual Basis for Ms. Siddiqui's Plea).

10. On December 30, 2014, the UC meets privately with Ms. Siddiqui and gives her a copy of the Inspire magazine article to provide to Velentzas. (Exhibit V).

11. On January 5, 2015, Ms. Siddiqui starts working as a childcare provider at an afterschool daycare program. (Exhibit V).

12. On January 6, 2015, Siddiqui, Velentzas and the UC meet for dinner at Velentzas's house but do not study.

13. On January 8, 2015, the UC tells Velentzas that Ms. Siddiqui has not called her since she helped her move.

14. On January 11, 2015, the UC asks Velentzas how Ms. Siddiqui is doing and Velentzas responds that, "she is in her career".

15. On January 13, 2015, the UC again informs Velentzas that Ms. Siddiqui is not calling.

16. On January 18, 2015, the UC goes to Ms. Siddiqui's residence and picks her up and takes her to a restaurant with Velentzas. The group does not study at the restaurant. During the dinner at the restaurant, the group decides to study the following week.

17. On January, 22, 2015, Velentzas and the UC meet to study, but Ms. Siddiqui again does not attend.

18. On January, 25, 2015, the UC picks Ms. Siddiqui up to ensure she will be present for studying, during the study session Ms. Siddiqui suggests that they should study on their own.

19. On February 3, 2015, Velentzas and the UC meet without Ms. Siddiqui and continue studying explosive devices. (Exhibit P).

20. On February 8, 2015, the UC against meets privately with Ms. Siddiqui and encourages her to rejoin the groups studies. (Exhibit Q).

21. On February 17, 2015, Velentzas and the UC meet without Ms. Siddiqui.

22. On February 22, 2015, the UC and Velentzas go to Ms. Siddiqui's house unannounced to meet with her. During their visit, Velentzas makes note of the home repair materials stored outside of Ms. Siddiqui's basement apartment and claims that Ms. Siddiqui has been holding out on them. Ms. Siddiqui jokes that she has a Home Depot in the basement. (Exhibit S, X).

23. On February 24, 2015, the UC meets with Ms. Siddiqui. During their conversation, Ms. Siddiqui states that she is not comfortable with science and she wants to focus on her poetry.

24. On March 1, 2015, the UC visited Ms. Siddiqui at her home. While at her home, the UC discovers that Ms. Siddiqui has not distributed the Inspire magazine article to Velentzas as instructed. The UC also tells Ms. Siddiqui that she wants to check the materials that Ms. Siddiqui has and asks about the propane tanks. Ms. Siddiqui responds that they could look up the UPC for the tanks on the phone to find out what they are. The UC had to read them to find out they were propane and not butane like Velentzas had suggested (Exhibit T, X).

25. On March 17, 2015, the UC and Ms. Siddiqui discussed her career goals and future plans, Ms. Siddiqui also talks about her boyfriend, Cristian Maldonado, a non-Muslim. Finally, she expresses concerns the FBI's interest in her because of the people she had associated with has derailed her pursuit of her goals. (Exhibit V).

## III.     OBJECTIONS TO THE PSR'S GUIDELINES CALCULATIONS

**Defendant objects to the misapplication of USSG § 2A1.5 (Conspiracy to Commit Murder) to calculate the base offense level instead of U.S.S.G. § 2K1.4(a)(1) (Arson; Property Damage by Use of Explosives)**

The defendant objects to the incorrect application of the U.S.S.G. § 2A1.5 (Conspiracy to Commit Murder) guideline to calculate Ms. Siddiqui's base offense level.  Ms. Siddiqui's crime of conviction is 18 U.S.C. § 842 (p)(2)(A) "Teaching and Distributing Information Pertaining to Explosive Devices". The starting point in the Guidelines for 18 U.S.C. § 842(p)(2)(A) is § 2K1.3(a) (Prohibited Transactions Involving Explosive Materials) which would provide a base offense level of 18. However, because the charged offense necessarily includes an underlying federal crime of violence, the base level of the offense must also consider whether a cross reference is appropriate. *See* §2K1.3(c). The PSR properly identifies the initial cross-reference to the Attempt, Solicitation, or Conspiracy guideline based on Count 1 of the indictment, (conspiracy to use a weapon of mass destruction).

The PSR, however, incorrectly further cross-references to the Conspiracy to Commit Murder guideline under §2A1.5. See (PSR, para. 29, 35) stating, "In this case, since the defendants

7

conspired to kill others in a bomb plot, the guideline is USSG §2A1.5." While the charged offense

does not limit the guidelines consideration to the charged offense, it does require a factual predicate

for an analogous offense as opposed to a conclusory statement. *See United States v. Nichols*, 169

F.3d 1255, 1275-76 (10th Cir. 1999).[6] The PSR does not support this statement with a factual

basis. Like *Nichols*, the defendant's relevant conduct includes a conspiracy to use a weapon of

mass destruction, rather than the actual use or attempted use of a weapon of mass destruction.

However, unlike *Nichols*, the factual background of the offense lacks an agreement on how the

device was going to be used. From the onset, Velentzas insisted the device would be used in self-

defense or used if someone messed with them, rather than on a particular target. (Exhibit E, I).

Likewise, when the UC tried to suggest governmental targets, Velentzas expressed interest, but

not agreement. Ms. Siddiqui was present, but voiced no opinion. Even as late as February, after

Ms. Siddiqui was no longer participating, Velentzas was stating that she was not sure what she

would do, fully acknowledging that any device may never be used. Under these circumstances, it

is speculative to conclude that the agreement to use an explosive device contained sufficient malice

aforethought to constitute murder.

Further unlike *Nichols*, there is no agreement on the type of explosive device to be used,

preventing an assumption that death is clearly foreseeable and intended. Finally, of course, death

did not result and indeed there is nothing to indicate that death was an imminent possibility, absent

---

[6] In *Nichols*, the Court of appeals held that although Terry Nichols was convicted acquitted of the crime of use of a weapon of mass destruction and only convicted of a conspiracy to use a weapon of mass destruction, he was properly sentenced under the first degree murder guideline. Finding that "1) the object of the conspiracy was to use a weapon of mass destruction against the Murrah building and the persons inside, (2) death resulted from the conspiracy, and (3) the deaths were a foreseeable result of Mr. Nichols' conduct. Considering the record as a whole, we think there was sufficient information from which the district court could infer that it was more likely than not Mr. Nichols harbored the malice and premeditation necessary to bring the case under section 2A1.1 of the Guidelines."*Id.*

intervention. Contrary to the factual assertion in the PSR, defendants Velentzas and Siddiqui had not stockpiled bombing materials or attempted to acquire them. Velentzas's purchases were not per se bomb making materials but more akin to an experiment to help her practice the basic of circuitry which the group had been studying. Ms. Siddiqui actually acquired nothing, but instead merely moved back into the basement of her parent's house where home repair items where present. There is no evidence that she did so in order to obtain access to these items or that the items could have actually been used to construct a bomb. In short, all the elements that supported the conclusion that Nichols possessed malice aforethought in conjunction with his conspiracy with Timothy McVeigh to use a weapon, are absent here. Accordingly, probations conclusion that the murder is the most analogous offense, is erroneous as there was no plan for a target, no plan for a specific device, and no present ability to conduct an attack to provide evidence of malice aforethought.

The government, on the other hand, correctly identifies the correct cross-reference for the alleged conspiracy the conspiracy charged in count 1 as 2K1.4 (Arson; Property Damage by Use of Explosives). The arson guideline is used as opposed to the weapon of mass destruction guideline found at §2M6.1, when the weapon of mass destruction is not nuclear, biological, or chemical. *See* Application Note 1 of USSG §2M6.1; *see also United States v. Wright, et. al.,* 1:12 CR 0238 (N.D. Oh.).

Relying on the §2K1.4(c)(1) cross-reference, which applies if "the offense was intended to cause death or serious bodily injury," the government, however, contends that a further cross reference to the §2A1.5 Conspiracy to Commit Murder guideline is appropriate in this case. Thus the government ultimately gets to the same place as probation by different route. The government's final destination of the murder guideline, however is likewise flawed because of the

lack of evidence of an intent to kill. While a specific target is not necessary to conclude that there is an intent to kill,[7] there nevertheless must be an intent to kill evidenced by the conspiracy. Here, as set forth above, there is no agreement that the group will use the device to kill because there is no plan for its use nor agreement to build a device that would clearly result in death. Without agreement as to what the device will be or how the device will be used, it cannot be said that the conspiracy encompassed the intent to kill.

In the absence of a specific intent to kill, under the § 2K1.4(a)(1) (Arson; Property Damage by Use of Explosives) guidelines, the Court must consider whether the underlying offense nevertheless created a "substantial risk of death or serious bodily injury to any person other than a participant in the offense, and that risk was created knowingly." 18 U.S.C.S. app. § 2K1.4(a)(1). Courts have almost uniformly defaulted to this guideline with respect to conventional explosive devices, in the absence of a specific intent to kill, because of the inherent dangers to life they pose, regardless of their composition or intended use. *See e.g.*, *United States v. Price*, 65 F.3d 903, 9 Fla. L. Weekly Fed. C 547 (11th Cir. 1995). Accordingly, the defendant agrees that despite the fact that there was no plan for what device to construct or how the device would be used, the use of any device would create a substantial risk of death, and that she was aware of the risk. Indeed, it was this fear that lead her to become depressed and to curtail her involvement.

