Re: Document /Docket # 171

Honorable Judge Diane Gujarati
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Dear Honorable Judge Gujarati,

Due to extraordinary and compelling circumstances, I was not able to mail this motion earlier. The reasons are ~~including~~ included on the following pages. Please accept this motion as a 60(b)(2) and combine it with Docket # 171 as its predecessor, as a motion stating newly discovered ~~evidence~~ evidence pertaining to the initial 2255 petition.

p. 1/3

My sentencing counsel Charles D. Swift and Linda Moreno chose not to respond to my 2255 petition during its filing process (in April 2022, then the unofficially amended 2255--my response to the government), but Mr. Swift responded to my complaint to the State Bar of Texas about his misconduct which I filed in April 2023. After filing for an appeal to the denial of my 2255, I have continued to strive for answers about how my counsel handled my case.

I waited for the State Bar of Texas to respond before submitting our conversation, and was further delayed by my imprisonment circumstances which are out of my control. The one copier available to us in Education was out of order from September to October 2023 (a letter from Education stating this outage is being sought). The printer is also out of ink daily. There were many lockdowns restricting movement for the past several months (including this past week) due to 2 suicides, 4 attempts, 2 drone drops, production of a 60 Minutes episode (to air end of November), multiple cell-phones found in Recreation yard, and stabbing incidents. This is an exerpt from Derek Gilna's Federal Legal News Letter Dated 11-13-23:

"[FCI] Aliceville has much more serious issues than trying to deceive the new director. From multiple sources: 'Another female has committed suicide while in the SHU here at Aliceville. She had been taken off her psych meds by doctors here despite begging them not too. She went to sick call every day for 2 weeks prior to going to the SHU, begging medical staff to give her back her mental health meds (because she was) depressed, suicidal, and mentally unstable. She was unable to receive her meds because staff felt she didn't need them. That makes 2 inmates in the past 4 months who committed suicide in the SHU.'"

In his May 11, 2023 response to my complaint, Swift writes (on page 2, last sentence), "It should be noted that as this case was under a protective order as it was a National Security case, had Ms. Siddiqui asked for her case file, I could not have given it to her." I asked for the sentencing paperwork (the memorandum and objections); those documents were not classified. And my family's letters, which are sealed, could have been shown to me the way the initial PSR was--in person.

On the bottom paragraph of page 3, Swift says, "The objections to the PSR filed by counsel are purely legal decisions and factual corrections, if any, and are not generally reviewed by the defendant."

Then in the top paragraph of page 4, he writes, "Clients are not consulted as to PSR responses unless there is an issue that needs attention or clarification, which there was not in this case."

Next paragraph down, he says regarding the template and sample letter, "(This is standard practice in any sentencing to send out suggested language so that the family and friends do not draft letters to the effect of 'My daughter didn't do this crime'[.])" So instead, he drafted a template suggesting my loved ones to write how I came about committing this crime?

On the last paragraph of page 4, Swift writes, "In 2020, our Law Center worked tirelessly to access medical treatment [...]. We sent numerous letters and made many calls to make sure the medical issues were being addressed." I only received one letter from CLCMA and it was counterproductive to my fight for my prescribed equipment. They misread and misinterpreted my eye prescription and said I was not FBOP-qualified for contact lenses, when, based on my medical records and the FBOP Ophthalmological Guidance, I was qualified (See Exhibits) and am even more so as my vision continues to deteriorate.

On page 2 of the June 7, 2023 response, Mr. Swift says in the bottom paragraph, "I advised Ms. Siddiqui of our intent to object to the enhancement, a right we had specifically reserved under the plea agreement." If his intent was to object to the enhancements, then the way Swift lied about my medical and mental health history--that Velentzas had caused me my depression by committing an act in violation of 18 U.S.C. 842(p)(a) with intent and influence--totally belied the facts and the fight against the enhancements.

In the same paragraph, Swift writes, "I did not consult Ms. Siddiqui further on the arguments put forth in my objections, as the objections are in the form of a legal argument and are the responsibility of counsel. Ultimately, the objections were unsuccessful." The legal arguments are still my right to know as they are being presented on my behalf. The objections might have been unsuccessful regarding the stand against applying the enhancements, but nonetheless, the objections were used in the government's sentencing proceedings, since not in my favor then against me causing prejudicial error, defeating the purpose of my Miranda rights, and committing perjury against me. If Swift had a heap of discovery, among it "more than 75 hours of taped conversations" (as he says on pages 3-4), why did he choose to perjurize my mental health history instead of using actual concrete data? The truth is he would not find anything concrete to prove intent and influence, so he chose to fabricate a story of me witnessing it. In claiming to "downplay" my role and sentence, he enhanced it.

On page 4, Swift writes, "Although obtaining of medical services while in pretrial detention (and post-sentencing in Ms. Siddiqui's case) is ordinarily not within the scope of criminal representation, my staff and I worked unceasingly to get her those services with significant success." I am the one who wrote a letter to Honorable Judge Johnson requesting medical care well overdue (See Docket # 101). And as mentioned earlier, Swift and his Law Center did not read my medical records accurately. I do not blame them as it is the job of medical professionals to be accurate about medical prescriptions and diagnoses, not legal professionals. So I am the one exhausting my remedies here at FCI Aliceville (See Exhibit) for almost four years now and the eye equipment issue has still not resolved.

Respectfully submitted November 15, 2023.

Asia Siddiqui, #85797053
Pro Se

State Bar of Texas
Chief Disciplinary Counsel
P.O. Box 12487
Austin, TX 78711

RECEIVED

JAN 26 2023

Chief Disciplinary Counsel
State Bar of Texas
By:_____

January 22, 2023

To Whom It May Concern:

I would like a copy of the code of conduct for lawyers. Thank you.

Sincerely,

Asia Siddiqui
Inmate # 85797-053

Asia Siddiqui #85797053
Federal Correctional Institution Aliceville
P.O. Box 4000
Aliceville, AL 35442

BIRMINGHAM AL 350
23 JAN 2023 PM 2 L

RECEIVED

JAN 26 2023

Chief Disciplinary Counsel
State Bar of Texas
By:_____

State Bar of Texas
Chief Disciplinary Counsel
P.O. Box 12487
Austin, TX 78711

78711-24878

**OFFICE OF THE CHIEF DISCIPLINARY COUNSEL**
**STATE BAR OF TEXAS**
**GRIEVANCE FORM**

**THREE WAYS TO FILE:**
1. **ONLINE FILING AVAILABLE AT http://cdc.texasbar.com.**
2. **FAX FILING AVAILABLE AT (512) 427-4169**
3. **MAIL FILING TO P.O. BOX 13287, AUSTIN, TX 78711**

## I. General Information

**Before you fill out this paperwork, there may be a faster way to resolve the issue you are currently having with an attorney.**

If you are considering filing a grievance against a Texas attorney for any of the following reasons:

> ➤ You are concerned about the progress of your case.
> ➤ Communication with your attorney is difficult.
> ➤ Your case is over or you have fired your attorney and you need documents from your file or your former attorney.

**You may want to consider contacting the Client-Attorney Assistance Program (CAAP) at 1-800-932-1900.**

CAAP was established by the State Bar of Texas to help people resolve these kinds of issues with attorneys quickly, without the filing of a formal grievance.

CAAP can resolve many problems without a grievance being filed by providing information, by suggesting various self-help options for dealing with the situation, or by contacting the attorney either by telephone or letter.

**I have _____ I have not _____✓_____ contacted the Client-Attorney Assistance Program.**

**If you prefer, you have the option to file your grievance online at http://cdc.texasbar.com.**

**In order for us to comply with our deadlines, additional information/documentation that you would like to include as part of your grievance submission must be received in this office by mail or fax within (10) days after submission of your grievance. Please limit your additional information to 25 pages. Information, including audio, video or image files, submitted on a USB thumb drive or flash drive must not exceed 25MB. Information received after the 10 day deadline will be returned and not considered, as well as information submitted on CDs, DVDs, cassette tapes or other unsupported media. Thank you for your cooperation in this matter.**

**NOTE: Please be sure to fill out each section completely. Do not leave any section blank. If**

If yes, please provide Court, County, City, State: _____

9.    Are you an attorney? Yes _____ No ✓
      If "yes," are you currently in litigation with the attorney named in this grievance?
      Yes _____ No _____

## III.   Information about Attorney

Note:  Grievances are not accepted against law firms.  You must specifically name the attorney against whom you are complaining.  A separate grievance form must be completed for each attorney against whom you are complaining.

1.    Attorney name: __Charles D. Swift__        Address: __100 N. Central Expy/__
                                                            __Ste 1010__
      City: __Richardson__        State: __TX__    Zip Code: __75080__

2.    Telephone number:  Work: __(972) 914 - 2507__  Home: _____ Other: _____

3.    Have you or a member of your family filed a grievance about this attorney previously?
      Yes        (No)         If "yes", please state its approximate date and outcome. _____

      Have you or a member of your family ever filed an appeal with the Board of Disciplinary Appeals about this attorney?
      Yes        (No)         If "yes", please state its approximate date and outcome. _____

4.    Please check one of the following:
      __✓__    This attorney was **hired** to represent me.
      _____    This attorney was **appointed** to represent me.
      _____    This attorney was hired to represent **someone else**.

      If you hired the attorney, tell us how you met the attorney. Specifically, please provide details about how you came to know and hire this attorney

      __I volunteered for CLCMA in NYC before my arrest. My brother found__
      __the headquarter in Texas when searching for a better attorney for me__

      Please give the date the attorney was hired or appointed.  __On or around May 23, 2016__

1.  Where did the activity you are complaining about occur?

    County: _____Brooklyn_____   City: _____New York_____

2.  If your grievance is about a lawsuit, answer the following, if known:

    a. Name of court: _____

    b. Title of the suit: _____

    c. Case number and date suit was filed: _____

    d. If you are not a party to this suit, what is your connection with it?  Explain briefly.

    _____

    _____

    **If you have <u>copies</u> of court documents, please attach.**

3.  Explain in detail why you think this attorney has done something improper or has failed to do something which should have been done.  Attach additional sheets of paper if necessary.

    **Supporting documents, such as copies of a retainer agreement, proof of payment, correspondence between you and your attorney, the case name and number if a specific case is involved, and copies of papers filed in connection with the case, may be useful to our investigation.   <u>Do not send originals, as they will not be returned.</u> <u>Additionally, please do not use staples, post-it notes, or binding.   Please limit your supporting documentation to 25 pages.  Information, including audio, video or image files, submitted on a USB thumb drive or flash drive must not exceed 25MB.</u>  Information received after the 10 day deadline will be returned and not considered, as well as information submitted on CDs, DVDs, cassette tapes or other unsupported media.**

    **Include the names, addresses, and telephone number of all persons who know something about your grievance.**

    **Please be advised that a copy of your grievance will be forwarded to the attorney named in your grievance. To protect your privacy and the privacy of others, please redact personal identifying information (i.e., social security number, date of birth) from any document you provide in support of your grievance and avoid submitting medical records or protected health information belonging to third-parties. <u>Please be advised that in the event that you do provide records that contain your own personal identifying information or protected health information, you are authorizing us to share this information with the attorney named in your grievance.</u> Be advised that documents that contain unredacted third party personal identifying information or that individual's protected health information will be returned and not considered. <u>By executing the grievance below,</u>**

3.

As my attorney on Federal Case #15-213(SJ), Mr. Charles D. Swift, Federal Bar License #24091964, of the law firm Constitutional Law Center for Muslims in America completely let me down when he violated my constitutional rights during my sentencing process.

Swift promised, stalled, and ultimately refused to provide me with my sentencing paperwork, using COVID-19 as one of his many excuses for the delay until it was well past the 1-year deadline to appeal, and still no paperwork. He violated my 5th and 14th Amendment rights to "due process of law", my 6th Amendment right to "be informed of the nature and cause of the accusation; to be confronted with the witnesses against [her]; and to have compulsory process for obtaining witnesses in [her] favor," and my 8th Amendment right "no cruel and unusual punishments inflicted" due to not being informed throughout my sentencing process all the details of my case and defense, such as the letters my family wrote about me and the story Swift fabricated about my mental health history (that my co-defendant had caused me my mental health problems by committing a crime of intent in front of me) when in actuality I never witnessed or accounted such an event, and have suffered my entire life from family problems that shaped me into the person I am today that were ongoing prior to my arrest at the time period Swift perjured about. I do not take his actions lightly. How dare Swift cover up my actual childhood trauma with his cheap attempt at passing the blame onto my co-defendant when he was supposedly also trying to prove neither of us had committed a crime of intent. That notoriously failed when he perjured the lie about why I was depressed using his power as my attorney over my identity without my consent or knowledge--a form of witness-tampering, and misrepresentation with the nature to deceive. Mr. Swift committed fraud on the court undermining the entire judicial process with his actions.

Upon requesting the unsealing of my character letters and PSR, I received a copy of the documents from the courts in late January 2023, more than 3 years after my sentencing. Immediately I noticed a pattern and the exact same content and wording in 6 of my 7 family members' letters in specific paragraphs. I requested the template Mr. Swift had provided my loved ones for writing the character letter, and the template explained the pattern. And it sparked so many questions. Why was my family told to write about the crime? That is bizarre. They were not even there, nor living with me at the time, and they never even met my co-defendant or saw us interact with one another. My sister also experienced Mr. Swift's firm CLCMA contacted her and dictated the length and content of her letter throughout the process. Even then, in the sealed letter, she stated the abuse I endured while I was detained in pre-trial by both staff and inmates, which Swift vehemently lied about in my sentencing paperwork farcing that I had the best time and treatment by staff and inmates after being locked up. Lies one would find unnecessary, suspicious, and prone to prejudicial error.

My 5th Amendment right "nor shall be compelled in any criminal case to be a witness against [her]self" was violated when Swift implicated in "Defendant's Objections of PSR", "even if the Court finds that Ms. Siddiqui's base offense level is murder based on her knowledge of the other participant's intent for the use of the device and that Velentzas's intend to use the weapon to injure or retaliate against the government, the Court must find that Ms. Siddiqui shared this intent." Knowing that I did not witness or account Velentzas having this intent, and knowing the government was recommending the 2A1.5 (Conspiracy or Solicitation to Commit Murder) and 3A1.4(b) (Terrorism) enhancements, tripled the ground for prejudicial error. Anything one co-conspirator is "witnessed" doing directly also falls on the other co-conspirator immediately compelling me also to be a witness against myself on multiple levels. Firstly, my silence while witnessing an actual crime of intent and influence would make me a co-signer, and the really poor easily disputed lie would bring heat to me for my third charge "material false statements" to the government, which the government then did bring up in response to Swift perjured changes, "Moreover, the defendant has already shown herself to lie and deceive to avoid detection by law enforcement" (Docket 140, pg.18).

I was denied due process and coerced by Swift to take the plea, to which he then proceeded with not showing me my paperwork throughout the process to the very end which would have made me act differently if I knew what Mr. Swift was really intending to do, and that he was going against my ethics and values, my will and wishes, and truth and justice. Mr. Swift needs to be barred from practicing law.