## IV.   OBJECTION TO THE APPLICATION OF THE TERRORISM ENHANCEMENT (U.S.S.G § 3A1.4)

U.S.S.G. §3A1.4 provides for a 12 level increase in the offense level, and automatic placement in criminal history category VI if a defendant's "offense is a felony that involved or was intended to promote a federal crime of terrorism." Application Note 1 defines a "federal crime of terrorism"

---

[7] See *United States v. Aldawsari*, 740 F.3d 1015, 1020-21 (5th Cir. 2014)(concluding that in the absence of a specific target the consideration of many targets was sufficient to satisfy the intent to kill requirement.

by referencing 18 U.S.C. §2332b(g)(5).  18 U.S.C. §2332b(g)(5) provides a two pronged definition

for a "federal crime of terrorism."  To qualify as a federal crime of terrorism an offense must be a

violation of any one of a list of enumerated statutes found in 18 U.S.C. §2332b(g)(5)(B).  In

addition to being an enumerated offense, the second prong requires that it also be an offense that

is "calculated to influence or affect the conduct of government by intimidation or coercion, or to

retaliate against government conduct." 18 U.S.C. §2332b(g)(5)(A).

The guidelines do not specify that the standard of proof is beyond the ordinary

preponderance of the evidence standard.  However, given the draconian nature of the

enhancement's application, there is case law support that the proof should be higher. In *McMillan*

*v. Pennsylvania*, 477 U.S. 79, 106 S. Ct. 2411, 91 L. Ed. 2d 67 (1986), the Supreme Court implied

that sometimes a higher standard of proof beyond the preponderance of the evidence may be

warranted in cases where the sentencing enhancement in question is "a tail which wags the dog of

the substantive offense." *Id.* at 88. The terrorism enhancement, falls within this category because

in most, if not all cases, its application has the practical effect of doubling the sentence or, in this

case, recommending the statutory maximum. Indeed, courts have struggled with the draconian

aspect of the enhancement as well as the proof requirements.

What there does seem to be is universal agreement that in order to apply the terrorism

enhancement, the sentencing guidelines require a showing that the defendant had the

individualized subjective intent to influence the government in conjunction with the commission

of their crime.[8]

---

[8] *See* James P. McLoughlin Jr., Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing
Failure in Cases of Financial Support for Foreign Terrorist Organizations, 28 Law & Ineq. 51 (2010). Available at:
http://scholarship.law.umn.edu/lawineq/vol28/iss1/2 . *See also* Punishing Terrorists: Congress, The Sentencing
Commission, The Guidelines, And The Courts, 23 Cornell J.L. & Pub. Pol'y 517 (2014). (Attached as Exhibits-- and
-- respectively).

Ms. Siddiqui's offense of conviction, 18 U.S.C. §842(p)(2)(a), is not on the list of enumerated offenses. The Second Circuit however has held that the terrorism guidelines can be applied to crimes where the underlying offense is among the enumerated offenses. In this case, the underlying offense of use of a weapon of mass destruction is listed and therefore, the defense concedes that Ms. Siddiqui is eligible for the enhancement if the second prong is met.

The same however cannot be said for the second prong of the test. Under the second prong, the burden is on the government to show, at a minimum by a preponderance of the evidence, that Ms. Siddiqui had the "specific intent" to commit an offense that was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *United States v. Awan*, 607 F.3d 306, 317 (2nd Cir. 2010) citing 18 U.S.C. 2332b(g)(5)(A); cf. *United States v. Noble*, 246 F.3d 946, 953 (7th Cir. 2001), *United States v. Starks*, 309 F.3d 1017, 1026 (7th Cir. 2002), *United States v. Johnson*, 227 F.3d 807, 813 (7th Cir. 2000) ("During sentencing, the Government must prove the facts underlying the base offense or an enhancement by a preponderance of the evidence.").

The government cannot meet this burden. As discussed above, the government and probation concede as much in calculating the base offense. Section 2M6.1(a)(1) is applicable if the offence was committed with the intent to injure the United States or aid a foreign nation or foreign terrorist organization. The terrorism enhancement similarly contains the requirement that the offense is, "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." As written, the test for the terrorism enhancement is actually narrower than the base offense level for use of a weapon of mass destruction with an intent to injure the United States. *See e.g. United States v. Awan*, 607 F.3d 306, 317 (2nd Cir. 2010) citing 18 U.S.C. 2332b(g)(5)(A), concluding that a conviction for a material

support of terrorism does not in all cases meet the test for the terrorism enhancement. In the absence of evidence of an intent to injure the United States, there is likewise the absence of an intent to influence.

Further, even if an intent to influence the United States can be ascribed to Velentzas in this case, based on her statements, the same cannot be said for Ms. Siddiqui. The Second Circuit, in *U.S. v. Stewart, et al.*, 590 F.3d 93 (2d Cir. 2009), rejected the argument that co-conspirators actions "calculated to influence or affect the conduct of government," could satisfy the requirement of section 2332b(g)(5)(A) for an individual defendant. Holding that, "section 2332b(g)(5)(A) describes a motivational requirement, a "specific intent." Accordingly, the Court found that it would be improper conflate an individual defendant's acts with his co-defendants' mental states. Thus, even if the Court finds that Ms. Siddiqui's base offense level is murder based on her knowledge of the other participant's intent for the use of the device and that Velentazs's intend to use the weapon to injure or retaliate against the government, the Court must find that Ms. Siddiqui shared this intent. The evidence does not support such a finding.

During the course of the alleged conspiracy, Ms. Siddiqui did not make any statements to suggest that she was supportive of an attack against the government or to affect government conduct. Further, Ms. Siddiqui's conduct demonstrates that she did not support conducting a terrorist attack with the device. Unlike Velentzas who maintained the possibilities of becoming a martyr or imprisoned, Ms. Siddiqui expressed the desire for a peaceful future. Most notably however, after the UC and Velentzas discussed the police funeral on December 27, 2014, Ms. Siddiqui's attendance drops dramatically. From January, 2015, to March, 2015, Ms. Siddiqui misses multiple study sessions and during the only session she attended, after being picked up by the UC, she suggested that they study separately. Further, Ms. Siddiqui tells the other members of

the group that she is suffering from anxiety and depression and stops calling Velentzas and the UC. In fact, if it were not for the efforts of the undercover, Ms. Siddiqui would have disappeared altogether. Based on her actions, even if it can be concluded that Ms. Velentzas intended to use the weapon at some point to conduct a terrorist attack, it cannot be reasonably concluded that Ms. Siddiqui did. Although, Ms. Siddiqui's actions are not sufficient to show that she withdrew from the conspiracy, as she did not make her withdrawal clear to the group, they are sufficient to make clear that she did not share the intent to influence the government. And, it is her intent that matters for the enhancement.

## V.    MS. SIDDIQUI SHOULD RECEIVE A 3 LEVEL REDUCTION FOR HER MINOR ROLE IN THE OFFENCE

The defendant objects to the PSR's finding that Ms. Siddiqui was a "co-equal participant" and that no "mitigating role adjustment is warranted". (PSR, para. 27).  The defense respectfully submits that Ms. Siddiqui should receive an adjustment for her minor role in the offense under § 3B1.2. The determination whether to apply a "minor role" or "minimal role" adjustment, 2 or 3 level decrease, respectively, is a fact-based determination based on the totality of the circumstances based largely on the facts of each particular case. Application Note 3(C), USSG § 3B1.2. (Mitigating Role).

Ms. Siddiqui is the least culpable individual in the instant offense. Her minor involvement with any studying or teaching and her continued demonstrated lack of interest in the topic distinguish her conduct from that of Velentzas and the UC. Ms. Siddiqui's role in the offense was to read to the group parts of the Inspire magazine article provided by the UC and to attempt to explain part of the chemistry studying to the group. Ms. Siddiqui's minor role in the offense merits a three level reduction under U.S.S.G. §3B1.2.  To determine if her role would make a minor

14

reduction appropriate her conduct must be compared to that of the average participant to determine

if she is "substantially less culpable." The Court considers five factors in this determination:

   i.   the degree to which the defendant understood the scope and structure of the
        criminal activity; -- *concede, factor precludes minimal*
  ii.   degree to which defendant participated in planning or organizing the criminal
        activity;
 iii.   the degree to which the defendant exercised decision-making authority or
        influenced the exercise of decision-making authority;
  iv.   the nature and extent of the defendant's participation in the commission of the
        criminal activity; and
   v.   the degree to which the defendant stood to benefit from the criminal activity.
        Application Note 3(c) USSG § 3B1.2. (Mitigating Role).

Application Note 3(c) also explains that the fact a defendant performs an essential or indispensable

role in the criminal activity is not determinative and that such a defendant may receive an

adjustment if they are "substantially less culpable". (See also *United States v. Castillo*, 277 F.

App'x 77, 79-80 (2d Cir. 2008)) (where the Court reversed the district court's decision to refuse a

minor reduction, stating that while the defendant was not a minimal participant, he was a minor

participant based on the factors outlined above and because of the lack of importance of his actions

to the success of the venture.)