## V. HOW DID YOU LEARN ABOUT THE STATE BAR OF TEXAS' ATTORNEY GRIEVANCE PROCESS?

| | | | | | |
|---|---|---|---|---|---|
| __ | Yellow Pages | __ | CAAP | | Ombudsman |
| | Internet | __ | Attorney | | |
| ✓ | Other | __ | Website | | |

## VI. ATTORNEY-CLIENT PRIVILEGE WAIVER

I hereby expressly waive any attorney-client privilege as to the attorney, the subject of this Grievance, and authorize such attorney to reveal any information in the professional relationship to the Office of Chief Disciplinary Counsel of the State Bar of Texas. I understand that it may be necessary to act promptly to preserve any legal rights I may have, and that commencement of a civil action may be required to preserve those rights.

Additionally, I understand that the Office of Chief Disciplinary Counsel may exercise its discretion and refer this Grievance to the Client-Attorney Assistance Program (CAAP) of the State Bar of Texas for assistance in resolving a subject matter of this Grievance. In that regard, I hereby acknowledge my understanding that such discretionary referral does not constitute the commencement of a civil action and that the State Bar of Texas will not commence any civil action on my part. I acknowledge that it is my responsibility to seek and obtain any necessary legal advice with respect to this matter. I also understand that any information I provide to the State Bar of Texas may be used to assist me and will remain confidential for purposes of resolving the issue(s) described above.

I understand that the Office of Chief Disciplinary Counsel maintains as confidential the processing of Grievances.

I hereby swear and affirm that I am the person named in Section II, Question 1 of this form (the Complainant) and that the information provided in this Grievance is true and correct to the best of my knowledge.

Signature: _____      Date: 3/26/23

TO ENSURE PROMPT ATTENTION, THE GRIEVANCE SHOULD BE MAILED TO:

OFFICE OF THE CHIEF DISCIPLINARY COUNSEL
P.O. Box 13287
Austin, TX 78711
Fax: (512) 427-4169

# STATE BAR OF TEXAS



*Office of the Chief Disciplinary Counsel*

April 18, 2023

Asia Siddiqui
Inmate #: 85797053
Aliceville Federal Correctional Institution
P.O. Box 4000
Aliceville, AL  35442

Re:  202302403 - Asia Siddiqui - Charles Davidson Swift

Dear Asia Siddiqui:

The Office of Chief Disciplinary Counsel of the State Bar of Texas has reviewed the above-referenced grievance and determined that the information provided alleges Professional Misconduct or a Disability, or both.  The lawyer will be provided a copy of your Complaint, directed to file a response, and provide you a copy of the response within thirty (30) days of receiving notice of the Complaint.

After receipt of the lawyer's written response, the Office of Chief Disciplinary Counsel shall investigate the Complaint to determine whether there is Just Cause to believe that the lawyer has committed Professional Misconduct or suffers from a Disability.  During this time it is important that you keep us informed of any changes to your address, telephone number, or employment, and that you cooperate fully with our investigation.  You will be notified in writing of further proceedings in this matter.

Please know that the Office of the Chief Disciplinary Counsel maintains confidentiality in the grievance process as directed by the Texas Rules of Disciplinary Procedure.

Sincerely,

Shawn Neel
Investigator

SN/sa

Cc:        Charles Davidson Swift

**The Princeton Building, 14651 Dallas Parkway, Suite 925, Dallas, Texas 75254
(972) 383-2900, (972) 383-2935 (FAX)**

# STATE BAR OF TEXAS



*Office of the Chief Disciplinary Counsel*

May 12, 2023

Asia  Siddiqui
Inmate #: 85797053
Aliceville Federal Correctional Institution
P.O. Box 4000
Aliceville, AL  35442

Re:  202302403 - Asia  Siddiqui - Charles Davidson Swift

Dear Asia Siddiqui:

The Office of the Chief Disciplinary Counsel has received the written response in the above-referenced complaint.  A copy of the response has been included for your review.

If you have further documents or information that you want to submit, please do so within ten (10) days.

Sincerely,

Shawn Neel ,
Investigator .

SN/sa

**The Princeton Building, 14651 Dallas Parkway, Suite 925, Dallas, Texas 75254**
**(972) 383-2900, (972) 383-2935 (FAX)**



CONSTITUTIONAL LAW CENTER
*for* MUSLIMS *in* AMERICA

May 11, 2023

Office of the Chief Disciplinary Counsel
14651 Dallas Parkway, Suite 925
Dallas, TX  75254

Re:  202302403 – Asia Siddiqui – Charles Davidson Swift

Dear Office of the Chief Disciplinary Counsel:

I am responding to the Complaint made by my former client, Asia Siddiqui.

I believe the best way to address the Complaint from Ms. Siddiqui is the give the Office of the Chief Disciplinary Counsel a brief overview of my opinion on what has happened in this matter, followed by a more thorough timeline of the case for which I was counsel to Ms. Siddiqui, Federal Case 1:15-cr-00213 in the Eastern District of New York.  This will perhaps put Ms. Siddiqui's Complaint in context to better understand what happened and why she filed this Complaint.

**OVERVIEW**

For four years I zealously represented Ms. Siddiqui in a federal criminal matter in New York at her and her family's request.  Two months before trial, a plea was entered providing an exceptional result for Ms. Siddiqui.  After reviewing the plea paperwork, pre-trial services report, and sentencing memorandum, Ms. Siddiqui was sentenced to 180 months in custody. Following sentencing, for the next two years, our office assisted Ms. Siddiqui with several issues surrounding accessing healthcare while in prison and tried to locate her laptop computer so it could be returned to her.  At no time in this two-year period following sentencing did Ms. Siddiqui ever mention any issues regarding my representation of her.

About a year and a half after her sentencing, her co-defendant was sentenced to *more* time than Ms. Siddiqui received at sentencing.  At this point, I believe Ms. Siddiqui felt guilty that she was sentenced to 18 moths less than her co-defendant and began angling to get back into court to be re-sentenced to more time – or in her words, a "fairer" sentence.  The avenue she lit upon was to raise an Ineffective Assistance of Counsel ("IAC") claim to appeal her sentence and be brought back to court for re-sentencing.  The Prosecutor and the Court both agreed (as do I) that there was no basis in fact or law for the claims made by Ms. Siddiqui, that her representation by me was ineffective, nor was she denied any of the Constitutional rights afforded a defendant in a criminal proceeding.  Subsequently, Ms. Siddiqui filed a bar complaint and has sent an additional letter to the Court asking for the earlier claim of IAC, which was denied/dismissed, be re-opened.

with Ms. Siddiqui numerous times over the course of three years to review discovery with her, answer questions, and provide guidance and legal advice as to how her case was progressing and what steps to expect next. We arranged for an iPad to be loaded with discovery so she could review the non-protective order discovery while she was in custody.

Ultimately, after our team's success in several of the pre-trial motions, and after the court ruling in our favor that many of Ms. Siddiqui's statements would be suppressed at trial, the government agreed to drop two of the charges, thus reducing Ms. Siddiqui's (and Ms. Velentzas's) exposure at sentencing.

Ms. Siddiqui was facing a potential sentence of Life in Prison for her top count, Conspiracy to Use a Weapon of Mass Destruction. I had diligently prepared for trial, and we were prepared to go to trial. It was explained to Ms. Siddiqui that she was in fact facing the potential of a sentence of Life in Prison if she went to trial and was convicted. She indicated to me that she did not want to risk that possibility and she was amenable to taking a plea, which we were able to secure for her just two months before the schedule trial date. (Trial was scheduled for 10/15/2019.)

On 8/20/2019, we received a formal plea offer from the government for Ms. Siddiqui, dismissing two of the three charges initially brough against her.

On 8/21/2019, I set up a phone call from Dallas with Ms. Siddiqui, who was still in custody in New York City, to review the plea documents.

On 8/23/2019, met again with Ms. Siddiqui and I appeared in court in New York for Ms. Siddiqui's plea. At the time of a plea in Federal Court, a defendant is specifically asked if anyone coerced them to enter a plea. Ms. Siddiqui was so asked, and she informed the Court that she was not coerced to enter the plea she entered and was pleading of her own accord.

From September to December 2019, the Pre-Sentence Report ("PSR") was drafted for her case, prior to her sentencing. (The procedure for a PSR is for a Probation Officer ("PO") to meet with the defendant—with counsel present—then draft an initial PSR. The draft PSR is provided to the defense attorney. Counsel then submits any objections to the PO about what s/he has written. Taking into account the objections from counsel, the PO then drafts a final PSR and files it under seal on the court docket. Defense counsel then officially files under seal their objections to the final PSR filed by the PO. The government then responds to the defense's objections.) Counsel Linda Moreno was present with Ms. Siddiqui during the PSR interview. The initial draft PSR was reviewed with Ms. Siddiqui. Copies of the PSR are never allowed to be given to the defendant, only shown, or read to them. The objections to the PSR filed by counsel are purely legal decisions and factual corrections, if any, and are not generally reviewed by the defendant.

Ms. Siddiqui had previously disclosed to me and my co-counsel, and now disclosed to the PO at her pre-sentence interview, that she had been sexually assaulted by a family member when she was a young adolescent. We discussed bringing up this information at sentencing as a mitigating factor to request a downward departure for her at sentencing. Ms. Siddiqui endorsed this decision in her sentencing strategy, and at no time did she indicate she was not on-board with

appeals are always allowed following a criminal case, and not barred as a result of any plea
agreement.)

In 2021, our Law Center worked throughout the year with Ms. Siddiqui to try to get her personal
property (laptop) back, which was seized when she was arrested. We tried to track down her
laptop, contacting prisons, detentions centers, her family, her prior attorney, Tom Dunn, and the
government, to no avail. We were unsuccessful in locating what happened to her laptop,
believing it have been given to her prior counsel, Thomas Dunn, five years prior. At no time
during 2021 did Ms. Siddiqui bring up to me or my staff that she was dissatisfied with my
representation of her, nor that she wanted to file a Habeas Petition alleging ineffective assistance
of counsel.

On 6/16/2021, Ms. Siddiqui's co-defendant, Noel Velentzas, was sentenced to 198 months in
custody. This was a year and a half *more* time than Ms. Siddiqui received when she was
sentenced on 1/9/20.

On 11/5/2021, Ms. Siddiqui filed a *pro se* motion/letter with the District Court to have her
property/laptop returned.

On 9/28/2022, her motion to return property was dismissed by the court, as she had "not adduced
any evidence that the laptop was seized or remains in the Government's possession."

It is believed that sometime in late 2021 or early 2022, Ms. Siddiqui learned of the higher
sentence received by Ms. Velentzas on 6/16/2021.

On 4/18/2022, Ms. Siddiqui filed a *pro se* 28 U.S.C. §2255 Habeas Petition alleging Ineffective
Assistance of Counsel. The general thrust of her petition was that she was not allowed by me at
sentencing to take more responsibility for her role in the crime and wanted to go back to court to
be resentenced, as her co-defendant had received more time than she had received. Ms.
Siddiqui's petition was filed more than two years after her conviction became final. Thus, her
petition was barred by the one-year statute of limitations under 28 U.S.C. § 2255. She, *inter
alia*, alleged we had not sent her the sentencing paperwork, so she had been unable to file a
timely petition. This § 2255 Habeas Petition was, in fact, the first I heard that Ms. Siddiqui had
issues with her representation, or that my office had failed to send her the documents from her
sentencing. (We in fact had sent her the sentencing documents. We re-sent them in May of 2022.
With her move from the MCC in New York City pre-trial, to her move post-sentencing to a
Bureau of Prisons location, it is entirely possible the original sentencing materials were not
received by her. However, at no time prior to 2022, was I made aware that she had not received
her sentencing materials.)

On 4/30/2022, the government reached out to me and my co-counsel to ask if we wanted to
respond to Ms. Siddiqui's § 2255 Habeas Petition – essentially to defend ourselves against her
allegation of IAC.

On 5/3/2022, my response to the government was "I have consulted with Ms. Moreno, and I am
responding on behalf of both of us. We disagree with Ms. Siddiqui's factual recitation. Until the
Court orders a factual hearing and determines that the attorney client privilege has been waived,

5

taking a plea. Far from this. I make it my practice never to strong-arm clients to take a plea, as it only has the net effect of having it backfire. I enjoy going to trial and I would much rather put on a defense than coerce a plea. That is not my practice and never has been. For Ms. Siddiqui to say that she was coerced to take a plea is a complete fabrication and magical thinking on her part.

While I understand that Ms. Siddiqui believes it is unfair that she received less time than her co-defendant, both Ms. Siddiqui *and* her co-defendant ended up receiving significantly less time than they originally would have, were it not for my vigorous representation of Ms. Siddiqui over the course of almost four years. Ms. Velentzas received a much lower sentence as an ancillary benefit of the sentencing case put on for Ms. Siddiqui.

Additionally, as to why this Complaint arose, I believe I am a "safe" person for Ms. Siddiqui to direct her frustration in being in the situation she finds herself. I had always been supportive of Ms. Siddiqui, and not judgmental about the actions she took that lead to her ultimate conviction. I did not contest or counter her initial claim of IAC in her § 2255 Habeas Petition made over two years after she was sentenced, but rather I let the Prosecution and the Court set the record straight, as they had been on Ms. Siddiqui's case since the beginning in 2015, as I did not believe it necessary to impugn Ms. Siddiqi at this late stage of her case.

The filing of a Bar Complaint, however, does warrant my direct and vigorous response, countering the fallacy of the allegations made by Ms. Siddiqui against me. Ms. Siddiqui had exceptional and ethical representation at every stage of her case. The ultimate result she received at sentencing would be the envy of many individuals charged in many terrorism related cases. All legal protections were afforded her, and her Constitutional rights were protected by me at every turn. That she now believes my representation was unprofessional, unethical, and ineffective, is completely out in leftfield, warranting a detailed and thorough response. As such, it is my position that the facts (and law) surrounding her Complaint against me are completely unsupported and the Office of the Chief Disciplinary Counsel must dismiss this Complaint.

Should you require clarification or further explanation, please feel free to reach out to me.

Pursuant to Rule 2.10 of the Texas Rules of Disciplinary Procedure, I will provide a copy of this Response, and accompanying attachments, directly to Ms. Siddiqui.

Respectfully submitted-


*/s/ Charles D. Swift*
Charles D. Swift
Criminal Department Head, CLCMA
100 N. Central Expy, Suite 1010
Richardson, TX  75080
972-914-2507
Texas Bar # 24091964
cswift@clcma.org



**CONSTITUTIONAL LAW CENTER**
*for* MUSLIMS *in* AMERICA

## WRITING YOUR CHARACTER REFERENCE LETTER (TEMPLATE INCLUDED)

**Letters Due: Monday, Nov. 25, 2019 (or earlier)**

Thank you for agreeing to write a letter of support for Ms. Asia Siddiqui. Below is some guidance on the purpose and content of your letter. At the end there is a sample/template letter to help you in drafting your own. Use **your own words** and please contact us if you have any questions.

Your letter about Ms. Siddiqui's character and nature will help the Judge to make a better and more complete impression of the kind of person Ms. Siddiqui is. The best character reference letters are from family, friends or co-workers because they can help provide a more detailed image of "who is Ms. Siddiqui?" and "Why/How was Ms. Siddiqui involved in this?" for the Court.