        The defendant concedes that the first factor would weigh against her having a minor role

in the offense as Ms. Siddiqui did understand the scope and structure of the offense conduct.

Because of this she is not eligible for the 4 level reduction. However, the remaining four factors

all weigh strongly in favor of Ms. Siddiqui warranting a minor role 3 level reduction. With regards

to the second factor, Ms. Siddiqui's participation in the criminal activity was limited and

consistently lacked any real interest or dedication. The undercover officer, in an accidental

recording from December 3, 2014, complained to another agent about Ms. Siddiqui's lack of

interest stating, "I'm just like, I'm like it just could, you know, be a little annoying sometimes,

because she says one thing and then does another. So I'm like, you know, if she's not into the

conversation, then she just shouldn't be there. She should go do her own thing." (Exhibit L). The additional facts above and the attached transcripts show that Ms. Siddiqui was not a vocal participant for the conversations that she was present for, she did not solicit either the Inspire magazine article or Anarchist cookbook. Ms. Siddiqui was taken to Home Depot with the other two women, but she did not discuss the items there or show any interest in items at the store. After Ms. Siddiqui moves out from Velentzas's apartment, she rarely meets with the two women, who frequently complain about her lack of involvement or interest. (Exhibits K, L, M, O, Q, S, V). For these reasons, Ms. Siddiqui's limited participation in the group warrant a minor role reduction.

Regarding the third factor, Ms. Siddiqui was the passive follower of the group, evidenced by her failure to initiate any of the conversations about studying or explosives. She was not a leader, and in fact, in a discussion about each of their roles in the group, Ms. Siddiqui assigned herself the role of memorizing verses of the Quran, while noting Velentzas was the teacher and the undercover was the time manager and in charge of money. (Exhibit K at 58). The undercover and Velentzas initiate all of the discussions about explosives and studying electricity and chemistry. They provide the materials and they pursue Ms. Siddiqui when she becomes distant. The facts above and the attached transcripts demonstrate Ms. Siddiqui was not a decision-making authority in the group.

The fourth and fifth factors weigh strongly in favor of Ms. Siddiqui receiving a reduction for her minor role in the offense because she did not stand to benefit from the offense conduct and the nature of her participation, as outline above was reluctant and in the context of engaging with friends. The PSR characterizes the used repair items in Ms. Siddiqui's basement as "stockpiling of bomb making materials", but this is a mischaracterization. Exhibit X shows these materials and Ms. Siddiqui will offer testimony from family members who also lived in the basement that explain

16

how long the small propane tanks had been there, along with the soldering materials and pipes and the piles of old textbooks from college and graduate study by various members of the household.

In the instant case, Ms. Siddiqui's role is minor when compared to the conduct of Velentzas, who took the initiative to solicit the Anarchist Cookbook, read the Inspire magazine article, to continuously attempt to organize the group to study, to study electricity and chemistry independently of the group, distributed the magazine as well as procured fertilizer and flux independently. For all five factors, Velentzas's offense conduct is more involved and it is clear she organized the study sessions and spent time studying and researching independently. This demonstrates that Ms. Siddiqui was a minor participant and her conduct was the least culpable. For these reasons, 3 points should be deducted for her minor role in the offense.

## VI.   CONCLUSION

For the above reasons, defendant Siddiqui through counsel, prays that the Court reject the above disputed facts and consider the defendant's proposed additional factual conduct and supporting evidence. The Defendant further prays that the Court reject the recommended base level offense under §2A1.5 recommended in the PSR and by the government, and find that the base offense level for the offense is more properly found at §2K1.4(a)(1). The defendant also prays that the Court reject the PSR and government recommendations that the §3A1.4 terrorism enhancement is applicable to the offense conduct and find that Ms. Siddiqui is eligible for a 3 level adjustment for her minor role in the offence in addition to her 3 level reduction for acceptance of responsibility.

Respectfully Submitted this 2nd day of December, 2019.

/s/ Charles D. Swift

17

Charles D. Swift
*Attorney for Asia Siddiqui*
Constitutional Law Center for
Muslims in America
833 E. Arapaho Rd, Suite 102
Richardson, TX  75081
Phone: (972) 914-2507
Fax: (972) 692-7454

Linda Moreno
*Attorney for Asia Siddiqui*
511 Avenue of the Americas, No. 312
New York, NY 10011
Office: (813) 247-4500
Fax: (855) 725-7454

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of December, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*/s/ Charles D. Swift*
Charles D. Swift
*Attorney for Asia Siddiqui*

Exhibit E₂

# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA**

    **v.**

                                         **Case No.: 15-CR-213 (SJ)**

**NOELLE VELENTZAS,**

**Defendant.**

## DEFENSE SENTENCING MEMORANDUM

Defendant Asia Siddiqui ("Ms. Siddiqui") through counsel, respectfully submits this Sentencing Memorandum in connection with her sentencing by the Court on December 5, 2019. On August 23, 2019, Ms. Siddiqui entered a guilty plea before this Honorable Court to one count of Teaching and Distributing Information Related to the Use of an Explosive Device, in violation of 18 USC § 842(p)(2)(A) and 844(a)(2). Ms. Siddiqui accepts full responsibility for her actions, and through this memorandum seeks to provide the Court with information pertinent to her sentencing in the interests of justice under 18 USC § 3553(a).

### SENTENCING ANALYSIS

In accordance with *United States v. Booker*, 543 U.S. 220 (2005), the Court is directed to impose a sentence in accordance with 18 U.S.C. § 3553(a). In so doing, the Court is to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes of punishment set forth in 18 USC § 3553(a)(2). *Id.* (emphasis added); *see, e.g., Kimbrough v. United States*, 552 U.S. 85, 111 (2007) ("sufficient, but not greater than necessary" requirement is the "overarching instruction" of § 3553(a)). Those purposes include "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 USC §

1

3553(a)(2)(A); "to afford adequate deterrence to criminal conduct," *id.* § 3553(a)(2)(B); "to protect the public from further crimes of the defendant," id. § 3553(a)(2)(C); and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Id.* § 3553(a)(2)(D). In determining a sentence "sufficient, but not greater than necessary" to accomplish these purposes, courts must consider a number of factors, including (as relevant here) "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); the guidelines sentencing range and any applicable Sentencing Commission policy statements, *id.* § 3553(a)(4), (5); and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," *id.* at § 3553(a)(6).

Based on the above criteria the defendant respectfully submits for the reasons set forth below that a sentence of no more than 60 – 70 months is sufficient, but not greater than necessary in this case.

## I. SENTENCING FACTORS UNDER 18 USC § 3553(a)

### A. History and Characteristics of the Defendant

The Presentence Report ("PSR") provides a broad overview of Ms. Siddiqui's personal life and history from her childhood through to her arrest. (PSR at 52-79). Ms. Siddiqui was born in Riyadh, Saudi Arabia, in 1984. She was born with leg deformities from polio that required medical care and physiotherapy that was refused to her family as immigrants in Saudi Arabia. (Exhibit A1, A2, A5). Her parents were forced to send her to India for treatment where she lived with her grandmother for four years, separated from her family. In 1988, Ms. Siddiqui was brought to the United States to join the rest of her family. She suffered from many physical ailments, including constant ear infections that resulted in her partial deafness. (Exhibit A1, A5).

2

Upon joining her family, Ms. Siddiqui was initially rejected by her siblings. She was taunted and thought of as being adopted, because she was "dark skinned and had messy hair". (Exhibit A2, A3). Ms. Siddiqui is not light-skinned like her other family members, and in some parts of her Pakistani community was bullied and rejected for this. (Exhibit A2, A3, A5). As Ms. Siddiqui got older, between the ages of 8 and 16, she was sexually molested by an older cousin who was living with the family. (Exhibit A2). For cultural reasons, Ms. Siddiqui never told her parents about the abuse, as it would be too shameful and dishonorable.

Ms. Siddiqui was smart and ambitious in high school. Though she was shy and suffered from low self-esteem, she wanted to make something of herself. Her parents encouraged studying and pursuing higher education for Ms. Siddiqui and all of her siblings. (Exhibits A1, A3, A5, A6, A7). While she had wanted to study art and writing, her parents felt these would not be lucrative professions and pushed her towards teaching. Ms. Siddiqui loved children and teaching came naturally to her. She worked in various teaching positions throughout her early child education program. (Exhibits A1, A2, A6).

In 2005, Ms. Siddiqui began dating a man she had met while in school and going clubbing. While she enjoyed music and going out, Ms. Siddiqui is from a religious and culturally traditional family and she understood that she was to save herself for marriage. Unfortunately, the individual who she had been dating, rather than respecting her beliefs, raped her. As a result of the rape, Ms. Siddiqui became withdrawn and depressed. To protect herself, unlike her other siblings, she began covering her whole body and her face with the veil and shunning dating as a result of her trauma and disgust with her experience. (Exhibit A2).

After this assault, Ms. Siddiqui struggled in her academic pursuits but persevered and completed her bachelor's degree in 2010, it took her a few extra years but she graduated. (Exhibit

A1, A5). After the rape and her retreat into an isolated and covered life, Ms. Siddiqui began seeking friendship online. She found acceptance and non-threatening male interaction with Muslim men online, men who were religious and unmotivated by sex.