## MS. SIDDIQUI HAS ADMITTED SHE IS GUILTY

The Court needs to know that you have been told what Ms. Siddiqui did and that she has plead guilty to Teaching and Distributing Information Pertaining to Explosive Devices. It is important to let the court know that you understand she committed this crime. Your letter is to show that there are other parts of Ms. Siddiqui's life and character that should also be taken into account when the judge is deciding how long a sentence to give to punish her.

## WHO YOU ARE AND YOUR RELATIONSHIP TO MS. SIDDIQUI

Your letter of support for Ms. Siddiqui is important **because you know/knew her well.** You should describe how you know Ms. Siddiqui, how long you have known her and how well you know her. You need to make it very clear how closely you know/knew Ms. Siddiqui so that the court knows why they should listen to your opinion of her character. You do not need to be a publicly important person, or famous etc. If you are a family member or long-time friend, you can have an important perspective of the her in the court's view.

You can emphasize that as her family member/friend you understand or know certain things about her childhood, life, struggles, her personality and following nature and the impact it had on her. You should also say whether you will continue to provide support for Ms. Sididqui going forward.

If you are an **employer**, your character reference is very important. It proves to the court that Ms. Siddiqui was employed, has goals and aspirations, was capable and competent. What was the job and how long was she employed? Was she hardworking? How was her attitude towards other people at work? What kind of employee was she? What was her personality like/ nature towards authority?

You should write a character reference that shows a good familiarity with Ms. Siddiqui. Please focus on Ms. Siddiqui's following nature, if you experienced that with her, and whether she is capable of

[Date]                          **SAMPLE/TEMPLATE**

To the Honorable Judge Sterling Johnson

District Court for the Eastern District of New York


Your Honor,

This letter is a character reference for Ms. Asia Siddiqui.

My name is [*name*]. I am [*explain who you are, your job title, role, how long you have been in that position etc.*]

I have known Ms. Siddiqui since [*describe how you met, how long you have known her, the relationship you have/had with her*]. [Describe any family history, community ties or other connections you share with Ms. Siddiqui to show the court how well you know her]. I know Ms. Siddiqui to be a [*describe what kind of person Ms. Siddiqui is, Shy? Meek? Passive?*]. She has [*ex. worked/provided/cared for, explain what Ms. Siddiqui is like in her life*].

I understand that Ms. Siddiqui has plead guilty to teaching and distributing information related to creating explosive devices with her co-defendant Noelle Velentzas for the purposes of potentially using such a device. [*Do NOT say or try and convince the court that she is innocent, she has already admitted she is guilty.*] What the court may be unaware of however is that Ms. Siddiqui [*describe and explain positive things Ms. Siddiqui has done, how she has been of benefit to you and your family or workplace. Explain and give examples of Ms. Siddiqui's generosity, kindness, work ethic etc.*]

[*Include a statement here about what you think Ms. Siddiqui's intentions were when she got involved with the other two women to commit her offense. For example, "I do not believe Ms. Siddiqui is an extremist. I believe she probably wanted to be part of the group and did not know how to get out the situation without losing her friends because she is a follower/meek/shy/passive. But she is not capable of and would not ever hurt anyone.*] [*Discuss Ms. Siddiqui's motivations and intentions are in life, what her goals were and any potential she had or steps she was taking for her future (if you know).*]

I believe that Ms. Siddiqui has already suffered greatly for her actions. She has been in prison for over four years and [*Describe what consequences Ms. Siddiqui, her family and her future/potential/career/ personal life have already suffered*].

 [*Here you can reiterate the positive view you have of Ms. Siddiqui, acknowledge that she committed the offense, and ask the Court to please consider what a good, if passive and meek follower she is and give her the lowest possible sentence*].

Sincerely,

[Signature] [Title] [Date] [Contact Information]

State Bar of Texas
Office of the Chief Disciplinary Counsel
14651 Dallas Parkway, Suite 925
Dallas, TX 75254

Re: Re: 202302403 - Asia Siddiqui - Charles Davidson Swift

Dear Chief Disciplinary Counsel,

Thank you for the swift response. I received this letter in regular mail on May 18, 2023 at 6pm. Please accept this within the 10-day time limit. If envelope is stamped "Legal Mail, Open in Presence of Inmate", I can get a copy of the date log from the mailroom. With regards to my further documents, I did want to submit some documents with a brief response if you will allow.

Firstly, I would like to say I did not tell Mr. Swift that I did not like his representation because I realized he had been lying to me and pacifying me for too long and could not be trusted. I no longer felt safe contacting him, his legal team, or the Constitutional Law Center for Muslims in America. Mr. Swift believes he is the "safe" person to direct my frustration on because he has no idea how much he has hurt me or perhaps he does not care.

Mr. Swift never told me I might receive life in prison. When he first visited me in MCC-NY in 2015, he told me he had faith in me. It was the striking factor that made me decide I wanted his representation over Thomas Dunn's. All that time, I thought, Swift would not have prepared for trial with me if he doubted me. When he knew I suffered mental health issues, Swift should have gotten me a mental health evaluation; instead, he was the one mentally evaluating me. I was being held at MCC-NY, a facility that did mental health evaluations. But rather than get an actual evaluation done, Swift would create his own version of my mental health history in my sentencing paperwork which he would never show me.

Since Mr. Swift has given timelines, what dates did he send me the sentencing documents? I have dates for some of the letters I sent him requesting those documents: one dating March 22, 2021 (Please see attachment). We were on 23-hour COVID lockdown so I could not access certified mail receipts at the time. Swift writes on page 4, "Clients are not consulted as to PSR responses unless there is an issue that needs attention or clarification, which there was not in this case." If Swift did not show me paperwork to consult with me before sentencing because he felt it was not my place, would he then send me paperwork after my sentencing so that I could proceed to appeal? I highly doubt it, although the fact of not receiving paperwork from him speaks for itself. When I arrived to FCI Aliceville, I was immediately forwarded mail from MCC-NY, but there was nothing from Swift or his legal team. In fact, Swift had told me in January 2020 after sentencing that he would not mail me the paperwork until after I transferred for that very reason. FCI Aliceville is very organized and consistent with its legal mail services even though it may be a little delayed. It is one thing to consult with the client, but I was not even shown or read the final draft of the PSR as admitted by Swift on page 3, "The initial draft PSR was reviewed with Ms. Siddiqui. Copies of the PSR are never allowed to be given to the defendant, only shown, or read to them. The objections to the PSR filed by counsel are purely legal decisions and factual corrections, if any, are not generally reviewed by the defendant." Why not? It is my life they were making "factual corrections" on. Who would know the facts of my life better than I? Who would be effected by the legal decisions on my case more than I? In addition, I was not educated extensively about the time limit to appeal. Besides, how would I appeal without having paperwork to guide, confirm, and realize the need and direction for my appeal? Eventually I was fed up with waiting and filed my 2255 in complete ignorance, confusion, and desperation; hearing the length of my co-defendant's sentence on top of mine alerted me that something was terribly wrong and my counsel had something to do with it. I am attaching my 2255 motion reply to the government (Please see attachment).

When Swift says on page 6 that I did not have many other friends, that is far from true. I am very social and enjoy making people laugh since childhood. It may be Swift was quoting my family members' character letters. If so, then he did not investigate my family dynamic properly. And how could he? That would have been done through mental health evaluation. And we were all living separately for many years by then. In addition, the character letter guidance and template were very inducing to describe me as such. It says, "WHY ARE YOU WRITING THIS LETTER (WHAT THE COURT SHOULD KNOW)?: Instead of only describing Ms. Siddiqui in general terms as good, responsible, reliable, or well respected;[...] Why do you say she is a follower? Were there instances when she clearly demonstrated low self-esteem or a desire for friendship? How was she meek and shy?/Explain how Ms. Siddiqui would have become involved in her crime, what were her intentions, if any? Why do you think she agreed to help the other women learn about making explosives? How do you think she became involved in this crime?" He talks about me like he knew me so well, but then he directed everyone to write negatively about me. He only knows the character he made up. I was right here to communicate and fact-check with. He chose not to. Even then, my family had

positive things to say that disprove this, that I am funny, kind, social, etc. (The letters are sealed or I would attach them.)

I wanted my intellectual property to be returned which was in my laptop that the FBI had confiscated, whose inventory log I was given in my initial Discovery DVDs when Thomas Dunn was my attorney. Mr. Swift said there was a female donor ready to donate funds for me to have my laptop harddrive transferred to a USB. I agreed to that idea. Swift said he would first request for my laptop from the prosecutors, before making other decisions. Once the prosecutors promised my laptop back (they still had it as it was part of my discovery), I waited for Swift to inform me when they were ready to return it. That day never came. In fact, the prosecutors started denying my laptop, and Swift never pushed them further. I still have the photo inventory in my discovery located in the Central File to prove it. Similarly in 2017, when the prosecutors did not give me all my audio files and mislabeled them, the requests for them went unheard (See attachment). If Swift made requests, he made them without results. If I had gone to trial with Swift as my attorney, I would surely have lost because he did not use the resources he had, and violated and deprived me of mine.

Under penalty of perjury, I declare the facts in this response and submission to the State Bar of Texas concerning Charles Davidson Swift are true, correct and complete.

Respectfully Submitted May 21st, 2023,

Asia Siddiqui #85797-053

The Florida Bar
Director of Lawyer Regulation
651 East Jefferson Street
Tallahassee, FL 32399

Dear Director of Lawyer Regulation,

   As my attorney on Federal Case #15-213(SJ), Linda Gail Moreno (Tampa, FL), Federal Bar License #112283, of the law firm Constitutional Law Center for Muslims in America completely let me down when she violated my constitutional rights during my sentencing process. According to the 2022-2024 Professionalism Handbook under the Rules Regulating the Florida Bar, Ms. Moreno has violated Rules 4-1.4 (Communication), 4-4.1 (Truthfulness in Statements to Others), and 4-8.4 (Misconduct).

   Ms. Moreno (along with attorney Charles D. Swift) promised, stalled, and ultimately refused to provide me with my sentencing paperwork, using COVID-19 as one of the many excuses for the delay until it was well past the 1-year deadline to appeal, and still no paperwork. She violated my 5th and 14th Amendment rights to "due process of law", my 6th Amendment right to "be informed of the nature and cause of the accusation; to be confronted with the witnesses against [her]; and to have compulsory process for obtaining witnesses in [her] favor," and my 8th Amendment right "nor cruel and unusual punishments inflicted" due to not being informed throughout my sentencing process all the details of my case and defense, such as the letters my family wrote about me and the story Ms. Moreno (along with Mr. Swift) fabricated about my mental health history (that my co-defendant had caused me my mental health problems by committing a crime of intent and influence in front of me) when in actuality I never witnessed or accounted such an event, and have suffered my entire life from family problems that shaped me into the person I am today that were ongoing prior to my arrest at the time period Ms. Moreno perjured about.

   I do not take her actions lightly. How dare Ms. Moreno cover up my actual childhood trauma with her cheap attempt at passing the blame onto my co-defendant when she was supposedly also trying to prove neither of us had committed a crime of intent. That notoriously failed when she perjured the lie about why I was depressed, using her power as my attorney over my identity without my consent or knowledge--a form of witness-tampering, and misrepresentation with the nature to deceive. Ms. Moreno committed fraud on the court undermining the entire judicial process with her actions. I only found this out in late June 2022 after exhaustive efforts to attain my paperwork which counsel to this day has denied me.

   Counsel's fraud was further revealed upon requesting the unsealing of my character letters and original PSR when I received a copy of the documents from the courts in late January 2023, more than 3 years after my sentencing. Immediately I noticed a pattern and the exact same content and wording in 6 of my 7 family members' and loved ones' letters in specific instances that completely derailed me. Why were they talking about my crime when they were not present during it nor had I informed them the details of my case? How could they word legal specifics that they do not even understand, know how to say, or even explain such as the charge I plead to? Why were they talking about my co-defendant when they did not even know or meet her? I requested the instructions Ms. Moreno had provided my loved ones for writing the character letter, and the template explained the pattern and answered the many questions. My loved ones were told to write about the crime as you can see by the letter-writing instructions and template, which I find extremely bizarre. They were not there, nor living with me at the time, and they never even met my co-defendant or saw us interact with one another. My sister also experienced Ms. Moreno's law firm CLCMA contacted her and dictated the length and content of her letter throughout the process. Even then, in the sealed letter, my sister stated the abuse I endured while I was detained in pre-trial by both staff and inmates, although Moreno vehemently lied about in my sentencing paperwork farcing that I had the best time and treatment by staff and inmates after being locked up healing me of my depression, lies one would find unnecessary, questionable, suspicious, and prone to prejudicial error.

   My 5th Amendment right "nor shall be compelled in any criminal case to be a witness against [her]self" was violated when Moreno implicated in "Defendant's Objections of PSR", "even if the Court finds that Ms. Siddiqui's base offense level is murder based on her knowledge of the other participant's intent for the use of the device and that Velentzas's intent to use the weapon to injure or retaliate against the government, the Court must find that Ms. Siddiqui shared this intent." Knowing that I did not witness or account Velentzas having this intent, and knowing the government was recommending the 2A1.5 (Conspiracy or Solicitation to Commit Murder) and 3A1.4(b) (Terrorism) enhancements, tripled the ground for prejudicial error. Anything one co-conspirator is "witnessed" doing directly also falls on the other co-conspirator immediately compelling me also to be a witness against myself on multiple levels. Firstly, my silence while witnessing an actual crime of intent and influence would make me a co-signer, and the really poor easily disputed lie (simply looking at my mental health records for what I was actually professionally observed being depressed about) would bring heat to me for my third charge "material false statements" to the government, which the government then did bring up in response to Moreno's perjured changes, "Moreover, the defendant has already shown herself to lie and deceive to avoid detection by law enforcement" (Docket 140, pg.18).

   I was denied due process and coerced by Ms. Moreno to take the plea, to which she then proceeded with not showing me my paperwork throughout the process to the very end which would have made me act differently if I knew what Ms. Moreno was really intending to do, and that she was going against my ethics and values, my will and wishes, and truth and justice. I would have removed her from counsel and replaced her with someone honest and committed to justice and true defense. Ms. Moreno needs to be brought to justice and barred from practicing law. Thank you for your time.

Respectfully submitted
April 9th 2023,



# The Florida Bar

**651 East Jefferson Street**
**Tallahassee, FL  32399-2300**

Joshua E. Doyle
Executive Director

850/561-5600
www.FLORIDABAR.org

April 18, 2023

Ms. Asia Siddiqui  #85797-053
F C I Aliceville
P.O. Box 4000
Aliceville, AL 35442

Re:    Ms. Linda Gail Moreno; RFA No. 23-10644

Dear Ms. Siddiqui:

This will acknowledge receipt of your letter regarding the above attorney.  The Supreme Court of
Florida has adopted rules that require the allegations be signed and under oath.  In order to
comply with this rule you must sign the oath below and return it to us by April 27, 2023 before
we can proceed with an investigation.

Under penalty of perjury, I declare that the facts contained in the inquiry submitted to The
Florida Bar concerning Ms. Moreno are true, correct and complete.