This is how Ms. Siddiqui first engaged with Samir Khan in 2006, an individual with whom she would later submit her poetry and publish in his online magazine, *Jihadist Recollections*. Ms. Siddiqui felt a similar comfort in writing to Muslim men in prison, like Tarek Mehanna. These men accepted her and valued her for her thoughts and her writing. During this time, Ms. Siddiqui found it difficult to find employment while wearing her long abaya and face veil. She continued to volunteer at Community Mediation Services in Jamaica, Queens, because she had volunteered there for so long and she enjoyed the satisfaction of being of service to others, especially children. (Exhibit A1, A2, A3).

Between 2008-2010, Ms. Siddiqui went with her father to Riyadh, Saudi Arabia, for a new job he had secured. By this time, there was mounting pressure for Ms. Siddiqui to be married. But she faced discrimination and rejection from her community for her dark skin tone and leg deformity. (Exhibit A1, A2). Suitors rejected Ms. Siddiqui on this basis, she was socially and culturally isolated. In Saudi Arabia, Ms. Siddiqui was miserable, constantly calling her sister and complaining about the restrictive lifestyle of women there and her longing to return to New York. (Exhibit A2).

After her return to New York, Ms. Siddiqui lived at home and was a significant support to her family, especially her two younger brothers. Ms. Siddiqui cared for them, cooked for them, cleaned the home and assisted them with schoolwork. (Exhibit A3, A6, A7). She took on the role of caretaker to assist her mother who had been diagnosed with high blood pressure and diabetes. (Exhibit A1, A5). Ms. Siddiqui culturally fell into the role of assisting, supporting and facilitating

4

her family, putting her own goals and ambitions on hold while her younger brothers attended college. (Exhibits A1, A3, A6, A7). Ms. Siddiqui's father describes her as kindhearted and believes if given a second chance she would continue being of service to others. (Exhibit A1). Her mother notes Ms. Siddiqui's charitable nature and her hard work saying Ms. Siddiqui sat for "several kinds of New York city exams for jobs and she did very well". Ms. Siddiqui's family has continued to receive job offers and offers to interview for Ms. Siddiqui from her arrest until now, the latest being a caseworker position with the city in July, 2019. (Exhibits A1, A5, W).

Between 2012 and 2014, Ms. Siddiqui studied in Canada for a certificate in publishing. She loved to write and wanted to pursue writing professionally. During this time, the undercover ("the UC") and Ms. Velentzas had just met Ms. Siddiqui in New York and she had befriended them. She was vulnerable, shy, without friends or a sense of belonging. The UC was pretty, well-spoken, a college student with a competitive internship who seemed primed for success. Ms. Velentzas was bold, outspoken, proud of her Muslim identity, and tough. Both of these women's personalities were alluring and impressive to Ms. Siddiqui and she became the quiet follower of the group, sometimes calling the UC to tell her she missed her. In August of 2014, Ms. Siddiqui returned to the United States from Canada. In the process of returning to the United States, she was met and questioned by FBI officers concerning her prior activities, including her publishing poetry in *Jihadish Recollections*, her relationship with Samir Khan, and her letters to Aafia Siddiqui and Tarek Mehanna. The interrogation left her shaken and under the belief that her arrest was almost assuredly going to follow.

When Ms. Siddiqui moved back to New York she was unable to resume living in her parents' home. The upstairs was rented out to tenants and the basement apartment where her brother was living was too small for her to stay in long-term. Consequently her brother asked her

5

to find somewhere else to stay. (Exhibit A3). Ms. Siddiqui moved in with Velentzas in July, 2014. Apart from the need for some place to stay at no cost, Ms. Siddiqui was happy to have some company while she was unemployed and looking for work in education and publishing. When she was not looking for work, Ms. Siddiqui helped out Velentzas by babysitting her younger daughter and by sharing her food stamps with Velentzas to help offset the cost of her staying there. (Exhibit A2, V).

### B. Nature and Circumstances of the Offense

While Ms. Siddiqui was living with Velentzas they met with the UC. The UC had been encouraging Velentzas to engage in jihad training suggesting at different points that Velentzas accompany her to a shooting range or to play paintball. Velentzas had rejected each of these suggestions because she didn't have the funds for them. In August, 2014, however, Velentzas suggested an alternative way to train for jihad and that was to learn about explosive devices which culminated in the underlying offense. (Exhibit E). To understand the nature of the offense and Ms. Siddiqui's role in it, a summary is appropriate. Each of these summaries are supported either by transcripts of recorded conversations or the UC's summary of the meeting where the UC failed to record the meeting.

#### Timeline of the Offense

**August 6, 2014** – Velentzas, Ms. Siddiqui, UC Agreement to learn about explosives for self-defense along with martial arts. (Exhibit E).

**September 7, 2014** - Velentzas, Ms. Siddiqui and UC discuss basics of electricity and possible uses in explosives.

**October 26, 2014** - UC discusses prisons and attacks, Velentzas clarifies they are not talking about "f*cking with people" and that the UC should mind her own business. Ms. Siddiqui present, but silent. (Exhibit I).

**November 2, 2014** – the UC tells Velentzas she downloaded the Anarchist Cookbook. At the UC's suggestion, Velentzas, Ms. Siddiqui and the UC visit Home Depot to determine the feasibility of purchasing materials that could be used in explosives. During the visit,

Velentzas and the UC look at different materials, while Ms. Siddiqui takes care of Velentzas's minor child during this visit. (Exhibit V).

**November 16, 2014** - the UC criticizes Ms. Siddiqui's lack of interest and Ms. Siddiqui said it was the push she needed to start running again. (Exhibit V).

**November 20, 2014** - the UC provides Inspire article and Velentzas instructs Ms. Siddiqui and the UC to read it. (Exhibit V at 4).

**November 23, 2014** - Velentzas, Ms. Siddiqui and UC discuss what they are trying to accomplish. Velentzas stated it was too early for any plan and she would not want to hurt anyone. (Exhibit V).

**December 8, 2014** – Ms. Siddiqui moves out of Velentzas's apartment and back into her family residence. She begins to distance herself from the group. (Exhibit L, M)

**December 12, 2014** – Ms. Siddiqui seeks psychiatric treatment for her stress and depression. Dr. Shafiq Khokhar diagnoses her with Major Depressive Disorder and Social Anxiety and prescribes appropriate medications.

**December 24, 2014** - the UC provided Spring issue of Inspire to Velentzas. Velentzas studied it. (Exhibit N).

**December 24, 2014** - the UC asked Velentzas what type of explosive was most practical, Velentzas replied nitroglycerin. Siddiqui not present. (Exhibit N).

**December 24, 2014** – Later in the conversation Siddiqui arrives and helps the UC and Velentzas read and try to understand the Anarchist Cookbook. (Exhibit N)

**December 27, 2014** UC discusses the large police funeral with Velentzas and Ms. Siddiqui. There is no discussion or agreement about the group targeting any similar event. (Exhibit O).

**December 30, 2014** – the UC met privately with Ms. Siddiqui and gave her a copy of Inspire article to distribute to Velentzas. (Exhibit V).

**January 5, 2015** – Ms. Siddiqui starts working at an afterschool daycare program. (Exhibit V).

**January 6, 2015** – Ms. Siddiqui, Velentzas and the UC meet for dinner but do not study.

**January 8, 2015** – the UC tells Velentzas that Ms. Siddiqui had not called her since she moved out.

**January 11, 2015** – the UC and Velentzas meet, Ms. Siddiqui is absent.

**January 13, 2015** – the UC and Velentzas meet, Ms. Siddiqui is absent and they note she is not calling.

7

**January 18, 2015** – the UC goes to Siddiqui's residence and takes her to a restaurant to have dinner with Velentzas, they do not study.

**January 22, 2015** – Velentzas and the UC meet to study, Ms. Siddiqui again is absent.

**January 25, 2015** – the UC picks up Ms. Siddiqui to ensure she is present for studying, Ms. Siddiqui suggest they study on their own.

**February 3, 2015** – the UC and Velentzas meet and study, Ms. Siddiqui is absent. (Exhibit P).

**February 8, 2015** – the UC again meets privately with Ms. Siddiqui and encourages her to rejoin the groups studies. (Exhibit Q).

**February 17, 2015** – the UC and Velentzas meet without Ms. Siddiqui.

**February 22, 2015** – the UC and Velentzas go to Ms. Siddiqui's house unannounced. Velentzas notes the home repair materials stored in the basement and jokes Ms. Siddiqui has been holding out on them. (Exhibit S, X)

**March 1, 2015** – the UC visits Ms. Siddiqui privately at her home. The UC discovers Ms. Siddiqui did not distribute the Inspire article to Velentzas as instructed. The UC inquires about the home repair materials and Ms. Siddiqui responds that they could look up the UPC codes to find out what the materials were (ie. Propane tanks instead of butane). (Exhibit T, X)

**March 17, 2015** – the UC and Ms. Siddiqui discuss her career goals and future plans, Ms. Siddiqui talks a lot about her boyfriend, Crisitian Maldonado, a non-Muslim. She expresses concerns that the FBI's interest in her because of her past online associations has derailed her pursuit of her goals. (Exhibit V).