_____        4/22/23
Asia Siddiqui                                          Date

**Please also provide more specific information regarding the exact nature of your complaint
against the attorney.**    Your response must not exceed 25 pages.

If you do not complete and return the oath form to us, we may be unable to proceed with the
investigation.  A copy of the rule imposing this obligation (3-7.3(c)) may be found on the Bar's
web site at www.floridabar.org.

Thank you for your cooperation.

Sincerely,

Allie F. Huston, Bar Counsel
Attorney Consumer Assistance Program
ACAP Hotline 866-352-0707



# The Florida Bar

**651 East Jefferson Street**
**Tallahassee, FL  32399-2300**

Joshua E. Doyle
Executive Director

850/561-5600
www.FLORIDABAR.org

May 2, 2023

Ms. Asia Siddiqui  #85797-053
F C I Aliceville
P.O. Box 4000
Aliceville, AL 35442

Re:     Linda Gail Moreno ; RFA No. 23-10644

Dear Ms. Siddiqui:

This will acknowledge receipt of your correspondence regarding Ms. Moreno.  After review of
the content of your correspondence, we have determined that more information is required before
we are able to proceed with an investigation.

***Please provide a clear written statement which describes the circumstances surrounding your
situation as well as a clear statement which describes the specific conduct you allege the
attorney engaged in which forms the basis of your inquiry.***  Please limit your submission to no
more than 25 pages.

Please note that if no additional information is provided, this file will not be processed further.

Sincerely,

Allie F. Huston, Bar Counsel
Attorney Consumer Assistance Program
ACAP Hotline 866-352-0707

The Florida Bar
Director of Lawyer Regulation
651 East Jefferson Street
Tallahassee, FL 32399

Re: Re: Linda Gail Moreno; RFA No. 23-10644

Dear Bar Counsel,
    Sorry for the delayed response. I received your letter in regular inmate mail on May 11, 2023 and am responding to your request for more information on my complaint.
    In my federal case, Linda Gail Moreno was a very intelligent, charming, but unfortunately dishonest lawyer. She left me very little autonomy as a client. Her co-attorney Charles D. Swift admits to this in his May 11, 2023 response to my complaint, on pages 3-4 (see attachment), "The objections to the PSR are purely legal decisions and factual corrections, if any, and are not generally reviewed by the defendant.[...] Clients are not consulted as to PSR responses unless there is an issue that needs attention or clarification, which there was not in this case." Growing up in a traditional Indian household amidst domestic violence and abuse, this is a dynamic I recognize very well. I was not allowed to challenge my elders' decisions, even when they were wrong, becoming abusive, or perpetrators of continuous unchecked abuse since the past. When I spoke to them, I was admonished and dismissed. I felt the same way addressing Ms. Moreno, walking on egg shells, feeling afraid to speak my mind, not because she was unkind but because she was unwilling to hear my perspective. I did not know how to take control of the situation. Ms. Moreno had so much real facts to work with. She failed to properly investigate and prepare for defense. She had been my lawyer for almost four years, but Ms. Moreno was planning to make her own defense that would not include my input, approval, or fact-check from day one. She forgot to put effort on my mental well-being, inclusivity, and honesty. The right thing for counsel to have done is get me a mental health evaluation, especially as I was held at a facility specializing in such (MCC- NY). If she fabricated information in my case, it makes one wonder, how many other clients has she been dishonest with? This is what makes her an untrustworthy servant of the court who needs to be investigated.
    When it came time for my sentencing, I wanted to see what a good job my lawyers had done on my Sentencing Memorandum. Lo and behold, I was denied my paperwork by Ms. Moreno and her team from the time I took the plea until now. Co-attorney Swift admits to this too when he says on page 3, "The initial draft PSR was reviewed with Ms. Siddiqui. Copies of the PSR are never allowed to be given to the defendant, only shown or read to them." He is admitting that the only document I saw was the initial draft of the PSR, not the final version, or the other paperwork. He also claims counsel sent me the sentencing documents several times after my transfer to FCI Aliceville from 2020 to 2022. I received forwarded mail from MCC- NY immediately upon arrival but nothing from my legal team. I finally received some of the documents in June 2022 through other persons after signing a government information release form. And Honorable Judge Diane Gujarati sent me a copy of the sealed PSR and character letters in January 2023. I finally see now that unnecessary fabrications and slander lead to my poor defense. No wonder counsel did not want me to see it. Upon reviewing Ms. Moreno and team's "Objections to the PSR" (Docket 132), "Defense Sentencing Memorandum" (Docket 133), the government's "Sentencing Memorandum" (Docket 140) and other articles (Docket 136, Re: 158), I declare Ms. Moreno committed coercion, perjury, fraud on the court, misrepresentation with the nature of deception, witness-tampering, and actual fraud actionable by law, acts that undermine the entire judicial process. I am now confirmed that Moreno lied far more gravely than I thought when initially filing my 2255 petition, causing me irreparable harm. Ms. Moreno deceived me in order to relinquish my legal rights in the 5th, 6th, and 14th Amendments to exert my innocence before an actual impartial jury and the public.
    I was coerced to take a plea by not being shown paperwork throughout the process which would have made me act differently if I knew Ms. Moreno was going against my wishes, truth and justice. If I was not violated of my 5th (and 14th) Amendment rights "nor shall be compelled in any criminal case to be a witness against [her]self, nor be deprived of life, liberty, or property, without due process of law," I would have been able to take the best approach in my legal process to attain a fair end. But Ms. Moreno denied me that opportunity. Instead I have faced trauma from misrepresentation through my lawyers' miscarriage of justice. I was violated of the 6th Amendment "to be informed of the nature and cause of the accusation: to be confronted with the witnesses against [her]; and to have compulsory process for obtaining witnesses in [her] favor" when I was lied on with perjured false testimony attributed to my name for Ms. Moreno's cheap, weak, lazy attempt at a defense when she could have had stronger defenses using the truth, as my life had been full of enough trauma and suffering if she wanted to speak on mental health to stand on its own. My lawyers conjured up a common scapegoating scenario of blaming the co- defendant at all cost, even at the cost of the truth, and their client's true defense which has caused me further trauma, distress,

1)4

Moreno's perjury about my co-defendant committing a crime of intent and influence in front of me caused me to be sentenced with prejudicial error when she wrote (Docket 132 p.10), "[D]espite the fact that there was no plan for what device to be used, the use of any device would create a substantial risk of death, and that she was aware of the risk. Indeed, it was this fear that lead her to become depressed and to curtail her involvement." First Moreno admitted there was no plan for what device to be used because there was no plan to use a device. Then she perjured that the fear of using that unplanned, uncreated, unattempted device caused me depression. Offering the plea to the second charge, the government still recommended the 2A1.5 (Conspiracy or Solicitation to Commit Murder) and 3A1.4(b) (Terrorism) enhancements. Then why did Moreno create the easily disprovable story about my mental health history when she knew it was unjust, unfavorable, and damaging to the nature of the charge, the plea, and the sentencing? Hence, my 5th Amendment right not to be a witness against myself was violated when Moreno implicated (Docket 132 p.13), "even if the court finds that Ms. Siddiqui's base offense level is murder based on her knowledge of the other participant's intent for the use of the device and that Velentzas's intend to use the weapon to injure or retaliate against the government, the Court must find that Ms. Siddiqui shared this intent." I did not witness or account Velentzas as having the intent to use a device, nor to use a weapon to injure or retaliate against the government. By implicating this, Moreno tripled the ground for prejudicial error.

It is prejudicial error because the government uses this fabricated argument in its own defense (Docket 140 p.9) as it justifies the base offense level of 33 by quoting counsel (Docket 132 p.10), "[T]he defendant agrees...the use of any device would create a substantial risk of death, and that she was aware of the risk." The part fabricated right after was the most damaging: "Indeed, it was this fear that lead her to become depressed and to curtail her involvement." Again the government quotes (Docket 140 p.11-12), "The defendant argues instead that the enhancement should not apply because the government has failed to prove[.,.]that the defendant herself--separate from her co-defendant Velentzas--had the 'individualized subjective intent to influence the government in conjunction with the commission of [her] crime.' See Def's PSR Letter at 11-12." It continues, "The argument is contrary to binding Second Circuit precedent.[...] [T]he Second Circuit expressly held that the government does not have to prove that the defendant herself committed an offense to influence," and says, "To read this language more narrowly in the manner that the defendant argues would 'defy common sense' according to the Circuit." The government quotes again to prove that I am aware my role is not minor, but at the least minimal if counsel says one of the "non-exhaustive" factors apply to me (Docket 140 p.15), "The scope and the structure of the criminal activity was straightforward, and the defendant concedes that this factor weighs against her. See Def's PSR Letter at 15." Ms. Moreno perjuring I had fear of the risk of using a device and that had caused me depression--when there was no risk of using a device nor was the fear of such causing me the depression I already suffered from actual fear throughout my life--was all the blame I needed to be culpable. When the government says on page 17, "[T]o downplay the seriousness of what she has already pleaded guilty to is belied by the undisputed facts and, in particular, her own words," which in reality were counsel's words perjured to be mine without my account or consent of such.

The government mentions on page 18, "[T]he defendant has already shown herself to lie and deceive to avoid detection" and that by taking the plea, "The defendant has admitted that there was 'more than the intent to simply learn.'" When the government says I have already shown I lie and deceive to avoid detection, that is exactly what I was doing when I took the plea. I was trying to hide Ms. Moreno's coercion by trying to sound confident when I was really scared of the threats my attorneys gave me right before entering the court room because they saw how hesitant I was, suddenly saying I will never win if I go to trial because of the poems I had written, when they had initially said they believed in me and the case had potential. And the government is implicating my counsel's Objections to the PSR when it references my lying and deceiving to avoid detection. Indeed my counsel, in the sentencing paperwork, lied and deceived using my name in order to avoid detection.

Whether it was intentional or shortsightedness, the fabrication caused prejudicial error and inflicted irreversible pain on me, violating the 8th Amendment. In the Defense Sentencing Memorandum on page 15, Moreno perjured: "[A]fter it became apparent to Ms. Siddiqui that Velentzas and the UC shared an intent to use the weapon of mass destruction she developed significant mental health issues[...] The attribution of Siddiqui's depression to the stress she felt from her association with Velentzas and the UC is demonstrated by the fact that once she was detained at the MCC, Ms. Siddiqui recovered." Once I was detained, I faced challenges in the pretrial center by staff that Ms. Moreno did not want me to address legally, claiming it would cause retaliation by staff. Then to add in the sentencing memo that staff's treatment of me was so good, it caused me to recover was not just a lie, but counterproductive and prejudicial. The cover-up of the abuse I have endured while detained at MCC-NY by Unit Team Secretary Stacy Harris and by some of my cellmates--even my former lawyer Thomas Dunn and my sister were aware of this abuse as my sister mentioned in her character letter--along with the suffering of my pre-arrest life is the greatest violation of my 8th Amendment right "nor cruel and unusual punishments inflicted".



# The Florida Bar

**651 East Jefferson Street**
**Tallahassee, FL 32399-2300**

**Joshua E. Doyle**
**Executive Director**

850/561-5600
www.FLORIDABAR.org

June 1, 2023

Ms. Asia Siddiqui  #85797-053
F C I Aliceville
P.O. Box 4000
Aliceville, AL 35442
Re:     Ms. Linda Gail Moreno; RFA No.: 23-10644

Dear Ms. Siddiqui:

Your inquiry concerning the above-referenced attorney has been referred to me for my review. You filed a complaint against Ms. Moreno alleging, among other things, that she did not adequately represent you in a criminal matter and did not share information with you. Bar complaints against one's own counsel cannot be used to short-circuit, second-guess, pre-judge, or replace appropriate criminal trial, appellate, and post-conviction procedures.

Stated differently, in regulating its own members, The Florida Bar cannot interfere with the procedures governing criminal trial, appellate and post-conviction matters, and the findings made, and results secured under those procedures. The Florida Bar has not authority to alter state criminal convictions or to undermine judicial findings and actions reached or otherwise governed by those rules of court. By virtue of the fact that your criminal conviction would necessarily need to be overturned or your sentence modified in order to show even a potential for a violation of the rules governing attorney conduct, the discipline system is not the correct forum in which to seek redress of your complaint about the handling of your criminal conviction. Your remedies (if any) lie with the courts in post-conviction or appellate proceedings, which must serve as the primary, if not exclusive, avenues for addressing and resolving your claims. The Florida Bar can make no findings or take any action that would second-guess, call into question, or otherwise interfere with a criminal conviction or sentence.

Consequently, I have closed our record in this matter effective May 31, 2023.  Please be advised that my action does not preclude you from consulting with private counsel, nor does it preclude you from exercising any legal remedy which may be available to you. Pursuant to the Bar's records retention schedule, the computer record and file will be disposed of one year from the date of closing.

Sincerely,

Allie F. Huston, Bar Counsel
Attorney Consumer Assistance Program
ACAP Hotline 866-352-0707

cc:     Ms. Linda Gail Moreno (w/enclosure)

# STATE BAR OF TEXAS



*Office of the Chief Disciplinary Counsel*

June 8, 2023

Asia Siddiqui
Inmate #: 85797053
Aliceville Federal Correctional Institution
P.O. Box 4000
Aliceville, AL  35442

Re:  202302403 -  Asia  Siddiqui - Charles Davidson Swift

Dear Asia Siddiqui:

The Office of the Chief Disciplinary Counsel has received the written response in the above-referenced complaint.  A copy of the response has been included for your review.

If you have further documents or information that you want to submit, please do so within ten (10) days.

Sincerely,

Nicholas Doane
Investigator

ND/sa

The Princeton Building, 14651 Dallas Parkway, Suite 925, Dallas, Texas 75254
(972) 383-2900, (972) 383-2935 (FAX)



CONSTITUTIONAL LAW CENTER
*for* MUSLIMS *in* AMERICA

June 7, 2023

Office of the Chief Disciplinary Counsel
14651 Dallas Parkway, Suite 925
Dallas, TX 75254

Re: 202302403 – Asia Siddiqui – Charles Davidson Swift

Dear Office of the Chief Disciplinary Counsel:

The following is provided in response to Ms. Siddiqui's Rebuttal to my Response
to the Complaint:

**Failure to adequately inform Ms. Siddiqui of the Potential for a Life Sentence**
Ms. Siddiqui inaccurately asserts she was never told that she faced life in prison for
her charged conduct. However, she was told at her arraignment by the Court and
as part of her dentition hearing, that conspiring to utilize a weapon of mass
destruction in violation of 18 U.S. Code § 2332a, count 1 of her indictment,
authorized a life sentence. Most importantly, apart from the evidence against her,
during my discussions with Ms. Siddiqui, the potential for a life sentence was the
central point discussed in the advantages of a plea to a lesser charge. This was
particularly true in Ms. Siddiqui's case because the advisory guidelines
recommended a term of 360 months to life, and the federal system has no
mechanism for parole. At the time we were negotiating the deal, Ms. Siddiqui was
adamant that she did *not* want to risk life in prison. Removing that risk was central
to her decision to accept the government's offer.