The defendant respectfully submits that the above timeline reveals three key points with respect to Ms. Siddiqui's participation in the offense conduct. First, Ms. Siddiqui's role in the group's study of explosive devices was inconsequential. When she was present she was largely silent and her participation limited to encouraging words. Unlike Velentzas, she did not lead the group discussions, request that the UC provide study materials, or study on her own. Second, that Ms. Siddiqui's participation diminshed as the potential for the actual use of the device became more concrete. Indeed, the UC first complains about Ms. Siddiqui's lack of attention in November, 2014, thereafter not only does Ms. Siddiqui not increase her participation in the group's discussions, instead she is increasingly absent from those discussions culminating in Ms.

Siddiqui's suggestion that they should study on their own after repeated attempts to have her rejoin the group. Finally, the impact of the stress that the group's activities is having on Ms. Siddiqui is evidenced by her seeking mental health treatment and her diagnosis with depression and anxiety. (PSR 64-66).

The government from the onset has argued that Ms. Siddiqui's stated desire to study on her own and her access to home repair items in her family's basement demonstrates that, despite her lack of interest, practical knowledge and pursuit of employment, she had an intent to commit an independent attack. A serious review of the evidence however quickly disposes of such a possibility. Ms. Siddiqui did not distribute the Inspire magazine because she wanted to use it for herself but rather because she had no interest in participating in the plan. She was unaware of the type of gas in the propane tanks and an inspection of those tanks shows that they had been utilized for home repair and were not being held in storage for a bomb. (Exhibit T, X). To construct a bomb from what Ms. Siddiqui had in her basement would have required the expertise of the fictional MacGuyver, and the claim that she was going to independently build her own explosive device is equally fictional.

### C. Sentencing Guidelines Range

Defendant Siddiqui in her objections to the draft PSR objected to both a base offense level calculated using §2A1.5 (Conspiracy to Commit Murder) and the application of the §3A1.4 terrorism enhancement to her offense. Under Ms. Siddiqui's proposed guidelines calculation, she would have a total offense level of 18 with a criminal history of I with a guidelines range of 27-33 months. If the Court were to reject the terrorism enhancement but accept the base offense level for Conspiracy to Commit Murder under the §2A1.5 guideline, and accept that Ms. Siddiqui's proposed minor role deduction, Ms. Siddiqui would have a total offense level of 27 with a criminal

history of I and a guidelines range of 70-87 months. If the Court accepts all of the PSR's recommendations, then she would have a total offense level of 41 with a criminal history of VI resulting in a recommended guidelines range of 240 months because of the statutory maximum. As illustrated in these different ranges, the primary effecting element in this case is the presence of the §3A1.4 terrorism enhancement. The defendant respectfully submits that this Court, like other Courts, should find that the terrorism enhancement provides little real guidance because it arbitrarily distorts the seriousness of the offense and the threat posed by the defendant and, as outlined in the objections, is inapplicable without a factual basis for the specific intent required.

In this case, as illustrated by the potential variances in the guideline range, the terrorism enhancement dictates a maximum sentence, despite the UC's instrumental role in the conduct the relatively minor actions of Ms. Siddiqui, and the lack of any real threat of harm. This is unreasonable considering the relevant conduct. In fact, this case is a textbook example of why *United States v. Booker,* 543 U.S. 220, 259-60 (2005) and its progeny hold that the Guidelines are merely one factor for the Court to consider at sentencing, along with the other factors enumerated in § 3553(a). This discretion to vary from the Guidelines is important in order to impose a just sentence in accordance with 18 USC §3553(a). Indeed, as the Supreme Court emphasized in *Nelson v. United States,* 129 S. Ct. 890 (2009), "[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." 129 S. Ct. at 892.[1]

---

[1] While the Supreme Court's ruling in *Rita v. United States,* 551 U.S. 338 (2007) established that a within Guidelines sentence can be presumptively reasonable, *id.* at 347, that presumption is restricted to appellate review, and "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Id.* at 351 (citing *United States v. Booker,* 543 U.S. 220, 259-60 (2005)). *See Nelson,* 129 S. Ct. 890, 892 (wherein the Court twice remanded the Fourth Circuit's decision(s) that affirmed a sentence even though the District Court had stated that while the Guidelines were not mandatory, they enjoyed a presumption of "reasonableness" and reiterated "district judges, in considering how the various statutory sentencing factors apply to an individual

Accordingly, while the court must still consider the Guidelines, *see* 18 USC § 3553(a)(4), nothing in the statute provides any reason to treat that calculation as more controlling of the final sentencing decision than any of the other factors a court must consider under § 3553(a) as a whole. *See United States v. Menyweather*, 431 F.3d 692, 701 (9th Cir. 2005); *United States v. Lake*, 419 F.3d 111, 114 (2d Cir. 2005), explaining *United States v. Crosby*, 397 F.3d 103, 111 13 (2d Cir. 2005).   In addition to lacking any presumption of reasonableness, the advisory Guidelines do not occupy any superior position among the factors listed in § 3553(a) that a court must consider in imposing sentence.

### D. The Need to Avoid Unwarranted Sentence Disparities

The United States Sentencing Commission advises that its statistical analysis uses arson offenses as an analogy to explosive offenses. This is because basic explosives are far less serious and dangerous than "weapons of mass destruction" as defined in 18 U.S.C. 2332a(c)(2)(B), (C), and (D).[2] For the purposes of sentencing, this is why 2M6.1 cannot apply as it is reserved for those more serious and dangerous "weapons of mass destruction". The basics of electricity and the single bag of fertilizer, two small and used home repair propane tanks, and the articles provided by the UC, at most amount to use of a small explosive device.   The Arson guideline in 2K1.4(a)(1) is the most analogous guideline for such an offense.   The average national sentence for arson offenses in 2017 was 67 months.

---

defendant 'may not presume that the Guidelines range is reasonable.'" 129 S. Ct. at 892, quoting *Gall*, 552 U.S. at 50); *see also id*. ("[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable").

[2] "Weapon of Mass Destruction" for the purposes of the sentencing guidelines is defined as "any weapon that is designed or intended to cause death or serious bodily injury through the release, dissemination, or impact of toxic or poisonous chemicals, or their precursors; any weapon involving a biological agent, toxin, or vector; or any weapon that is designed to release radiation at a level dangerous to human life. See Application Note 1, 2M6.1 and 18 U.S.C. 2332a(c).

Defendant Siddiqui proposes that an analogous case for the Court to consider is *United States v. Wright, et. al.*, 1:12CR0238 (N.D. Oh.) (*see also United States v. Wright*, 747 F.3d 399, 405 (6th Cir. 2014). The defendants in Wright were all members of the Occupy Movement, who began with political protests and then later, with the encouragement of an FBI agent, conspired to attack financial institutions, bridges, and police in the Cleveland area. In carrying out their plans, the conspirators prepared for over several months to blow up a bridge. The defendants purchased what they believed were explosives from an informant and actually placed the explosives at the base of the Route 82 Bridge outside Cleveland. The defendants then attempted to blow up the bridge with a detonator accessed via cellular phones. The defendants took all actions necessary to commit an act of terrorism through detonating a weapon of mass destruction, only to be foiled because they mistakenly had been given fake explosives. One defendant—Stafford—was convicted after trial and the remaining four defendants pled guilty. During sentencing, the Court determined that the terrorism enhancement was applicable to the defendants conduct because the conduct was intended to influence government and/or retaliate against government conduct. The Court nevertheless ordered sentences significantly below what was called for with the application terrorism enhancement. Defendant Stafford, who went to trial, received a sentence of 10 years. The remaining defendants who pled guilty received sentences of 11.5 years, 9.75 years, 8 years and 1 month, and 6.75 years.[3]

The government undoubtedly will take issue with *Wright* as an analogous case pointing out that the Court rejected the Chapter Two (Offenses Against the Person) Murder guideline as the appropriate base offence level and utilized, as the defense proposes here, §2K1.4(a). Even if the Court were to adopt the §2A1.5 Conspiracy to Commit Murder guideline, the defense submits that

[3] The above facts were taken from the Sixth Circuit's decision on Stafford's appeal, *United States v. Stafford*, 782 F.3d 786 (6th Cir. 2015).

12

*Wright* represents the most analogous conduct. Like the defendants in *Wright*, Ms. Siddiqui and Ms. Velentzas's criminal conduct originated in political dissent. They were both frequent attenders of political protests, tried to support prisoners and saw *dawah*, spreading the message of Islam, as their primary mission.

The primary difference lies in the fact that unlike the defendants in *Wright*, Ms. Siddiqui and Velentzas did not select a target. The government will likely argue that the lack of selection means that the target could have been persons, rather than property, and therefore they warrant a greater sentence. But that argument cuts both ways because the fact that they had not selected a target leaves open the possibility that they would have selected property as a target instead of persons. Further, unlike in *Wright*, where the defendants demonstrated the willingness to commit the attack by actually building the bomb and attempting to detonate, the defendants here demonstrated no such willingness or ability. In fact, during the course of the alleged conspiracy they did not demonstrate the willingness to carry out the attack that the *Wright* conspirators presented. Accordingly, *Wright* is an apt, if imperfect, analogous case.