**Failure to adequately inform Ms. Siddiqui of the contents of her plea
agreement**
Contrary to Ms. Siddiqui's insinuations, she was informed regarding the serious
nature of the charges against her and the terms of the plea agreement. The plea was
extensively discussed with Ms. Siddiqui, including the pros and cons of accepting
the government's offer. For my part, I was amenable to trying the case, believing
an argument could be made that the government could not prove beyond a
reasonable doubt that Ms. Siddiqui and her co-defendant had agreed to utilize a
weapon of mass destruction. I also advised Ms. Siddiqui that there was
circumstantial evidence of her intent in the forms of positive statements Ms.

Thereafter, during sentencing, the Court specifically inquired of Ms. Siddiqui whether the PSR has been reviewed with her and whether she had any additional objections or additions. To the first question Ms. Siddiqui answered in the affirmative, and to the second question she answered in the negative.

The sentencing memorandum is a separate document wherein counsel, on behalf of the client, puts forth the arguments supporting the suggested sentence to the court. In Ms. Siddiqui's case, I argued that a below guidelines sentence of 60-70 months, was sufficient but not greater than necessary under the factors set forth by Congress. Prior to making the argument, I consulted with Ms. Siddiqui as is my standard practice. Ms. Siddiqui concurred in the requested sentence. As part of the argument, I generically referred to Ms. Siddiqui's childhood sexual assault, which was already before the Court in form of the PSR, based on statement Ms. Siddiqui had made to Presentencing Officer. Because my memorandum and argument were public, (the PSR is a non-public document), I specially discussed with Ms. Siddiqui that I would only generically refer to the incident to prevent public embarrassment and family friction. The Court ultimately awarded a sentence of 15 years (180 months), citing in part the incident raised in her PSR. The 15-year sentence was 25% below the government's recommendation and the guidelines sentence of 240 months.

**Failure to advise her on the time restrictions for appeal and habeas relief.**
After imposing sentence, the Court informed Ms. Siddiqui that should she desire to appeal, she was required to file a notice within two weeks of sentencing. After the hearing, I reminded Ms. Siddiqui that she had waived the right to appeal as part of her plea agreement and any appeal would void the plea agreement, allowing the government to reinstate the dropped charges. I explained to Ms. Siddiqui that for this reason I did not intend to file a notice of appeal on her behalf. Ms. Siddiqui did ask that I seek to amend the Court's recommendation for the location where she would serve her sentence, which I did, but voiced no desire to appeal. I also advised Ms. Siddiqui that any habeas action had to be initiated within one year of the sentencing proceedings. Finally, I informed her that I was not aware of any grounds on which to file a habeas action and consequently I would not be doing habeas action on her behalf.

**Failure to Obtain a Mental Health Evaluation.**
As part of my case preparation, I reviewed with Ms. Siddiqui, her life history, including her medical history. While Ms. Siddiqui did disclose family dislocation, she did not disclose any prior treatment for mental health, or any acute symptoms of mental illness. In addition to interviewing Ms. Siddiqui, I listened to more than

contact prior counsel (Thomas Dunn) with no luck. I have my doubts about this story because in my experience, seized items are not returned during the pendency of criminal charges. Apparently, I am not the only one with doubts concerning the government's claim that they returned the laptop to Mr. Dunn, as the issue of the missing laptop is now being investigated by the Court in this case. Recently, pm May 31, 2023, the Government was directed to file a Response to Ms. Siddiqui's second motion for the return of her laptop. ("ORDER: The Government is directed to file a response to the [170] Letter re: returning of laptop by June 5, 2023. Ordered by Magistrate Judge Peggy Kuo on 5/31/2023. (RO)").

While I sympathize with Ms. Siddiqui concerning the apparent loss of her property by the government or prior counsel, this is beyond the scope of my representation. Specifically, my representation was limited to representing Ms. Siddiqui on the criminal charges, as evidence by the fact that I have not been asked to participate in the current hearing/investigation. Nor do I believe I acquired a fiduciary duty with respect to the laptop, as I have never been in the possession of this computer.

**The Florida Complaint Regarding Linda Moreno**
In her rebuttal, Ms. Siddiqui also includes her complaint regarding my co-counsel, Linda Moreno. After I received Ms. Siddiqui's rebuttal from the Texas Bar, I contacted Ms. Moreno, who in turn contacted the Florida Bar where she is licensed. The Florida Bar indicated to Ms. Moreno that the Florida Bar's disciplinary office dismissed Ms. Siddiqui's compliant against Ms. Moreno after an initial review without requiring a response from Ms. Moreno.

Pursuant to Rule 2.10 of the Texas Rules of Disciplinary Procedure, I will provide a copy of this Response to her Rebuttal, directly to Ms. Siddiqui.

Respectfully submitted-


*/s/ Charles D. Swift*
Charles D. Swift
Criminal Department Head, CLCMA
100 N. Central Expy, Suite 1010
Richardson, TX  75080
972-914-2507
Texas Bar # 24091964
cswift@clcma.org

Recollections; I did not think I was submitting to a magazine that would later be known as the precursor to Al-Qaeda's Inspire magazine, nor was I endorsing Al-Qaeda as I did not even know Khan was going to become part of Al-Qaeda at any point. Nonetheless I would live to regret it. I met Noelle Velentzas in February 2012 at a federal prisoner appeal demonstration, and met the undercover in March 2012 at the Women's Day March on Wall Street. How are my poetry publication in 2009 and the sting operation dating 2013 (see Indictment) related in intent? Swift knew they were not correlated; he claimed the believed in me, and that he was working on a defense for me to protect my freedom of speech. That was the message he sold me to choose his representation, stating that my poetry was no different than a rap song letting out frustration against authority, and that it had nothing to do with the accused crime, although it is not a piece of work I am proud of. The poetry was dragged into the conversation with the third charge of "material false statement" when the FBI had interrogated me at La Guardia airport in 2014 asking if I knew Samir Khan and if I had published a poem. On page 2, Swift admits that Velentzas and I "merely intended to learn" when he says "a jury might concluded she and her co-conspirator had not merely intended to learn how to use a weapon of mass destruction, but intended to use the same." But during pre-sentencing, he did not speak of my writings being directly related to intent, only of my reputation before the government as a jihadi writer, hence the beef.

As for my willingness to take a plea, it was Swift who coerced and rehearsed me to take the plea in the manner I did. When a second offer came, he began threatening me that I was not going to get any more offers, as he saw how quick I was to reject the first offer. I did not understand the sudden change of his tone, the harsh stern manner with which he ordered me, and why he was forcing me to read from a piece of paper he had prepared with the government, stating that I had to say my plea in those exact words, that no other wording was acceptable. I felt like he was taking advantage of my vulnerable state of duress.

During sentencing, I did not even see nor imagine the paperwork would be so far altered from the initial PSR, nor was I aware of what my counsel had prepared because I truly thought they would show it to me, eventually, which never came to fruition. Thank you for your time.

Under penalty of perjury, I declare the facts in this response and submission to the State Bar of Texas concerning Charles Davidson Swift are true, correct, and complete.

Respectfully Submitted June 15, 2023.

Asia Siddiqui #85797-053

Note: As I have stated, the poems I submitted to Jihad Recollections are works I am ashamed of--they are reactionary, impulsive works, not proactive resolving works with a positive message to be publish-worthy. I wrote those poems upon seeing a WikiLeaks video of a man claiming to be in the U.S. Army stationed in Afghanistan and he was inebriated on alcohol and drugs claiming he had just "raped a beautiful 14 year old Afghan girl and loved it," how she was a virgin, and that she was screaming to get away--so I lashed out in writing instead of seeking mental help. The poems were also to give perspective on how people of those regions sometimes feel as a result. They were not written to influence or intend anything of my own. But if the poems offended in an illegal manner, then I would have preferred an honest charge based on my writings being too illicit. I had addressed this to Swift, but he said the Courts would not care for this.

State Bar of Texas
Office of the Chief Disciplinary Counsel
14651 Dallas Parkway
Suite 925
Dallas, TX 75254

Re: Re: 202302403 - Asia Siddiqui - Charles Davidson Swift

Dear Office of the Chief Disciplinary Counsel,

Thank you for the continued opportunity to speak. Mr. Swift keeps changing his story. In his first response (pages 3-4), Swift admits I was only shown the initial draft of the PSR when he states, "The objections to the PSR filed by counsel are purely legal decisions and factual corrections, if any are not generally reviewed by the defendant[...] Clients are not consulted as to PSR responses unless there is an issue that needs attention or clarification, which there was not in this case." Now he wants to claim I also saw the final PSR and was (on page 2) "specifically asked to identify any factual errors or additional matters I wanted included."

Swift is saying the objections to the PSR were unsuccessful, but the government still quoted them in its own defense, especially to call them contradictory. So the issue is not if the objections were accepted or not; 'The Objections to the PSR' is still a legal document that was quoted by the government in its own defense to point out that the objections were damaging to me and proof against me, causing prejudicial error, when in fact they were fabrications by Swift, not truths reached through attorney-client privilege.

Just because the Florida Bar did not grasp the misconduct does not prevent the State Bar of Texas from seeing something the Florida Bar missed. Ultimately, the goal is speaking on the misconduct and getting closer to justice, an opportunity for which I am truly grateful.

In case Swift did not look at my mental health records, when reviewing all those hours of discovery, surely Swift heard me telling the Undercover how my mother, sister, and brother mistreated me. And Swift keeps talking about the sexual abuse from that one family member when I told the Probation Officer I have been sexually assaulted by numerous people throughout my life during multiple incidents that caused me trauma which she recorded in the PSR. Why are they omitted in counsel's sentencing paperwork? I never asked them to be, otherwise I would never have brought them up during the interview. Counsel also never told me it would hold back what my relative did to me for my family's sake because I am the client, not my family. I am the one in federal prison facing a crazy embarrassing degrading life-changing charge for whose sake my counsel should have spoken. In fact, when counsel introduced my family to the late Judge Sterling Johnson, he was not impressed perhaps due to the treatment I received growing up, some which was mentioned in the character letters that I would not see until recently. So why was Swift concerned about my family's reputation instead of mine?

With all due respect, legal counsel and Probation Officers are not medical or mental health professionals, and cannot make medical diagnoses and prognoses and decisions. And so when they do, those decisions are merely opinions from a non-specialist, not facts, and need a professional angle in addition to support or reject their claim. If Swift did not think I had serious mental health problems, why did he use mental health as a defense? Why was my mental health history taken so lightly that he could use it malleably and make up whatever story he wanted? Mental competence and accurate medical facts are two separate things, but my mental health history should have lead to a mental health evaluation. Why was my mental health not evaluated? And why is the blame on me for not requesting an evaluation when the legal knowledge, direction, and decisions were up to counsel since he wanted to address mental health in his strategy? For example, based on the fact that my mental health specialist noted I was not getting along with my siblings, my brother had kicked me out of the house, my mother allowed him to do so and had mood problems with me as she had my entire life (stated in mental health record 2014-2015), and even the government undercover verbally and emotionally abusing me throughout the discovery, Mr. Swift should have asked for me to be evaluated. He did not even work with the mental health record at hand, nor did he have lengthy conversations with me about my family and mental health as he claims; he did not have time, that is why he should have ordered me a mental health evaluation. Just reviewing all those hours of discovery, he heard the discussions I had with the Undercover when confiding in her thinking she was my friend. How can he now inquire about other information when he did not even work with what he had?

Swift brings up my poem as if it was relevant to the timeline of events and sting operation of this case. The poem I wrote was published in 2009 by Samir Khan whom I only knew of online since 2003 from an online journal called Xanga since the days when he was living in New York and promoted anti-terrorism. His Xanga blog, www.xanga.com/inshallahshaheed, even had a badge, group, link against terrorism on the left-hand side if you scrolled down. I don't know if it is still available. My username was filextacy. When I submitted my poems to him in 2009, he had an inshallahshaheed wordpress blog and I believed him to be living in his parents' basement in North Carolina (as shown on the news during interviews) working on the magazine Jihad

Recollections; I did not think I was submitting to a magazine that would later be known as the precursor to Al-Qaeda's Inspire magazine, nor was I endorsing Al-Qaeda as I did not even know Khan was going to become part of Al-Qaeda at any point. Nonetheless I would live to regret it. I met Noelle Velentzas in February 2012 at a federal prisoner appeal demonstration, and met the undercover in March 2012 at the Women's Day March on Wall Street. How are my poetry publication in 2009 and the sting operation dating 2013 (see Indictment) related in intent? Swift knew they were not correlated; he claimed he believed in me, and that he was working on a defense for me to protect my freedom of speech. That was the message he sold me to choose his representation, stating that my poetry was no different than a rap song letting out frustration against authority, and that it had nothing to do with the accused crime, although it is not a piece of work I am proud of. The poetry was dragged into the conversation with the third charge of "material false statement" when the FBI had interrogated me at La Guardia airport in 2014 asking if I knew Samir Khan and if I had published a poem. On page 2, Swift admits that Velentzas and I "merely intended to learn" when he says "a jury might concluded she and her co-conspirator had not merely intended to learn how to use a weapon of mass destruction, but intended to use the same." But during pre-sentencing, he did not speak of my writings being directly related to intent, only of my reputation before the government as a jihadi writer, hence the beef.

As for my willingness to take a plea, it was Swift who coerced and rehearsed me to take the plea in the manner I did. When a second offer came, he began threatening me that I was not going to get any more offers, as he saw how quick I was to reject the first offer. I did not understand the sudden change of his tone, the harsh stern manner with which he ordered me, and why he was forcing me to read from a piece of paper he had prepared with the government, stating that I had to say my plea in those exact words, that no other wording was acceptable. I felt like he was taking advantage of my vulnerable state of duress.

During sentencing, I did not even see nor imagine the paperwork would be so far altered from the initial PSR, nor was I aware of what my counsel had prepared because I truly thought they would show it to me, eventually, which never came to fruition. Thank you for your time.

Under penalty of perjury, I declare the facts in this response and submission to the State Bar of Texas concerning Charles Davidson Swift are true, correct, and complete.

Respectfully Submitted June 15, 2023.

Asia Siddiqui #85797-053

Note:  As I have stated, the poems I submitted to Jihad Recollections are works I am ashamed of--they are reactionary, impulsive works, not proactive resolving works with a positive message to be publish-worthy. I wrote those poems upon seeing a WikiLeaks video of a man claiming to be in the U.S. Army stationed in Afghanistan and he was inebriated on alcohol and drugs claiming he had just "raped a beautiful 14 year old Afghan girl and loved it," how she was a virgin, and that she was screaming to get away--so I lashed out in writing instead of seeking mental help. The poems were also to give perspective on how people of those regions sometimes feel as a result. They were not written to influence or intend anything of my own. But if the poems offended in an illegal manner, then I would have preferred an honest charge based on my writings being too illicit. I had addressed this to Swift, but he said the Courts would not care for this.

# STATE BAR OF TEXAS



*Office of the Chief Disciplinary Counsel*

July 11, 2023

Asia Siddiqui
Inmate #: 85797053
Aliceville Federal Correctional Institution
P.O. Box 4000
Aliceville, AL 35442

Re: 202302403 - Asia Siddiqui - Charles Davidson Swift

Dear Asia Siddiqui:

You are hereby notified that the referenced Complaint has been placed on a Summary Disposition Panel docket.