This is true because the present facts differ from almost all other reported "terrorism" cases involving the use of a weapon of mass destruction, wherein the weapon was used or attempted to be used. In each of those cases, the Court could be confident that the attackers desired the attack to occur as evidenced by the actions in pushing the button or amassing the materials necessary to conduct the attack, or by relying on the defendant's statements of who they wanted to attack and listing potential targets. *See United States v. Alhaggagi*, 2019 U.S. Dist. LEXIS 37889, *16, 2019 WL 1102991 (N.D. Cal. March 8, 2019); *United States v. Aldawsari*, 740 F.3d 1015 (5th Cir.). None of those facts are present here.

13

Within the conspiracy, Ms. Siddiqui is most like, the defendant Hayne, who received the 6.75-year sentence in *Wright,* down from a guidelines range of 262 to 327 months. *Wright,* 747 F.3d at 410. This defendant's sentence was less because of the relatively minor role he played due to him joining the conspiracy late. In Ms. Siddiqui's case she was an early participant whose participation faded over time and the defense submits is therefore worthy of an even greater reduction in sentence as she demonstrated little threat.

## II. PURPOSES UNDER 18 USC § 3553(a)(2)

### A. Seriousness Of The Offense, To Promote Respect For The Law, And To Provide Just Punishment For The Offense

The offense of conviction, 18 U.S.C. 842(p)(2)(A) 'Teaching and Distributing Material Related to the Use of Explosives' is a serious offense. Just punishment for this offense, however, requires consideration of Ms. Siddiqui's actual conduct. As the timeline of the offense and the stipulated facts show, Ms. Siddiqui was not a leader, nor a major contributor nor even an enthusiastic participant. Ms. Siddiqui more often than not was the babysitter, focusing on Velentzas's child rather than the group's study of explosive materials. She did not seek or distribute the Inspire magazine articles or the Anarchist Cookbook. She did not read or research any of the topics by herself. Her offense conduct consisted of participating in the UC and Velentzas study of the Anarchist Cookbook where she read portions of the book aloud and offered her understanding of what it meant. Contrary to assertions by the government and probation, she did not acquire or store explosive materials. She merely moved into a basement that had home repair items in it. As evidenced by Exhibit T, because of her lack of study, she did not even know what the home repair materials in her basement were or whether they could be used in a bomb. (Exhibit T).

14

Further, after it became apparent to Ms. Siddiqui that Veletzas and the UC shared an intent to use the weapon of mass destruction she developed significant mental health issues. (PSR 64-66). In December, 2014, Ms. Siddiqui was suffering from such severe stress and depression after living with Velentzas and participating in Velentzas's and the UC's discussions that she sought psychiatric treatment from Dr. Shafiq Khokhar. She met with Dr. Khokhar every single week after moving out of Velentzas's apartment, from December, 2014, until her arrest in April, 2015. Her psychiatric treatment throughout the last 4 months of the offense conduct and her resulting diagnoses of Major Depressive Disorder and Social Anxiety are evidence of the immense impact the offense had on her. (PSR 64-66, Exhibit A2).

The attribution of Ms. Siddiqui's depression to the stress she felt from her association with Velentzas and the UC is demonstrated by the fact that once she was detained at the MCC, Ms. Siddiqui recovered from her depression and social anxiety without further mental health treatment. This recovery is counter to the normal experience where prisoners become depressed and anxious after their arrest, not before. For these reasons, although the offense is serious, just punishment is not served by having Ms. Siddique serve significantly more time for her offense of conviction.

**B. Deterrence and Protection of the Public.**

As this Court is well aware, the MCC over the past few years has not been a model facility. Despite this fact, Ms. Siddiqui has been a model detainee. Ms. Siddiqui has flourished during her time in detention. (Exhibits B, C). She has taken classes, befriended and comforted her cellmates, been dependable and helpful to her Unit Team, been of great service to the Chapel and has been a positive model inmate. This improvement has been noticed by the Federal Bureau of Prisons. (Exhibit B, C).

Ms. Siddiqui's case manager in prison, her chaplain and two cellmates from her time in prison write highly of their interactions with her and her behavior as an inmate. (Exhibit B, C). She is described as "very responsible and dependable" and an "extremely hard worker assisting whenever needed" by her case manager, Ms. Olivares. (Exhibit C). Reverend Steve Mun, the prison's Chaplain, notes that Ms. Siddiqui "has done a wonderful job" in her role assisting in Chapel and that she is "up for a Certificate of Appreciation" for her service. Reverend Mun describes Ms. Siddiqui as a "positive model for other inmates". (Exhibit B). Ms. Siddiqui's former cellmates also wrote on her behalf stating she was helpful and caring towards them, assisting them through depression and even giving one of her cellmates her own sneakers so she could go to the gym. Everyone wishes Ms. Siddiqui a bright future and hopes she receives a second chance. (Exhibits A1, A2, A3, A4, A5, A6, A7, A8, A9, B, C).

Ms. Siddiqui had no criminal history and never posed any danger to anyone, even during the instant offense conduct. Since her arrest, Ms. Siddiqui has not had any mental health issues. (PSR 66). She has not needed or received any mental health treatment in the last 5 years and she has been a model inmate in that time. She is not an extremist. She is a simple woman, the type whose mentors only worried that she could be a danger to herself, never anyone else. (Exhibit A4). For these reasons, the Defense submits that signifiant additional time is not necessary under 18 U.S.C. § 3553(a)(2).

## C. The Need for Care, Treatment or Training of Defendant is Not Implicated

Ms. Siddiqui was shocked and overwhelmed with grief when she was first arrested. She beat herself up for her stupidity and felt deep sorrow at losing all she had begun to build in her life in the months before her arrest. Her job, her boyfriend, her family, relationships, and her freedom. Accepting that loss has taken time, but Ms. Siddiqui knew she should have had the strength of

16

character to walk away from her "friends" and report their behavior, instead of meekly tagging along and hoping nothing would happen. She did not have the courage or sense of self-worth at that time to shun the only company she had. But in prison, Ms. Siddiqui has learned to stand up for herself and for others. She looked after her cellmates. (Exhibit A). She wrote to the Court to request medical care numerous times. The Court heard her and she received that care. Ms. Siddiqui is a stronger person now, she has learned a difficult lesson and faced great loss as a consequence of her crime, a just punishment for her offense. But Ms. Siddiqui's gentle nature, her kindness and generosity towards others has sustained a sense of hope in her. She has no history of drug use or alcohol consumption. She has no criminal history with the exception of the current conviction and she is full of remorse, eager to move forward in her life. The defense respectfully submits that no greater punishment is necessary to achieve the purposes of sentencing here. Perhaps there is still time for Ms. Siddiqui to have a family of her own, a desire she has shared with her current cellmate, who shares the same hope for Ms. Siddiqui. (Exhibit C). For these reason a sentence that requires Ms. Siddique to serve significant additional time is not necessary for her care and treatment, and indeed likely counter-productive.

## III. MS. SIDDIQUI'S SENTENCING RECOMMENDATIONS AND REQUESTED FINDINGS

### A. Term of Time Served (60-70 months) is the Appropriate Sentence

For the reasons set forth above, the defendant recommends a sentence of 60-70 months. This sentence reflects the seriousness of the crime, which may well be understated if utilizing the guidelines under 2K1.4(a)(1) without a terrorism enhancement and is reflective of a sentence under the 2A1.5 Conspiracy to Commit Murder guideline without a terrorism enhancement or, under the Arson guideline with a terrorism enhancement. In short, it represents the median of any guideline

approach does not create sentencing disparities under the facts of this case and for the reasons set forth above is sufficient but not greater than necessary.

### B. No Fine Should Be Imposed

Respectfully Submitted this 2nd day of December, 2019.

*/s/ Charles D. Swift*
Charles D. Swift
*Attorney for Asia Siddiqui*
Constitutional Law Center for
Muslims in America
833 E. Arapaho Rd, Suite 102
Richardson, TX  75081
Phone: (972) 914-2507
Fax: (972) 692-7454

Linda Moreno
*Attorney for Asia Siddiqui*
511 Avenue of the Americas, No. 312
New York, NY 10011
Office: (813) 247-4500
Fax: (855) 725-7454

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of December, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*/s/ Charles D. Swift*
Charles D. Swift
*Attorney for Asia Siddiqui*

18

Exhibit F,

**Medical Information**       Page 1

## Universal Medical Care, PC

Name: Asia Siddiqui    Age: 30  Gender: Female  Marital status: Single
Education: BA    Occupation: Unemployed   Employment:    Tel #: 347 998 3396
The closest person in your life: Noelle Velentzas
How did you come to know about us? Dr. Naheed Sultana