The Summary Disposition Panel is an independent panel of grievance committee members comprised of both volunteer lawyers and public members. The Panel will review all information, documents and evidence submitted during the investigation and determine whether the Complaint should be dismissed or should proceed. The Rules of Disciplinary Procedure provide that, at the summary disposition proceeding, the Chief Disciplinary Counsel will present the Complaint without the presence of the Complainant or the Respondent. You will be notified of the results by letter.

Sincerely,

Diana Cervantes
Assistant Disciplinary Counsel

DC/sa

(972) 383-2900

**The Princeton Building, 14651 Dallas Parkway, Suite 925, Dallas, Texas 75254**
**(972) 383-2900, (972) 383-2935 (FAX)**

# STATE BAR OF TEXAS



*Office of the Chief Disciplinary Counsel*
August 16, 2023

Asia Siddiqui
Inmate #: 85797053
Aliceville Federal Correctional Institution
P.O. Box 4000
Aliceville, AL 35442

Re: 202302403 - Asia Siddiqui - Charles Davidson Swift

Dear Asia Siddiqui:

Upon completion of its investigation of your grievance, the Chief Disciplinary Counsel has determined that there is no just cause to believe that the above named lawyer has committed professional misconduct.

In accordance with the Texas Rules of Disciplinary Procedure, following this determination by the Chief Disciplinary Counsel your complaint was presented to a Summary Disposition Panel of the District 6 Grievance Committee. The Panel which is comprised of volunteer lawyers and public members has the option to dismiss the complaint or vote to proceed should they believe the case should go forward. This is solely their decision to make on any complaint presented to them. The Panel has voted to dismiss the complaint after reviewing all the evidence submitted and obtained during the investigation. Please know that the Office of the Chief Disciplinary Counsel maintains confidentiality in the grievance process as directed by the Texas Rules of Disciplinary Procedure.

Although there is no appeal of the Panel's decision to dismiss your grievance, the State Bar of Texas maintains the Client-Attorney Assistance Program (CAAP), which you may have contacted prior to filing your grievance. Please be advised that even after a grievance has been dismissed, CAAP can still attempt to assist you through alternative dispute resolution procedures unless the attorney at issue is *deceased, disbarred, suspended* or *not your lawyer*. **CAAP is not a continuation of the attorney disciplinary process, and participation by both you and your attorney is voluntary.** Should you wish to pursue that option, CAAP may be reached at 1-800-932-1900.

Sincerely,

Diana Cervantes
Assistant Disciplinary Counsel
DC/sa

**The Princeton Building, 14651 Dallas Parkway, Suite 925, Dallas, Texas 75254**
**(972) 383-2900, (972) 383-2935 (FAX)**

FROM: Gilna, Derek
TO: 85797053
SUBJECT: Federal Legal News  11-13-23
DATE: 11/14/2023 01:58:27 PM

SCOTUS To Review Case Clarifying ACCA Predicates "Close in Location and Time;" Beware Bureau Scheme on Halfway House Beds; FLC Wins Evidentiary Hearing, Resentencing in Florida 2255 case; 7th Circuit Latest Circuit to Find 922g1 Cases Unconstitutional; Bureau Continues Pattern of Medical Deception By Indicating Those who Refused COVID Vaccines were Vaccinated; Surprise Inspection at FCI Tallahassee Contrasted with "Dog and Pony Show" at Aliceville; Supreme Court to Hear Case on Government Seizure of Property

By Derek Gilna, Director of Research

The Supreme Court of the United States (SCOTUS) has accepted for review the case of Erlinger v. US, No. 23-370, a case scheduled to be conferenced by SCOTUS this week. The government in its filing noted: "Petitioner renews his contention that the Sixth Amendment requires a jury to find (or a defendant to admit) that predicate offenses were committed on different occasions under the ACCA. In light of this Court's recent articulation of the standard for determining whether offenses occurred on different occasions in Wooden v. United States, 595 U.S. 360 (2022), the government agrees with that contention....In Wooden, this Court considered the proper test for determining whether prior convictions were committed on different occasions for purposes of the ACCA.  See 595 U.S. at 364. The government advocated an elements-based approach to determining whether two offenses occurred on different occasions, which it viewed as consistent with judicial determination of a defendant's ACCA qualification. "  If you have a case where the ACCA predicates were close in location and time, you might have grounds for a sentence reduction. We can assist.

We are continuing to hear about release dates being pushed back (in violation of Second Chance or First Step Act), with case managers saying, "the halfway house is full.." Consider that phrase just another (slightly more polite) way of saying "get out of my office." As noted by a reader, "Section 102 of the First Step Act requires the Director of the BOP to ensure that there is adequate RRC availability for those inmates applying FSA time credits. I just moved for an injunction against the BOP for an inmate who was told the 'bedspace lie' as I like to call it. I requested that the Court enjoin the BOP to make bedspace available as it is a requirement under federal law. I think it may trigger a sudden availability of bed space from the Residential Reentry Manager."

I am pleased to report that we were successful recently in winning a vacation of sentence and resentencing as a result of a 2255 habeas petition. In the case of US v Cottone,  21-cr-00131,  (D of MD- FL at Tampa,  2023), the movant instructed his attorney to file an appeal to deal with several serious issues, and the attorney failed to do so. The government objected, correctly stating the law that to prevail, Cottone would have to show that "no competent counsel" would have failed to file the appeal, nevertheless attempted to argue the merits of his issues, rather than the obvious fact that in both his petition and an accompanying affidavit, he laid out in specific detail the attempts to reach counsel, his conversations with counsel's secretary, and the lack of a response. The court vacated the judgment, appointed local counsel, and instructed him to file an appeal.

In the 7th Circuit, at the district court level, in in the case of U..S. vs. Glen Prince,  Case No. 22 CR 240, Judge Robert W. Gettleman granted a motion to dismiss the Indictment of a 922 (g) (1) as unconstitutional. Judge Gettleman is a senior judge in this district that has gave a favorable Memorandum Opinion and Order.

Regular readers will recall that on numerous occasions I have implored them to obtain copies of their medical records to check for inadequacies and omissions, specifically, understatement of your symptoms, or minimalization of the extent of your illness.  There appears to be little respect in some institutions for the federal and state laws that requires accurate health care records to be maintained: For example: "We had 62 people on the  side of our unit and 44 on the  side of our unit REFUSE COVID vaccine last week during the  massive vaccine clinic. We signed refusal forms and everything...BUT GUESS WHAT, our medical records-33 people so far who all refused-reflect we received the vaccine and they even sent us printouts of our vaccine cards via interoffice mail! Cards, all signed IN PEN (wet signature), by the Clinical Nurse Coordinator/Quality Assurance Nurse .unbelievable...except completely believable. No doubt, this is just another way for  to keep their statistics of vaccinations high, and to keep people from gaining on compassionate release motions when citing poor vaccination rates."

At Tallahassee, Florida, the Department of Justice (DOJ) Office Inspector General (OIG) performed an un-announced on-site inspection, which was conducted in May 2023 at FCI Tallahassee. Several serious operational deficiencies were identified as a result of the inspection, which was the second unannounced inspection under the DOJ OIG's new BOP inspections program. At the female prison, moldy bread as well as discolored and rotting vegetables were being served in a food preparation refrigerator, per the OIG. Evidence of rodent droppings, warped food containers, and bags of cereal with insects in them were also found in the food storage warehouses.

During the inspection, the OIG also found that female housing unit roofs routinely leaked, claiming that all five general population housing unit roofs needed to be replaced. "Additionally, we observed worn bedding, rusted inmate storage lockers, issues with showers and toilets, and black substances on walls and ceilings," said the OIG. The OIG also identified staff shortages in the health services department, which has allegedly caused "staff to modify the time of day it distributes insulin and

TRULINCS 85797053 - SIDDIQUI, ASIA - Unit: ALI-C-B

----------------------------------------------------------------------------------------------------

drugs to female inmates, which may limit the therapeutic benefit of these drugs for certain inmates," per the OIG. The OIG, of course, only issues reports, and has no authority to make the administrative changes that are desperately needed at all prisons, not just those recently inspected.

Contrast this with the recent announced inspection at Aliceville by the Director and "60 Minutes" camera crew, which was preceded by an outburst of cleaning and painting, as well as stuffing prisoner educational classes with non-registered participants to boost the numbers.

Aliceville has much more serious issues than trying to deceive the new director. From multiple sources: "Another female has committed suicide while in the SHU here at Aliceville. She had been taken off her psych meds by doctors here despite begging them not too. She  went to sick call every day for 2 weeks prior to going to the SHU, begging medical staff to give her back her mental health meds (because she was) depressed, suicidal, and mentally unstable. She was unable to receive her meds because staff felt she didn't need them.. That makes 2 inmates in the past 4 months who committed suicide in the SHU."

From the women's prison in Arizona come news that the prison's drinking water is probably not drinkable: "(The) women's camp has had yellow to brown water coming out of all water lines. This has been going on for over a week with the prison not solving the issue.  They were handing out bottled water each day to the girls, but not the last couple of days. The girls now have been forced to drink the contaminated water."  Virtually every prison in West Virginia, for both men and women, have dealt with contaminated water issues.

The Supreme Court will hear a case to decide whether the Constitution requires a prompt hearing after law enforcement seizes vehicles for civil forfeiture. The plaintiffs in Culley v. Marshall had their vehicles seized because a family member and friend allegedly possessed drugs while borrowing them. Law enforcement held each car for over a year without a hearing. In Culley v. Marshall, the state of Alabama argues that prompt hearings would be unworkable because police need time to investigate after they take cars. But that gets the working of the justice system backward. Police need to investigate before they take property, not after. If it's unclear property is involved in a crime, police shouldn't seize it in the first place. The Sixth U.S. Circuit Court of Appeals, wrote in US v Wilson that the failure to provide a prompt hearing in Ms. Wilson's case violated due process. The Sixth Circuit delved into the relevant history and found that the delays built into Detroit's forfeiture laws were inconsistent with founding- era practice. As the Sixth Circuit wrote, the Detroit officials who denied Ms. Wilson a hearing were "no Alexander Hamiltons." Judge Amul Thapar had even stronger words, writing in concurrence that the county's willingness to return cars for a fee shows the "scheme is simply a money-making venture one most often used to extort money from those who can least afford it."

Remember, information is a powerful weapon in our fight against injustice. If you haven't already done so, make sure your loved ones subscribe to the newsletter to protect your access to this source of information, so they can read what you do. The Bureau loves to censor this and other newsletters.

Be not afraid and let not your heart be troubled.

Derek Gilna, Director of Research, JD, (De Paul Law School, 1975), MARJ, (Master of Restorative Justice), (Vermont Law School, 2020), Federal Legal Center, 133 W. Market, #171, Indianapolis, IN 46204; dgilna1948@yahoo.com (English newsletter and ALL inquiries, English or Spanish); federallc_esp@yahoo.com, Spanish newsletter, but NO inquiries. (This Newsletter is for Information Only and Does Not Constitute Legal Advice.)

# Native American

# Memorial Ceremony/Service

## For

## Mary Thompson

## Thursday, November 9, 2023

## 12:00 pm – 2:00 pm

## *No callouts will be made.

*M. Morning Chaplain*

MAPSON, ELISA 25769111

# **Interfaith**

# **Memorial Ceremony/Service**

## For

## **Mary Thompson**

## **Saturday, November 11, 2023**

## **2:00 pm – 3:30 pm**

*M. Morning Chaplain*

MAPSON, ELISA  25769111

To: Whom it may Concern/Nov 9, 2023

Hello,

I'm Elisa Mapson REG #25769-111. I'm housed at FCI Aliceville. I'm the fastest walker on the Compound. I quickly walk every time to Education Department so I can get my copeies and prints otherwise I might suffer Not to get what I need for my legalwork, like so many other inmates after me. Only about 10 inmates get everything they need before FCI Aliceville Education runs out of paper, ink, or toner. The Education Department tells us inmates, they have No funds for our Educational Needs, or FCI staff complain that they have to get up from thier office to put paper in the printer/copy machine. The FCI EDUCATion copy machine was out of service for over a month. The month BOP Director Colette Peters came to visit FCI Aliceville in Oct 2023.

Elisa Mapson testimony: Elisa Mapson
Date Nov 9, 2023

**Memorial**                    S

**Ma**                    )1

**Saturday,**                    1

**2:00**                    n

Asia Siddiqui #85797 053's print out
a few minutes later.    [signature] 11/9/23



CLCMA

CONSTITUTIONAL LAW CENTER
*for* MUSLIMS *in* AMERICA

July 14, 2020

Dear Ms. Siddiqui,

We have received and reviewed your letters regarding contact lenses and your brother's intake submission on the same matter. Unfortunately, we do not believe—based on the information available to us—that you are eligible for contact lenses. Charles Swift, who as you know is the Director of the Center, asked me to research this issue and respond to you as I primarily work on accommodation issues in prisons.

Put simply, contact lenses are not an affirmative right guaranteed to inmates. They are only allowed in certain restrictive situations where prescription glasses are not effective or feasible. From the information we have been provided by you, it appears that you have a working pair of prescription glasses. If this is inaccurate and it has been more than 24 months since your last pair was issued, we encourage you to consult with the facility's medical department.

Per the Bureau of Prison's guidance, contact lenses are only authorized where medically necessary and are **not** prescribed for cosmetic reasons. Some examples of conditions for which contacts are approved are keratonconus (progressive thinning of the cornea), unilateral aphakia (absence of the lens of one eye), corneal trauma resulting in astigmatism or scarring, more than a 4.0 difference in prescription strength between the eyes, or a prescription of +/- 10.00 where it is documented that contact lenses provide better vision strength. I have enclosed a copy of the relevant portions of the Ophthalmology Guidance for your reference.

There is no method by which an inmate can purchase their own glasses, per the attached guidance, and we believe that extends to your family members as well.

Further, based on our understanding of your present health, your vision is not sufficient to raise an Americans with Disabilities Act violation as "an individual cannot be "regarded as" disabled . . . if the impairment is "transitory and minor" . . .. *Bracken v. Dasco Home Med. Equip., Inc.*, 2014 U.S. Dist. LEXIS 123978 (S.D. Ohio 2014). A 2006 National Institutes of Health study reported that 14 million people in the United States have some level of visual impairment that can be corrected by glasses or contacts. For this reason, we believe that you would have a difficult time raising a minor impairment as an ADA violation because you likely do not fit the criteria of a person suffering from a disability.

## 3. REFRACTION

Indications for prescription eyewear for inmates are listed below.

### INDICATIONS FOR EYEGLASSES

- **Inmates with corrected visual acuity of 20/40** or better in the worse eye do not need refraction, except as noted below. **Inmates who have visual acuity worse than 20/40 or who complain of headache or other symptoms** potentially related to vision, may request refraction for eyeglasses by copout.

- **Inmates with vision requirements better than 20/40** (e.g., tower drivers, those in vision-intensive vocational or educational programs, or those in job assignments requiring constant reading or depth perception such as working on a slicing machine or with dangerous power tools) may be referred for refraction.