Please describe your reason(s) for consultation: Anxiety & Depression

Your current problems are: _____

### Have you been experiencing any of the following problems in the past few months

| | YES | NO | Please explain | | YES | NO | Please explain |
|---|---|---|---|---|---|---|---|
| Appetite | ✓ | | | Anger management | ✓ | | |
| Weight | | ✓ | | Sadness | ✓ | | |
| Sleeping habits | ✓ | | | Mood swings | ✓ | | |
| Urine Frequency | ✓ | | | Frustration tolerance | ✓ | | |
| Bowel movement | ✓ | | | Agitation | ✓ | | |
| Energy level | ✓ | | | Poor Concentration | ✓ | | |
| Fatigue/ Tiredness | ✓ | | | Phobia/ Fear | | ✓ | |
| Body tension | ✓ | | | Nervousness | ✓ | | |
| Pain/ discomfort | ✓ | | | Suspiciousness | | | |
| Daily Functioning | ✓ | | | Guilt feeling | ✓ | | |
| Performance at work | ✓ | | | Self esteem | ✓ | | |
| Relationship issues | ✓ | | | Hopelessness | | | |
| Feeling Numb | ✓ | | | Helplessness | | | |
| Sexual problems | | | | Worthlessness | | | |
| Interest / Motivation | ✓ | | | Confusion | | | |
| Anxiety/Worries | ✓ | | | Mental Stress | ✓ | | |
| Financial problems | ✓ | | | Perceptual problems | | | |

Are you seeing a Medical Doctor regularly?   ☑Yes   ☐No
Medical Doctor's Name/Clinic: Dr Naheed Sultana  87-42 164th street  Dr.'s Tel #: 718 206 2022
Date of most recent physical exam: Sept 10 2014 Result:
Current Physical problems: Stomach and back pains + burning sensation, can't function or sleep due to pain 8 hrs) + a day in mornings
Vaccination/Immunization status:
☐ Hepatitis   ☐ Measles   ☐ Rubella   ☐ Tetanus   ☐ Flue shots   ☐ Pneumovax
Are you currently seeing any of the following?
☐ Psychiatrist   ☐ Psychologist   ☐ Therapist   ☐ Counselor
Name:                                    Tel #:
Current Diagnosis (if known):
Are you currently taking medications?   ☐Yes ☑No   if yes for your NERVES? ☐Yes ☐No
Current Medications and dosages:

Are you taking any over the counter/Herbal/Vitamins or nutritional supplements? ☑Yes ☐No
If yes, Please write down the names: Vitamin D
About your Past:
Did you suffer from mental stress or psychiatric problems in the past? ☐Yes ☑No If yes, explain:
Have you ever been dependent on recreational Drugs or Alcohol? ☐Yes ☑No If yes, explain:
Have you ever seen a psychiatrist/ therapist before? ☐Yes ☑No If yes, Name:
Were you ever hospitalized? ☐Yes ☑No if yes, explain:
If hospitalized in psych, reasons for admission(s):

# Universal Medical Care, PC.

**Medical information**      Page 2

| | | |
|---|---|---|
| Do you use Alcohol? | ☐Yes ☑No | if yes, please explain: _____ |
| Do you use Drugs? | ☐Yes ☑No | if yes, please explain: _____ |
| Do you smoke? | ☑Yes ☐No | How long: 2 months How much: 1 cigar/day any problems: _____ |
| Sleep Problems? | (Yes) ☐No | if yes, explain your problems: Pain and stress keep me up or wake m |
| Allergic to food/Meds? | ☐Yes ☑No | Please explain: _____ |
| Weight Problems? | ☐Yes ☑No | Please explain problems: _____ |
| Eating Problems? | ☑Yes ☐No | Please explain if any: Loss of appetite |
| Sexual problems? | ☐Yes ☐No | if yes, Please explain: _____ |
| Legal problems? | ☐Yes ☐No | if yes, Please explain: _____ |

**About your Family:**
Has any member of your family (including parents, grandparents, siblings & cousins) has/had following Problems?
Cancer/Hypertension/Heart disease/Diabetes or other serious medical problems: heart disease/ diabetes/blood pressu
Anyone in the family has a history of psychiatric problems: No
Anyone in the family has a history of Drugs or Alcohol problems: No
Current Family problems (if any): _____

**Were you ever treated for any of the following?**

| | | |
|---|---|---|
| ☐ Heart disease | ☑ Skin diseases | ⊘ Seizures/Epilepsy |
| ☐ Asthma or lung disease | ☑ Stomach or intestinal problems | ☑ Panic Attacks |
| ☐ Diabetes | ☐ Endocrine or thyroid problems | ☑ Severe Mental Stress |
| ☐ Arthritis | ☐ Growth or cancer | ☐ Psychosis |
| ☐ Hepatitis or Jaundice | ☐ Sexually transmitted diseases | ☐ Obsessive Compulsive disorder |
| ☐ High blood pressure | ☐ Immune System problems | ☐ Drug addiction/dependency |
| ☑ Hearing or vision problems | ☐ Neurological problems | ☐ Clinical depression |
| ☐ Vascular problems or DVT | ☐ Bipolar disorder | ☐ Other major illness: _____ |

**Have you ever had...?**

| | | |
|---|---|---|
| ☐ Blurring of vision | ☐ Burning sensation after eating | ☑ Body shakes |
| ☐ Ringing in your ears | ☐ Discomfort after eating | ☐ Perceptual problems _____ |
| ☐ Loss of hearing | ☐ Frequent diarrhea or constipation | ☐ Memory problems |
| ☐ Head injuries | ☑ Painful/ bloody bowel movements | ☐ Excessive fatigue |
| ☐ Loss of consciousness | ☐ Painful /bloody or dark urine | ☐ Allergy to food or medicine |
| ☑ Dizziness / Light headedness, | ☑ Loss of urine when sneeze /cough | ☑ Depression for many days |
| ☐ Rapid heart beat | ☐ Tendency to bleed | ☐ Nervous breakdown |
| ☐ Chest Pains/discomfort/tightening | ☑ Bruise easily / Skin rash | ☐ Sexual problems |
| ☑ Shortness of breath | ☐ Blackouts | ☑ Obsessive Compulsive thinking |
| ☑ Pain or discomfort in the body | ☐ Convulsion / seizures | ☐ Phobia/specific fear_____? |
| ☐ Swollen legs, ankles, or feet | ☐ Frequent headaches | ☑ Severe anxiety or nervousness |
| ☑ Frequent nausea or vomiting | ☑ Tremors | ☑ Excessive Guilt |
| ☐ Discomfort when swallowing | ☑ Body tension | ☑ Other: Panic Attacks |

**Gender specific questions:**

| | | |
|---|---|---|
| ☑ Pre-menstrual syndrome (PMS) | ☐ Problems with Breast | ☐ (Males) Testicular problems: _____ |
| ☑ Premenstrual mood problems | ☐ Date of last PAP smear _____ | ☐ Sexual problems: _____ |
| ☑ Menstrual problems | ☐ Date of last mammography _____ | ☑ Urinary problems: Frequent urination |
| ☐ In menopause? Since when? | ☐ (Males) Prostrate problems: _____ | |

**Please indicate additional information that will help us better understand your condition:**
I've been unemployed and job hunting for three and a half
years now with no success If I do get interviews,
I tend to mess up in them with extreme nervousness and
anxiousness — I was never like this before. I prepare well
before interviews and don't feel self-conscious so the way I perform surprises
me.

Signature: _____      Date: 12/12/14

Exhibit F2

15/12/16

**Universal Medical Care, PC**                    **Initial Psychiatric Evaluation**
                                                            Confidential

Name: _Siddiqi Asia_ Age: _30_ Marital: _Single_ Living: _w Brothers / Sister_
Gender: _F_ Education: _College_ Occupation: _____ Race: _____ Ref: _____

CC: _I feel anxious all the time — 1 year_

Presenting Illness: _30 y/o female c̄ y/o anxiety and sad mood. States she has severe financial problems and is dependent on her parents for her expenses. Has been unemployed for over a year. Living in parents house with younger sister and brother. Does not get along c̄ siblings. c̄ Sadness, anxiety, irritability, muscle_

Stressors: i) Unemployment ii) Financial iii) Living situation iv) Lack of Support
Symptoms: _Sadness / Anxiety_
Current Rx &outcome: _none_
Ψ: _____ Mood _Depressed_ Anx: _high_ Danger: _0_ Sub/Alc: _0_ Cog: _0_ Med: _____
Past Ψ Hx: _0 Denies_
Start: _0_
Treatment & Response: _0_

Ψ OPD Tx: _____ Hospitalization: _0_
Sui: _0_ Homi: _0_ Abuse: _0_ Viol: _0_ Crime: _0_
Ψ: _____ SubA. _____ Anx: _____ Mood: _____ Eating: _____

Medical: _0_ Review: _____
Allergy: _0_ Trauma: _0_ Epilepsy: _0_ Risky: _0_ Surgery: _____
Psychosocial: _30 y/o female, single, unemployed, living c̄ siblings, no smoking no drugs_
Family & Relationships: _____
Family Hx: _Mom has mood problems_

MSE:
Appearance: _Anxious_
Attitude & Behavior: _Cooperative_
Speech & Thoughts: _Soft_
Mood & Affect: _Anxious_
A &O: _x3_ Attention: _Decreased_ Concentration: _Decreased_ Abstraction: _____
Reg: _X3_ Recall: _2/3_ LT Memroy: _____ Intelligence: _____ Insight/Judgment: _____
Assessment:
Strengths: _____ Liabilities: _____
Self Care. _____ Frustration tolerance: _____ Imp. Control: _____
Coping skills: _____ Anger Mgmt. _____ Stress Mgmt: _____
Issues: _____
Dx:I: _Major depressive D/O_ _Social anxiety D/O_
II: _____ III: _None Cdtold_ IV: _____ V: _____

Medication: _Citalopram 20mg daily x̄ 15 Paroxetine 20mg #15_
Therapy: _Tabs Clonazepam 0.5 mg # ___ cl_
Signature: _Paroxetine 20 mg @ 15 #15_
_Clonazepam 0.5mg @ 15 #15_
_Educated about side effects_
_Supportive Psychotherapy_         Date: _12/12/16_

Exhibit F3

**Universal Medical Care, PC**
92-17, 101 Avenue, Ozone Park, NY 11416
Tel: (718) 845-6500

3000?