- **Eyeglasses may be replaced once every 24 months (consistent with Medicaid) and is at the institution's discretion.** Generally, if the change in refraction is less than 0.5 diopters for either distance or near correction, eyeglasses should not need replacement. If an inmate only needs readers that are available in Commissary, he or she may purchase them there. Currently, there is no mechanism for inmates to purchase their own prescription eyeglasses.

### INDICATIONS FOR CONTACT LENSES

By BOP policy, contact lenses ordinarily are authorized only when medically necessary and are not prescribed for cosmetic reasons.

**Examples of conditions for which contact lenses may be approved include:**

- Keratoconus (unilateral or bilateral) with best spectacle correction worse than 20/60–20/80 range.
- Unilateral aphakia (post-cataract with no lens implant) with the aphakic eye having best corrected visual acuity of 20/100 or better. Contact lenses are not required if the eye is amblyopic (lazy eye) or has extensive macular damage.
- Corneal trauma resulting in significant corneal toricity (astigmatism) or central scarring.
- Greater than 4.0 diopters of anisometropia (difference in prescription power) between the eyes, provided that an amblyopia (lazy eye) or strabismus (squint) is not present.
- Severe refractive error (myopia greater than -10.00D, hyperopia greater than +10.00), but only if it is documented that contact lenses provide better vision.

NOTES:

- Because contact lenses may cause eye complications, prior to prescribing the lenses, confirm that there is sufficient time remaining on the inmate's sentence to ensure a proper and healthy fit. If an inmate with contact lenses leaves prior to a final fitting, *do not* send the contact lenses with him or her if reliable eye care cannot be assured.

- Prescriptions for contact lenses are not to be provided to an inmate who wants to order them from the private sector.

- Bandage contact lenses that are ordered/provided by an ophthalmology consultant are exempt from these criteria.

FCI Aliceville

B5797 - 053

## Davis Eye Clinic

**VISIT - DOS:** 9/3/2021
**Type:** Comprehensive OV / Visit-Office
**Davis Eye Clinic**
**Location:** Main Office: 700 Helen Keller Blvd. Tuscaloosa, AL 35404
**Main:** (205) 556-9400 **Fax:** (205) 556-1556
**Provider:** Thomas M. Davis Jr., MD
**PM Pt ID:** 58092 **Chart Number:** 58092

SIDDIQUI, ASIA          Gender: FEMALE          DOB: 1/23/1984          Age: 37

**Ocular History**
severe myopia

**Ocular Surgical History**
None

**Medical History**
ovarian cyst

**Surgical History**
Cytoscopy

**Systemic Medications**
None

**Family History**
High Blood Pressure (hypertension)
Diabetes
Heart Disease
Cataracts

**Allergies**
Sulfa (Sulfonamides)

**Social History**
Smoking Status: former smoker
Alcohol: No
Drugs: No

**Review of Systems**
Patient Indicated: Previous Eye Sx & Contact Lens & Hard of Hearing & Heartburn & Hives/Eczema
All Other Indications Negative
Systems Reviewed: Eyes, Ear/Nose/Throat, Cardiovascular, Constitutional, Respiratory, Gastrointestinal, Genito-Urinary, Psychiatric, Endocrine, Blood/Lymphnodes, MusculoSkeletal, Skin, Neurological, Immunologic

## Chief Complaint

blurry vision

| | | | | |
|---|---|---|---|---|
| **Severity:** | significant | **Quality:** | near |
| **Location:** | in OU | **Timing:** | occasionally |
| **Duration:** | several months | **Factors:** | while reading |
| **Associated:** | watery and itching | | |

(HPI Performed, History/ROSReviewed by: Thomas M. Davis Jr., MD)

## Workup

### Visual Acuity

| | OD | OS | OU |
|---|---|---|---|
| CC | 20/40-1 | 20/40-1 | |
| SC | | | |
| PH | | | |
| Test Used: Sn | | | |

### Near Vision Test

| | OD | OS | OU |
|---|---|---|---|
| CC | | | |
| SC | | | |

### Pupils

| | Dark | Light | Near | Shape | APD |
|---|---|---|---|---|---|
| OD | 4mm | 3mm | | round | absent |
| OS | 4mm | 3mm | | round | absent |

### Extraocular Motility

OD          OS

FULL          FULL

### Confrontational Visual Field

 

OS          OD

FULL          FULL

### Intraocular Pressure

| Time | | OD | OS | Notes |
|---|---|---|---|---|
| 11:13:06 AM : iCare | IOP | 15 | 18 | |
| | CC | | | |

### Keratometry

| | OD | OS |
|---|---|---|
| Max | 41.5 @ 28 | 41.5 @ 131 |
| Min | 40 @ 118 | 40.75 @ 41 |

| **Psyc** | | **Dilated** |
|---|---|---|

**Mood** Appropriate
**Orientation** Normal

Yes OU At 11:19 AM
Agent: 1% Tropicamide & 2.5%
Phenylephrine
Frequency: 1 gtt

(Workup Reviewed by: Thomas M. Davis Jr., MD)

## Exam

### Slit Lamp Exam

| OD | | OS |
|---|---|---|
| WNL | Lids | WNL |
| WNL | Lashes | WNL |
| WNL | Adnexa | WNL |
| White and Quiet | Conjunctiva | White and Quiet |
| White and Quiet | Sclera | White and Quiet |
| Clear | Cornea | Clear |
| Deep and Quiet | Anterior Chamber | Deep and Quiet |
| Flat and Round | Iris | Flat and Round |
| Clear | Lens | Clear |
| | Diagnoses | |

### Fundus Exam

**Lens Used:** 90 D lens and 20 D lens    **Cup/Disc Ratio:** OD Vt 0.7   Hz 0.7    OS Vt 0.7   Hz 0.7

| OD | | OS |
|---|---|---|
| Vt 0.7 Hz 0.7 | Cup/Disc Ratio | Vt 0.7 Hz 0.7 |
| Normal Color and Contour | Disc | Normal Color and Contour |
| WNL | Choroid | WNL |
| WNL | Retina | WNL |
| Flat | Macula | Flat |
| WNL | Vessels | WNL |
| WNL | Periph | WNL |
| Clear | Vitreous | Clear |

# Refractions and Contacts

## Refractions

### Manifest Refraction

|  | Sphere | Cylinder | Axis | ADD | Prism Type | Prism | Va D | Va N |
|---|---|---|---|---|---|---|---|---|
| OD | -11.00 | +2.25 | x 2 |  |  |  | 20/30 |  |
| OS | -12.25 | +1.25 | x 172 |  |  |  | 20/30 |  |

### Final/Rx   Expires: 1 year

|  | Sphere | Cylinder | Axis | ADD | Prism Type | Prism | Va D | Va N |
|---|---|---|---|---|---|---|---|---|
| OD | -11.00 | +2.25 | x 2 |  |  |  |  |  |
| OS | -12.25 | +1.25 | x 172 |  |  |  |  |  |

## Contacts

### Trial Contact Lens

|  | Sphere | Cylinder | Axis | BC | Dia | ADD | Product |
|---|---|---|---|---|---|---|---|
| OD | -8.50 | -1.75 | 90 |  |  |  | ACUVUE Oasys Toric |
| OS | -10.00 | -1.25 | 80 |  |  |  | ACUVUE Oasys Toric |

### Final Contact Lens

EXPIRES: 1 YEAR

|  | Sphere | Cylinder | Axis | BC | Dia | ADD | Product |
|---|---|---|---|---|---|---|---|
| OD | -8.50 | -1.75 | 90 |  |  |  | ACUVUE Oasys Toric |
| OS | -10.00 | -1.25 | 80 |  |  |  | ACUVUE Oasys Toric |

## Assessment

### Astigmatism

Location: OU

OD Severity: Mild<br />OS Severity: Mild

ICD10: H52.203

### Myopia

Location: OU
ICD10: H52.13

## Plan

### Discussion

Myopia:  Refractive error, contact lens and glasses prescribed, reviewed contact lens care and wearing regimen high myopia reviewed sx of rd,

### Discussed With Patient

Myopia:  reviewed the treatment options and the risks benefits.

### Patient Instructions

Myopia:  get contacts and glasses from prescription

### Return to Office

1 year

Printed: 9/03/2021 11:56 AM

SIDDIQUI, ASIA DOB: 1/23/1984 DOS: 9/3/2021

ra:BOP Info:Appointment Update - [Register Number: 85797-05                    10:38 09/02/21 ET Pg 8-7

## Bureau of Prisons
## Health Services
## Consultation Request

| Inmate Name: SIDDIQUI, ASIA | Reg #: 85797-053 | Complex: ALI |
|---|---|---|
| Date of Birth:    01/23/1984 | Sex:   F | |

**Report of Consultation:** Optometry                    **Subtype:** Offsite Visit

Inmate Name: SIDDIQUI, ASIA                                    Reg #:    85797-053
Date of Birth: 01/23/1984                                      Sex:      F
Institution:    ALICEVILLE FCI
                11090 HIGHWAY 14
                ALICEVILLE, Alabama 35442
                2053730611

**Assessment:**

High Myopia & Astigmatism

**Plan:** SCL — accuvue contact she to distortions from high myopia

**Signature**
**Date**
**Completed By:**

Report may be hand-written or (preferably) typed on this form.  If dictated on office or hospital letterhead to follow, please indicate essential findings or recommendations to be acted upon pending final report.

Follow-up services and primary responsibility for inmate health care remains with Bureau of Prisons staff.  While discussion of diagnostic/treatment options with the inmate may be appropriate, they are subject to review by the inmate's primary care provider, the institution utilization review committee and/or the BOP National Formulary.

·Please notify institution prior to scheduling surgery dates or follow-up appointments.

Inmate not to be informed of appointment dates.

Generated 03/10/2021 09:48 by Li, Xinyu MD/CD            Bureau of Prisons - ALI                    Page 2 of  3

**Davis Eye Clinic**
700 Helen Keller Blvd.
Tuscaloosa, AL 35404
Tel:   (205) 556-9400
Fax:   (205) 556-1556

**Thomas M. Davis Jr., MD**
NPI # 1053402164

**NAME:** SIDDIQUI, ASIA

**DOB:** 01/23/1984
**RX DATE:** 09/03/2021

**℞**   Contact Lens

**EXPIRES: 1 YEAR**

| | Sphere | Cylinder | Axis | ADD | BC | Dia | Product |
|---|---|---|---|---|---|---|---|
| OD | -8.50 | -1.75 | 90 | | | | ACUVUE Oasys Toric |
| OS | -10.00 | -1.25 | 80 | | | | ACUVUE Oasys Toric |

**Wearing Instructions**

**Remarks**

Electronically Generated Signature

Control #60583-
637662664512876983

Signed _____ JM Davi MD _____

Pg 1/3

Orginal Copy

BP-A0148
JUNE 10
**INMATE REQUEST TO STAFF** CDFRM
U.S. DEPARTMENT OF JUSTICE                    FEDERAL BUREAU OF PRISONS

| TO: (Name and Title of Staff Member) Ms Welles / Health Services Administrator | DATE: 12/5/21 |
|---|---|
| FROM: Asia Siddiqui | REGISTER NO.: 85797 053 |
| WORK ASSIGNMENT: n/a | UNIT: C2 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.

Dear Ms Welles, When I was sent out to the eye doctor in
September 2021, he said I "need contact lenses for functionality,
not vanity." I suffer from severe refractive error Myopia and
my levels have plunged below the -10 level required to have
contact lenses in the FBOP. The only requirement that is
not being met is that the eye doctors automatically
assume the FBOP will honor their prescription — so they
don't detail that the contact lenses are better for my vision
(Do not write below this line)                    (continued)

DISPOSITION:
A REVIEW OF YOUR MEDICAL RECORDS SHOWS AN OPHTHALMOLOGY SPECIALIST HAS
NOT DIAGNOSED YOU WITH A CONDITION WHICH MANDATES THE USE OF CONTACT LENSES.
ADDITIONALLY, THE OPHTHALMOLOGIST DID INDICATE YOU COULD WEAR EYEGLASSES.

| Signature Staff Member | Date 8 DEC 21 |
|---|---|

Record Copy - File; Copy - Inmate

PDF                              Prescribed by P5511

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER          **SECTION 6**

pg 2/3 based on my severe myopia. I dropped to a -10 in lens power by 2017 so the FBOP optometrist in NYM, Dr. James Weyand, changed my glasses prescription to contact lenses. In 2019, after I was again prescribed contact lenses in July, I made a huge mistake. After getting a stye in my eye, in my ignorance, I requested if he could also order me glasses — as if I was in the free world and could have multiple corrective devices. Although Dr. Weyand also wrote the glasses prescription after my several attempts, he was so hesitant, he wrote the glasses prescription wrong. Glasses prescriptions for myopia are one level higher in power than contact lenses (ie: -9 contact lenses are -10 eyeglasses). Instead of converting it, he kept it the prescription of the contact lenses, stating that he hoped my contact prescription would not be refused. The only accurate prescription was for the contacts — I never received any of the eyewear, and upon arriving to ALI, had a hard time getting my contact solution renewed for the contacts I still had from the previous year (same prescription). Dr. Li said he would order eyewear for me only after he sent me to an optometrist here. The optometrist I saw in September 2021 prescribed contacts and was about to order them for me too; but Officer Hutchins told him this institution would order the eyewear based on his prescription. She was present when I asked him to write down if the contacts are necessary to which he replied, "You need contact lenses for functionality, not vanity." In addition, with my severe refractive error, I am supposed to wear contact lenses for a greater ratio of the day, up to 16 hours, and glasses for the remainder of the time before bed. So the contact lenses are not only necessary as glasses for long term use, are damaging (causing my cornea to bulge over time, causing deformity) and also don't give full vision — the tremendously blurry periphery reduces my ability to see objects angularly closest to me limiting my acuity and safety, but the contact lenses don't leave any blind spots as they have full coverage of one's visual region due to being placed directly on the eyes. When wearing glasses with my severe myopia, I have to push the lenses as close to my eyeballs as possible as glasses are designed to sit half an inch from the eyes. So glasses cannot be worn with comfort by a person with severe myopia (such as myself) due to the constant effort put in positioning and cleaning the glasses throughout the day, preventing from performing a smooth continuous task.

Continued on next page →

(original copy)

pg 3/3          Original Copy

These problems may sound petty, but they are cruel unusual punishment. If I could benefit from glasses with ease and equally to the contact lenses, no FBOP doctor would prescribe me contact lenses. Dr. Weyand initially (2015) did <u>not</u> prescribe them to me for 2 years. I completely agree that incarceration is to strip us of unnecessary luxuries and vain pursuits. Please help me get my right to see without compromising my vision. If glasses did not compromise my vision, I would not be pleading to you right now to honor the eye doctor's prescription for contact lenses. Hope to hear from you soon. Thank you.