Process Notes

Name: Asia Siddiqui    #: _____

| | |
|---|---|
| 12/19 | _[handwritten clinical notes, largely illegible]_ |
| billed 12/23/14 | |
| 12/ | _[handwritten clinical notes, largely illegible]_ |
| 1/9/15 | _[handwritten clinical notes, largely illegible]_ |

**Process Notes**

**Universal Medical Care, PC**

92-17, 101 Avenue, Ozone Park, NY 11416
Tel (718) 845-6500

Name: [illegible] #: ______

| | |
|---|---|
| 1/16/15 | Started living in her apartment [illegible] |
| | Mood [illegible] improved [illegible] Clean [illegible] |
| | in the apartment [illegible] Sleep [illegible] |
| | Moved in to [illegible] |
| | Not taking Clonazepam |
| | Taking Sertraline 50mg QD [illegible] 75 |
| | Suggested to resume |
| | [illegible] 50 [illegible] 30 |
| 1/21/15 | Pt is complaining of pain [illegible] stomach |
| | [illegible] |
| | [illegible] NOT able to |
| | eat [illegible] |
| | worrying about health |
| | [illegible] somatic [illegible] |
| | [illegible] |

**Universal Medical Care, PC**
92-17, 101 Avenue, Ozone Park, NY 11416
Tel. (718) 845-6500

**Process Notes**

Name: [illegible] Siddiqui #: ______

| | |
|---|---|
| 2/17/15 | Pt is feeling sick with URTI |
| | has sinus headache, congestion & |
| | fever. She has been sick for |
| | the past couple of days not |
| | able to function well. She [illegible] |
| | her bad mood is down & depressed |
| | withdrawn & isolating self |
| | Not able to care for self |
| | Pt is not able to [illegible] up with time |
| | often disconnected with [illegible] |
| | [illegible] [illegible] factors & or [illegible] |
| | of self. Cont supp therapy & meds |
| | |
| 2/20/15 | Pt continues to have congestion |
| | stuffy nose, headache, sinus pressure |
| | feeling lethargic tired, [illegible] |
| | down & affect withdrawn |
| | limited energy, concentration |
| | [illegible] [illegible] [illegible] w/ mood |
| | symptoms. Sleep is [illegible] |
| | compliant c meds & [illegible] |
| | Cont. supp Th. |
| | [illegible] [illegible] 10 |
| | [illegible] [illegible] |
| 2/24/15 | Pt is [illegible] [illegible] she |
| | fell [illegible] [illegible] in the [illegible] |
| | three days [illegible] [illegible] |
| | balance. Dad is coming |
| | next week. |
| | Worry in [illegible] |
| | Feeling stressed & worried about |
| | [illegible] [illegible] |
| | Worry [illegible] anxiety [illegible] |
| | Cont [illegible] [illegible] |
| | [illegible] cream 1% [illegible] |

Exhibit G

BP-A0148
JUNE 10

INMATE REQUEST TO STAFF CDFRM

U.S. DEPARTMENT OF JUSTICE                    FEDERAL BUREAU OF PRISONS

| TO:(Name and Title of Staff Member) Adam Johnson, Attorney | DATE: 6/19/17 |
|---|---|
| FROM: Asia Siddiqui | REGISTER NO.: 85797 053 |
| WORK ASSIGNMENT: Unassigned | UNIT: 2 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.

Dear Mr. Johnson,
   On May 10 2017 in court, prosecutor Jennifer Sasso told Judge Sterling Johnson
that the reason why the prosecutors have not given me all the audio recordings of my
discovery yet is because they are looking to switch the I-Pod to a larger memory
device. It has been a year since my new lawyers asked for the rest of the discovery
Here are some of the issues regarding the I-Pod: ① There are numerous audios included
initially on the I-Pod that are missing since its return, including recordings whose
transcripts were highlighted by the prosecutors themselves. All audios from October 2014
and November are missing which were present during the initial receival of the IPOD
back in December 2015. Here are the dates of the transcripts: (continued on back)

(Do not write below this line)

DISPOSITION:

| Signature Staff Member | Date |
|---|---|

Record Copy - File; Copy - Inmate

PDF                               Prescribed by P5511

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER          SECTION 6

Circled are the dates which aren't audios. Underlined are the dates with the transcripts whose audios are missing from the iPod:

| | |
|---|---|
| July 2014 | ⑩, ⑬, ⑯, ㉕, ㉘, ㉚ |
| Aug 2014 | 3, ⑥, ⑧, ⑬ 17, 21, 24 |
| Sep 2014 | 4, 7, 11, 14, ⑯, 21, 28 |
| Oct 2014 | 2, 13, 15, 23, 26, 27, 30 |
| Nov 2014 | 2, 3, 5, 9, 11, 12, 13, 16 |

| | |
|---|---|
| Dec 2014 | 3, 4, ⑰,㉑, 24, 27, ㉛ |
| Jan 2015 | ④, 6, 8, 11, 13, 16, ㉒, ㉕ |
| Feb 2015 | ⑨,⑧,⑩, ⑮, ⑰, ㉒, ㉔ |
| Mar 2015 | ①,④,⑧,㉙ |

② There are multiple copies of many audios that are taking up unnecessary space. Some of these are : 7/25/14, 8/6/14, 8/8/14, 9/21/14, 9/24/14, 12/30/14, 12/31/14, 2/10/15, 2/15/15, 2/17/15, 2/22/15, 3/8/15, 3/11/15, 3/29/15

③ There is an audio that is not part of this case and was not included before. Filename: Track 01    Length: 27:15

④ There is an audio which is 3 hours 12 minutes long but does not play. File name: 0003

⑤ Some of the audios don't match the dates they are named as: HD source 10-21-14 is really 9-21-14, w-source_09182014.10 is really 9-16-14

⑥ There are incomplete audios of many dates which cannot be determined because the files were named as digits such as 0001, 0002, 0003, etc. and their other parts, when listening to all the audios beginning to end, cannot be found.

⑦ The Playlists are made up of Random audios that don't match dates nor connect to one another thus further confusing me as I work on my case. Here are a few examples of such playlists:

Play List     Files

HD Source Aug 17, 2014    0001 is 8/6/14 pt 1, 0002 is ?, and another 0001 is 8/8/14 pt.1

Aug 6, 2014    0001 is 8/8/14 pt.1, 0002 is 8/6/14 pt.2, and 0003 is some 3 sec audio

Dec 24, 2014    0001 is 8/6/14 pt.1, 0002 is ?, another 0001 is 8/8/14 pt.1

Dec 27, 2014    0003 is an agent audio    0004 is 8/8/14 pt.2
                with tv in the background,

Oct 2014 is really September audios and they are mis-named 10-21-14

Sept 21, 2014 0001 is 8/6/14 pt.1, 0002 is 9/21/14 pt.2, another 0001 is 8/8/14 pt

Misc Sept 03 2014    0001 is agent talking, 0002 is 8/6/14 pt.2, 0003 is the unplayable audio
                0004 is agent watching tv, 0005 is agent watching tv, 0002 is agents
                talking, and 0003 is agent watching tv.

I would like my complete discovery please. I am going to trial and will be needing it. A lot of time has already passed in wait for Thank You!

Exhibit H

Copy                                          September 10, 2018

Dear Honorable Judge Johnson,

    I pray you are in good spirit and health. I, Asia Siddiqui #85797 053, am being detained at MCC, New York.

    The reason I am writing to you is I am getting harassed, belittled, and discriminated against by a staff member named Stacy Harris, the long-standing Unit 2 (Women's Unit) Team Secretary, who is known for holding back sanitary supplies (ie; pads, tampons, toilet paper) and clothes, particularly undergarments from the female inmates. She has even followed me into the shower, as I was undressing, in rage forcing me to fill out a BP-8 against her for refusing to provide me sanitary napkins.

    I have been addressing these bizarre issues numerous times over the past several months to the supervising staff and my attorneys - however nothing has been done. I am depressed, hopeless, and have no peace of mind as a Pretrial detainee. I cannot continue to get treated in this oppressive manner, especially by staff who are hired to watch and protect us. This is a violation of my 8th Amendment right.

    I thank you for taking your time to read this, and please respond immediately. Going forward, other inmates have complained about the same officer in documentation.

                                          Sincerely,

                                          [signature]



Asia Siddiqui 85797 053
FCI Aliceville
P.O. Box 4000
Aliceville, AL 35442

CERTIFIED MAIL
7020 1810 0001 9911 3177

The Honorable
Justice Sterling Johnson
Cadman Plaza East
Federal Courts Eastern District of NY
Brooklyn, New York 11201