## Bureau of Prisons
## ~~Health Services~~
## Vision Screens

| Reg #:  85797-053 | Inmate Name: SIDDIQUI, ASIA |
|---|---|

Vision Screen on  07/24/2019 15:15

Blindness:

| | | | | |
|---|---|---|---|---|
| Distance Vision: | OD: 20/400 | OS: 20/400 | OU: 20/400 |
| Near Vision: | OD: 20/400 | OS: 20/400 | OU: 20/400 |

With Corrective

| | | | | |
|---|---|---|---|---|
| Distance Vision: | OD: 20/20 | OS: 20/20 | OU: 20/20 |
| Near Vision: | OD: 20/20 | OS: 20/20 | OU: 20/20 |

Present Glasses - Distance                                  Refraction - Distance

| | Sphere | Cylinder | Axis | Add | | Sphere | Cylinder | Axis | Add |
|---|---|---|---|---|---|---|---|---|---|
| R: | | | | | R: | -8.00 | | | |
| L: | | | | | L: | -9.00 | | | |

Color Test:   Normal

Tonometry:   R: 11        L: 11

Comments:   MEDICALLY NEEDS NEW SCL
OD -8.00 ACCUVE OASIS
OS -9.00 ACCUVE OASIS
ORDER 4 BOXES EACH EYE, NEW SCL CASE AND SOLUTIONS

Orig Entered:   07/24/2019 15:19 EST   Weyand, James OD

SCL stands for Soft Contact Lenses
The refraction level converted from SCL to glasses
would be at least one point lower for each eye,
so R would be -9 and L would be -10.

U.S. DEPARTMENT OF JUSTICE

**REQUEST FOR ADMINISTRATIVE REMEDY**

Federal Bureau of Prisons

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: Siddiqui, Asia         85797 053     C2          ALI
      LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A - INMATE REQUEST**

Program Statement 6031.04 says, "Contact lenses will only be prescribed when, in the clinical judgment of a Bureau of contract optometrist or ophthalmologist, with the concurrence of the clinical director and Health Services Administrator, an eye-refractive error is best treated with contact lenses." According to the FBOP Ophthalmology Guidance, my '-11' and '-12.25' refractions are more severe than the -10 levels needed for my opia to require contacts. My blindness and depriving my lenses in required prescribed contact form...

11/15/23
DATE                                              SIGNATURE OF REQUESTER

**Part B - RESPONSE**

_____                    _____
DATE                                       WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

**ORIGINAL: RETURN TO INMATE**                CASE NUMBER: _____

**Part C - RECEIPT**
                                              CASE NUMBER: _____

Return to: _____
           LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

_____                    _____
DATE                                       RECIPIENT'S SIGNATURE (STAFF MEMBER)

FPI-PEPR        PRINTED ON RECYCLED PAPER                    BP-229(13)
                                                            APRIL 1982

is cruel and unusual punishment (violation of my 8th Amendment) and a complete disregard of my safety and medical health. I do not need contact lenses for vanity purposes as F.B.O.P.'s own Clinical Guidance states. I was issued contact lenses in FBOP MCC-NY for three years because my vision was/& is -10 refractive error, and worse now. When I transferred here in March 2020, I have been denied those same necessary prescriptions because the lack of training and education of medical staff. It is to be noted, as a myopia patient, I will always be prescribed eyeglasses too for emergency but the contact lenses are the primary equipment to be worn with the severe refractive error below -10. So the ratio for wearing contact lenses is higher than the ratio for wearing the eye glasses according to the prescriptions. Please order me my **prescribed** contact lenses as FCI Aliceville has already, already, honored the eyeglasses when I returned from the Davis Eye Clinic in September 2021 (even when Davis Eye Clinic only issued contact lens prescription) which I received in 2022. Please issue my medical record for September 20, 2023 eye appointment and issue me my contact lenses as prescribed. There are other inmates on this compound who receive contact lenses. A Bivens will be filed **accordingly** for discriminating me mine(by-right).

ALI 1330.17
October 15, 2012
Attachment A

## INFORMAL RESOLUTION REQUEST (IRR) FORM

| Inmate Name | Asia Siddiqui | Register Number | 85797 053 |

### INFORMAL RESOLUTION PROCESS

Briefly state the specific complaint, including details and facts which support your request and the date on which the basis for your complaint occurred, your recommended resolution, and the actions you have taken and to whom you have spoken to resolve your complaint in Section 1. Return the form to your Correctional Counselor or other Unit Team staff designated by the Unit. If all efforts at informal resolution fail, you will be issued a BP-9 form in which you may proceed in accordance with our policies and outlined in the institution supplement. The informal resolution process is not in any manner intended to prohibit you from pursuing complaints through this program. It is intended to ensure that all parties attempt to informally resolve an issue prior to initiating the formal process of filing an Administrative Remedy.

**SECTION 1**
Briefly state your specific complaint, recommended solution, and actions you have taken to resolve:   (Please Print)   This is an urgent request in order to achieve rightful medical care.
I need my medical records for the Optometry appointment
I had in Health Services on 9/20/23 before my paperwork
and prescriptions expire, as they did for my last medical
record request for my September 2021 eye appointment. Thank you.

**SECTION 2**
Date Received by Counselor for Response: _____
Summary of fact-finding: _____

Actions taken to resolve informally: _____

Explain reasons for no resolution: _____

Date IRR form Issued to Inmate: 11-2-23   Unit Team Name (print): D. McDaniel
Date IRR form Returned to Staff: 11-2-23   Unit Team Name (print): D. McDaniel
Date Inmate Issued BP-9: _____   Unit Team Name (print): _____
Date Unit Manager/Camp Administrator Reviewed & Signature:

**SECTION 3**
On _____ (date), this issue was informally resolved.   Inmate Signature

Distribution:  (1) If complaint is informally resolved, forward the original, signed and dated by the inmate, to the Correctional Counselor for filing.   (2) If complaint is NOT informally resolved, forward original, attached to BP-9, to the Coordinator's office for processing by the Clerk.

The medical records technician is in receipt of your request for medical records.  Medical records requests are processed in the order received.  Additionally, pursuant to Program Statement 6031.04, you may not have contact lenses.

original Copy

BP-A148.055
SEP 98

rcvd 10/4/2023

U.S DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS

INMATE REQUEST TO STAFF

| TO:(Name and Title of Staff Member) | DATE: 9/25/23 |
| McDavis, HIT, Medical Records | |
| FROM: Asia Siddiqui | REGISTER NO.: 85797 053 |
| WORK ASSIGNMENT: | UNIT: Q2 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary. Your failure to be specific may result in no action being
taken. If necessary, you will be interviewed in order to successfully respond to your
request.

Dear Medical Records,

I would like a copy of my medical records for the Optometry Appointment I had on September 20th, 2023. Thank you so much.

(Do not write below this line)

DISPOSITION:

Your request has been added
to the list and will be processed
in the order it was received.
Please be patient.

Thank you

S. Davis
Health Information Tech
FCI Aliceville

Please be more
specific in your
request

Signature Staff Member                    Date   10/4/2023

Record Copy - File; Copy - Inmate
(This form may be replicated via WP)

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER          **SECTION 6**

Received 12/2/21                    131

BP-A0148                    **INMATE REQUEST TO STAFF** CDFRM
JUNE 10
U.S. DEPARTMENT OF JUSTICE |              FEDERAL BUREAU OF PRISONS

| TO: (Name and Title of Staff Member) Ms. Farrior/Medical Records | DATE: 11/1/21 |
|---|---|
| FROM: Asia Siddiqui | REGISTER NO.: 85797-053 |
| WORK ASSIGNMENT: | UNIT: A2 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary. Your failure to be specific may result in no action being
taken. If necessary, you will be interviewed in order to successfully respond to your
request.

Dear Ms. Farrior, When my eyeglasses prescription
dipped to -10 in 2017, the FBOP eye doctor said I will
be prescribed contact lenses as I suffer from
severe myopia and the FBOP provides contact lenses
for my -10 vision. -10 eyeglass lens prescription converts
to -9 in contact lens prescription. Please see attached
paperwork for details. (Do not write below this line) Thank you for all that you do

DISPOSITION:

Per the Clinical Director, you are not
authorized contact lenses.

| Signature Staff Member Ms. Farrior, HIT | Date 11-30-2021 |
|---|---|

Record Copy - File; Copy - Inmate

PDF

Prescribed by P5511

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER                    **SECTION 6**

SECTION 6

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

PDF                                        Prescribed by P5511

Record Copy - File; Copy - Inmate

| Signature Staff Member | | Date |
|---|---|---|

DISPOSITION:

(Do not write below this line.)

Dear Ms Farior,

I need all my eye exam medical records
from April 2015 to August 2017, and I need
all my medical records from July 2018 to
December 2021. Thank you.

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary. Your failure to be specific may result in no action being
taken. If necessary, you will be interviewed in order to successfully respond to your
request.

| TO: (Name and Title of Staff Member) | | DATE: |
|---|---|---|
| Ms Farior , Medical Records | | 12/5/21 |

| FROM: | REGISTER NO.: |
|---|---|
| Asia Siddiqui | 85797 053 |

| WORK ASSIGNMENT: | UNIT: |
|---|---|
| n/a | C2 |

FEDERAL BUREAU OF PRISONS                          U.S. DEPARTMENT OF JUSTICE

BP-A0148
JUNE 10          INMATE REQUEST TO STAFF CDFRM

Original Copy

Exhibit B5

Original Copy

INMATE REQUEST TO STAFF COFRM

BP-A0148
JUNE 18
U.S. DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF PRISONS

| TO: (Name and Title of Staff Member) | DATE: 4/28/22 |
|---|---|
| Medical Records | |
| FROM: Asia Siddiqui | REGISTER NO.: 85797 053 |
| WORK ASSIGNMENT: N/a | UNIT: C2 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.)

Dear Medical Records,

I need all my medical records from April 2015 to August 2017, and from July 2019 to May 2022 pertaining my eye exams. This is my second written request in 5 months. It is urgent. Thank you.

(Do not write below this line)

DISPOSITION: This is the first request I have gotten in the mail. Your request has been processed and the records will be issued to you when they are ready. I apologize for the delay & thank you for your patience.

| Signature Staff Member | Date |
|---|---|
| S. Davis HIT | 11/1/2022 |

Record Copy - File; Copy - Inmate

PDF

Prescribed by P5511

This form replaces BP-148.070 dated Oct 86 and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER

SECTION 6

*Original Copy*

BP-A0148
JUNE 10

**INMATE REQUEST TO STAFF** CDFRM

**U.S. DEPARTMENT OF JUSTICE**                                    **FEDERAL BUREAU OF PRISONS**

| TO:(Name and Title of Staff Member) Health Information Technician | DATE: |
|---|---|
| Ms Davis, Medical Records Technician | 12/7/22 |
| FROM: Asia Siddiqui | REGISTER NO.: 85797 053 |
| WORK ASSIGNMENT: n/a | UNIT: C2 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.

Dear Medical Records,

Thank you so much for printing me the medical records I received on December 1st, 2022 at 3 pm in Medical. Sadly those records did not include the records I specifically requested for the visit to the eye specialist in the summer of 2021. The medical records you had sealed in the envelope only include my eye exams from 2015, 2016, 2018, and 2019. Please, may I get my medical records for the eye appointment I went to in the summer of 2021. Thank you.

(Do not write below this line)

DISPOSITION:

| Signature Staff Member | Date |
|---|---|
|  |  |

Record Copy - File; Copy - Inmate

PDF                          Prescribed by P5511

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR Privacy FOLDER        **SECTION 6**

Regional Administrative Remedy Appeal No: 1139253-R1
Part B - Response

This is in response to your Regional Administrative Remedy Appeal receipted December 21, 2022. You allege you requested copies from your medical records; however, the records you received did not include a consultation report for an outside eye appointment that occurred during the summer of 2021. As relief, you are requesting a copy of the report in question.

An investigation revealed you received a copy of the consultation report from your September 3, 2021, appointment at the Davis Eye Clinic on January 26, 2022.

Further, you requested additional copies from your medical records in your Regional Administrative Remedy Appeal that were not requested in your Request for Administrative Remedy. You must first make your request at the institution level via an Inmate Request to Staff Member (cop out) forwarded to the attention of Medical Records.

Accordingly, this response to your Regional Administrative Remedy Appeal is for informational purposes only. If dissatisfied with this response, you may appeal to the Office of General Counsel. Your appeal must be received in the Office of General Counsel, Bureau of Prisons, 320 First Street, NW, Washington, DC, 20534, within 30 calendar days of the date of this response.

2/13/23
Date

Regional Director, SERO

U.S. Department of Justice

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: **Siddiqui, Asia**          **85797-053**     **C2**      **ALI**
　　　 LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.       UNIT     INSTITUTION

**Part A - REASON FOR APPEAL**

I am appealing the response to my Regional Administrative Remedy Appeal No. 1139253-R1. The purpose of my appeal is to have FCI Aliceville's Health Services Department properly investigated as Regional was misinformed during its investigation into my case about the issuance of my medical records. This is no small matter as I am not the only one who has suffered FCI Aliceville's Health Services' lack of transparency and diligence. (See attachment.)

2/27/23
DATE　　　　　　　　　　　　　　　　SIGNATURE OF REQUESTER

**Part B - RESPONSE**

RECEIVED

MAR 0 7 2023

Administrative Remedy Section
Federal Bureau of Prisons

_____          _____
DATE                                          GENERAL COUNSEL

ORIGINAL: RETURN TO INMATE          CASE NUMBER: _____

**Part C - RECEIPT**
　　　　　　　　　　　　　　　　　　　　　CASE NUMBER: _____

Return to: _____
　　　　　LAST NAME, FIRST, MIDDLE INITIAL       REG. NO.       UNIT       INSTITUTION

SUBJECT: _____

_____          _____
DATE                              SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

BP-231(13)
JUNE 2002

UPN LVN                    PRINTED ON RECYCLED PAPER

**Administrative Remedy No. 1139253-A1**
**Part B — Response**

This is in response to your Central Office Administrative Remedy
Appeal wherein you allege a lack of transparency and diligence
regarding your request for Optometry records. You contend the
Regional Office was misinformed during its investigation into
your concerns. For relief, you request the Health Services
Department at your parent institution be properly investigated.

We have reviewed documentation relevant to your appeal and,
based on our findings, concur with the way the Warden and
Regional Director responded to your concerns at the time of your
Request for Administrative Remedy and subsequent appeal.

Our review of your medical record reveals on April 28, 2022, you
submitted an Inmate Request to Staff requesting all your medical
records from April 2015, to August 2017, and from July 2019, to
May 2022, pertaining to your eye exams indicating this was your
second request. The Health Information Technologist (HIT)
responded to your request indicating this was the first time
your request was received and the requested records would be
issued to you when ready.

On December 7, 2022, you submitted another Inmate Request to
Staff thanking the HIT for receiving your medical records but
indicated the records did not include an eye specialist visit in
the summer of 2021. You requested a copy of this consultation.
Your request was processed on January 21, 2023.

Based on this information, without evidence to the contrary, we
do not find, nor did you provide, any evidence corroborating
your allegations to substantiate your claim of lack of
transparency and diligence regarding your request for Optometry
records. We do not find an investigation is warranted with
record of you receiving the medical records you requested.

Considering the foregoing, this response is provided for
informational purposes only.

March 17, 2023                    *A. Connors* here
Date                             Ian Connors, Administrator
                                 National Inmate Appeals